Record No. _____

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

*IN RE* PETER JOSEPH STRAUSS, JR.

**[Filed UNDER SEAL]**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA

---

**PETITION FOR A WRIT OF MANDAMUS**

---

Joseph P. Griffith, Jr., Esquire
Joe Griffith Law Firm, LLC
946 Johnnie Dodds Boulevard
Mt. Pleasant, South Carolina 29464
(843) 225-5563
joe@joegriffith.com

Elizabeth Franklin-Best
Elizabeth Franklin-Best, P.C.
3710 Landmark Drive, Suite 113
Columbia, South Carolina 29204
(803) 445-1333
elizabeth@franklinbestlaw.com

*Counsel for Petitioner*

# Table of Contents

I.    Introduction ........................................................... 1

II.   Procedural History .................................................. 3

III.  Standard of Review ................................................. 4

IV.   Arguments in Support of Writ of Mandamus ......................... 5

    a.  Judge Gergel erred when he completely disregarded the statutory requirements of 28 USC §144 in issuing an order denying Petitioner's motion to recuse him for the criminal sentencing of this case.............. 5

        i.   Judge Gergel erred when he failed to consider that the plain language of 28 U.S.C. §144 required him to assess only the sufficiency and timeliness of Petitioner's motion to recuse, accepting all allegations as true. ......................................... 5

        ii.  Judge Gergel further erred by conducting a merits analysis of Strauss's request when he was unauthorized to do so, and when his analysis went far beyond an assessment of the sufficiency and timeliness of the affidavit. ........................ 8

        iii. Strauss's affidavit and counsel's certification of good faith were sufficient under the statute to require Judge Gergel's recusal. ............................................................11

    b.  Judge Gergel erred in denying Petitioner's motion to recuse him under 28 USC §§455(a), (b)(1) and 144 because his impartiality might reasonably be questioned under the facts of this case and because he has personal bias and has personal knowledge of facts outside the record and totality of circumstances indicate that he lacked reasonable appearance of impartiality. .................................................... 14

        i.   Judge Gergel's erroneous remarks regarding Strauss's invocation of his rights under the Fifth Amendment were

improper and provide a basis to question his appearance of impartiality. ....................................................................... 16

ii.    Judge Gergel additionally engaged in improper extrajudicial investigations and *ex parte* communications that reasonably give rise to questions about his impartiality in this matter.19

iii.   Judge Gergel threatened to have Strauss delivered to the courthouse by the United States Marshals Service when there was no objective basis to do so, giving rise to the reasonable belief to question Judge Gergel's impartiality. ....................................................................... 24

iv.    Judge Gergel's overfamiliarity with "his" U.S. Attorney's Office (who were present at these hearings when they were not party to the litigation) gave rise to the reasonable belief of bias in favor of that office and against Strauss. ............ 25

v.     The totality of the circumstances warrants Judge Gergel's recusal from Petitioner's criminal sentencing hearing. .... 27

c.Judge Gergel's order reflects the continued impropriety of his presiding over Strauss's criminal case. ....................................................................... 28

V.     Conclusion ............................................................................. 33

VI.    Certificate of Compliance ...................................................... 35

VII.   Certificate of Service .............................................................. 36

VIII.  Attachments

a.  Judge Gergel's Order Denying Motion to Recuse, filed December 11, 2023, ECF No. 32 (*** under seal)

b. Defendant's Motion for Recusal or Disqualification and Discovery, and Memorandum in Support, filed December 6, 2023 and Exhibits in Support, (ECF No. 26) (*** under seal).

    i.    Transcript of May 6, 2019 Hearing
    ii.    Transcript of May 9, 2019 Hearing
    iii.    Strauss Affidavit
    iv.    Seymour Affidavit

# TABLE OF AUTHORITIES

**Cases:**

*Backus v. State of South Carolina*, C.A. No. 3:11-cv-3120 ........................ 25

*Berger v. United States*, 255 U.S. 22 (1921) ........................................... 8

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) .......................... 10

*Cheney v. U.S. Dist. Court*, 542 U.S. 367 (2004) ...................................... 4

*Griffin v. California*, 380 U.S. 609 (1965) ............................................... 16

*In re Boston's Children First*, 244 F.3d 164 (1st Cir. 2001) ...................... 14

*In re Double Jump, Inc.*, Case No. 19-50102-BTB (D.Nev.) ..................... 18

*In re Federal Deposit Ins. Corp.*, 835 F. 2d 874 (1987) .............................31

*In re Murchison*, 349 U.S. 133 (1955) ................................................... 10

*Kerr v. U.S. Dist. Court*, 426 U.S. 394 (1976) .......................................... 4

*Liteky v. United States*, 510 U.S. 540 (1994) .......................................20-22

*Microsoft Corp. v. United States*, 530 U.S. 1310 (2000) .......................... 14

*Mims v. Shapp*, 541 F.2d 415 (3rd Cir. 1976) ........................................... 8

*Mistretta v. United States*, 488 U.S. 361 (1989) ...................................... 10

*Sanders v. United States*, C.A. No. 2:16-cv-2356-RMG (D.S.C. Jan. 28, 2020) ...... 25

*Simonson v. Gen. Motors Corp.*, 425 F. Supp. 574 (E.D.Pa. 1976) .............. 8

*Solar Eclipse Investment Fund XXXV, LLC and East West Bank v. $5,000,000.00 U.S. Dollars Deposited to IOLTA Account of Strauss Law Firm, LLC in rem, and the Strauss Law Firm, LLC, in personam*, C.A. No. 9:19-cv-1176-RMG (D.S.C.) ................................................................................................................ 3

*Spevak v. Klein*, 385 U.S. 511 (1967) ................................................. 11, 13, 15

*Tehan v. Unites States ex rel. Shott*, 382 U.S. 406 (1966) .......................... 16

*United States v. Bell*, 5 F.3d 64 (4ᵗʰ Cir. 1993) ........................................... 7

*United States v. Cherry*, 330 F.3d 658 (4th Cir. 2003) ................................ 14

*United States v. Dong*, C.A. No. 2:11-cr-00510-RMG (Sept. 13, 2012) ............. 25, 26

*United States v. Evans*, 262 F. Supp. 2d 1292 (D. Utah 2003) ................................ 14

*United States v. Passaro*, 577 F.3d 207 (4ᵗʰ Cir. 2009) ................................ 7

*United States v. Peter J. Strauss*, Criminal No. 9:23-cr-833-RMG (D.S.C.) .............. 4

*United States v. Studley*, 783 F.2d 934 (9th Cir. 1986) .............................. 14

**U.S. Constitution:**

U.S. Const. Amend. V .................................... 1, 10-12, 14, 16-18, 26, 28, 30

**Federal Statutes and Rules:**

18 U.S.C. §2232(a) ................................................................ 4

28 U.S.C. §144 ................................................ 1, 3, 5-6, 10, 12-14

28 U.S.C. §455 ................................................................. 13-14

28 U.S.C. §455(a) .......................................................... 13-14, 26

28 U.S.C. §455(b)(1) ........................................................13, 20

American Bar Association's Model Code of Judicial Ethics, Rule 2.9(C) ............. 21

Code of Judicial Conduct for U.S. Judges, Canon 3A(4)................................ 20, 29

Code of Judicial Conduct for U.S. Judges, Canon 3(C)(1) .................................. 26

**State Rules:**

South Carolina Rules of Professional Conduct, Rule 8.3(c), Reporting Professional Misconduct ........................................................................7, 9

**Other Sources:**

https://www.justice.gov/usao-sc/meet-us-attorney................................................ 25

13D *Wright and Miller*, Jurisdiction § 3549 ............................................13

## I.    INTRODUCTION

Peter Strauss ("Petitioner" or "Strauss") petitions this Court for a writ of mandamus to vacate U.S. District Judge Richard M. Gergel's order, ECF 32 ("Order"), in a criminal case denying Strauss's motion, ECF 26 ("Motion"), for recusal or disqualification. Strauss, an attorney,[1] timely filed the Motion and provided an affidavit, along with counsel's certification that it was made in good faith, which sufficiently set forth Judge Gergel's personal prejudice against Strauss, his personal bias in favor of the U.S. Attorney's Office ("USAO"), and the appearance of the judge's lack of impartiality. Judge Gergel ignored the statutory requirements of 28 U.S.C. §144 by failing to rule on the sufficiency of said affidavit and failing to assign the Motion to another judge.

In a prior civil proceeding, in disregard of U.S. Supreme Court precedent, Judge Gergel displayed his prejudice against Strauss by threatening to subject him to punishment for asserting his Fifth Amendment rights by reporting him to the South Carolina Supreme Court's Office of Disciplinary Counsel ("ODC") for disciplinary action. Judge Gergel instructed Strauss to self-report his assertion of the Fifth Amendment, even though invoking the Fifth Amendment was not an ethical

---

[1] Strauss's law license has been suspended.

violation, and Strauss had not committed any illegality in the civil matter. By reporting Strauss to the ODC, Judge Gergel became a material, adverse witness against Strauss. These prior threats and instructions by themselves indicate a deep-seated antagonism that would make fair judgment of Strauss impossible in the case at bar. Judge Gergel further displayed his prejudice against Strauss by concluding and/or implying, in part, that Strauss or his law firm had acted in an illegal, unlawful, surreptitious and dubious manner without any evidentiary support in the record.

Judge Gergel displayed bias towards the USAO during a hearing in which he possessively referenced a prosecutor attending a hearing as "my head of my U.S. Attorney's Office." Judge Gergel further displayed his prejudice against Strauss by threatening him with arrest when there was no indication that Strauss would not comply with the judge's request to attend a hearing. Judge Gergel's prejudiced comments and conclusions were, in part, based upon his extra-judicial evidentiary investigations and *ex parte* communications, which included visiting Strauss's law firm website on the internet, researching news articles and repeatedly communicating with a bankruptcy judge about law enforcement and other matters unrelated to the bankruptcy court's jurisdiction with respect to the civil case. Finally, Judge Gergel completely ignored the opinion of an ethics expert who opined "that the judge should recuse himself from the criminal matter against Mr.

Strauss to avoid the appearance of impropriety." The totality of the above circumstances demonstrates that Judge Gergel's impartiality might reasonably be questioned by the objective observer. As such, Strauss's affidavit was sufficient under 28 U.S.C. §144, the Order should be vacated and Gergel disqualified, and Strauss's criminal case should be remanded to a different judge for sentencing. In the alternative, the Order should be vacated and the case remanded to a different judge to rule on the Motion. Unless a writ of mandamus issues, Strauss will be without a remedy due to the fact that he has waived appeal of conviction and sentencing as part of his plea agreement.

## II.    PROCEDURAL HISTORY

The complaint in the prior civil suit was filed on April 23, 2019.[2] Plaintiffs were investors who generally alleged that they were the owners of $5,000,000 and that the money had been transferred to Strauss Law Firm on December 18, 2018 without proper authorization. They generally sought return of the money and/or an accounting. An initial hearing was held on May 6, 2019, and a second hearing was held on May 9, 2019. Strauss attended the second hearing pursuant to the judge's

---

[2] *See Solar Eclipse Investment Fund XXXV, LLC and East West Bank v. $5,000,000.00 U.S. Dollars Deposited to IOLTA Account of Strauss Law Firm, LLC in rem, and the Strauss Law Firm, LLC, in personam*, C.A. No. 9:19-cv-1176-RMG (D.S.C.).

verbal order. The $5,000,000 transfer was a transaction completely separate and distinct from the $3,000,000 transaction which is the subject of the charge against Strauss and his resulting guilty plea.

On October 17, 2023, the Government filed a one-count Information alleging Strauss violated 18 U.S.C. §§ 2232(a) and 2 (ECF 2), with respect to a $3,000,0000 transfer from an account controlled by client Jeff Carpoff to Strauss Law Firm, which occurred on January 15, 2019, and the Plea Agreement (ECF 5) was filed as well.[3] According to the docket sheet, on October 27, 2023, Judge Gergel was assigned to this criminal case. On November 6, 2023, a guilty plea hearing was held and Strauss pled guilty to the Information. On December 6, 2023, Strauss filed his Motion for recusal or disqualification and discovery.

## III.    STANDARD OF REVIEW

A petitioner seeking mandamus relief bears the burden of demonstrating that he has satisfied three requirements. *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380 (2004). First, he must establish there are no other adequate means of obtaining the relief sought. Next, he must prove that his "right to the issuance of the writ is clear and indisputable. *Id*. at 381. Then, even if the petitioner satisfies the first two criteria,

---

[3] *See United States v. Peter J. Strauss*, Criminal No. 9:23-cr-833-RMG (D.S.C.).

"the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.* The decision to issue a writ of mandamus "is in large part a matter of discretion with the court to which the petition is addressed." *Kerr v. U.S. Dist. Court*, 426 U.S. 394, 403 (1976).

## IV.       ARGUMENTS IN SUPPORT OF A WRIT OF MANDAMUS

### a. Judge Gergel erred when he completely disregarded the statutory requirements of 28 U.S.C §144 in issuing an order denying Strauss's motion to recuse him for the criminal sentencing of this case.

In three material respects, Judge Gergel committed legal error in his assessment of Strauss's motion to recuse under 28 U.S.C. §144: He failed to adequately consider the plain language of the statute; he conducted a merits inquiry that exceeded the scope of his legitimate review of the sufficiency and timeliness of the motion; and, he failed to find that the affidavit and certificate of counsel submitted in this case were sufficient to justify his recusal and have the Motion transferred to another judge. For these reasons, this Court should vacate his order and find him disqualified from further presiding over Strauss's criminal case. In the alternative, this Court should vacate his order and remand the case to another judge to rule on the Motion.

### i.       Judge Gergel erred when he failed to consider that the plain language of 28 U.S.C. §144 required him to assess only the sufficiency and timeliness of Petitioner's motion to recuse, accepting all allegations as true.

Judge Gergel erred when he failed to regard the plain language of 28 U.S.C. §144 in denying Strauss's motion to recuse.

28 U.S.C. §144 provides:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, **such judge shall proceed no further therein**, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists…. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith. (emphasis added)

Congress unambiguously articulated the requirements for recusal under §144. So long as any party to the proceeding makes and files a timely and sufficient affidavit which is accompanied by a certificate of counsel attesting the affidavit is made in good faith, that is all that is required under the statute for the judge to end his participation on the case. The reviewing judge, then, has the *limited* authority to determine whether the affidavit is sufficient and whether it is timely. Judge Gergel failed to conduct that inquiry, choosing instead to defend his role in the case and explain how referring Strauss to the ODC for professional misconduct was no remark

on his personal beliefs as to any potential ethical wrongdoing, or how Strauss misinterpreted his threat to have the Marshals arrest him.[4]

Even though Judge Gergel reported Strauss to the ODC and *urged him to do the same*, Judge Gergel claims, in footnote 3 of the Order, that he has "not reached a conclusion concerning whether Strauss committed professional misconduct. ECF 32, p. 15. *But see* South Carolina Rules of Professional Conduct, Rule 8.3(c), Reporting Professional Misconduct: "A lawyer ***who knows*** that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honestly, trustworthiness, or fitness as a lawyer in other respects, shall inform the appropriate professional authority." (emphasis added).

---

[4] Judge Gergel states that Strauss's counsel equivocated when asked if Straus would attend the May 9th hearing. But such was not the case, as the record shows:

> THE COURT:  Mr. Overstreet, do you anticipate any problem having Mr. Strauss appear on Thursday?

> MR. OVERSTREET:  Your Honor, I will call him when we walk out of this courtroom.  My understanding is he was in Hilton Head when we spoke earlier, so I don't see that—

> THE COURT:  Let him know that if he seems to have any difficulty getting here, I'm glad to have him escorted by the marshals.  ECF 26-1, p. 13.

Judge Gergel interrupted counsel and said he would get the Marshals involved. Counsel did not equivocate.  Judge Gergel's supposition that Strauss was not likely to appear at the hearing willingly was baseless.

Judge Gergel's decision to report Strauss to ODC and his urging him to do the same would have led a reasonable person to believe that the district court had already concluded Strauss had engaged in professional misconduct and was clearly intimating that Strauss must have also known his conduct was improper.

When engaging in statutory interpretation, this Court will "first and foremost strive to implement congressional intent by examining the plain language of the statute." *United States v. Passaro*, 577 F.3d 207, 213 (4th Cir. 2009). "[A]bsent ambiguity or a clearly expressed legislative intent to the contrary," this Court must give a statute its "plain meaning." *United States v. Bell*, 5 F.3d 64, 68 (4th Cir. 1993). The plain language of the statute provides the framework for assessing Strauss's request for the district court judge to be disqualified. Judge Gergel committed legal error in completely disregarding the statute and conducting his assessment of the Motion instead.

> **ii.   Judge Gergel further erred by conducting a merits analysis of Strauss's request when he was unauthorized to do so, and when his analysis went far beyond an assessment of the sufficiency and timeliness of the affidavit.**

Judge Gergel's order defending his role in this case was improper and far exceeded his authority under the statute. In conducting a sufficiency and timeliness inquiry, the district court must assess whether "an affidavit sets forth 'sufficient' factual allegations…" *Simonson v. Gen. Motors Corp.*, 425 F. Supp. 574, 577 (E.D.Pa.

1976). When a party files a motion and supporting affidavit pursuant to §144, the district court is required to accept the allegations of the movant as true. *Mims v. Shapp*, 541 F.2d 415, 417 (3rd Cir. 1976). "Neither the truth of the allegations nor the good faith of the pleader may be questioned, regardless of the judge's personal knowledge to the contrary." *Id.*; *See also Berger v. United States*, 255 U.S. 22, 35 (1921).

To the extent Judge Gergel's order can be construed as an assessment of the "sufficiency" of Strauss's affidavit, Judge Gergel further legally erred by not accepting the truth of his allegations, instead suggesting that Strauss's concerns are baseless because he is "unfamiliar" with legal processes, ECF 32, p. 13 ("the Defendant appeared unfamiliar with how to assert the privilege") or "misguided," *id.*, p. 14 ("the Defendant's objection to the Court's statement appears to be based on the misguided conclusion that his simple invocation of the (sic) his right to silence prompted the Court's decision to make a report to the South Carolina Supreme Court") or is based on his "inexperience in the federal judicial arena." *id.,* p. 17 (in explaining how Strauss "misinterpreted certain routine court statements, actions and judicial findings in the prior civil case as some form of personal animosity towards him").

To be clear, Judge Gergel, in this case—having heard no argument and without considering any evidence supporting a conclusion of an ethical violation—reported Strauss to the ODC to have Strauss potentially stripped of his bar license for ethical violations. This courtroom exchange was not "routine court statements or actions" and was not a judicial ruling. This referral would have been abjectly improper unless Judge Gergel committed to his own personal belief that he "knew" that Strauss had committed professional misconduct. And this was no idle threat on the part of the district court. Judge Gergel, in fact, made that referral. *Id.*, p. 15.

Since Judge Gergel denied Strauss's request for discovery in this matter, and because ODC investigations are confidential, neither undersigned counsel nor Strauss know what Judge Gergel represented to ODC beyond that he must have personally "known" that Strauss committed professional misconduct, the standard under Rule 8.3(c) of the S.C. Rules of Professional Conduct. Judge Gergel was, and is now, an adverse witness against Strauss. It strains credulity why Judge Gergel insists on continuing to preside over this matter as though it were "routine" for federal district court judges to make disciplinary referrals where the judge is also a witness, and then continues to preside over that defendant's criminal case. Nothing about this situation is "routine" and this Court should vacate Judge Gergel's Order, disqualify him, and assign Strauss's case to another judge. A fair trial in a fair tribunal

is a basic requirement of due process. U.S. Const. Amend. V; *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009). And the appearance of the impartiality of the judicial branch is critically important to the legitimacy of the courts. *See Mistretta v. United States*, 488 U.S. 361, 407 ("The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship."); *In re Murchison*, 349 U.S. 133, 136 (1955) ("[T]o perform its high function in the best way 'justice must satisfy the appearance of justice.'").

Judge Gergel should be disqualified, and he erred in minimizing Strauss's concern about his continued participation. Judge Gergel committed legal error when he far exceeded his authority under the statute to determine the sufficiency and timeliness of the affidavit and issued an Order dismissing Strauss's good faith and valid assertions of prejudice, partiality, and the appearance of the same.

### iii.    Strauss's affidavit and counsel's certification of good faith were sufficient under the statute to require Judge Gergel's recusal.

Strauss met the requirements under 28 U.S.C. §144 when his motion for recusal was filed on December 6, 2023, which incorporates by reference another affidavit submitted to the district court by legal ethics expert, Barbara Seymour. In his affidavit, Strauss set forth sufficient bases upon which he is seeking Judge Gergel's disqualification. However, Judge Gergel largely disregarded both the fact

of its submission and any analysis of the law relevant to his request as set forth by Ms. Seymour.

Significantly, Ms. Seymour, a well-established expert in legal ethics, concluded Judge Gergel was wrong when he informed Strauss that his invocation of his Fifth Amendment rights was an ethical violation.  She alerted Judge Gergel that there is a United States Supreme Court case directly on point—*Spevak v. Klein*, 385 U.S. 511, 514 (1967)--that holds "the Self-Incrimination Clause of the Fifth Amendment... extends its protections to lawyers as well as to other individuals, and [] it should not be watered down by imposing the dishonor of disbarment and the deprivation of a livelihood as a price for asserting it." ECF 26-4, p. 8.  She also opined that Judge Gergel's recusal in this matter is warranted because his impartiality might reasonably be questioned. ECF 26-4, pp. 5-10.[5]

The central requirement under 28 U.S.C. §144, Strauss's affidavit was not afforded the weight it deserved. Strauss's affidavit, which incorporated Ms. Seymour's affidavit, carefully enumerated a number of facts that would have led a

---

[5] Judge Gergel tries to justify his report of an ethical violation to ODC as the result of an adverse inference which may be made against a party who asserts the Fifth Amendment in a civil case.  ECF 32, p. 14.  The adverse inference doctrine is not applicable to the recusal analysis.  Strauss merely wants to be sentenced by a judge who has not previously wrongfully accused him of ethical and criminal violations and made himself a material, adverse witness against Strauss.

reasonable person to question Judge Gergel's impartiality, including the following: (1) Judge Gergel's threat to report Strauss to the ODC for invoking the Fifth Amendment (which report was made in violation of Supreme Court precedent and which made the judge a material witness adverse to Strauss); (2) Judge Gergel's prohibition of Strauss's counsel from advising him with respect to the Fifth Amendment; (3) Judge Gergel's threat to arrest Strauss; (4) Judge Gergel's extra-judicial evidentiary investigations including researching Strauss's website and selectively researching newspaper and/or internet articles related to the Carpoffs and their DC Solar companies gave him personal knowledge of disputed evidentiary facts; (5) Judge Gergel's *ex parte* communications with the bankruptcy judge clearly involving matters unrelated to whether the bankruptcy court had jurisdiction over Gergel's civil case and with whom Gergel was "working closely;" (6) Judge Gergel's remarks, that were, in part, based upon evidence obtained through extra-judicial investigations and *ex parte* communications, that implicated Strauss as involved in criminal wrongdoing regarding the $5,000,000 transaction; and, (7) Judge Gergel's expressed affinity for the USAO prosecutors who were attending the civil hearings. ECF 26-3, 26-4. Given the totality of the circumstances, Judge Gergel's impartiality might be reasonably questioned by an objective observer.

Tellingly, Judge Gergel's Order failed to even acknowledge the *Spevak* case—controlling authority in this case—even after it was brought to his attention, and he failed to credit, or even acknowledge, an expert opinion that he should recuse himself. Judge Gergel committed an error of law in failing to conduct the proper analysis under 28 U.S.C. §144 and in failing to recuse himself from any further participation in this matter.

**b. Judge Gergel erred in denying Petitioner's motion to recuse him under 28 USC §§455(a), (b)(1) and 144 because his impartiality might reasonably be questioned under the facts of this case and because he has personal bias and has personal knowledge of facts outside the record and the totality of circumstances indicate he lacked the reasonable appearance of impartiality.**

28 U.S.C. §455 provides, in pertinent part, as follows:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; …

Section 455(a) requires disqualification even if the judge does not have actual personal bias or prejudice. *See* 13D *Wright and Miller*, Jurisdiction § 3549. Under §455(a), a "federal judge is obliged to recuse himself if a person with knowledge of the relevant facts might reasonably question his impartiality." *United States v.*

*Cherry*, 330 F.3d 658, 665 (4th Cir. 2003). "If a judge possesses actual or apparent prejudice either for or against a party, federal law provides the aggrieved party with a statutory remedy," to wit, §455. *Id.*

Under §455(a), even close cases must be resolved in favor of disqualification. *In re Boston's Children First*, 244 F.3d 164, 167 (1st Cir. 2001); *United States v. Evans*, 262 F. Supp. 2d 1292, 1294 (D. Utah 2003). Regarding the necessity of recusal, it "is not the reality of bias or prejudice but its appearance" that matters. *Microsoft Corp. v. United States*, 530 U.S. 1310, 1302 (2000).

The analysis for recusal, under Sections 144 and 455, other than the affidavit requirements, are similar. "The standard for recusal under 28 U.S.C. §§ 144, 455 is 'whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.'" *United States v. Studley*, 783 F.2d 934, 939 (9th Cir. 1986).

Judge Gergel adversely commented on Strauss's inviolate right to assert the Fifth Amendment in a related civil proceeding. Further, he sought to punish Strauss for asserting these rights by reporting him to the bar in clear violation of U.S. Supreme Court precedent, he further advised Strauss to self-report his Fifth Amendment invocations to the ODC, and he became a material witness adverse to Strauss. Judge Gergel threatened to have Strauss escorted to a court hearing by the

U.S. Marshal's Service when there were no indications he would not comply with his request to attend a quickly scheduled hearing. Judge Gergel also expressed personal prejudice towards Strauss and personal bias in favor of the USAO. Also, Judge Gergel sought and obtained personal knowledge of facts outside the current and former legal proceedings which will likely influence his ability to be impartial in this case. Under the unusual facts of this case, Judge Gergel's impartiality might reasonably be questioned, and his recusal is required.

As noted by ethics expert Seymour in her Affidavit, in her opinion, "the judge should recuse himself from the criminal matter against Mr. Strauss to avoid the appearance of impropriety." ECF 26-4 at p. 5. In her Affidavit, *id.* at p. 5-6, ethics expert Seymour further points out as follows:

> A federal judge should recuse himself from a sentencing hearing in a criminal case when there is a reasonable appearance of personal bias, even if the judge believes he can be impartial. This is a fundamental principle of judicial ethics and fairness and it helps ensure that the criminal justice system maintains public trust and confidence.

**i. Judge Gergel's erroneous remarks regarding Strauss's invocation of his rights under the Fifth Amendment were improper and provide a basis to question his appearance of impartiality.**

As noted above, the *Spevack* Court unequivocally held that a witness, including an attorney, has the "**unfettered**" right to "**remain silent**" by asserting Fifth Amendment protections and shall "**suffer no penalty . . . for such silence.**" 385

U.S. at 514 (emphasis added). The U.S. Supreme Court reversed the disbarment of attorney Spevack because the adverse action against him was based upon his assertion of the right to remain silent in a New York disciplinary proceeding. Judge Gergel's reaction to attorney Strauss invoking the Fifth Amendment was as follows:

```
 6          THE COURTROOM DEPUTY:  Sir, may I have those
 7   documents?  Thank you.
 8          THE COURT:  Mr. Strauss, I'm going to put you on
 9   notice that I intend to advise the South Carolina Supreme Court
10   that you took the Fifth Amendment today in a matter involving
11   potential criminal activity, and I would suggest you
12   self-report your appearance here today and your actions.
```

Judge Gergel obviously concluded Strauss's invocation of the Fifth Amendment was a violation of the ethical duties of an attorney, informed Strauss that he would advise the S.C. Supreme Court of the fact "that you took the Fifth Amendment today," and suggested Strauss self-report the same. Judge Gergel's comments can only be perceived as threatening and were in clear violation of the Supreme Court's holding in *Spevack* that an attorney has an unfettered right to remain silent and cannot suffer any penalty for doing so.[6]

---

[6] The "Fifth Amendment ... forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965); *Tehan v. Unites States ex rel. Shott*, 382 U.S. 406 (1966) ("adverse comment by a prosecutor or trial judge" upon a

As opined by ethics expert Seymour, "[i]n fact, it is not professional misconduct for a lawyer to assert Fifth Amendment rights." ECF 26-4 at p. 7. There is no duty for a judge to report an attorney for disciplinary action, including under the S.C. Rules of Professional Conduct, because the attorney has lawfully asserted the Fifth Amendment right to remain silent.

Any such report of an attorney's supposed professional misconduct by a judge to the South Carolina ODC, or threat of the same, for invoking the Fifth Amendment, is inconsistent with Supreme Court precedent and the rules of professional responsibility. Such an unfounded report, or threat of the same, necessarily demonstrates a deep-seated and unequivocal lack of impartiality and/or personal animus. At the very least, such a report would reflect that the offending judge's "appearance of impartiality" is reasonably questioned.

Furthermore, during the May 9th hearing, Judge Gergel instructed Strauss's lawyer to cease communicating with Strauss while he was on the witness stand. Because Strauss was not experienced in criminal law and was unsure when to assert his constitutional right to remain silent, Strauss's lawyer had been trying to assist Strauss as to when to invoke the Fifth Amendment. ECF 26-3 at p. 3.

---

defendant's failure to testify violates the federal privilege against compulsory self-incrimination).

As noted by ethics expert Seymour, given "that the law is clear that invoking the privilege against self-incrimination is not professional misconduct, the judge's reaction and response to Mr. Strauss's refusal to answer certain questions related to his clients' financial transactions would cause a reasonable defendant concern regarding the judge's ability to decide his fate in a fair and impartial manner." ECF 26-4 at p. 8.

Due to Judge Gergel's comments and perceived threats regarding his assertion of the Fifth Amendment, his becoming an adverse witness against Strauss in reporting an ethical violation to ODC due to the same, as well as the Judge's prohibition of his counsel from assisting with the invocation of the Fifth Amendment, Strauss likewise reasonably questions the judge's impartiality towards him.

### ii. Judge Gergel additionally engaged in improper extrajudicial investigations and *ex parte* communications that reasonably give rise to questions about his impartiality in this matter.

As a further indication of Judge Gergel's actual or perceived prejudice against Strauss and/or apparent lack of impartiality during the civil case, it is clear Judge Gergel conducted extra-judicial and *ex parte* investigations and communications and learned material facts which were not in evidence provided by the parties.

Judge Gergel openly acknowledged that he had "been in communication with the Bankruptcy Court," and spoken to "Judge Beesley" about his bankruptcy

hearings involving the Carpoffs' DC Solar and related companies.[7]   Judge Gergel

knew that the $5 Million transferred to Strauss was not listed in the bankruptcy court

as an obligation or liability, and that neither civil plaintiffs were listed as creditors.

ECF 26-1 at pp. 11-12.  Apparently, Judge Beesley requested that Judge Gergel "do

what I can to repatriate these [$5,000,000] funds[.]" *Id.*  He selectively referenced

that there were "press accounts" and "dozens of FBI agents circling the Carpoffs'

home" at the time of the raid on December 18, 2018.  *Id.* at p. 12.  On the day the

Carpoffs' warrants were executed, he knew that "DC Solar was defunct at that point,

literally defunct. The lights were off, the staff was laid off, and all of its accounts were

seized by the Federal Government"; that "all accounts of DC Solar had been seized

. . . that the Carpoffs' personal accounts had been seized and all the corporations had

been seized"; and that "it was in all the newspapers out there."[8]  ECF 26-2 at pp. 51,

61.

---

[7] ECF 26-1 at pp. 9-12.  Upon information and belief, former U.S. Bankruptcy Judge Bruce T. Beesley, of the District of Nevada, was, at the time, handling at least one bankruptcy case involving DC Solar or its affiliates. *See In re Double Jump, Inc.*, Case No. 19-50102-BTB (D.Nev.).

[8] One or more DC Solar entities filed for bankruptcy protection in or around February, 2019, and engaged a nationally recognized professional restructuring advisor to lead the reorganizations.

He knew Judge Beesley held numerous bankruptcy hearings, and that at "every hearing" he "has SEC investigators and FBI agents sitting in the audience." ECF 26-1 at p. 12. He knew that one day after the $5,000,000 wire transfer, the "Government has seized every asset they can of the Carpoffs." *Id.* at p. 10. On April 30, 2019, before any hearing took place, he apparently visited the Strauss Law Firm website in furtherance of his investigation, as was disclosed in ECF 14, at footnote 1, as follows:

[1] The Strauss Law Firm is comprised of four professionals, including at least one attorney and one Certified Public Accountant, and provides "strategic solutions to high-net-worth individuals, families and business owners" with "experience in the legal, tax, insurance, and accounting arenas." *See* http://thestrausslawfirm.com/about (last visited, Apr. 30, 2019).

Acting like a law enforcement agent, Judge Gergel went outside the record of the civil case to personally investigate and obtain information and evidence that were material "to disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1); *Liteky*, 510 U.S. at 556 (judge must not rely "upon knowledge acquired outside" judicial proceedings nor display "deep-seated and unequivocal antagonism that would render fair judgment impossible"). Prior to the May 6th and May 9th hearings in the civil case, Strauss is unaware of any evidence introduced to the court that included descriptions of press accounts of the Carpoffs' businesses being raided by law enforcement or FBI agents "circling" their home. There was certainly no

evidence in the record from the parties regarding communications of bankruptcy Judge Beesley.

Canon 3A(4) of the Code of Judicial Conduct for U.S. Judges provides, in part, as follows: "a judge ***should not initiate***, permit, ***or consider ex parte communications*** or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers." (emphasis added) Likewise, Rule 2.9(C) of the American Bar Association's Model Code of Judicial Ethics also provides as follows: "A judge shall not investigate facts in a matter independently and shall consider only the evidence presented and any facts that may properly be judicially noticed."

The fact Judge Gergel went outside the record to investigate and obtain evidence in the civil case, and his particular focus on the role that law enforcement played in the Carpoffs' bankruptcy matters and the news accounts of the FBI's raids of their home and businesses, leads one in Strauss's position to reasonably and objectively question the neutrality and impartiality of the Judge. This is particularly true in light of the many comments by Judge Gergel suggesting Strauss participated in the criminal activity of his clients, the Carpoffs, with respect to the $5,000,000 wire transfer. *Liteky*, 510 U.S. at 545, n. 1 (disqualification warranted when bias or prejudice stem from an extrajudicial source and "result in an opinion on the merits

[of a case] on some basis *other than what the judge learned from his participation in the case."*) (emphasis added).

For instance, during the civil case May 6th and May 9th hearings, Judge Gergel stated or commented as follows:

- "[L]et's be candid. To the extent [the plaintiff's counsel's] hypothesis is correct, *anybody involved in the transaction potentially has criminal implications tied to them* … [i]f they're actually involved in converting the funds[.]" Exhibit 2, p. 68, lines 21 - 24 (emphasis added)

- "[I]t appears that the $5 million *transfer to the Strauss Law Firm is likely an illegal transfer*, and those recipients [to whom the funds were disbursed] are in receipt of funds that should not have gone to them from this fund. … it was certainly done in a way that appears surreptitious to me." Exhibit 1, p. 10, lines 17 – 23 (emphasis added)

- "I will say on the record that these [transactions] are not protected, attorney-client privilege. *These transactions appear to be unlawful*. They would not be protected by privilege, and he appears – it's not quite clear what capacity Mr. Strauss actually received these funds since he's taking some of the funds himself and putting them in accounts he controls." Exhibit 1, p. 13, line 20 - p.14, line 1 (emphasis added)

- "I think *it's looking pretty dubious that they have a right to those funds*, and *particularly under the circumstances* where Skadden Arps [law firm] apparently particularly is involved and these other criminal defense firms are fully aware of the circumstances here[.]" Exhibit 1, p. 12, lines 10 – 14 (emphasis added)

- The fund was to purchase mobile solar generators. It wasn't to pay all these lawyers and captive funds and all of this, and *it was certainly done in a way that appears surreptitious to me*. It's one day after the Government has seized every asset they can of the Carpoffs. Exhibit 1, p. 10, lines 21 – 24 (emphasis added)

These comments and statements, which erroneously appear to criminally implicate Strauss with respect to the perceived unlawful $5,000,000 wire transfer, certainly raise an objective, reasonable doubt as to whether Judge Gergel had formed a negative opinion about Strauss and his integrity. These pejorative comments and statements were based, in part, not on "facts introduced or events occurring in the course of the current, or of prior proceedings[.]" *Liteky,* 510 U.S. at 555. When coupled with Judge Gergel's extra-judicial investigations and *ex parte* communications with respect to the civil case, at a minimum, these comments and statements objectively and reasonably put into question the appearance of his impartiality towards Strauss in the case at bar.  As noted by ethics expert Seymour, the "judge's statements regarding his communications with the bankruptcy judge and his pledge to use the civil case to assist in marshalling assets for the debtors' creditors would cause a reasonable person to question his impartiality." ECF 26-4 at p. 9.

### iii.    Judge Gergel threatened to have Strauss delivered to the courthouse by the United States Marshals Service when there was no objective basis to do so, giving rise to the reasonable belief to question Judge Gergel's impartiality.

As noted above, a further indication of Judge Gergel's actual or perceived prejudice against Strauss and/or apparent lack of impartiality, occurred during the May 6, 2019 hearing in the civil case.  There was absolutely no indication that Strauss

would not abide by Judge Gergel's instructions or orders for him to attend the May 9th hearing. Threatening to have the U.S. Marshal's Service "escort" Strauss to attend the hearing was simply a euphemism that he would be arrested without a warrant. Such a threat or strong suggestion was not necessary, and serves to underscore, at a minimum, Judge Gergel's perceived prejudice against Strauss, and, at a minimum, makes his appearance of impartiality toward Strauss reasonably questionable.

> **iv. Judge Gergel's overfamiliarity with "his" U.S. Attorney's Office (who were present at these civil hearings when they were not party to the litigation) gave rise to the reasonable belief of bias in favor of that office and against Strauss.**

As noted above, a further indication of Judge Gergel's actual or perceived prejudice against Strauss and/or apparent lack of impartiality during the civil case, Judge Gergel made possessive reference to federal prosecutors attending the May 6, 2019 hearing, stating: "I don't mind to say that *my* head of *my* U.S. Attorney's Office is sitting in the back row here right now, and ***there's a lot of Government interest in all of this***." ECF 26-1 at p.12, lines 10 – 20 (emphasis added).

While Judge Gergel may have made innocent slips in characterizing the federal prosecutor attending the hearing and the federal prosecutor's office as his, the perception that he has some ownership or close possessive relationship with them certainly raises the specter that his impartiality towards Strauss might reasonably be

questioned. The Judicial Branch and the Executive Branch (*i.e.*, the USAO) are meant to be kept separate under the Constitution. Strauss believes the prosecutor who Judge Gergel was referencing at the hearing as "my head of my U.S. Attorney's Office" is the same prosecutor who is currently prosecuting Strauss in the case at bar.

Reasonable concerns about impartiality arise because Judge Gergel expressed an indication that he knew that "there's a lot of Government interest in all of this." ECF 26-1 at p.12, line 20. Such knowledge of the Government's interest in the proceedings certainly reinforces the perception that a close relationship exists between the prosecutor, the prosecutor's office, and the Judge. There are certainly no indications in the docket sheet of the civil case that the USAO received any formal notice of either the May 6th or May 9th hearings, and the Government was not a party in the action or proceedings. Given all these circumstances, in addition to the fact that the current U.S. Attorney was also Judge Gergel's law clerk for about five years,[9] Strauss has a legitimate concern that the Judge is biased towards the prosecutors and the USAO and is prejudiced against Strauss.

_____

[9] https://www.justice.gov/usao-sc/meet-us-attorney ("From 2013 to 2017, Boroughs clerked for Judge Gergel, where she worked on a number of high-profile cases").

As noted by ethics expert Seymour, the "perception of personal bias in this matter is heightened due to the judge's expressed affinity or affiliation with the federal prosecutor." ECF 26-4 at p. 8.

At the very least, Strass is justified in reasonably believing there is an objective appearance of the lack of impartiality.

> **v.    The totality of the circumstances warrants Judge Gergel's recusal from Petitioner's criminal sentencing hearing.**

Judge Gergel has previously held that recusal is appropriate from cases when "the public might reasonably believe there is a lack of impartiality." *Sanders v. United States*, C.A. No. 2:16-cv-2356-RMG (D.S.C. Jan. 28, 2020), ECF 54; *Backus v. State of South Carolina*, C.A. No. 3:11-cv-3120; *United States v. Dong*, C.A. No. 2:11-cr-00510-RMG (Sept. 13, 2012), ECF 189.

In the criminal case of *United States v. Dong*, at ECF 189, Judge Gergel recognized that the question of recusal should take into consideration the totality of the circumstances. Judge Gergel stated "recusal was appropriate" pursuant to the provisions of 28 U.S.C. § 455(a) on the basis that ***under the totality of circumstances*** present in this matter ***his 'impartiality might reasonably be questioned*.'" *Id.* (emphasis added)

Ethics expert Seymour opined in her Affidavit, ECF 26-4 at pp. 9-10, as follows:

Canon 3(C)(1) of the Code of Judicial Conduct for U.S. Judges (effective March 12, 2019) states that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned[.]" … This provision provides an objective standard and does not require a showing of actual bias.

When the factors and circumstances enumerated above are considered in their totality, a reasonable, well-informed observer would objectively question Judge Gergel's impartiality with respect to Strauss in the case at bar. As opined by ethics expert Seymour, "the judge's threat to file a disciplinary complaint against Mr. Strauss for asserting his Fifth Amendment rights, in direct contravention of established law; his stated opinions in the civil case that the transactions appeared "'dubious,'" "'surreptitious,'" "'illegal,'" and "'unlawful;'" and, his language suggesting he is in alliance with the U.S. Attorney combine to raise a reasonable question about his impartiality." Judge Gergel's threat to arrest Strauss, his extra-judicial investigations to obtain information and evidence in the civil case, as well as his *ex parte* communications with respect thereto, are additional circumstances which, when taken in their totality, reasonably raise a question as to Judge Gergel's impartiality towards Strauss.

### c. Judge Gergel's Order reflects the continued impropriety of his presiding over Strauss's criminal case.

Remarks made in Judge Gergel's Order denying Strauss's motion for recusal provide an additional basis upon which a reasonable person might question the

court's impartiality. With regards to Strauss's invocation of his Fifth Amendment rights at the May 9, 2019 hearing, as noted above, Judge Gergel failed to address controlling United States Supreme Court caselaw that Strauss cannot be punished *in any manner* for that conduct, caselaw that was expressly provided to him in Ms. Seymour's affidavit. Instead of addressing this important legal issue, in his Order Judge Gergel *speculates* that perhaps Strauss was "uncomfortable to admit that exercising his right to silence required him to acknowledge that his responses to questions regarding transactions to and from his law firm's trust account might tend to incriminate him in the commission of a crime." ECF 32, p. 13. Respectfully, this remark is entirely improper and mischaracterizes what occurred in Judge Gergel's courtroom.

Strauss was called to a hastily called court hearing to testify by Judge Gergel a mere three days after the initial civil hearing. Though his civil attorneys were present, his recently retained criminal defense counsel was unable to be present for the hearing. It is not "routine" that Strauss, then a civil witness, believed he needed the services of a criminal lawyer because the judge remarked that he found his conduct involved a "likely illegal transfer," "appeared to be unlawful," that it was "dubious" that others received the funds, and that it was "done in a way that appears surreptitious," but Judge Gergel's remarks made it clear that Strauss needed

counsel's assistance.  ECF 26, pp. 17-18. Then, Judge Gergel told Strauss he would file a grievance against him because he believed it was warranted because of the exercise of his Fifth Amendment right.  Judge Gergel's order characterizes this as nothing more than "routine court statements, actions, and judicial findings."  ECF 32, p. 31.  Threatening a witness in a civil matter to have that witness arrested, and reported to the bar due to a perceived ethical violation, are far from "routine" and Judge Gergel's continued minimizing of his conduct during that hearing raises serious issues as to his bias and prejudice against Strauss.  At a minimum, it raises the specter of a lack of impartiality.

It is also deeply concerning that Judge Gergel fails to acknowledge how threatening it would be to a litigant to have the judge presiding over his criminal case be the same judge who threatened to have him arrested by the Marshal's Service. This is especially true when, viewing the situation in the most charitable light to Judge Gergel, the judge misconstrued counsel's statement that he was going to call his client to inform him of an upcoming court hearing as some equivocation that Strauss was not preparing to attend the hearing.

Judge Gergel also fails to recognize that conducting his own investigation into these events could lead a person to question his impartiality in Strauss's case.  Judge

Gergel made it abundantly clear at the May 6, 2019 hearing that he thought there was

criminal activity afoot as he painted a picture for everyone in the courtroom:

> I think it's looking pretty dubious that they [the law firms who received
> money from the Carpoff's] have a right to those funds, and particularly
> under the circumstances where Skadden Arps apparently particularly is
> involved and these other criminal defense firms are fully aware of the
> circumstances here, that there has been—I mean, the press accounts,
> there were dozens of FBI agents circling the Carpoff's home.  Judge
> Beasley tells me that every hearing he has, he has SEC investigators and
> FBI agents sitting in the audience and I don't mind to say that my head
> of my U.S. Attorney's Office is sitting in the back row right here now,
> and there's a lot of Government interest in all of this.

ECF 27, p. 12.

Judge Gergel's investigation clearly went beyond his "inspect[ing] the public

filings in the Nevada bankruptcy proceeding." ECF 32, p. 15.  And this extrajudicial

investigation and these *ex parte* communications with the bankruptcy court are not

acceptable simply because "[n]o party to the civil action questioned the accuracy of

the Court's reference to the earlier national media reports or requested evidence to

be placed in the record to confirm such reports." ECF 32, p. 17.

It is not the duty of litigants to police members of the federal judiciary when

Canon 3A(4) of the Code of Judicial Conduct for U.S. Judges expressly provides that

such conduct is improper:  "a judge should not initiate, permit, or consider *ex parte*

communications  or  consider  other  communications  concerning  a  pending  or

impending matter that are made outside the presence of the parties or their lawyers."

31

Moreover, significant questions remain—just how did the USAO attorneys know to be present for these hearings since the Government was not a party to the litigation? What is full the extent of Judge Gergel's investigations and *ex parte* communications? What representations did Judge Gergel make to ODC? Because Judge Gergel denied Strauss the opportunity to conduct discovery, it appears these questions will not be answered.

Judge Gergel's Order on Strauss's Motion to recuse provides additional support for Strauss's claim that Judge Gergel should not preside over his criminal case. He minimizes to the point of triviality very valid concerns Strauss has with Judge Gergel's conduct, including improperly seeking to have Strauss punished for invoking his rights under the Fifth Amendment, and he has done so by characterizing Strauss, a member of the bar for nearly 20 years and the owner of a law firm and separate business, as "inexperienced," "misguided," and generally naïve. But critically, Judge Gergel's order fails to recognize that, by filing his complaint with ODC in which he necessarily would have committed to his personal belief that Strauss committed professional misconduct because that is what the rule requires, he has placed himself in an adversarial posture towards Strauss because he most assuredly is a material witness in that investigation. It is hard to conceive of events that could more strikingly raise the specter of a lack of impartiality, especially when

Judge Gergel, not content to potentially strip Strauss of his bar license, now insists on also imposing his criminal sentence.

To maintain the appearance of impartiality in this criminal case, this Court should vacate Judge Gergel's Order, disqualify him, and remand this case for re-assignment to another district court judge for sentencing. In the alternative, this Court should vacate Judge Gergel's Order, and remand this case for re-assignment to another district court judge to rule on the Motion to recuse. *In re Federal Deposit Ins. Corp.*, 835 F. 2d 874 (1987) (holding Judge Blatt should have recused himself and providing him with an opportunity to do so before formally issuing the writ).

## V.    CONCLUSION

For all the reasons set forth above, Strauss's petition for mandamus should be granted.

[Signatures next page]

Respectfully submitted,

/s/ Joseph P. Griffith, Jr.
Joseph P. Griffith, Jr., Esquire
Joe Griffith Law Firm, LLC
946 Johnnie Dodds Boulevard
Mt. Pleasant, South Carolina 29464
(843) 225-5563
joe@joegriffith.com

Elizabeth Franklin-Best
Elizabeth Franklin-Best, P.C.
3710 Landmark Drive, Suite 113
Columbia, South Carolina 29204
(803) 445-1333
elizabeth@franklinbestlaw.com

Dated this 27th day of December, 2023.

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limit because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral arguments, signature block, certificates of counsel, addendum, attachments):

   [ X ] this brief contains 7,652 words.

2. This brief document compiles with the typeface and type style requirements because:

   [ X ] this brief contains has been prepared in a proportionally spaced typeface using *Microsoft Word* in *14pt Equity.*

Dated: December 27, 2023.                    /s/ Elizabeth Franklin-Best

## CERTIFICATE OF SERVICE

Counsel hereby certifies that she has sent a copy of this Petition for a Writ of Mandamus to the Honorable Richard M. Gergel, District Court Judge, by sending it through the US Mail, prepaid postage first-class on this date, December 27, 2023 to the address listed on the official court website to:

The Honorable Richard M. Gergel
U.S. District Judge
P.O. Box 835
Charleston, South Carolina 29402

Counsel also certifies she has served the US Attorney's Office on this date, by sending through the US Mail, prepaid postage first-class on this date, December 27, 2023 at the following:

U.S. Attorney
District of South Carolina
Attn: Criminal Process Clerk
Attn: Asst. U.S. Attorney Emily Limehouse
151 Meeting Street, Suite 200
Charleston, South Carolina 29401

/s/ Elizabeth Franklin-Best

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH CAROLINA
### BEAUFORT DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| vs. | ) | Criminal No. 9:23-833-RMG |
| | ) | |
| Peter J. Strauss, | ) | |
| | ) | |
| Defendant. | ) | **ORDER** |
| | ) | |
| | ) | |

This matter comes before the Court on Defendant's motion to recuse. (Dkt. No. 26). Defendant asserts that the Court's findings and comments made on the record in an earlier, related civil proceeding mandate the Court's voluntary recusal or disqualification.  The motion is made pursuant to 28 U.S.C. §§ 144 and 455 and the Due Process Clause of the Fifth Amendment.  The criminal case before the Court involves a charge that the defendant, Peter J. Strauss ("Strauss"), knowingly transferred and aided and abetted the transfer of funds on behalf of clients to avoid lawful seizure orders of the United States.  The previous civil case involved allegations that these same clients had converted funds provided by an investor to their own personal use and then passed those funds through the trust account of Strauss' law firm to be distributed to other persons and entities for the clients' benefit. Defendant pled guilty before the Court to the pending criminal charge on November 6, 2023, and he moved to recuse on December 6, 2023.  For reasons set forth below, the motion is denied.

### Factual Background

It is important at the outset to understand the complex factual setting of the original civil action that came before the Court involving Defendant's law firm and the alleged use of its trust account to facilitate the transfer of funds converted by clients of the firm, Jeff and Paulette Carpoff,

1

(the "Carpoffs").  The Carpoffs were principals of a company, DC Solar, which manufactured and promoted as investments solar powered generators that could provide emergency power on an environmentally sustainable basis.  Most notably, purchasers of the solar powered generators qualified for a generous tax credit, and DC Solar generated hundreds of millions of dollars in investments.  Among these investors was East West Bank, a California state-chartered bank.

On December 17, 2018, the East West Bank transferred $13 million to Solar Eclipse Investment Fund XXXV ("the Fund"), which was an entity used to purchase solar powered generators from DC Solar.  The Fund was one of many related entities under the control of the Carpoffs.  Unknown to the East West Bank, DC Solar and the Carpoffs were at that time under federal criminal investigation for operating a Ponzi scheme and money laundering operation.  One day after the East West Bank made its $13 million dollar payment to the Fund, December 18, 2018, federal agents executed search warrants on the Carpoffs' residence and business operations.  The Government also issued seizure orders seeking to take control of all accounts associated with DC Solar and the Carpoffs.  These law enforcement activities were widely reported in the press.

The day after law enforcement searched their residence and businesses, December 19, 2018, the Carpoffs wired $5 million from the Fund's bank account to the trust account of Strauss Law Firm.  A day later, on December 20, 2019, $2 million of those funds were transferred out of the Strauss Law Firm trust account to another law firm to pay for the Carpoffs' future legal services.  By December 28, 2019, another $2 million of those funds were transferred out of the trust fund of Defendant's law firm, again for the personal use and benefit of the Carpoffs.  By February 1, 2019, all of the $5 million transferred by the Carpoffs to the Strauss Law Firm trust account on December 19, 2018 had been wired to others for the personal benefit of the Carpoffs.

DC Solar filed for bankruptcy in Nevada on February 3, 2019, and the Carpoffs were removed from control over many of the investment accounts related to DC Solar, including the Fund, where the East West Bank had transferred its $13 million.  On March 13, 2019, the Chief Restructuring Officer of DC Solar informed the East West Bank that $5 million of its investment funds had been improperly transferred by the Carpoffs to the trust account of the Strauss Law Firm. (C.A. No. 9:19-1176, Dkt. No. 9-2 at 4).[1]  Counsel for East West Bank communicated with Strauss by letter dated March 22, 2019, informing him that the funds which the Carpoffs had transferred to his trust account had been "fraudulently obtained and disbursed." (*Id*. at 8-9).   Counsel for East West Bank asked Strauss for an accounting of these funds and details about disbursements and authorizations provided.  Strauss responded by email on March 25, 2019, claiming that the funds transferred into his accounts were the lawful property of DC Solar and that further details should be sought from the bankruptcy trustee for DC Solar. (*Id*. at 10).  On March 26, 2019, East West Bank counsel requested from Strauss information concerning his law firm's role in these illicitly obtained funds. (*Id*. at 11).  Strauss provided no response to this second letter.

Strauss received additional correspondence from the newly appointed manager of the Fund, Curtis Jung, on April 9, 2019, stating that it appeared that the transfer of the funds to his law firm's trust account was improper.  Jung asked for further details of the circumstances under which the law firm's trust fund received the funds and demanded the return of the $5 million.  Noting that "time is of the essence," Jung demanded a response by April 12, 2019. (C.A. No. 9:19-1176, Dkt. No. 9-3 at 6). Strauss responded by email on April 10, 2019, without providing any details

---

[1]  Citations to the civil case docket will be identified by reference to the civil action number, 9:19-1176.  All references to the criminal case docket will simply refer to the docket number.

regarding the circumstances surrounding the receipt or disbursement of the $5 million and referred all communications to the DC Solar bankruptcy trustee. (*Id*. at 7).

East West Bank and the Fund filed suit against the Strauss Law Firm on April 23, 2019, seeking an accounting and return of the $5 million and the issuance of a preliminary injunction and temporary restraining order ("TRO") relating to any funds still in the Strauss Law Firm's trust account. (C.A. No. 9:19-1176, Dkt. No. 1). Plaintiffs attached supporting documents to their motion. (C.A. No. 9:19-1176, Dkt. Nos. 9-2, 9-3). The Court issued a TRO on April 30, 2019, directing that none of the funds related to the $5 million be transferred from the Strauss Law Firm trust account and prohibiting the destruction of any relevant records. In granting the TRO, the Court noted the highly "fungible" nature of funds transferred to the law firm's trust account and made a finding that Plaintiffs "are likely to succeed on the merits" of their claims that the Carpoffs had improperly transferred the funds one day after they "became the target of a federal raid related to a money laundering investigation." The Court set a hearing on Plaintiffs' motion for a preliminary injunction for May 6, 2019. (C.A. No. 9:19-1176, Dkt. No. 14 at 6). The Strauss Law Firm filed a response to the motion for preliminary injunction indicating the $5 million at issue had already been transferred out of the firm's trust account. The Strauss Law Firm further asserted that the "subject funds implicate[]" the DC Solar bankruptcy, which, if true, would require a stay of the current civil action before the Court. (C.A. No. 9:19-1176, Dkt. No. 21 at 2).

Immediately before the May 6, 2019 hearing, counsel for the Strauss Law Firm produced records detailing the wire transfer of the $5 million into the law firm's trust account and nine separate wire transfers out to persons and entities for the personal benefit of the Carpoffs. Counsel for the Strauss Law Firm appeared at the hearing but informed the Court he lacked knowledge regarding many of the critical details related to the receipt and disbursement of the $5 million.

(Dkt. No. 26-1 at 3-4, 6-7). The Court advised the parties that it would schedule another hearing three days hence, on May 9, 2019, and directed that Strauss appear at that time and "produce all the documents related to the instructions he received for these transfers." (*Id*. at 11). The Court asked the Strauss Law Firm's counsel whether he anticipated any problem having Strauss appear for the May 9, 2019 hearing. The law firm's counsel responded by indicating he would "call him when we walk out of the courtroom," which the Court viewed as an equivocal response. The Court, making it clear its directive for Defendant to appear was an order, not a suggestion, stated: "Let him know that if he seems to have difficulty getting here, I'm glad to have him escorted by the marshals." (*Id*. at 13).

The Court addressed at the May 6, 2019 hearing the Strauss Law Firm's assertion in its May 3, 2019 response that this dispute was subject to the DC Solar bankruptcy action and, thus, to the automatic stay issued by the Nevada Bankruptcy Court. The Court informed counsel that it had checked the publicly available filings of the DC Solar bankruptcy action on the ECF and did not see any listing for the $5 million transferred to the Strauss Law Firm. To show proper respect for the jurisdiction of the bankruptcy court, the Court made contact with the presiding bankruptcy judge to determine whether there might be a claim that these apparently converted funds by the Carpoffs were part of the DC Solar bankruptcy estate. The bankruptcy judge indicated that further factual development on the issue might be necessary but for now the Court was encouraged to continue its efforts to repatriate the funds and then sort out later their relationship, if any, to the bankruptcy estate. The Court fully disclosed these discussions with the Nevada bankruptcy court at the May 6, 2019 hearing and indicated the Court would continue to consider the issue of whether the Court's action was subject to the bankruptcy court's stay. (*Id.* at 11-12).

Following the conclusion of the May 6, 2019 hearing, the Court extended the TRO to

the nine recipients of the funds transferred from the Strauss Law Firm trust account and ordered

that they not disburse or expend any of these funds until further order of the Court.  The Court

further ordered Strauss to appear at a hearing on May 9, 2019. (C.A. No. 9:19-1176, Dkt. No. 25).

Strauss appeared at the May 9, 2019 hearing.  By this time, the Court had received

sufficient documentary evidence to support the conclusion that the Carpoffs had unlawfully seized

investment funds from the Fund that had been provided by East West Bank and that the Strauss

Law Firm's trust account had been utilized to transfer these converted funds to nine different

persons or entities for the benefit of the Carpoffs.  Many details regarding these transfers were then

unknown, and it appeared that Strauss was the most promising source of information to bring

clarity to this situation.

The Court initially sought to question Strauss about the receipt and disbursement of the

funds transferred to his law firm's trust account by the Carpoffs.   Strauss declined to answer any

of the Court's questions relating to these funds on Fifth Amendment grounds, indicating that his

responses might tend to incriminate him. (Dkt. No. 26-2 at 9-10).  Plaintiffs' counsel requested the

Court allow her to question Strauss in more detail, noting that in a civil proceeding the assertion

of the Fifth Amendment right against self-incrimination by a witness casts a negative inference.

The Court allowed Plaintiffs' counsel to ask additional questions and Strauss repeatedly asserted

his Fifth Amendment right against self-incrimination. (*Id*. at 11-32).

The record at this point provided strong support for Plaintiffs' claims that the Carpoffs had

unlawfully seized and converted investment funds, and the trust account of the Strauss Law Firm

had been used to improperly transfer these converted funds to others for the benefit of the Carpoffs.

The quick sequence of the arrival and dispersal of these funds through the Strauss Law Firm trust

account shortly after the federal law enforcement seizure operation cast further suspicion regarding

these transactions.  Thus, when Strauss appeared at the May 9, 2019 hearing and asserted his Fifth Amendment right against self-incrimination, a substantial question was raised from the totality of facts before the Court concerning whether Strauss, a member of the South Carolina Bar, had engaged in professional misconduct.  Consequently, the Court placed Strauss on notice that "I intend to advise the South Carolina Supreme Court that you took the Fifth Amendment today in a matter involving potential criminal activity" and suggested that Strauss self-report his actions to the South Carolina Supreme Court.

The Court issued an order on May 13, 2019, finding that Plaintiffs had demonstrated a likelihood of success on the merits that the $5 million investment had been unlawfully converted by the Carpoffs for their personal use after they became the target of a federal raid related to a money laundering investigation.  The Court enjoined all recipients of the transfers from the Strauss Law Firm trust account from transferring or expending these funds until further order of the Court. (C.A. No. 9:19-1176, Dkt. No. 36).  The Court also issued a text order on June 20, 2019 inviting the parties and the DC Solar bankruptcy trustee to brief the issue of whether the pending civil action was stayed by the Nevada bankruptcy court's automatic stay. (C.A. 9:19-1176, Dkt. No. 47).

The Court addressed in an order dated July 3, 2019 the issue of whether the $5 million converted by the Carpoffs was part of the DC Solar bankruptcy estate and, thus, subject to the bankruptcy court's stay.  The Court noted that the DC Solar filing of unsecured creditors did not list the $5 million transferred to the Strauss Law Firm, and the DC Solar bankruptcy trustee had concluded that the funds were not part of the DC Solar bankruptcy estate.  The Court, after reviewing the full record in this matter, concluded that "the $5,000,000 wire transfer of December 19, 2018, made one day after the federal government seized all known accounts of the Carpoffs

and related entities, was an unlawful conversion of the Fund's assets for the personal use of the Carpoffs and was not an asset of the DC Solar bankruptcy estate." (C.A. No. 9:19-1176, Dkt. No. 56 at 4).

After the flurry of activity surrounding the issue of preliminary injunctive relief, the Court's civil action progressed at a less intense pace.[2] Meanwhile, the conduct of the Carpoffs and Strauss became the subject of formal criminal proceedings. On January 22, 2020, the United States Attorney for the Eastern District of California filed a Felony Information charging Jeff and Paulette Carpoff with various financial crimes. Two days later, on January 24, 2020, both Carpoffs pled guilty. Jeff Carpoff was sentenced on November 9, 2021 to 30 years in prison and was ordered to pay restitution in excess of $790 million. (C.A. No. 2:20-17, Dkt. Nos. 11, 53 (E.D. Cal.)). Paulette Carpoff was sentenced on June 28, 2022 to a little over 11 years in prison and was ordered to pay over $660 million in restitution. (C.A. No. 2:20-18, Dkt. Nos. 11, 51 (E.D. Cal.)).

Strauss was charged under a Felony Information on October 17, 2023 related to the transfer of funds from Jeff Carpoff for the purpose of preventing or impairing the Government's efforts to seize the Carpoffs' assets. Strauss pled guilty before the Court on November 6, 2023 and agreed as part of a plea agreement to pay $2.7 million in restitution. Defendant filed his motion to recuse a month later, on December 6, 2023. (Dkt. Nos. 2, 5, 24, 26).

## Legal Standard

Two federal statues address the recusal or disqualification of a federal district judge. 28 U.S.C. § 144 prohibits a district judge from presiding in a case where the judge "has a personal bias or prejudice" against a party. 28 U.S.C. § 455 provides for the disqualification of a judge "in

---

[2] The parties in the civil action ultimately reached a negotiated settlement and the case was dismissed.

which his impartiality might reasonably be questioned" or where a judge has a "personal bias or prejudice concerning a party." § 455(a), (b)(1).  Any disqualification of a judge based on an appearance of impartiality must be considered from the perspective of a reasonable person fully informed of all the "surrounding facts and circumstances."  *Microsoft v. United States*, <u>530 U.S. 1301, 1302</u> (2000) (Rehnquist, CJ).

Federal district judges routinely handle criminal cases in which the judge may have previously handled related criminal or civil proceedings.  These previous civil or criminal proceedings often result in judicial findings and statements related to the facts presented in the pending criminal case before the court   The United States Supreme Court squarely addressed in *Liteky v. United States*, <u>510 U.S. 540</u> (1994), the very limited circumstances in which previous judicial findings or statements by a trial judge in related civil or criminal cases can be the basis for judicial recusal or disqualification.  The *Liteky* court stated that prior judicial rulings "almost never constitute a valid basis for a bias or partiality motion." *Id.* at 555.  The Court went on to state:

> [O]pinions formed by a judge on the basis of facts introduced, or events occurring in the course of current proceedings, or prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.  Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.  They *may* do so if they reveal an opinion derives from an extrajudicial source, and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Id*.

The Fourth Circuit addressed the issue of judicial disqualification based on a judge's involvement in a prior civil or criminal proceeding in *Belue v. Leventhal*, <u>640 F.3d 567</u> (4th Cir. 2011).  The Fourth Circuit stated that the case law firmly established that "parties would have to meet a high bar" to achieve recusal based on comments by a trial judge in the current or previous

proceeding.  To meet that high bar, the judge's comments must involve "singular and startling facts" that reflect "particularly egregious conduct." *Id*. at 573.  To allow any other rule, the Fourth Circuit noted, would produce "limitless gamesmanship" and would invite "a form of brushback pitch for litigants to hurl at judges who do not rule in their favor." This would make litigation "even more time-consuming and costly than it is and do lasting damage to the independence and impartiality of the judiciary." *Id*. at 574.

### Discussion

Defendant asserts in an affidavit that "I believe in good faith that Judge Gergel has a personal bias against me and in favor of the U.S. Attorney's Office, and that Judge Gergel's impartiality might reasonably be questioned." (Dkt. No. 26-3 at 1).  Defendant referenced various findings and statements by the Court in the previous civil case to support his personal belief of judicial bias.  The Court addresses these challenged statements and findings below.

A.      <u>Defendant's objection to the Court's comments at the May 6, 2019 hearing that the transfer of funds by the Carpoffs to his law firm's trust account was "likely an illegal transfer" and "these transactions appear to be unlawful."</u>

The Court conducted a hearing on Plaintiffs' motion for a preliminary injunction on May 6, 2019, following the receipt of records that indicated that one day after federal law enforcement officers raided the Carpoffs' home and business sites they transferred to the trust account of Strauss' law firm $5 million dollars that had been deposited in an investment fund by the East West Bank to purchase solar generators.  The record indicated that these funds were quickly wired to others for the personal benefit of the Carpoffs. (C.A. No. 9:19-1176, Dkt. No. 25 at 2-3).  The manager of the investment fund from which these monies were seized and transferred by the Carpoffs had advised Strauss that the transfers were unauthorized and demanded their prompt return to the Fund.  Based on these facts and many others, the Court made the following statement:

> From the information I have, it appears that the $5 million transfer to the Strauss
> Law Firm is likely an illegal transfer, and those recipients are in receipt of funds
> that should not have gone to them from this fund.  The fund was to purchase mobile
> solar generators.  It wasn't to pay all these lawyers and captive funds and all of this,
> and it was certainly done in a way that appears surreptitious to me.  It's one day
> after the Government has seized every asset they can of the Carpoffs.

(Dkt. No. 26-1 at 10).

The Court issued orders on April 30, 2019 and May 13, 2019 which included findings consistent with the challenged statement.  These statements and findings are exactly the type of prior judicial actions that are not a proper basis for a judicial recusal motion.  Further, later developments in this and other cases have validated the accuracy of the Court's challenged statements and findings.

    B.    <u>The Court's reference to the local United State's Attorney's Office staff as "my U.S. Attorney's Office."</u>

During the May 6, 2019 hearing, counsel for the Strauss Law Firm sought to characterize the transfers into the firm's trust account as ordinary transactions involving clients of the law firm, the Carpoffs.   The inference was that the Plaintiffs were overreacting and that there was nothing particularly remarkable about these fund transfers into and out of the Strauss Law Firm trust account.   The Court noted the intensive law enforcement interest in these transactions, with numerous federal law enforcement officers sitting in the courtroom.  This suggested to the Court that close scrutiny of these transactions was appropriate.  The reference to "my U.S. Attorney's Office" was simply a shorthand reference to the fact that these particular transactions were receiving scrutiny from the United States Attorney's Office for the District of South Carolina and did not reflect any endorsement of actions of the United States Attorney's office.

    C.    <u>The Court's statement that it would, if necessary, send the United States Marshal to escort Defendant to the May 9, 2019 hearing</u>.

Prior to the morning of the May 6, 2019 hearing, Plaintiffs had repeatedly attempted, without success, to obtain from Strauss an accounting of the $5 million that the Carpoffs had transferred to his law firm's trust account.  On the morning of the May 6, 2019 hearing, Plaintiffs were provided by the Strauss Law Firm's counsel a listing of the persons and entities which had been the recipients of the $5 million from the firm's trust account.  Plaintiffs still had no details regarding who had authorized the transfers of investment funds to persons and entities for the personal benefit of the Carpoffs.  During the May 6, 2019 hearing, it was apparent that counsel for the Strauss Law Firm had little knowledge concerning these missing details.  The Court noted the need to summon Strauss to a hearing on May 9, 2019 to address these unanswered questions.  The Court asked counsel for the Strauss Law Firm whether he anticipated any problem having Strauss appear at the May 9, 2019 hearing.  Rather than assure the Court his client would be present, the law firm's counsel indicated he would have to call his client to determine his availability.  The Court interpreted this response as equivocating on whether Mr. Strauss would appear as directed by the Court, which prompted the Court's statement to the law firm's counsel: "Let him know that if he seems to have any difficulty getting here, I'm glad to have him escorted by the marshals." (Dkt. No. 26-1 at 13).  This statement was for the purpose of making it clear that the command to be present on May 9, 2019 was an order, not a suggestion.

The Court regards this statement, while perhaps stern, as an unambiguous assertion of the Court's authority to compel the attendance of a witness, an essential element of the orderly administration of justice.  This statement reflected no personal hostility toward Strauss, only the Court's resolve that he was to appear on May 9, 2019.  The challenged statement is the very type of a "judge's ordinary efforts at courtroom administration" that is not a proper basis for judicial recusal. *Liteky*, 510 U.S. at 556.

D.      The Court's statement that Defendant needed to state that his
        assertion of his Fifth Amendment right was based on the
        fact that his answers might tend to incriminate him.

The Court initially questioned Strauss at the May 9, 2019 hearing.  He promptly attempted

to invoke his right to silence by stating that "[o]n advice of counsel, I have to invoke my Fifth

Amendment privilege."  (Dkt. No. 26-2 at 9).  Since the Defendant appeared unfamiliar with how

to assert the privilege, the Court explained that the basis of the assertion of the right to silence

under the Fifth Amendment was that the witness's responses may tend to incriminate him.  It was

not sufficient to invoke the privilege simply because his attorney told him to do this.  After

explaining the full scope of the rule, the Court asked the Defendant whether he was "asserting the

Fifth Amendment right because your response may tend to incriminate you."  The Defendant then

responded "[y]es, your honor."

The Court provided Strauss an accurate explanation of the elements necessary to assert the

right to silence under the Fifth Amendment.   Perhaps Defendant found it uncomfortable to admit

that exercising his right to silence required him to acknowledge that his responses to questions

regarding transactions to and from his law firm's trust account might tend to incriminate him in

the commission of a crime.  The Defendant's discomfort with the elements of the assertion of his

Fifth Amendment right to silence is hardly the basis for judicial recusal.

E.      The Court's statement that "I intend to advise the South Carolina
        Supreme Court that you took the Fifth Amendment today in a
        matter involving potential criminal activity . . . ."

Defendant objects to the Court's statement that it intended to report to the South Carolina

Supreme Court his invocation of his Fifth Amendment right against self-incrimination "in a matter

involving potential criminal activity." (Dkt. No. 26-2 at 33).  The Court's statement followed

significant record evidence that Defendant's law firm had received $5 million dollars from the

Carpoffs one day after their home and offices had been raided by federal law enforcement officials and these funds were rapidly transferred from the trust account of the Strauss Law Firm to third parties for the benefit of the Carpoffs. When asked under oath by the Court of his knowledge regarding the details of these transactions, Strauss invoked his Fifth Amendment rights on the grounds that his responses might incriminate him.

After considering the totality of circumstances in the record then before the Court, there was a substantial question whether Defendant had engaged in professional misconduct in violation of the South Carolina Rules of Professional Conduct. South Carolina Appellate Court Rule 407, Rule 8.3(c) imposes a duty on every licensed attorney to report actions by an attorney that raise a substantial question concerning another attorney's professional misconduct.

Defendant appears to argue that his invocation of his right against self-incrimination immunized him from a judge reporting to the South Carolina Supreme Court facts that raised a substantial question of professional misconduct. This misapprehends the application of the assertion of the right against self-incrimination. Where a defendant asserts his right to silence under the Fifth Amendment, that fact may not be used against him in a criminal trial. However, the invocation of the Fifth Amendment right against self-incrimination can cast an adverse inference in a civil proceeding. *Michael v. United States*, 526 U.S. 314, 328 (1999).

The Defendant's objection to the Court's statement appears to based on the misguided conclusion that his simple invocation of the his right to silence prompted the Court's decision to make a report to the South Carolina Supreme Court. The complete statement of the Court was that Strauss was put on notice that "I intend to advise the South Carolina Supreme Court that you took the Fifth Amendment today *in a matter involving potential criminal activity*." (Dkt. No. 26-2 at 33) (emphasis added). This "potential criminal activity" raised a substantial question of whether

14

Strauss had committed professional misconduct regarding the operation of his law firm's trust account. The fact that Struss asserted his Fifth Amendment right against self-incrimination did not immunize him from a judicial report of possible professional misconduct.[3]

Strauss was not the first attorney that the Court has reported to the South Carolina Supreme Court where a substantial question has been raised whether the attorney has engaged in professional misconduct. Judges have an important duty, as do all licensed attorneys, to uphold the integrity and professionalism of the Bar. Such a report is not a valid basis for judicial recusal.

   F. Defendant's contention that the Court's review of the public docket in the DC Solar bankruptcy case and communication with the Nevada bankruptcy judge constituted an *ex parte* communication and an independent investigation by the Court.

The defense asserted in the civil case that the Plaintiffs' suit was stayed by the pending bankruptcy proceeding of DC Solar. Since this matter went to the jurisdiction of the Court over this pending matter, the Court took the assertion seriously to determine whether the bankruptcy court's stay applied to the funds transferred from the Fund, an entity separate and independent from DC Solar. As is routine when such bankruptcy related matters arise on the Court's docket, the Court inspected the public filings in the Nevada bankruptcy proceeding, which were available a few clicks away on the ECF. The Court found no reference to the $5 million transfer from the investment fund on the unsecured creditors listed in the DC Solar bankruptcy.

The Court was, however, sensitive to the prerogatives of a sister court and reached out to the Nevada bankruptcy court to avoid any unnecessary conflict or miscommunication regarding the scope of the DC Solar bankruptcy estate. Such communications are commonly made by the

---

[3] The Court has not reached a conclusion at this time concerning whether Strauss committed professional misconduct regarding transactions made on behalf of the Carpoffs from his law firm's trust account. This is a matter that should first be addressed by the South Carolina Supreme Court.

Court and received from other federal and state judges.  Indeed, the Manual for Complex Litigation published by the Federal Judicial Center recommends communications between courts in complex litigation to promote judicial efficiency and to avoid unnecessary duplication.  *See* Manual for Complex Litigation §§ 10.12, 20.2 (Federal Judicial Center 2004).

The Court's review of the publicly available records of the DC Solar bankruptcy docket was part of routine federal court practice, as were the communications with the Nevada bankruptcy court.  The Court fully disclosed these communications to counsel and there was no suggestion or concern expressed at that time that such communications were anything but routine.  Court to court communications or inspection of publicly available court records are not a valid basis for judicial recusal.

G.    The Court's reference to widespread news reports of the federal government's law enforcement activities at the Carpoffs' residence and businesses.

When the civil action was filed in April 2019, there had been months earlier a great deal of news coverage concerning the FBI's raid of the residence and businesses of the Carpoffs on December 18, 2018.[4]   The substance of the news coverage from the past December was well known to the parties, the Court, and anyone else who had a passing interest in current affairs.  The record before the Court contained the critical details relevant to the civil case and was far more detailed that the cursory news reports that had been made around the time of the federal government's enforcement action.  What was relevant regarding the news reports was not the substance of the reports but whether they had provided notice to the Strauss Law Firm of the

---

[4]  *E.g.*, "FBI Raids Home of DC Solar CEO," ESPN Website (December 20, 2018); "FBI Conducts Raid on DC Solar's Headquarters, CEO's Home," NBC Sports Website (December 20, 2018); "How an FBI Raid Indirectly Led to a NASCAR Team Shutting Down," USA Today Website (January 5, 2019).  The Carpoffs prominent role as a sponsor of a NASCAR team generated a great deal of media interest in the federal government's enforcement activities.

16

federal enforcement action before the $5 million was wired out of the law firm's trust account to others for the benefit of the Carpoffs.

No party to the civil action questioned the accuracy of the Court's reference to the earlier national media reports or requested evidence to be placed in the record to confirm such reports. Had such a request been made, the Court would have taken judicial notice of the earlier news reports because they could be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Federal Rule of Evidence 201(b)(2).  The late complaint about the Court's reference to the previously undisputed news reports does not provide a basis for recusal.

Defendant, in his affidavit, does not dispute the widespread national news reports concerning the raid on the Carpoff's home, but complains that the Court failed to quote statements by Carpoff's lawyers that the raid was merely a "tax dispute" and the Carpoffs "planned to grow their business."  (Dkt. No. 26-3 at 5).  By the time the case was filed in April 2019, DC Solar was in bankruptcy and it was apparent that this was far more than a "tax dispute."  The Court's failure to quote a statement of the Carpoffs' lawyer in December 2018 during the hearings in May 2019 would certainly not be a basis for recusal.

     H.    <u>The Defendant is mistaken in his belief that the Court harbors any personal bias or animosity toward him or favors the Government in his pending criminal case</u>.

The Defendant, perhaps due to his personal inexperience in the federal judicial arena, has misinterpreted certain routine court statements, actions, and judicial findings in the prior civil case as some form of personal animosity towards him.  The pending criminal case before the Court, in which Defendant has pled to a single felony count, is a fairly routine matter on the Court's docket. The Court's statements and orders in the prior civil case reflected a determination, first, to

17

determine the facts, and then, upon determining that there had most probably been an improper conversion of funds by the Carpoffs, to move expeditiously to repatriate the funds so that the Plaintiffs might have an effective remedy for the wrong they had suffered.    The Court will approach Defendant's sentencing, as it does in every sentencing, with a careful review of the presentence report, including the calculation of the sentencing guidelines, and consideration of all objections, arguments of counsel, and evidence offered in mitigation.    The Court's goal is to impose a sentence with is "sufficient but not greater than necessary" to accomplish the purposes of the law.  The Court's prior handling of the related civil case or consideration of this motion to recuse will have no bearing on the Court's sentencing decision.

### Conclusion

After a careful view of the full record in the prior civil proceeding and in this pending criminal matter, consideration of the motion for recusal and attachments, and the applicable case law, the Court finds that there is no reasonable basis to question the impartiality of the Court based upon a reasonable person standard with full knowledge of all facts and circumstances.  28 U.S.C. § 455(a).  The Court further finds that, applying the same standard, there is no valid basis for recusal or disqualification on the grounds of personal bias.  28 U.S.C. §§ 144, 455(b)(1). Consequently, the Defendant's motion to recuse or disqualify (Dkt. No. 26) is denied.[5]

    **AND IT IS SO ORDERED**.

                                     s/ Richard Mark Gergel
                                     Richard Mark Gergel
                                     United States District Judge

December 11, 2023
Charleston, South Carolina

---

[5]  The Defendant's motion also contained a request to conduct discovery.  The Court finds no basis or need to conduct discovery and that motion is also denied.

18

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | **Criminal Action No.: 9:23-cr-833-RMG** |
| | ) | |
| v. | ) | |
| | ) | |
| Peter J. Strauss, | ) | **Filed Under Seal Per Court Order** |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>**DEFENDANT'S MOTION FOR RECUSAL OR DISQUALIFICATION AND**</u>
<u>**DISCOVERY, AND MEMORANDUM IN SUPPORT**</u>

The Defendant, Peter J. Strauss ("Strauss" or "Defendant"), by and through his undersigned counsel, hereby respectfully moves (the "Motion") the Honorable Richard M. Gergel to recuse or disqualify himself from this case. The Motion includes a request for discovery. The Motion is respectfully made pursuant to 28 U.S.C. §§ 144 and 455, and the Due Process Clause of the Fifth Amendment. This Motion is filed under seal pursuant to Court Order. ECF # 10.

## I.  PROCEDURAL HISTORY

On October 12, 2023, Defendant executed a plea agreement with the United States Government ("United States" or "Government"), by and through the U.S. Attorney's Office for the District of South Carolina ("USAO"), agreeing to plead guilty to a violation of 18 U.S.C. §§ 2232(a) and 2.

On October 17, 2023, the Government filed a motion to seal (ECF # 1), a one-count Information alleging a violation of 18 U.S.C. §§ 2232(a) and 2 (ECF # 2), a Penalty Sheet (ECF # 3) and the Plea Agreement (ECF # 5).

On November 3, 2023, U.S. District Judge Richard M. Gergel ("Judge Gergel") granted the motion to seal. ECF # 10.

On November 6, 2023, in a hearing before Judge Gergel, Strauss pleaded guilty to the said one-count Information.

The parties await the issuance of a Pre-Sentence Report ("PSR") from the United States Probation Office, and a sentencing hearing is not yet scheduled.

Strauss continues to cooperate with the USAO.

## II. FACTUAL BACKGROUND

Defendant Strauss is an attorney and had a law practice, Strauss Law Firm, LLC ("SLF" or "Strauss Law Firm") that operated on Hilton Head Island, South Carolina, for approximately 15 years. The Strauss Law Firm is now closed. Strauss Law Firm's focus included captive insurance, estate planning, tax planning and corporate law. Strauss also operated a captive insurance management company, Hamilton Captive Management, LLC ("Hamilton"), which managed over hundred captive insurance companies for clients from across the United States.[1]

Around 2015, Jeffrey Carpoff, a purported billionaire, became a captive insurance client of Strauss and Hamilton. Carpoff had founded a company which purportedly manufactured mobile solar-powered generators. Carpoff's company, DC Solar Solutions, Inc. ("DC Solar"), generally promised investors federal income tax credits from its solar equipment and lease payments from the leases of thousands of its mobile solar generators. Ultimately, DC Solar proved to be a giant Ponzi scheme and a fraud upon its investors. Unknown to Strauss and DC

---

[1] Captive insurance companies are wholly-owned subsidiaries of operating businesses that self-insure risks of the parent business pursuant to Internal Revenue Code § 831(b) and 806. Hamilton was founded in 2012 to provide turn-key services for middle market captive clients, including evaluating captive opportunities (underwriting, risk assessment and actuarial reports); captive insurance formation (design, drafting and executing of participation agreement, share issuance, directors resolution and service agreement); captive insurance management (policy design, banking/financial reporting, regulatory compliance, claims administration, legal/regulatory guidance); and reinsurance facilitation (risk pooling of separate captives through reinsurance provider).

Solar's investors, most of the purported mobile solar generators did not exist, and investors in DC Solar's lease programs were being paid from new investors' money and not from lease payments.

Through 2018, Strauss was only generally aware of the nature of Carpoff's business, and was completely unaware of the frauds that Carpoff had been committing with DC Solar. During this time, Strauss was mainly providing Carpoff (and his wife) captive insurance services, and assistance with personal real estate investments, estate planning and life insurance. Strauss hoped to develop and operate a Family Office for the Carpoffs.

On December 18, 2018, a search warrant was executed by federal law enforcement on Carpoff's California residence and business office.

On December 19, 2018, unknown to Strauss, Carpoff's wife, Paulette, arranged a wire transfer of $5,000,000 to the SLF trust account. Later that day, after this money was wired to SLF's trust account, Strauss was contacted by the national law firm Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), primarily through partner Armando Gomez ("Gomez"), and instructed to wire $2,000,000 to Skadden for a retainer deposit.

**From:** "Gomez, Armando" <Armando.Gomez@skadden.com>
**Date:** December 19, 2018 at 3:23:57 PM EST
**To:** "'pstrauss@thestrausslawfirm.com'" <pstrauss@thestrausslawfirm.com>
**Subject: Wire instructions**

Peter,

Further to our discussion a short while ago, I understand that Jeff Carpoff has asked you to arrange a wire to Skadden for a retainer. The wire can be sent to Citibank at the following instructions:

CITIBANK, N.A.
399 Park Avenue
NEW YORK, NY 10022

ABA # ▮▮▮▮
Swift Code ▮▮▮▮ (required for international wires only)
FOR CREDIT TO:
ACCOUNT ▮▮▮▮ of Skadden, Arps, Slate, Meagher & Flom LLP

My business address and contact information is set forth below. Once the wire has been sent, please send me the wire details so that we can confirm receipt. Thank you.

**Armando Gomez**
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
T: 202.371.7868 | F: 202.661.8284 | M: 703.819.1788
armando.gomez@skadden.com

Skadden

motion for recusal 2023-12-06

Skadden attorneys, including Gomez, Annie Li, Van Durrer and Jack DiCanio, and/or the

Carpoffs, continued to direct Strauss and SLF to disburse money to various other professionals,

including other lawyers and bankruptcy consultants for the Carpoffs and their companies.

On December 28, 2018, pursuant to Carpoff's instructions, Deltec, his bank in Nevis,

wired $3,000,000 from his DC Solar International, Inc. ("DC Solar International") account to

Port Royal Insurance Company for partial payment of his captive insurance company premiums

of $4,500,000 which were due to Hamilton at the time.

On January 15, 2019, pursuant to Carpoff's instructions, Deltec, his bank in Nevis, wired

another $3,000,000 from his DC Solar International account to the SLF trust account.  This

$3,000,000 was used, *inter alia*, to pay for SLF attorney's fees which were due at the time, and

other professional fees and captive insurance commutation fees.

On April 23, 2019, Solar Eclipse Investment Fund XXXV ("Fund 35") and East West

Bank ("EWB") filed a complaint in federal court against the $5,000,000, *in rem*, in the SLF trust

account which was wired on December 19, 2018, and against Strauss Law Firm, *in personam*.[2]

The complaint generally alleged that the plaintiffs owned the $5,000,000, and the money was

unlawfully and fraudulently transferred to SLF's trust account by the FUND 35 manager, Halo

Management Services, LLC ("Halo").[3]  The complaint contained five causes of action, to wit, (1)

a declaratory judgment of the court for its *in rem* control of the remainder of the $5,000,000 in

the SLF trust account; (2) a declaratory judgment that the plaintiffs were entitled to the said

---

[2] ECF # 1, *Solar Eclipse Investment Fund XXXV, LLC and East West Bank, Plaintiffs, v. $5,000,000 U.S. Dollars Deposited to IOLTA Account of the Strauss Law Firm, LLC in rem, and the Strauss Law Firm, LLC, in personam*; Civil Action No. 9:19-cv-01176-RMG (D.S.C.) (the "Fund 35-EWB Case").

[3] Upon information and belief, Halo was controlled by the Carpoffs.

remaining funds in the SLF trust account; (3) an accounting from the Strauss Law Firm of all disbursements of the original $5,000,000; (4) a constructive trust of the remainder of the $5,000,000 in the SLF trust account; (5) rescission of any agreement authorizing the original transfer of the $5,000,000 to the SLF trust account; and, (6) injunctive relief enjoining SLF from any further disbursements of the remainder of the $5,000,000 in the SLF trust account.

On May 6, 2019, Judge Gergel held a hearing in the Fund 35-EWB Case.  *See* Exhibit 1 (Transcript of 5/6/2019 hearing).[4]  During this hearing, Judge Gergel made the following statements:

> [I]t appears that the $5 million transfer to the Strauss Law Firm is likely an illegal transfer, and those recipients [to whom the funds were disbursed] are in receipt of funds that should not have gone to them from this fund. … it was certainly done in a way that appears surreptitious to me. *Id.* at p. 10, lines 17 - 23.

> I'[m] going to order Mr. Strauss into the Court here, and I'm going to order him to produce all the documents related to the instructions he received for these transfers. *Id.* at p. 11, lines 4 - 7.

> I think it's looking pretty dubious that they have a right to those funds, and particularly under the circumstances where Skadden Arps [law firm] apparently particularly is involved and these other criminal defense firms are fully aware of the circumstances here, that there has been -- I mean, the press accounts, there were dozens of FBI agents circling Carpoffs [Mr. Strauss's clients'] home. Judge Beasley tells me that every hearing he has, he has SEC investigators and FBI agents sitting in the audience, and I don't mind to say that my head of my U.S. Attorney's Office is sitting in the back row here right now, and there's a lot of Government interest in all of this. *Id.* at p. 12, lines 10 - 20.

> Let him [Strauss] know that if he seems to have any difficulty getting here, I'm glad to have him escorted by the marshals.  *Id.* p. 13, lines 8 - 10.

> These transactions appear to be unlawful. They would not be protected by privilege, and he appears – it's not quite clear what capacity Mr. Strauss actually received these funds since he's taking some of the funds himself and putting them in accounts he controls. *Id.* at p. 13, line 22 - p. 14, line 1.

---

[4] All cited Exhibits and Affidavits are attached hereto and incorporated herein by reference.

On May 9, 2019, Judge Gergel held another hearing in the Fund 35-EWB Case.  *See* Exhibit 2 (Transcript of 5/9/2019 hearing). During this hearing, Strauss asserted the Fifth Amendment in response to many questions posed to him by the judge and counsel for the plaintiffs.  Judge Gergel made the following statement as a result:

> Mr. Strauss, I'm going to put you on notice that I intend to advise the South Carolina Supreme Court that you took the Fifth Amendment today in a matter involving potential criminal activity, and I would suggest you self-report your appearance here today and your actions." *Id.* at p. 33, lines 8 - 12.

Judge Gergel made this statement while contemporaneously recognizing the criminal implications regarding the transactions relating to the $5,000,000.  *Id.* at p. 68, lines 21 – 24.

Defendant Strauss submits an affidavit (Exhibit 3) in support of this Motion that he believes in good faith that Judge Gergel has a personal bias against him and in favor of the USAO, and that Judge Gergel's impartiality is reasonably questioned.

This Motion is further supported by an affidavit (Exhibit 4) and expert opinion by attorney Barbara Seymour, an ethics expert and the former Deputy Disciplinary Counsel of the South Carolina Office of Disciplinary Counsel.  As set forth in more detail below, Ms. Seymour concludes that it "is my expert opinion . . . that the judge should recuse himself from the criminal matter against Mr. Strauss to avoid the appearance of impropriety."  *Id.* at 5.

### III.  LAW

The Motion is made pursuant to 28 U.S.C. §§ 144 and 455(a) and (b)(1), and the Due Process Clause of the Fifth Amendment to the United States Constitution.

28 U.S.C. § 455 provides, in pertinent part, as follows:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

motion for recusal 2023-12-06

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; …

28 U.S.C. § 144 provides as follows:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

Section 455(a) requires disqualification even if the judge does not have actual personal bias or prejudice. *See* 13D *Wright and Miller*, Jurisdiction § 3549.

Under § 455(a), a "federal judge is obliged to recuse himself if a person with knowledge of the relevant facts might reasonably question his impartiality." *United States v. Cherry*, 330 F.3d 658, 665 (4th Cir. 2003). "If a judge possesses actual or apparent prejudice either for or against a party, federal law provides the aggrieved party with a statutory remedy," to wit, § 455. *Id.*

Under § 455(a), even close cases must be resolved in favor of disqualification. *In re Boston's Children First*, 244 F.3d 164, 167 (1st Cir. 2001); *United States v. Evans*, 262 F. Supp. 2d 1292, 1294 (D. Utah 2003). Regarding the necessity of recusal, it "is not the reality of bias or prejudice but its appearance" that matters. *Microsoft Corp. v. United States*, 530 U.S. 1310, 1302 (2000).

Likewise, Courts have recognized that the Code of Judicial Conduct mandates recusal even if there is only an appearance of impropriety or partiality. *Microsoft Corp. v. United States*, 253 F.3rd 34, 114-15 (D.C. Cir 2001) ("The very purpose of § 455(a) is to promote confidence in

the judiciary by avoiding even the appearance of impropriety whenever possible . . . Appearance

may be all there is, but that is enough to invoke the Canons [of Judicial Conduct] and § 455.");

Code of Judicial Conduct, Canon 2A ("A judge should respect and comply with the law and

should act at all times in a manner that promotes public confidence in the integrity and

impartiality of the judiciary.")  As noted by the Fifth Circuit Court of Appeals in *Potashnick v.*

*Port City Const. Co.*, 609 F.2d 1101, 1111 (5th Cir. 1980):

> This overriding concern with appearances, which also pervades the Code of Judicial
> Conduct and the ABA Code of Professional Responsibility, stems from the recognized
> need for an unimpeachable judicial system in which the public has unwavering
> confidence…. Any question of a judge's impartiality threatens the purity of the judicial
> process and its institutions.

In applying § 455, "it is appropriate to consider the risk of injustice to the parties in the

particular case, the risk that the denial of relief will produce injustice in other cases, and the risk

of undermining the public's confidence in the judicial process." *Liljeberg v. Health Servs.*

*Acquisition Corp.*, 486 U.S. 847, 864 (1988).  If a judge fails to recuse himself when the statute

required recusal, even a final judgment can be reopened. *Id.* at 863-64.

While critical or hostile judicial comments or remarks during a proceeding or prior

proceeding do not necessarily require recusal, judicial comments against a party are grounds for

recusal if "they display a deep-seated favoritism or antagonism that would make fair judgment

impossible." *Liteky v. United States*, 510 U.S. 540, 556 (1994).  There is no requirement that

biased comments or prejudiced opinions justifying recusal arise from an extrajudicial source.  *Id.*

at 555 ("neither the presence of an extrajudicial source necessarily establishes bias, nor the

absence of an extrajudicial source necessarily precludes bias;" extrajudicial source is simply a

"factor" to be considered).  However, biased judicial comments or prejudiced opinions derived

from extrajudicial sources are a proper basis for recusal.  *Sales v. Grant*, 158 F.3d 768, 781 (4th

Cir. 1998) (biased judicial remarks may support a recusal challenge "if they reveal an opinion that derives from an extrajudicial source").

A judge should also disqualify himself in circumstances where "he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1); *Sine v. Local No. 992 Int'l Bhd. of Teamsters*, 882 F.2d 913, 914 (4th Cir. 1989).

The standard to determine impartiality is an objective test requiring a judge to disqualify himself whenever his impartiality might reasonably be questioned. The inquiry is whether a reasonable person would have a reasonable basis for questioning the judge's impartiality, not whether the judge is in fact impartial. *In re Beard*, 811 F.2d 818, 827 (4th Cir. 1987) (recognizing the right to petition the appellate court for a writ of mandamus in the event a judge fails to recuse, and holding the "proper test to be applied is whether another with knowledge of all of the circumstances might reasonably question the judge's impartiality."). Disqualification is required "if a person with knowledge of the relevant facts might reasonably question [the judge's] impartiality." *Cherry*, 330 F.3d at 665.

The standard for recusal under 28 U.S.C. § 144 is the same as under § 455, to wit, "'whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.'" *Mayes v. Leipziger*, 729 F.2d 607 (9th Cir. 1984); *United States v. Studley*, 783 F.2 d 934, 939 (9th Cir. 1986).

The Due Process Clause of the Fifth Amendment also mandates a requirement of judicial impartiality, and, like Section 455(a), has been implemented by an objective standard that does

not require proof of actual bias.[5]  *United States v. Liggins*, No. 22-1236, 2023 U.S. App. LEXIS 20040 (6th Cir. Aug. 3, 2023); *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883-87 (2009) (due process analysis of recusal under the Fourteenth Amendment); *Aiken County v. BSP Div. of Envirotech Corp.*, 866 F.2d 661, 678 (4th Cir. 1989) ("The due process clause protects not only against express judicial improprieties but also against conduct that threatens the 'appearance of justice.'"); *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (question is not whether a judge harbors an actual bias but whether, as an objective matter, there is an unconstitutional potential for bias).

Like the statutory bases for recusal, the Due Process Clause looks at the totality of the circumstances as to whether recusal is constitutionally required.  *Rippo v. Baker*, 580 U.S. 285, 287 (2017) (Supreme Court precedents require courts to ask "whether, considering all the circumstances alleged, the risk of bias was too high to be constitutionally tolerable").  While recusal under Due Process is a higher bar than under the statutes, recusal is required when "the *probability* of actual bias rises to an unconstitutional level." *Caperton*, 556 U.S. at 887 (emphasis added); *In re Murchinson*, 349 U.S. 133, 136 (1955) (Due Process "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.'").

## IV.  ARGUMENT

With much respect, Judge Gergel should be recused or disqualified from this case.  Judge Gergel has adversely commented on the Defendant's inviolate right to assert the Fifth

---

[5] To the extent the Due Process Clause of the Fourteenth Amendment is applicable to a motion to recuse a federal judge, Defendant invokes the same.  The due process analysis regarding recusal under both the Fifth and Fourteenth Amendments are the same.

Amendment in a related proceeding.  Further, he sought to punish Defendant for asserting such

rights by reporting him to the bar in clear violation of U.S. Supreme Court precedent, and he

further advised Defendant to self-report his Fifth Amendment invocations to the Office of

Disciplinary Counsel.  Judge Gergel threatened to have Defendant escorted to a court hearing by

the U.S. Marshall's Service when there was no indication Defendant would not comply. Judge

Gergel has expressed personal prejudice towards the Defendant and personal bias towards the

USAO.  Judge Gergel has sought and obtained personal knowledge of facts outside of the current

and former legal proceedings which will likely influence his ability to be impartial in this case.

Under the totality of the circumstances, Judge Gergel's impartiality *might* reasonably be

questioned, and his recusal is mandated.

 As noted by ethics expert Seymour in her Affidavit (<u>Exhibit 4</u> at 5), in her opinion, "the

judge should recuse himself from the criminal matter against Mr. Strauss to avoid the appearance

of impropriety."  In her Affidavit (<u>Exhibit 4</u> at 5-6) ethics expert Seymour further points out as

follows:

> A federal judge should recuse himself from a sentencing hearing in a criminal case when
> there is a reasonable appearance of personal bias, even if the judge believes he can be
> impartial. This is a fundamental principle of judicial ethics and fairness and it helps
> ensure that the criminal justice system maintains public trust and confidence. There are
> several reasons why recusal in such situations is essential:
>
>> Judicial Code of Conduct: Federal judges are bound by a Code of Conduct, which
>> outlines their ethical obligations. One of the key principles in this code is that
>> judges must avoid both actual bias and the appearance of bias. This means that
>> judges should not only be impartial but also avoid situations where their
>> impartiality might reasonably be questioned.
>>
>> Preservation of Judicial Impartiality: The cornerstone of a fair and just legal
>> system is the impartiality of judges. Judges must be seen as unbiased and neutral
>> arbiters who apply the law objectively. This perception of impartiality is crucial to
>> maintain public confidence in the judiciary.

Public Perception: Even if a judge genuinely believes he can be impartial, the perception of bias can undermine the public's trust in the judicial system. If the public believes a judge is personally biased or has a potential conflict of interest, it can erode confidence in the fairness of the proceedings.

Equal Protection Under the Law: The principle of equal protection under the law requires that all individuals receive the same treatment and consideration in court, regardless of their background, status, or the nature of the case. Any hint of bias, even if unintentional, can raise doubts about whether this principle is being upheld.

Fair Trial Rights: In criminal cases, the defendant has a Constitutional right to a fair trial. This includes the right to be judged by an impartial tribunal. If a judge's impartiality is in question due to an appearance of bias, it can infringe upon the defendant's Constitutionally protected fair trial rights.

Avoiding Litigation and Appeals: When a judge's impartiality is questioned and not addressed through recusal, it can lead to prolonged litigation and appeals. This is costly, time-consuming, and may not ultimately result in a just outcome. Recusal can help prevent such complications.

Maintaining the Integrity of the Judiciary: The integrity of the judicial system relies on judges who adhere to the highest ethical standards. Recusal in cases where impartiality might reasonably be questioned is a proactive step to maintain the reputation and credibility of the judiciary.

## A. ADVERSE FIFTH AMENDMENT COMMENTS

In the case of *Spevack v. Klein*, <u>385 U.S. 511, 514</u> (1967), the U.S. Supreme Court clearly held that a witness, including an attorney, has the "**unfettered**" right to "**remain silent**" by asserting Fifth Amendment protections and shall "**suffer no penalty** . . . **for such silence**." (emphasis added)  The U.S. Supreme Court reversed the disbarment of attorney Spevack because the adverse action against him was based upon his assertion of the right to remain silent in a New York disciplinary proceeding.

However, after Strauss asserted his right to remain silent pursuant to the Fifth Amendment during the May 9, 2019 hearing in the Fund 35-EWB Case, Judge Gergel reacted with the following:

```
 6            THE COURTROOM DEPUTY:  Sir, may I have those
 7    documents?  Thank you.
 8            THE COURT:  Mr. Strauss, I'm going to put you on
 9    notice that I intend to advise the South Carolina Supreme Court
10    that you took the Fifth Amendment today in a matter involving
11    potential criminal activity, and I would suggest you
12    self-report your appearance here today and your actions.
```

The Judge obviously decided that Strauss's invocation of the Fifth Amendment was a violation of the ethical duties of an attorney, informed Strauss that he would advise the S.C. Supreme Court of the fact "that you took the Fifth Amendment today," and suggested Strauss self-report the same. Judge Gergel sought to punish Strauss for the assertion of his Constitutional rights, despite the fact that the Judge ascertained that the matter involved "potential criminal activity." The Judge's comments can only be perceived as threatening, and were in clear violation of the Supreme Court's holding in *Spevack* that an attorney has an unfettered right to remain silent and cannot suffer any penalty for doing so.

As the *Spevack* Court noted, "'penalty' is not restricted to fine or imprisonment…. It means … the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.'" *Id.*, at 515.[6]

The Supreme Court has noted that the Fifth Amendment "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him or her not to answer official questions put to him or her in any other proceeding,

---

[6] The "Fifth Amendment ... forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965); *Tehan v. Unites States ex rel. Shott*, 382 U.S. 406 (1966) ("adverse comment by a prosecutor or trial judge" upon a defendant's failure to testify violates the federal privilege against compulsory self-incrimination).

motion for recusal 2023-12-06

civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v Turley*, 414 U.S. 70, 77 (1973).

As opined by ethics expert Seymour, "[i]n fact, it is not professional misconduct for a lawyer to assert Fifth Amendment rights." Exhibit 4 at 7. There is no duty for a judge to report an attorney for disciplinary action, including under the S.C. Rules of Professional Conduct, because the attorney has lawfully asserted the Fifth Amendment right to remain silent.

Any such report of an attorney's supposed professional misconduct by a judge to the South Carolina Office of Disciplinary Counsel, or threat of the same, for invoking the Fifth Amendment, is inconsistent with Supreme Court precedent and the rules of professional responsibility. Such an unfounded report, or threat of the same, necessarily demonstrates a deep-seated and unequivocal lack of impartiality and/or personal animus. At the very least, such a report would reflect that the offending judge's "appearance of impartiality" is reasonably questioned.

Furthermore, during the May 9th hearing, Judge Gergel instructed Strauss's lawyer to cease communicating with Strauss while he was on the witness stand. Because Strauss was not experienced in criminal law and was unsure when to assert his constitutional right to remain silent, Strauss's lawyer had been trying to assist Strauss as to when to invoke the Fifth Amendment. Exhibit 3 at 3 (Strauss Affidavit).

As noted by ethics expert Seymour, given "that the law is clear that invoking the privilege against self-incrimination is not professional misconduct, the judge's reaction and response to Mr. Strauss's refusal to answer certain questions related to his clients' financial transactions would cause a reasonable defendant concern regarding the judge's ability to decide his fate in a fair and impartial manner." Exhibit 4 at 8. Due to Judge Gergel's comments and

perceived threats regarding his assertion of the Fifth Amendment, as well as the Judge's prohibition of his counsel from assisting with the invocation of the Fifth Amendment, Strauss likewise reasonably questions the judge's impartiality towards him.  *See* Exhibit 3.

## B. EXTRA-JUDICIAL AND *EX PARTE* INVESTIGATIONS AND COMMUNICATIONS

As a further indication of Judge Gergel's actual or perceived prejudice against Strauss and/or apparent lack of impartiality during the Fund 35-EWB Case, it is clear that Judge Gergel conducted extra-judicial and *ex parte* investigations and communications and learned material facts which were not in evidence provided by the parties.

Judge Gergel openly acknowledged that he had "been in communication with the Bankruptcy Court," and spoken to "Judge Beesley" about his bankruptcy hearings involving the Carpoffs' DC Solar and related companies.[7]  Judge Gergel knew that the $5 Million transferred to Strauss was not listed in the bankruptcy court as an obligation or liability, and that neither Fund 35 nor EWB were listed as creditors.  Exhibit 1 at pp. 11-12.  Apparently, Judge Beesley requested that Judge Gergel "do what I can to repatriate these [$5,000,000] funds[.]"  *Id.*  He selectively referenced that there were "press accounts" and "dozens of FBI agents circling the Carpoffs' home" at the time of the raid on December 18, 2018.  *Id.* at p. 12.  On the day the Carpoffs' warrants were executed, he knew that "DC Solar was defunct at that point, literally defunct. The lights were off, the staff was laid off, and all of its accounts were seized by the Federal Government"; that "all accounts of DC Solar had been seized . . . that the Carpoffs' personal

---

[7] Exhibit 1 at pp. 9-12.  Upon information and belief, former U.S. Bankruptcy Judge Bruce T. Beesley, of the District of Nevada, was, at the time, handling at least one bankruptcy case involving DC Solar or its affiliates.  *See In re Double Jump, Inc.*, Case No. 19-50102-BTB (D.Nev.).

accounts had been seized and all the corporations had been seized"; and that "it was in all the newspapers out there."[8]  Exhibit 2 at pp. 51, 61.

He knew that Judge Beesley held numerous bankruptcy hearings, and that at "every hearing" he "has SEC investigators and FBI agents sitting in the audience."  Exhibit 1 at p. 12. He knew that one day after the $5,000,000 wire transfer, the "Government has seized every asset they can of the Carpoffs."  *Id.* at p. 10.  On April 30, 2019, before any hearing took place, he apparently visited the Strauss Law Firm website in furtherance of his investigation, as was disclosed in ECF # 14, at footnote 1, as follows:

[1] The Strauss Law Firm is comprised of four professionals, including at least one attorney and one Certified Public Accountant, and provides "strategic solutions to high-net-worth individuals, families and business owners" with "experience in the legal, tax, insurance, and accounting arenas." *See* http://thestrausslawfirm.com/about (last visited, Apr. 30, 2019).

Clearly, Judge Gergel went outside the record of the Fund 35-EWB Case to personally investigate and obtain information and evidence that were material "to disputed evidentiary facts concerning the proceeding."  28 U.S.C. § 455(b)(1); *Liteky*, 510 U.S. at 556 (judge must not rely "upon knowledge acquired outside" judicial proceedings nor display "deep-seated and unequivocal antagonism that would render fair judgment impossible"). Prior to the May 6th and May 9th hearings in the Fund 35-EWB Case, Strauss is unaware of any evidence introduced to the court that included descriptions of press accounts of the Carpoffs' businesses being raided by law enforcement or FBI agents "circling" their home.  There was certainly no evidence in the record from the parties regarding communications of bankruptcy judge Beesley.

[8] One or more DC Solar entities filed for bankruptcy protection in or around February, 2019, and engaged a nationally recognized professional restructuring advisor to lead the reorganizations.

Page **16** of **24**

Canon 3A(4) of the Code of Judicial Conduct for U.S. Judges provides, in part, as follows:  "a judge **should not initiate**, permit, **or consider ex parte communications** or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers." (emphasis added)

While not binding on federal judges, Rule 2.9(C) of the American Bar Association's Model Code of Judicial Ethics also provides as follows:  "A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed."

That fact that Judge Gergel went outside the record to investigate and obtain evidence in the Fund 35-EWB Case, and his particular focus on the role that law enforcement played in the Carpoffs' bankruptcy matters and the news accounts of the FBI's raids of their home and businesses, naturally leads one in a position such as Strauss to reasonably and objectively question the neutrality and impartiality of the Judge.  This is particularly true in light of the many comments by Judge Gergel suggesting that Strauss participated in the criminal activity of his clients, the Carpoffs, with respect to the $5,000,000 wire transfer.  *Liteky*, 510 U.S. at 545, n. 1 (disqualification warranted when bias or prejudice stem from an extrajudicial source and "result in an opinion on the merits [of a case] on some basis **other than what the judge learned from his participation in the case."**) (emphasis added).

For instance, during the Fund 35-EWB Case May 6th and May 9th hearings, Judge Gergel stated or commented as follows:

- "[L]et's be candid. To the extent [the plaintiff's counsel's] hypothesis is correct, **anybody involved in the transaction potentially has criminal implications tied to them** … [i]f they're actually involved in converting the funds[.]" Exhibit 2, p. 68, lines 21 - 24 (emphasis added)

- "[I]t appears that the $5 million **transfer to the Strauss Law Firm is likely an illegal transfer**, and those recipients [to whom the funds were disbursed] are in receipt of funds that should not have gone to them from this fund. … it was certainly done in a way that appears surreptitious to me." <u>Exhibit 1</u>, p. 10, lines 17 – 23 (emphasis added)

- "I will say on the record that these [transactions] are not protected, attorney-client privilege. **These transactions appear to be unlawful**. They would not be protected by privilege, and he appears – it's not quite clear what capacity Mr. Strauss actually received these funds since he's taking some of the funds himself and putting them in accounts he controls." <u>Exhibit 1</u>, p. 13, line 20 - p.14, line 1 (emphasis added)

- "I think **it's looking pretty dubious that they have a right to those funds**, and **particularly under the circumstances** where Skadden Arps [law firm] apparently particularly is involved and these other criminal defense firms are fully aware of the circumstances here[.]" <u>Exhibit 1</u>, p. 12, lines 10 – 14 (emphasis added)

- The fund was to purchase mobile solar generators. It wasn't to pay all these lawyers and captive funds and all of this, and **it was certainly done in a way that appears surreptitious to me**. It's one day after the Government has seized every asset they can of the Carpoffs. <u>Exhibit 1</u>, p. 10, lines 21 – 24 (emphasis added)

These comments and statements, which erroneously appear to criminally implicate

Strauss with respect to the perceived unlawful $5,000,000 wire transfer, certainly raise objective,

reasonable doubt as to whether Judge Gergel had formed a negative opinion about Strauss and

his integrity. These pejorative comments and statements were based, in part, not on "facts

introduced or events occurring in the course of the current, or of prior proceedings[.]" *Liteky*,

<u>510 U.S. at 555</u>. When coupled with Judge Gergel's extra-judicial investigations and *ex parte*

communications with respect to the Fund 35-EWB Case, at a minimum, these comments and

statements objectively and reasonably put into question the appearance of his impartiality

towards Strauss in the case at bar. As noted by ethics expert Seymour, the "judge's statements

regarding his communications with the bankruptcy judge and his pledge to use the civil case to

assist in marshalling assets for the debtors' creditors would cause a reasonable person to question

his impartiality." <u>Exhibit 4</u> at 9.

## C. UNWARRANTED THREAT OF ARREST

As a further indication of Judge Gergel's actual or perceived prejudice against Strauss and/or apparent lack of impartiality, during the May 6, 2019 hearing in the Fund 35-EWB Case, Judge Gergel indicated that, on three days' notice, he was going to order Strauss to come to court, produce documents and testify.

Judge Gergel then stated as follows:

Let him [Strauss] know that if he seems to have any difficulty getting here, I'm glad to have him escorted by the marshals.  Exhibit 1, p. 13, lines 8 - 10.

At this point in the Fund 35-EWB Case proceedings, there was absolutely no indication that Strauss would not abide by Judge Gergel's instructions or orders for him to attend the May 9th hearing.  Threatening to have the U.S. Marshall's Service "escort" Strauss to attend the hearing was simply a euphemism that he would be arrested.  Such a threat or strong suggestion was not necessary, and serves to underscore, at a minimum, the Judge's perceived prejudice against Strauss.  This threat or strong suggestion, at a minimum, certainly makes the Judge's appearance of impartiality toward Strauss reasonably questionable.

## D. REFERENCES TO, AND RELATIONSHIP WITH, THE U.S. ATTORNEY'S OFFICE

As a further indication of Judge Gergel's actual or perceived prejudice against Strauss and/or apparent lack of impartiality during the Fund 35-EWB Case, Judge Gergel made possessive reference to federal prosecutors attending the May 6, 2019 hearing.  During the said hearing, he stated as follows:  "I don't mind to say that **_my_** head of **_my_** U.S. Attorney's Office is sitting in the back row here right now, and **_there's a lot of Government interest in all of this_**."  Exhibit 1, p.12, lines 10 – 20 (emphasis added).

While Judge Gergel may have made innocent slips in characterizing the federal prosecutor attending the hearing and the federal prosecutor's office as his, the perception that he

has some ownership or close possessive relationship with them certainly raises the specter that his impartiality towards Strauss might reasonably be questioned.  The Judicial Branch and the Executive Branch (i.e., the U.S. Attorney's Office) are meant to be kept separate under the Constitution. Upon information and belief, the prosecutor who Judge Gergel was referencing at the hearing as "my head of my U.S. Attorney's Office" is the same prosecutor who is currently prosecuting Strauss in the case at bar.

Reasonable concerns about impartiality arise because Judge Gergel expressed an indication that he knew that "there's a lot of Government interest in all of this."  Exhibit 1, p.12, line 20.  Such knowledge of the Government's interest in the proceedings certainly reinforces the perception that a close relationship exists between the prosecutor, the prosecutor's office and the Judge.  There are certainly no indications in the docket sheet of the Fund 35-EWB Case that the U.S. Attorney's Office received any formal notice of either the May 6th or May 9th hearings, and the Government was not a party in the action or proceedings.  Given all these circumstances, in addition to the fact that the current U.S. Attorney was also Judge Gergel's law clerk for about five years,[9] Strauss has a legitimate concern that the Judge is biased towards the prosecutors and the U.S. Attorney's Office, and is prejudiced against Strauss.

As noted by ethics expert Seymour, the "perception of personal bias in this matter is heightened due to the judge's expressed affinity or affiliation with the federal prosecutor." Exhibit 4 at 8.

At the very least, Strass is justified in reasonably believing there is an objective appearance of the lack of impartiality.

---

[9] https://www.justice.gov/usao-sc/meet-us-attorney ("From 2013 to 2017, Boroughs clerked for Judge Gergel, where she worked on a number of high-profile cases").

motion for recusal 2023-12-06

## E. TOTALITY OF THE CIRCUMSTANCES

Judge Gergel has previously recused himself from cases when "the public might reasonably believe there is a lack of impartiality." *Sanders v. United States*, C.A. No. 2:16-cv-2356-RMG (D.S.C. Jan. 28, 2020), ECF # 54; *Backus v. State of South Carolina*, C.A. No. 3:11-cv-3120; *United States v. Dong*, C.A. No. 2:11-cr-00510-RMG (Sept. 13, 2012), ECF # 189.

In his *sua sponte* order of recusal in the criminal case of *United States v. Dong*, at ECF # 189, Judge Gergel recognized that the question of recusal should take into consideration the totality of the circumstances. In recusing himself, Judge Gergel stated that "the undersigned … hereby recuses himself pursuant to the provisions of 18 U.S.C. § 455(a) on the basis that ***under the totality of circumstances*** present in this matter ***his 'impartiality might reasonably be questioned*.'" *Id.* (emphasis added)

Ethics expert Seymour opined in her Affidavit (Exhibit 4 at 9-10) as follows:

Canon 3(C)(1) of the Code of Judicial Conduct for U.S. Judges (effective March 12, 2019) states that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned[.]" The Canon goes on to provide some examples of circumstances where such may occur, including "personal bias or prejudice concerning a party[.]" However, the issue of judicial recusal involves more than actual bias and can be required where a judge's "impartiality might reasonably be questioned." This is based on an objective standard whether "a reasonable well informed observer" outside the judiciary "might reasonably question [the judge's] impartiality on the basis of all the circumstances." The purpose of this judicial disqualification standard is to preserve public confidence in the integrity and impartiality of the federal judiciary by requiring recusal where there might be a public perception of a lack of impartiality or fairness by a judge sitting in a particular matter. The question of recusal is broader than the issue of personal bias, extending to the potential appearance of partiality and public confidence in the integrity and fairness of the judicial process. The Court's duty to avoid even an appearance of impartiality must ultimately be decided on an objective standard designed to preserve public confidence in our system of justice. This provision provides an objective standard and does not require a showing of actual bias.

When the factors and circumstances enumerated above are considered in their totality, a reasonable, well-informed observer would objectively question Judge Gergel's impartiality with

respect to Strauss in the case at bar.  As opined by ethics expert Seymour, "the judge's threat to file a disciplinary complaint against Mr. Strauss for asserting his Fifth Amendment rights, in direct contravention of established law; his stated opinions in the civil case that the transactions appeared "'dubious,'" "'surreptitious,'" "'illegal,'" and "'unlawful;'" and, his language suggesting he is in alliance with the U.S. Attorney combine to raise a reasonable question about his impartiality."  Judge Gergel's extra-judicial investigations to obtain information and evidence in the Fund 35-EWB Case, as well as his *ex parte* communications with respect thereto, are additional circumstances which, when taken in their totality, reasonably raise a question as to Judge Gergel's impartiality towards Strauss.  At the very least, in order to avoid an appearance of partiality, Judge Gergel should be recused or disqualified from this case at bar.

Judge Gergel, in the *Dong* case, further stated as follows:

[T]he issue of judicial recusal involves more than actual bias and can be required where a judge's "impartiality might reasonably be questioned." 28 U.S.C. § 455(a). This is based on an objective standard of "a reasonable well informed observer" who is aware of all of the facts and circumstances. *United States v. DeTemple*, 162 F.3d 279, 286 (4th Cir. 1998). The purpose of § 455(a) is to preserve public confidence in the integrity and impartiality of the federal judiciary by requiring recusal where there might be a public perception of a lack of impartiality or fairness by a judge sitting in a particular matter. *See United States v. Bobo*, 323 F. Supp. 2d 1238, 1242 (N.D. Ala. 2004).

Judge Gergel should abide by his previously pronounced standards for recusal and, in an abundance of caution, be disqualified from this proceeding in order to avoid an appearance of impropriety and an appearance of lack of impartiality pursuant to 28 U.S.C. §§ 144 and 455 and the Due Process Clause.

## F.  DISCOVERY IS WARRANTED

Based upon Judge Gergel's above referenced extra-judicial and *ex parte* communications and investigations, discovery is warranted so that "all of the circumstances" surrounding the impartiality analysis are known and the record can be supplemented for appeal.  *In re Kensington*

*International Limited*, No. 03-4212 (3rd Cir. Dec. 18, 2003) (granting discovery on recusal when judge undertook *ex parte* communications because the question is "'whether a reasonable person knowing all the circumstances would harbor doubts concerning the judge's impartiality' — an inquiry which necessarily requires that we know all the circumstances."). Defendant requests such discovery.

## ATTORNEY CERTIFICATION OF GOOD FAITH

The undersigned counsel for the Defendant certifies that this Motion and Defendant's Affidavit are made in good faith.[10]

## CONCLUSION

For the reasons set forth above, as well as any which may be advanced during any subsequent hearing on the Motion, Defendant Strauss respectfully requests that this Motion be granted and that Judge Gergel be recused or disqualified. Defendant Strauss respectfully requests that this Motion be transferred to another District Judge within the District of South Carolina for determination, and discovery be allowed. *Id.*; *Cherry*, 330 F.3d 658 n. 13; *United States v. Heldt*, 668 F. 2d 1238, 1271-72 (D.C. Cir. 1981); 28 U.S.C. § 144.

SO MOVED.

December 6, 2023                    Respectfully submitted,

Charleston, S.C.                   /s/ Joseph P. Griffith, Jr.
                                   Joseph P. Griffith, Jr., Esquire (Fed.I.D. # 2473)
                                   Joe Griffith Law Firm, LLC
                                   946 Johnnie Dodds Boulevard
                                   Mt. Pleasant, South Carolina 29464
                                   (843) 225-5563 (tel)
                                   (843) 722-6254 (fax)
                                   joegriffithjr@hotmail.com
                                   joe@joegriffith.com

---

[10] The undersigned counsel consulted with the Assistant U.S. Attorney handling this case and she has indicated she will oppose this Motion.

www.joegriffith.com

Attorney for Defendant Peter J. Strauss

Exhibits:

<u>Exhibit 1</u>  Transcript of 5/6/2019 hearing
<u>Exhibit 2</u>  Transcript of 5/9/2019 hearing
<u>Exhibit 3</u>  Strauss Affidavit
<u>Exhibit 4</u>  Seymour Affidavit

motion for recusal 2023-12-06

9:19-cv-01176-RMG    Date Filed 05/07/19    Entry Number 27    Page 1 of 16
USCA4 Appeal: 23-2313    Doc: 17    Filed: 12/27/2023    Pg: 86 of 242    Page 1 of 16
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-1    Page 1 of 16

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

```
* * * * * * * * * * * * * * *  *
SOLAR ECLIPSE INVESTMENT FUND  *
XXXV, LLC and EAST WEST BANK   *
                               *
versus                         *    Civil Action No. 9:19-cv-1176
                               *
$5,000,000.00 U.S. DOLLARS     *    May 6, 2019
DEPOSITED TO IOLTA ACCOUNT     *
OF THE STRAUSS LAW FIRM, LLC   *
IN REM, AND THE STRAUSS LAW    *
FIRM, LLC, IN PERSONAM         *
                               *
* * * * * * * * * * * * * * *  *
```

REPORTER'S OFFICIAL TRANSCRIPT OF THE
MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION BEFORE THE
HONORABLE RICHARD M. GERGEL
UNITED STATES DISTRICT JUDGE
MAY 6, 2019

Appearances:

For the Plaintiffs:              Nexsen Pruet
                                 BY:  Cheryl D. Shoun
                                      R. Bruce Wallace
                                 PO Box 486
                                 Charleston, SC  29402
                                 843.577.9440

For Defendant Strauss            Earhart Overstreet
   Law Firm:                     BY:  David Overstreet
                                      Mike McCall
                                 878 Whipple Road
                                 Suite 200
                                 Mt. Pleasant, SC  29464
                                 843.972.9400

Official Court Reporter:         Tana J. Hess, CRR, FCRR, RMR
                                 U.S. District Court Reporter
                                 85 Broad Street
                                 Charleston, SC  29401
                                 843.779.0837
                                 tana_hess@scd.uscourts.gov

Proceedings recorded by mechanical stenography using
computer-aided transcription software.

USCA4 Appeal: 23-1312   Doc: 17      Date Filed: 05/07/19   Entry Number 27   Page 2 of 16
9:23-cr-00833-RMG *SEALED*      Date Filed 12/06/23    Entry Number 26-1    Page 2 of 16

2

|      |                                                                              |
|------|------------------------------------------------------------------------------|
|      | 1    (Call to order of the Court.)                                            |
| 3:58PM | 2    **THE COURT:**  Please be seated.  Okay.  I am convening               |
| 3:58PM | 3  a hearing in the matter of Solar Eclipse Investment Fund XXXV            |
| 3:58PM | 4  LLC, and East West Bank versus $5,000,000.00 U.S. dollars, and          |
| 3:58PM | 5  the Strauss Law Firm, LLC, in personam, 9:19-1176.  It's before          |
| 3:59PM | 6  me -- I have a temporary restraining order I granted, and there         |
| 3:59PM | 7  is a motion by the plaintiff for a preliminary injunction.              |
| 3:59PM | 8    Could counsel for the plaintiff identify                              |
| 3:59PM | 9  themselves for the record, please?                                      |
| 3:59PM | 10   **MS. SHOUN:**  Yes, sir, Your Honor.  Thank you.  I'm               |
| 3:59PM | 11 Cheryl Shoun.  I'm here on behalf of plaintiffs with my partner        |
| 3:59PM | 12 Bruce Wallace.                                                          |
| 3:59PM | 13   **MR. WALLACE:**  Good afternoon, Your Honor.                        |
| 3:59PM | 14   **THE COURT:**  Yes.  And for defense?                               |
| 3:59PM | 15   **MR. OVERSTREET:**  Your Honor, David Overstreet                    |
| 3:59PM | 16 represents Strauss Law Firm here with Mike McCall.                      |
| 3:59PM | 17   **THE COURT:**  And for the record, no one from the                  |
| 3:59PM | 18 Strauss Law Firm is here; is that correct?                              |
| 3:59PM | 19   **MR. OVERSTREET:**  That's correct, Your Honor.  I'm               |
| 3:59PM | 20 here for them.                                                          |
| 3:59PM | 21   **THE COURT:**  Okay.  Now, the response I received from             |
| 3:59PM | 22 the -- from the Defendant Strauss Law Firm was that it was not         |
| 3:59PM | 23 going to contest the entry of a preliminary injunction, but --         |
| 4:00PM | 24 and it represented that -- that the $5 million had come into           |
| 4:00PM | 25 its account and had departed; is that correct?                          |

4:00PM  1          **MR. OVERSTREET:**  Yes, Your Honor.

4:00PM  2          **THE COURT:**  And, Mr. Overstreet, as I understand the

4:00PM  3   situation here, funds were transferred from this Solar Eclipse

4:00PM  4   Investment Fund XXXV, LLC to the Strauss Law Firm; is that

4:00PM  5   correct?  Was it directly from the fund -- I'll call that "the

4:00PM  6   fund" -- to the Strauss Law Firm?

4:00PM  7          **MR. OVERSTREET:**  I apologize, Your Honor.  I'm not

4:00PM  8   sure of the particulars; only that the 5 million did come to

4:00PM  9   the Strauss Law Firm Iolta.

4:00PM  10         **THE COURT:**  You're not sure where it came from?

4:00PM  11         **MR. OVERSTREET:**  We do have a copy of the wire for

4:00PM  12  that night.

4:00PM  13         **MR. MCCALL:**  I believe, Your Honor, that the funds

4:00PM  14  did come from an account that was in the name of Solar.

4:01PM  15         **THE COURT:**  So it's -- it's the Solar account and

4:01PM  16  then into the Strauss Law Firm?

4:01PM  17         **MR. MCCALL:**  Correct, Your Honor.

4:01PM  18         **THE COURT:**  And to your knowledge, had the Strauss

4:01PM  19  Law Firm been a normal recipient of funds from that account?

4:01PM  20         **MR. OVERSTREET:**  Yes, Your Honor, I do believe

4:01PM  21  Strauss Law Firm had received funds from them in the past to

4:01PM  22  the Iolta.

4:01PM  23         **THE COURT:**  From the Solar Eclipse Investment Fund

4:01PM  24  XXXV?

4:01PM  25         **MR. OVERSTREET:**  I'm not aware of that, Judge.  I

9:19-cv-01176-RMG    Date Filed 05/07/19    Entry Number 27    Page 4 of 16
USCA4 Appeal: 23-3313    Doc: 17    Filed: 12/27/2023    Pg: 89 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-1    Page 4 of 16
4

| | | |
|---|---|---|
| 4:01PM | 1 | don't know the answer to that. |
| 4:01PM | 2 | THE COURT:  So where would they have gotten funds |
| 4:01PM | 3 | from? |
| 4:01PM | 4 | MR. OVERSTREET:  I just know they had an ongoing |
| 4:01PM | 5 | relationship with the Carpoffs and their entities. |
| 4:01PM | 6 | THE COURT:  The Carpoffs.  And could you state who |
| 4:01PM | 7 | they are? |
| 4:01PM | 8 | MR. OVERSTREET:  My understanding is they own DC |
| 4:01PM | 9 | Solar. |
| 4:01PM | 10 | THE COURT:  Okay.  So -- so there was a personal |
| 4:01PM | 11 | relationship between Carpoff -- the Carpoffs and the Strauss |
| 4:01PM | 12 | Law Firm? |
| 4:01PM | 13 | MR. OVERSTREET:  Attorney-client relationship, yes, |
| 4:01PM | 14 | Your Honor. |
| 4:01PM | 15 | THE COURT:  Okay.  And had the -- and what were the |
| 4:02PM | 16 | Carpoffs' role in transferring this $5 million from this -- |
| 4:02PM | 17 | this fund to the Strauss Law Firm? |
| 4:02PM | 18 | MR. OVERSTREET:  I'm sorry, Judge.  What was their |
| 4:02PM | 19 | role? |
| 4:02PM | 20 | THE COURT:  What was the role of the Carpoffs |
| 4:02PM | 21 | personally in transferring those funds? |
| 4:02PM | 22 | MR. OVERSTREET:  I'm sorry, Judge.  I'm unaware of |
| 4:02PM | 23 | that.  I don't know. |
| 4:02PM | 24 | THE COURT:  You don't know.  Who directed the money |
| 4:02PM | 25 | to come to the Strauss Law Firm? |

9:19-cv-01176-RMG    Date Filed 05/07/19    Entry Number 27    Page 5 of 16
USCA4 Appeal: 23-2313    Doc: 17    Filed: 12/12/2023    Pg: 90 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-1    Page 5 of 16

5

4:02PM   1         **MR. OVERSTREET:** My understanding, Judge, is that

4:02PM   2  Mr. Strauss was not aware that the money was going to come.

4:02PM   3         **THE COURT:** So how did he even learn of it?

4:02PM   4         **MR. OVERSTREET:** It hit his account.

4:02PM   5         **THE COURT:** Well, and then did he communicate with

4:02PM   6  somebody?

4:02PM   7         **MR. OVERSTREET:** Yes, Your Honor.

4:02PM   8         **THE COURT:** And who did he communicate with?

4:02PM   9         **MR. OVERSTREET:** My understanding is he spoke with

4:02PM 10  Mr. Carpoff.

4:02PM 11         **THE COURT:** Mr. Carpoff?

4:02PM 12         **MR. OVERSTREET:** I think so.

4:02PM 13         **THE COURT:** And are there any written instructions

4:02PM 14  from Mr. Carpoff or anyone else about where to distribute this

4:02PM 15  $5 million?

4:02PM 16         **MR. OVERSTREET:** I do believe, Your Honor, there is

4:02PM 17  some email correspondence that we can certainly pull and hand

4:02PM 18  to the other side regarding the distribution of the funds.

4:03PM 19         **THE COURT:** And was that your understanding from

4:03PM 20  Mr. Carpoff to Mr. Strauss?

4:03PM 21         **MR. OVERSTREET:** I believe so, Your Honor.

4:03PM 22         **THE COURT:** Okay. And did that detail where these

4:03PM 23  amounts were to go? I mean, how would Mr. Strauss know where

4:03PM 24  to send the money?

4:03PM 25         **MR. OVERSTREET:** I believe he was invoiced from a

9:19-cv-01176-RMG    Date Filed 05/07/19    Entry Number 27    Page 6 of 16
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-1    Page 6 of 16

6

| | | |
|---|---|---|
| 4:03PM | 1 | number of entities. |
| 4:03PM | 2 | THE COURT:  How did they know that he would have the |
| 4:03PM | 3 | money? |
| 4:03PM | 4 | MR. OVERSTREET:  I don't know that, Your Honor.  I |
| 4:03PM | 5 | assume Mr. Carpoff and his entities retained those other |
| 4:03PM | 6 | entities, which as we discussed were law firms. |
| 4:03PM | 7 | THE COURT:  Okay.  Well, some of them are law firms. |
| 4:03PM | 8 | Not all of them.  Let's go through those.  $2 million went to |
| 4:03PM | 9 | the Skadden Arps Law Firm? |
| 4:03PM | 10 | MR. OVERSTREET:  Yes, Your Honor.  That's my |
| 4:03PM | 11 | understanding. |
| 4:03PM | 12 | THE COURT:  And we have met in chambers, so I know a |
| 4:03PM | 13 | little bit about this from you, Mr. Overstreet, and my |
| 4:03PM | 14 | understanding is that Skadden Arps represented one of the |
| 4:03PM | 15 | Carpoffs for about six hours; is that correct? |
| 4:04PM | 16 | MR. MCCALL:  Your Honor, I believe that Skadden |
| 4:04PM | 17 | represented Mr. Carpoff for a month approximately and then |
| 4:04PM | 18 | Mrs. Carpoff for the better part of a day on the day of the |
| 4:04PM | 19 | seizure, and I believe they've also been engaged by DC Solar in |
| 4:04PM | 20 | various capacities over several years. |
| 4:04PM | 21 | THE COURT:  Okay.  And the $2 million is in the |
| 4:04PM | 22 | Skadden Arps account?  Is that what you understand? |
| 4:04PM | 23 | MR. MCCALL:  That's my understanding. |
| 4:04PM | 24 | THE COURT:  And are they holding it?  Have they |
| 4:04PM | 25 | expended those moneys? |

9:19-cv-01176-RMG    Date Filed 05/07/19    Entry Number 27    Page 7 of 16
USCA4 Appeal: 23-3313    Doc: 17    Filed: 12/12/2025    Pg: 92 of 242    Page 7 of 16
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-1    Page 7 of 16
7

| | | |
|---|---|---|
| 4:04PM | 1 | MR. MCCALL:  My understanding, Your Honor, is that |
| 4:04PM | 2 | those funds are currently sitting in an interest-bearing |
| 4:04PM | 3 | account, all of them. |
| 4:04PM | 4 | THE COURT:  And is -- by the way, was Mr. Strauss |
| 4:04PM | 5 | aware the day before these moneys were transferred that the |
| 4:04PM | 6 | Federal Government had executed search warrants and seizure |
| 4:04PM | 7 | warrants and had seized all of the assets of the Carpoffs and |
| 4:04PM | 8 | DC Solar?  Was he aware of that? |
| 4:04PM | 9 | MR. OVERSTREET:  I don't know, Your Honor. |
| 4:05PM | 10 | THE COURT:  And then there's something called Paul |
| 4:05PM | 11 | Meltzer, a professional corporation in Santa Cruz, California. |
| 4:05PM | 12 | What is that?  $500,000. |
| 4:05PM | 13 | MR. MCCALL:  Our understanding, Your Honor, is |
| 4:05PM | 14 | Mr. Meltzer is a criminal defense attorney in California who |
| 4:05PM | 15 | represents either Mr. or Mrs. Carpoff. |
| 4:05PM | 16 | THE COURT:  Okay.  And then there is a $750,000 |
| 4:05PM | 17 | payment to Worldwide Property and Casual Ltd. SAC.  What is |
| 4:05PM | 18 | that? |
| 4:05PM | 19 | MR. MCCALL:  Your Honor, that is -- that is a portion |
| 4:05PM | 20 | of a premium owed for Mr. Carpoff's captive insurance company, |
| 4:05PM | 21 | Bay Shore Select, for the upcoming year. |
| 4:05PM | 22 | THE COURT:  And who manages that Worldwide Property |
| 4:05PM | 23 | and Casualty Ltd. SAC? |
| 4:06PM | 24 | MR. MCCALL:  Who manages it? |
| 4:06PM | 25 | THE COURT:  Yes. |

USCA4 Appeal: 23-2313    Doc: 17    Filed: 12/07/2023    Pg: 93 of 242

9:19-cv-01176-RMG    Date Filed 05/07/19    Entry Number 27    Page 8 of 16
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-1    Page 8 of 16

8

4:06PM  1          **MR. MCCALL:**  I mean, I don't know if manage is the

4:06PM  2    appropriate term, but I can represent to the Court that the

4:06PM  3    Strauss Law Firm -- or Peter Strauss certainly has control

4:06PM  4    over --

4:06PM  5          **THE COURT:**  Has control over that fund, that

4:06PM  6    $750,000?

4:06PM  7          **MR. MCCALL:**  Correct.  And the same would be true for

4:06PM  8    the next $750,000.

4:06PM  9          **THE COURT:**  Madison First Property and Casualty,

4:06PM  10   another $750,000.  And so Mr. Strauss transferred those funds

4:06PM  11   that had come out of this investment fund to those accounts?

4:06PM  12         **MR. MCCALL:**  Correct, Your Honor, for premiums for

4:06PM  13   the two captive insurance companies.

4:06PM  14         **THE COURT:**  And these were captive insurance

4:06PM  15   companies.  These were not DC Solar.  This was something else?

4:06PM  16         **MR. MCCALL:**  I believe they are DC Solar affiliated.

4:06PM  17   I believe that DC Solar Solutions is the insured for one of the

4:06PM  18   captives, and then DC Solar Distributors is the insured for one

4:06PM  19   of the --

4:07PM  20         **THE COURT:**  Those are separate entities?

4:07PM  21         **MR. MCCALL:**  Correct, Your Honor.

4:07PM  22         **THE COURT:**  Yes, sir.  I thought so.

4:07PM  23         **MR. MCCALL:**  One is owned by Mr. Carpoff.  One is

4:07PM  24   owned by Mrs. Carpoff.

4:07PM  25         **THE COURT:**  And then the Law Office of Daniel Bakondi

USCA4 Appeal: 23-3313   Doc: 17      Date Filed: 05/07/19   Entry Number 27   Page 9 of 16
9:23-cr-00833-RMG *SEALED*      Date Filed 12/06/23   Entry Number 26-1   Page 9 of 16

9

| | | |
|---|---|---|
| 4:07PM | 1 | in San Francisco.  Who is that?  $250,000. |
| 4:07PM | 2 | MR. MCCALL:  Your Honor, we were not -- we haven't |
| 4:07PM | 3 | been able to find out exactly who Mr. Bakondi represents in |
| 4:07PM | 4 | this, but it's our understanding it's one of the Carpoffs in |
| 4:07PM | 5 | some connection with the ongoing investigation. |
| 4:07PM | 6 | THE COURT:  Clark Hill PLLC LLC in Las Vegas. |
| 4:07PM | 7 | $275,000.  What's that? |
| 4:07PM | 8 | MR. MCCALL:  That's law firm in Las Vegas, Your |
| 4:07PM | 9 | Honor, that is the lead bankruptcy counsel for DC Solar and |
| 4:07PM | 10 | affiliated entities. |
| 4:07PM | 11 | THE COURT:  And then Segal and Associates Client |
| 4:07PM | 12 | Trust Account in Sacramento, 250,000.  What's that? |
| 4:07PM | 13 | MR. MCCALL:  That is an engagement, a retainer for an |
| 4:07PM | 14 | attorney, another criminal defense attorney in California named |
| 4:08PM | 15 | Malcolm Segal who represents I believe Mr. Carpoff in the |
| 4:08PM | 16 | criminal matters. |
| 4:08PM | 17 | THE COURT:  Then $175,000 to BR -- BRGR Revenue |
| 4:08PM | 18 | Depository.  What is that? |
| 4:08PM | 19 | MR. MCCALL:  That is GlassRatner, Your Honor, which |
| 4:08PM | 20 | is the -- a gentleman at GlassRatner named Seth Freeman was |
| 4:08PM | 21 | appointed as the chief restructuring officer for DC Solar, and |
| 4:08PM | 22 | that was his retainer. |
| 4:08PM | 23 | THE COURT:  And then $50,000 to BH Capital Ventures |
| 4:08PM | 24 | LLC.  What is that? |
| 4:08PM | 25 | MR. MCCALL:  We haven't -- we haven't found exactly |

4:08PM    1    what BH Capital Ventures is, but our understanding is they have

4:08PM    2    some involvement in some real estate assets that they were

4:08PM    3    attempting to sell when the bankruptcy was in Chapter 11 before

4:08PM    4    it was converted into Chapter 7.

4:08PM    5            THE COURT: Well, bankruptcy wasn't filed until

4:08PM    6    February, and these were made in December.

4:09PM    7            MR. MCCALL: I believe the last two were made on

4:09PM    8    February 1st.

4:09PM    9            THE COURT: Oh, I see.

4:09PM    10            MR. MCCALL: And so --

4:09PM    11            THE COURT: Still before the bankruptcy filing.

4:09PM    12            MR. MCCALL: I believe it might have been the day of,

4:09PM    13    Your Honor, and I believe they're somehow connected with some

4:09PM    14    real estate transactions that they were trying to carry out in

4:09PM    15    the bankruptcy.

4:09PM    16            THE COURT: Well, here is my concern. From the

4:09PM    17    information I have, it appears that the $5 million transfer to

4:09PM    18    the Strauss Law Firm is likely an illegal transfer, and those

4:09PM    19    recipients are in receipt of funds that should not have gone to

4:09PM    20    them from this fund. The fund was to purchase mobile solar

4:09PM    21    generators. It wasn't to pay all these lawyers and captive

4:09PM    22    funds and all of this, and it was certainly done in a way that

4:09PM    23    appears surreptitious to me. It's one day after the Government

4:09PM    24    has seized every asset they can of the Carpoffs.

4:10PM    25              So there's a source of concern by the Court

9:19-cv-01176-RMG    Date Filed 05/07/19    Entry Number 27    Page 11 of 16
USCA4 Appeal: 23-231    Doc: 17    Filed: 12/22/2023    Pg: 96 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-1    Page 11 of 16

11

4:10 PM 1    about all of this, and I've asked you a lot of questions I

4:10 PM 2    understand y'all can't answer for me.  You just don't know the

4:10 PM 3    answer.  So I'm going to order this -- well, I'll schedule this

4:10 PM 4    sometime Thursday.  I'll going to order Mr. Strauss into the

4:10 PM 5    Court here, and I'm going to order him to produce all the

4:10 PM 6    documents related to the instructions he received for these

4:10 PM 7    transfers.

4:10 PM 8            I'm also going to extend the TRO to all of these

4:10 PM 9    entities, and I'm going to offer them the opportunity to come

4:10 PM 10   in to be heard on the preliminary injunction.  I anticipate --

4:10 PM 11   I don't think it takes a crystal ball -- that the plaintiff is

4:10 PM 12   likely to add them as parties; is that fair, Ms. Shoun?

4:10 PM 13           MS. SHOUN:  Yes, sir, Your Honor, that is absolutely

4:10 PM 14   fair.

4:10 PM 15           THE COURT:  And, you know, the easy way to do this is

4:10 PM 16   simply to repatriate the moneys if there's some legal question

4:10 PM 17   about it, and we'll set up a way in which that can be done to

4:11 PM 18   the Court.  I would urge you to go ahead and talk to

4:11 PM 19   Mr. Strauss about that captive premium.  And, you know, to the

4:11 PM 20   extent that the $5 million is repatriated, this Court doesn't

4:11 PM 21   have any further jurisdiction.

4:11 PM 22           I'll say on the record, I have been in

4:11 PM 23   communication with the Bankruptcy Court.  It does not appear

4:11 PM 24   that this -- this liability, this obligation, this debt is

4:11 PM 25   listed as a liability.  They're not listed as creditors in the

USCA4 Appeal: 23-2312    Doc: 17       Date Filed: 05/07/19    Entry Number: 27    Page 12 of 16
9:23-cr-00833-RMG *SEALED*       Date Filed: 12/06/23    Entry Number: 26-1    Page 12 of 16

12

| | |
|---|---|
| 4:11 PM | 1 |
| 4:11 PM | 2 |
| 4:11 PM | 3 |
| 4:11 PM | 4 |
| 4:11 PM | 5 |

1  bankruptcy.  I've spoken to Judge Beasley about this.  He has

2  asked me do what I can to repatriate these funds, and then once

3  we do that, we'll sort out between the two courts about whether

4  this is an asset of the bankruptcy or not.  I don't know the

5  answer to that, but we'll need to get further evidence.

6         But right at this moment, I think the most

7  urgent thing is to -- is to restore the status quo, and to the

8  extent these law firms think they have some lawful entitlement

9  to it, they can come here and litigate that issue if they wish

10  before me.  I think it's looking pretty dubious that they have

11  a right to those funds, and particularly under the

12  circumstances where Skadden Arps apparently particularly is

13  involved and these other criminal defense firms are fully aware

14  of the circumstances here, that there has been -- I mean, the

15  press accounts, there were dozens of FBI agents circling the

16  Carpoffs home.  Judge Beasley tells me that every hearing he

17  has, he has SEC investigators and FBI agents sitting in the

18  audience, and I don't mind to say that my head of my U.S.

19  Attorneys Office is sitting in the back row here right now, and

20  there's a lot of Government interest in all of this.

21         So I don't have any desire to put more on my

22  plate than I need, but I'm going to -- I feel like the

23  plaintiffs have a legitimate claim to these funds, at least

24  what I've heard so far, and my job is to try to restore the

25  status quo to this, and then we can sort out who actually owns

9:19-cv-01176-RMG   Date Filed 05/07/19   Entry Number 27   Page 13 of 16
9:23-cr-00833-RMG *SEALED*   Date Filed 12/06/23   Entry Number 26-1   Page 13 of 16

13

| | | |
|---|---|---|
| 4:13PM | 1 | the money.  Does that make sense to everybody? |
| 4:13PM | 2 | MS. SHOUN:  Yes, sir, Your Honor. |
| 4:13PM | 3 | THE COURT:  Mr. Overstreet, do you anticipate any |
| 4:13PM | 4 | problem having Mr. Strauss appear on Thursday? |
| 4:13PM | 5 | MR. OVERSTREET:  Your Honor, I will call him when we |
| 4:13PM | 6 | walk out of the courtroom.  My understanding is he was in |
| 4:13PM | 7 | Hilton Head when we spoke earlier, so I don't see that -- |
| 4:13PM | 8 | THE COURT:  Let him know that if he seems to have any |
| 4:13PM | 9 | difficulty getting here, I'm glad to have him escorted by the |
| 4:13PM | 10 | marshals. |
| 4:13PM | 11 | MR. OVERSTREET:  Yes, sir. |
| 4:13PM | 12 | THE COURT:  Okay? |
| 4:13PM | 13 | MR. OVERSTREET:  Your Honor, if I could briefly add |
| 4:13PM | 14 | one thing, my firm had some concern at the very beginning about |
| 4:13PM | 15 | whether or not releasing the information related to the |
| 4:13PM | 16 | distribution of these funds from the Iolta would in any way be |
| 4:13PM | 17 | privileged.  We'd be -- |
| 4:13PM | 18 | THE COURT:  Mr. Overstreet, you raised that with me. |
| 4:13PM | 19 | MR. OVERSTREET:  Yes, Your Honor. |
| 4:13PM | 20 | THE COURT:  And I told you, and I will say on the |
| 4:13PM | 21 | record that these are not protected, attorney-client privilege. |
| 4:13PM | 22 | These transactions appear to be unlawful.  They would not be |
| 4:13PM | 23 | protected by privilege, and he appears -- it's not quite clear |
| 4:13PM | 24 | what capacity Mr. Strauss actually received these funds since |
| 4:14PM | 25 | he's taking some of the funds himself and putting them in |

USCA4 Appeal: 23-3314    Doc: 17    Filed: 12/23/2025    Pg: 99 of 242    Page 14 of 16
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-1    Page 14 of 16

14

4:14 PM    1    accounts he controls.

4:14 PM    2            Ms. Shoun, do you have anything else you wish to

4:14 PM    3    add in terms of the Court --

4:14 PM    4        MS. SHOUN:  Your Honor, only one matter of logistics,

4:14 PM    5    and that would be the service of the TRO as it will be extended

4:14 PM    6    to these third parties.

4:14 PM    7        THE COURT:  Yeah, let's talk about that for a minute.

4:14 PM    8    As a practical matter, I -- I will try to get something out

4:14 PM    9    this afternoon if that is possible and on the record.  I will

4:14 PM   10    ask and direct both counsel to do everything possible to

4:14 PM   11    communicate with each of these entities, to allow them to

4:14 PM   12    number 1, be advised that those funds are restrained pending

4:14 PM   13    further action of the Court, and I'm going to afford them the

4:14 PM   14    opportunity to appear on Thursday, if they wish, before I

4:14 PM   15    extend the preliminary injunction to them, and then I will

4:14 PM   16    afford them further opportunity to address this issue with the

4:15 PM   17    Court.

4:15 PM   18            But what we're going to do is we're going to

4:15 PM   19    restore the fund's support, and then if there's a claim to it,

4:15 PM   20    we'll sort out among these various parties about who has a

4:15 PM   21    legitimate claim to these funds.

4:15 PM   22        MS. SHOUN:  Your Honor, we are not in receipt of the

4:15 PM   23    documents from which counsel I suppose and Your Honor is

4:15 PM   24    reading.

4:15 PM   25        THE COURT:  Would you, Mr. Overstreet, hand Ms. Shoun

| 4:15PM | 1 | those documents now? |
| 4:15PM | 2 | MS. SHOUN: Thank you. |
| 4:15PM | 3 | THE COURT: And I will before the end of the day |
| 4:15PM | 4 | notice the hearing for Thursday. We'll come back and do that, |
| 4:15PM | 5 | and we'll enter an order in just a few minutes. |
| 4:15PM | 6 | Ms. Shoun, anything else I need to do at this |
| 4:15PM | 7 | point from the plaintiff? |
| 4:15PM | 8 | MS. SHOUN: Beg the Court's indulgence, Your Honor. |
| 4:15PM | 9 | (Pause.) |
| 4:15PM | 10 | MS. SHOUN: Nothing, Your Honor. Thank you. |
| 4:15PM | 11 | THE COURT: Mr. Overstreet, anything further? |
| 4:15PM | 12 | MR. OVERSTREET: No, sir. Thank you, Your Honor. |
| 4:15PM | 13 | THE COURT: Very good. And, Mr. Overstreet, I don't |
| 4:15PM | 14 | have even the slightest suggestion that you or your law firm |
| 4:15PM | 15 | have done anything untoward here. It's quite clear you've come |
| 4:15PM | 16 | in at a very late hour, and you've done everything you can to |
| 4:15PM | 17 | try to straighten this out, and I appreciate that. And |
| 4:16PM | 18 | we'll -- you know, if something inappropriate has happened, |
| 4:16PM | 19 | it's not involved your law firm. |
| 4:16PM | 20 | MR. OVERSTREET: Thank you, Your Honor. |
| 4:16PM | 21 | MR. MCCALL: Thank you, Your Honor. |
| 4:16PM | 22 | THE COURT: Thank you very much. This hearing is |
| 4:16PM | 23 | adjourned. |
| 4:16PM | 24 | MS. SHOUN: Thank you, Your Honor. |
| | 25 | |

9:19-cv-01176-RMG   Date Filed 05/07/19   Entry Number 27   Page 16 of 16
9:23-cr-00833-RMG *SEALED*   Date Filed 12/06/23   Entry Number 26-1   Page 16 of 16
USCA4 Appeal: 23-231 ... Doc: 17 ... Filed: 12/21/2023 ... Pg: 101 of 242
16

1                          * * * * * * * *

2                            **CERTIFICATE**

3            I, Tana J. Hess, CCR, FCRR, Official Court Reporter

4     for the United States District Court, District of South

5     Carolina, certify that the foregoing is a true and correct

6     transcript, to the best of my ability and understanding, from

7     the record of proceedings in the above-entitled matter.

8

9

10                          _____
                            Tana J. Hess, CRR, FCRR, RMR
11                          Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

```
* * * * * * * * * * * * * *  *
SOLAR ECLIPSE INVESTMENT FUND *
XXXV, LLC and EAST WEST BANK  *
                              *
versus                        *    Civil Action No. 9:19-cv-1176
                              *
$5,000,000.00 U.S. DOLLARS    *    May 9, 2019
DEPOSITED TO IOLTA ACCOUNT    *
OF THE STRAUSS LAW FIRM, LLC  *
IN REM, AND THE STRAUSS LAW   *
FIRM, LLC, IN PERSONAM        *
                              *
* * * * * * * * * * * * * *  *
```

REPORTER'S OFFICIAL TRANSCRIPT OF THE
MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION BEFORE THE
HONORABLE RICHARD M. GERGEL
UNITED STATES DISTRICT JUDGE
MAY 9, 2019

Appearances:

For the Plaintiffs:           Nexsen Pruet
                              BY:  Cheryl D. Shoun
                                   R. Bruce Wallace
                                   Val H. Stieglitz
                                   J. Ronald Jones, Jr.
                              PO Box 486
                              Charleston, SC  29402
                              843.577.9440


For Defendant Strauss         Earhart Overstreet
   Law Firm                   BY:  David Overstreet
                              878 Whipple Road
                              Suite 200
                              Mt. Pleasant, SC  29464
                              843.972.9400


For Recipients Hamilton       Allen Legal
   Captive Management LLC,     BY:  Samuel K. Allen
   Worldwide Property          1417 Ashley River Road
   Casualty, and Madison       Charleston, SC  29407
   First Property Casualty     843.481.4000

Appearances:

For Recipients Skadden Arps      Nelson Mullins Riley
    Slate Meagher & Flom             and Scarborough
    LLP, Clark Hill PLC,          BY:  Patrick Coleman Wooten
    GlassRatner Advisory &        151 Meeting Street
    Capital Group LLC, Law        Sixth Floor
    Offices of Paul Meltzer,      Charleston, SC   29401
    and Segal & Associates        843.534.4102

For Recipient BH Capital         Graybill Lansche & Vinzani LLC
    Ventures LLC                  BY:  Jake S. Barker
                                  225 Seven Farms Drive
                                  Suite 207
                                  Charleston, SC   29492
                                  843.408.4063

Parties present via telephone:

                                 Jeff Hartman
                                 Don Gaffney
                                 Candace Carlyon
                                 Curtis Jung
                                 Maita Prout
                                 Annie Li

Official Court Reporter:         Tana J. Hess, CRR, FCRR, RMR
                                 U.S. District Court Reporter
                                 85 Broad Street
                                 Charleston, SC   29401
                                 843.779.0837
                                 tana_hess@scd.uscourts.gov

Proceedings recorded by mechanical stenography using
computer-aided transcription software.

| | INDEX | |
|---|---|---|
| **NAME** | | **PAGE** |
| Peter Strauss | | |
| Examination by the Court | | 8 |
| Cross-Examination by Ms. Shoun | | 12 |

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 105 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 4 of 72

4

| | | |
|---|---|---|
| 11:55 | 1 | (Call to order of the Court.) |
| 11:56 | 2 | **THE COURT:**  Good morning.  Please be seated. |
| 11:56 | 3 | **MS. SHOUN:**  Good morning, Your Honor. |
| 11:56 | 4 | **THE COURT:**  Ms. Perry, we have folks on line as |
| 11:56 | 5 | well -- |
| 11:56 | 6 | **COURTROOM DEPUTY:**  Yes, Your Honor. |
| 11:56 | 7 | **THE COURT:**  -- on the telephone?  Okay.  Okay. |
| 11:56 | 8 | Let's -- this is a -- the matter of Solar Eclipse Investment |
| 11:56 | 9 | Fund XXXV versus $5,000,000.00 and the Strauss Law Firm. |
| 11:56 | 10 | Could counsel identify themselves for the |
| 11:56 | 11 | record, please? |
| 11:56 | 12 | **MS. SHOUN:**  Yes, sir, Your Honor.  Thank you.  I'm |
| 11:56 | 13 | Cheryl Shoun with Nexsen Pruet here on behalf of the |
| 11:57 | 14 | plaintiffs.  Sitting at counsel table with me is my partner, |
| 11:57 | 15 | Bruce Wallace.  Also present, Your Honor, from Nexsen Pruet on |
| 11:57 | 16 | behalf of the plaintiffs is Val Stieglitz, and -- who is also |
| 11:57 | 17 | on the complaint on behalf of the plaintiffs, and Ron Jones, |
| 11:57 | 18 | who has not made a formal appearance, but we'd ask the Court |
| 11:57 | 19 | note his appearance here today. |
| 11:57 | 20 | **THE COURT:**  Note his appearance as well, yes. |
| 11:57 | 21 | **MS. SHOUN:**  Thank you, Your Honor. |
| 11:57 | 22 | **THE COURT:**  Very good. |
| 11:57 | 23 | **MR. OVERSTREET:**  Thank you, Your Honor.  David |
| 11:57 | 24 | Overstreet representing the Strauss Law Firm. |
| 11:57 | 25 | **THE COURT:**  Yes. |

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 106 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 5 of 72

5

11:57  1    **MR. ALLEN:**  Yes, Your Honor.  Sam Allen on behalf of

11:57  2  Hamilton Captive Management LLC, which is a South Carolina

11:57  3  company.  Also as the agent at this point in time for Worldwide

11:57  4  Property Casualty and Madison First Property Casualty, which

11:57  5  are both bohemian companies.

11:57  6    **THE COURT:**  These are recipients?

11:57  7    **MR. ALLEN:**  They are, Your Honor.

11:57  8    **THE COURT:**  Okay.  Others representing recipients?

11:57  9    **MR. WOOTEN:**  Your Honor, Patrick Wooten here on

11:57  10  behalf of several of the recipients:  Skadden, Clark Hill,

11:57  11  GlassRatner, the Law Offices of Paul Meltzer, and Segal and

11:58  12  Associates.

11:58  13    **THE COURT:**  Okay.

11:58  14    **MR. BARKER:**  Good morning, Your Honor.  Jacob Barker

11:58  15  here on behalf of BH Capital Ventures LLC, one of the

11:58  16  recipients.

11:58  17    **THE COURT:**  Okay.  Well, folks, we certainly seem to

11:58  18  have attracted a little bit of attention.  Now, there are some

11:58  19  folks online.  Could folks online identify themselves?

11:58  20    **MR. HARTMAN:**  Your Honor, this is Jeff Hartman in

11:58  21  Reno representing Christine Lovato in the DC Solar Solutions

11:58  22  case.

11:58  23    **THE COURT:**  Very good.  Thank you.

11:58  24    **UNIDENTIFIED FEMALE SPEAKER:**  Good morning, Your

11:58  25  Honor.  This is --

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 107 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 6 of 72

6

1          THE COURT:  Please say that again.

2          MR. GAFFNEY:  Your Honor, this is Don Gaffney of the

3  Snell and Wilmer Law Firm in Phoenix, Arizona, representing

4  Solarmore, a representative of approximately 20 investment

5  funds.

6          THE COURT:  Okay.

7          MS. CARLYON:  Good morning, Your Honor.  Candace

8  Carlyon at Clark Hill PLC.

9          THE COURT:  Okay.  Anyone else?

10          MR. JUNG:  Yes, good morning, Your Honor.  This is --

11          THE COURT:  Go ahead.

12          MR. JUNG:  This is Curtis Jung.  This is Curtis Jung

13  on behalf of the plaintiff, Solar Eclipse Investment Fund XXXV.

14          THE COURT:  Okay.

15          MS. PROUT:  This is Maita Prout, Deputy General

16  Counsel of East West Bank.

17          THE COURT:  Anyone else?

18          MS. LI:  Good morning, Your Honor.  This is Annie Li

19  from Skadden Arps.

20          THE COURT:  Okay.  Anyone else?

21          Okay.  Folks, I have been -- the purpose of this

22  particular hearing was that I had a hearing several days ago on

23  the 6th of May, and defense counsel appeared and was able to

24  answer some of my questions, but indicated on others that he

25  would have to defer to his client to answer questions.  I'm

USCA4 Appeal: 23-2312    Doc: 17      Filed: 12/27/2023    Pg: 108 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 7 of 72

7

12:00  1    trying to sort out here a sort of threshold question, initially

12:00  2    a threshold question, and that is whether these funds, the $5

12:00  3    million which is the subject of this litigation, was ever

12:00  4    taken -- taken under the control of DC Solar, or did it go from

12:00  5    the investment fund directly to some other third party and not

12:00  6    DC Solar?  That obviously has potential relevance to the

12:00  7    jurisdiction of this Court, the jurisdiction of the Bankruptcy

12:00  8    Court.  And I was hoping that Mr. Strauss might appear and

12:01  9    provide us more detail about exactly how this transaction

12:01  10   occurred.  We know that it came from the -- it's the plaintiff.

12:01  11   I'm going to call it "the fund".  This is Solar Eclipse

12:01  12   Investment Fund XXXV.  I'll call it "the fund" here.  How it

12:01  13   got from the fund to Mr. Strauss' law firm, and what we can

12:01  14   talk about in terms of instructions you received, who gave

12:01  15   those instructions.  So who facilitated the transfer?  Who gave

12:01  16   instructions for the disbursal to these recipients?

12:01  17                And all of that is at least at this stage trying

12:01  18   to sort out whether this was ever an asset of DC Solar and went

12:02  19   into the accounts of DC Solar, or did it go -- or was it in

12:02  20   some way taken by someone, transferred to a third party.  We'll

12:02  21   see who that is; and whether that would then take it outside of

12:02  22   the bankruptcy estate.  I'm not reaching a conclusion that it

12:02  23   would.  I don't know -- literally, I'm telling you I don't know

12:02  24   the answer to this.

12:02  25                So if I could ask -- initially what I intend to

9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 8 of 72

8

| | |
|---|---|
| 12:02 | 1 |

do is put Mr. Strauss on the stand.  Put him under oath, put

him on the stand.  I intend to ask some questions, and then the

parties to the lawsuit may ask questions as well.

        So, Mr. Strauss, if you would approach my

courtroom deputy, and she will administer the oath.

      **THE COURTROOM DEPUTY:**  Place your left hand on the

Bible and raise your right hand.  Please state your full name.

      **THE WITNESS:**  Peter Joseph Strauss.

            (Witness sworn.)

      **COURTROOM DEPUTY:**  Thank you.  Please take the stand.

         **PETER JOSEPH STRAUSS,**

a witness called by the Court, being first duly sworn, was

examined and testified as follows:

                **EXAMINATION**

              **BY THE COURT:**

**Q.**   Could you state your full name, please, sir?

**A.**   Peter Joseph Strauss.

**Q.**   And, Mr. Strauss, you are a licensed attorney; is that

correct?

**A.**   Yes.

**Q.**   And do you also operate businesses beyond just simply

operating a law practice?

**A.**   Yes, I do.

**Q.**   What's the nature of those businesses?

**A.**   A captive insurance management firm.

STRAUSS - EXAMINATION BY THE COURT

12:03    1    **Q.**    Okay.  And what's the name of that firm?

12:03    2    **A.**    Hamilton Captive Management.

12:03    3    **Q.**    And I believe that's one of the two companies that

12:03    4    received payments after the funds arrived in your account; is

12:03    5    that correct?

12:03    6    **A.**    On advice of counsel, I have to invoke my Fifth Amendment

12:03    7    privilege.

12:04    8    **Q.**    You're asserting your Fifth Amendment right to that

12:04    9    question?

12:04    10    **A.**    Yes, Your Honor.

12:04    11    **Q.**    You -- can you share with me how the funds came to you,

12:04    12    from what account the funds derived that came to the Strauss

12:04    13    Law Firm?

12:04    14    **A.**    I'm sorry, Your Honor.  I have to invoke my Fifth

12:04    15    Amendment again --

12:04    16    **Q.**    Because --

12:04    17    **A.**    -- on advice of counsel.

12:04    18    **Q.**    -- your answer may tend to incriminate you?

12:04    19    **A.**    On advice of counsel, I --

12:04    20    **Q.**    Well, that's what it is, is it may tend to incriminate

12:04    21    you.  You're asserting your Fifth Amendment right because your

12:04    22    response may tend to incriminate you?  Is that what you're

12:04    23    telling me?

12:04    24    **A.**    I'm asserting my Fifth Amendment right on advice of

12:04    25    counsel.

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 111 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed: 12/06/23    Entry Number 26-2    Page 10 of 72

10

STRAUSS - EXAMINATION BY THE COURT

12:04  1   **Q.**   Yeah, but that's -- advice of counsel is not a Fifth
12:04  2   Amendment right.  Fifth Amendment right is that you have a
12:04  3   right to remain silent, because your response may tend to
12:04  4   incriminate you, and you don't -- there's no requirement that
12:05  5   you be a witness against yourself.  That is the basis of the
12:05  6   Fifth Amendment.  Are you insisting -- asserting the Fifth
12:05  7   Amendment right because your response may tend to incriminate
12:05  8   you?
12:05  9   **A.**   Yes, Your Honor.
12:05 10   **Q.**   Okay.  Did you -- in this transfer of funds, did you have
12:05 11   any interaction or instructions from either Mr. or
12:05 12   Mrs. Carpoff?
12:05 13   **A.**   Your Honor, on advice of counsel, I have to invoke my
12:05 14   Fifth Amendment right.
12:05 15   **Q.**   Your law firm received funds.  We know that.  Your
12:05 16   attorneys have provided us documents indicating that.  Can you
12:05 17   tell me how your law firm -- how your law firm characterized
12:06 18   those funds in your Iolta account?
12:06 19   **A.**   On advice of counsel, I have to invoke my Fifth Amendment
12:06 20   right.
12:06 21   **Q.**   Had you previously received funds in this manner as you
12:06 22   received them in the $5 million?  Had that been a routine
12:06 23   practice of any type?
12:06 24   **A.**   On advice of counsel, I have to invoke my Fifth Amendment
12:06 25   right.

STRAUSS - EXAMINATION BY THE COURT

12:06  1   Q.   Who gave you the instructions regarding the nine entities
12:06  2   which were to receive the $5 million?
12:06  3   A.   On advice of counsel, I have to invoke my Fifth Amendment
12:06  4   right.
12:06  5   Q.   I take it to any question concerning the arrival or
12:07  6   instructions or the disbursement of funds, you're going to
12:07  7   assert your Fifth Amendment right; is that correct?
12:07  8   A.   Yes, Your Honor.
12:07  9        THE COURT:  Okay.  Any questions from the plaintiff?
12:07  10       MS. SHOUN:  May I beg the Court's indulgence for just
12:07  11   a moment, Your Honor?
12:07  12       THE COURT:  Yes.
12:07  13                   (Pause.)
12:07  14       MS. SHOUN:  Your Honor, if it may please the Court,
12:07  15   counsel for plaintiffs have some questions, and just as a bit
12:07  16   of a preface to this, Your Honor, I understand what Mr. Strauss
12:07  17   has indicated to the Court about invoking his Fifth Amendment
12:07  18   rights.  Nonetheless, it is our understanding because this is a
12:07  19   civil matter that it's -- it behooves us to go ahead and
12:07  20   present these questions to Mr. Strauss, even though he's
12:07  21   indicated what his answer is going to be.  So I would just ask
12:08  22   for the Court's patience and indulgence while we go through
12:08  23   this process.
12:08  24       THE COURT:  Keeping them within reason.  I think he's
12:08  25   indicated to us that he is going to assert his Fifth Amendment

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 113 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed: 12/06/23    Entry Number 26-2    Page 12 of 72

12

STRAUSS - CROSS-EXAMINATION

| | |
|---|---|
| 12:08 | 1 |

right, but please proceed.

                    MS. SHOUN:  Yes, sir.  Thank you, Your Honor.

                         CROSS-EXAMINATION

                         BY MS. SHOUN:

Q.   Mr. Strauss, have you ever represented Solar Eclipse
Investment Fund XXXV?

A.   On advice of counsel, I need to invoke my Fifth Amendment
right.

Q.   Yes, sir.  For ease of reference, I will hereinafter refer
to that entity, Solar Eclipse Investment Fund XXXV, simply as
"the fund".

                    Were -- have you ever acted as counsel for DC
Solar Solutions?

A.   On advice of counsel, I'm invoking my Fifth Amendment
right.

Q.   Did you receive any funds on December 19th, 2018 as
counsel for DC Solar solutions?

A.   On advice of counsel, I'm invoking my Fifth Amendment.

Q.   Do you have a signed, valid retainer agreement with DC
Solar Solutions?

A.   On advice of counsel, I'm invoking my Fifth Amendment
right.

Q.   When did you first review the limited liability company
agreement of Solar Eclipse Investment Fund?

A.   On advice of counsel, I'm invoking my Fifth Amendment

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 114 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 13 of 72

13

STRAUSS - CROSS-EXAMINATION

12:09  1   right.

12:09  2   Q.   When did you first read the solar equipment purchase

12:09  3   agreement entered into between the fund and DC Solar Solutions?

12:09  4   A.   On advice of counsel, I'm invoking my Fifth Amendment

12:09  5   right.

12:09  6   Q.   Yes, sir.  Mr. Strauss, have you presented to this Court

12:09  7   today all documentation the Court required you to present to it

12:09  8   relative to the $5 million wired into the Iolta account at the

12:09  9   Strauss Law Firm and all monies wired out of that $5 million?

12:09  10  A.   On advice of counsel, I'm invoking my Fifth Amendment

12:09  11  right.

12:09  12  Q.   Mr. Strauss, in responding to the Court's order that all

12:09  13  documents be produced relative to the wire of the $5 million

12:09  14  into the Iolta account of the Strauss Law Firm and all monies

12:09  15  wired out of the Strauss Law Firm, have you undertaken a

12:09  16  thorough examination of the records, your personal records, the

12:09  17  records of the Strauss Law Firm, and the records of Hamilton

12:09  18  Captive Management?

12:09  19  A.   On advice of counsel, I'm invoking my Fifth Amendment

12:10  20  right.

12:10  21  Q.   What is the physical address of the Strauss Law Firm?

12:10  22  A.   10 Hospital Center Common, Hilton Head Island, South

12:10  23  Carolina, 29926.

12:10  24  Q.   Does it maintain any other physical presence?

12:10  25  A.   I don't know how to answer that.  We're moving offices

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 115 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 14 of 72

14

STRAUSS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 12:10 | 1 | soon. |
| 12:10 | 2 | **Q.**  I'm sorry? |
| 12:10 | 3 | **A.**  We're moving offices soon.  I don't know how to answer the |
| 12:10 | 4 | question. |
| 12:10 | 5 | **THE COURT:**  Answer it as of today. |
| 12:10 | 6 | **A.**  As of today, no. |
| 12:10 | 7 | **Q.**  Are records of the Strauss Law Firm maintained at any |
| 12:10 | 8 | location other than the 10 Hospital Drive address in Hilton |
| 12:10 | 9 | Head Island? |
| 12:10 | 10 | **A.**  On advice of counsel, I'm invoking my Fifth Amendment |
| 12:10 | 11 | right. |
| 12:10 | 12 | **Q.**  Are the records of Hamilton Captive maintained at any |
| 12:10 | 13 | physical address other than 10 Hospital Drive, Hilton Head |
| 12:10 | 14 | Island? |
| 12:11 | 15 | **A.**  On advice of counsel, I'm invoking my Fifth Amendment |
| 12:11 | 16 | right. |
| 12:11 | 17 | **Q.**  How many personal email addresses do you maintain? |
| 12:11 | 18 | **A.**  On advice of counsel, I'm invoking my Fifth Amendment |
| 12:11 | 19 | right. |
| 12:11 | 20 | **Q.**  Do you maintain more than one? |
| 12:11 | 21 | **A.**  On advice of counsel, I'm invoking my Fifth Amendment |
| 12:11 | 22 | right. |
| 12:11 | 23 | **Q.**  How many personal telephone numbers do you maintain? |
| 12:11 | 24 | **A.**  On advice of counsel, I'm invoking my Fifth Amendment |
| 12:11 | 25 | right. |

STRAUSS - CROSS-EXAMINATION

12:11  1   **Q.**   How many phone numbers are maintained, owned by, or
12:11  2   utilized by the Strauss Law Firm, LLC?
12:11  3   **A.**   On advice of counsel, I'm invoking my Fifth Amendment
12:11  4   right.
12:11  5   **Q.**   How many telephone numbers are owned, utilized or
12:11  6   otherwise maintained by Hamilton Captive?
12:11  7   **A.**   On advice of counsel, I'm invoking my Fifth Amendment
12:11  8   right.
12:11  9   **Q.**   Mr. Strauss, have you been apprised of any criminal action
12:11  10  being pursued against you?
12:11  11  **A.**   On advice of counsel, I'm invoking my Fifth Amendment
12:11  12  right.
12:12  13  **Q.**   Have you received a target letter indicating any action is
12:12  14  being investigated or pursued against you?
12:12  15  **A.**   On advice of counsel, I'm invoking my Fifth Amendment
12:12  16  right.
12:12  17  **Q.**   Are you aware of any criminal investigation or criminal
12:12  18  action that may be pursued against any employee or other
12:12  19  individual affiliated with the Strauss Law Firm?
12:12  20  **A.**   On advice of counsel, I'm invoking my Fifth Amendment
12:12  21  right.
12:12  22  **Q.**   Are you aware of any criminal investigation or action that
12:12  23  is being pursued against any individual employed by or
12:12  24  otherwise affiliated with Hamilton Captive?
12:12  25  **A.**   On advice of counsel, I'm invoking my Fifth Amendment

STRAUSS - CROSS-EXAMINATION

12:12    1    right.

12:12    2    Q.    In response to the Court's question, you indicated, I do

12:12    3    believe, that you hold a valid license as a member of the South

12:12    4    Carolina Bar; is that correct?

12:12    5    A.    Yes.

12:12    6    Q.    Do you hold any other licenses issued by the state of

12:12    7    South Carolina or any other state?

12:13    8    A.    Law license?

12:13    9    Q.    Any other license.  I mean, other than maybe a fishing

12:13    10   license or a driver's license.  Do you have to -- do you hold a

12:13    11   license for your activity associated with captive management

12:13    12   work, with your insurance captive management group?

12:13    13   A.    On advice of counsel, I'll invoke my Fifth Amendment

12:13    14   right.

12:13    15   Q.    Mr. Strauss, is it your testimony that the $5 million at

12:13    16   issue here just landed in the Iolta account of the Strauss Law

12:13    17   Firm on December 19th, 2018 without any prior notice to the

12:13    18   Strauss Law Firm?

12:13    19   A.    On advice of counsel, I'm invoking my Fifth Amendment

12:13    20   right.

12:13    21   Q.    Do you have any agreement or document that sets forth the

12:13    22   basis for those funds, the $5 million being wired into the

12:13    23   Iolta account of the Strauss Law Firm on December 19th?

12:13    24   A.    On advice of counsel, I'm invoking my Fifth Amendment

12:13    25   right.

STRAUSS - CROSS-EXAMINATION

12:13  1   Q.   On December 19th, 2018, did you indeed represent DC Solar

12:14  2   Solutions?

12:14  3   A.   On advice of counsel, I'm invoking my Fifth Amendment

12:14  4   right.

12:14  5   Q.   On December 19th, 2018, did you represent the fund?

12:14  6   A.   On advice of counsel, I'm invoking my Fifth Amendment

12:14  7   right.

12:14  8   Q.   On December 19th, 2018, did you represent either Jeffrey

12:14  9   or Paulette Carpoff?

12:14  10  A.   On advice of counsel, I'm invoking my Fifth Amendment

12:14  11  right.

12:14  12  Q.   Mr. Strauss, what individual or entity did you represent

12:14  13  on December 19th, 2018 that's related in any manner to the wire

12:14  14  of $5 million into your Iolta account from the fund?

12:14  15  A.   On advice of counsel, I'm invoking my Fifth Amendment

12:14  16  right.

12:14  17  Q.   How did you learn that $5 million had been wired into your

12:14  18  Iolta account?

12:14  19  A.   On advice of counsel, I'm invoking my Fifth Amendment

12:14  20  right.

12:14  21  Q.   What did you do when you learned $5 million had been wired

12:14  22  into your Iolta account?

12:14  23  A.   On advice of counsel, I'm invoking my Fifth Amendment

12:14  24  right.

12:15  25  Q.   Mr. Strauss, when did you become aware that the business

STRAUSS - CROSS-EXAMINATION

12:15  1    locations of DC Solar Solutions had been the subject of various
12:15  2    search and seizure warrants of the Federal Government?
12:15  3    A.   On advice of counsel, I'm invoking my Fifth Amendment
12:15  4    right.
12:15  5    Q.   At what point did you become aware that the principals of
12:15  6    the DC Solar Solutions and affiliated entities had been the
12:15  7    subject of various search and seizures warrants of the Federal
12:15  8    Government?
12:15  9    A.   On advice of counsel, I'm invoking my Fifth Amendment
12:15  10   right.
12:15  11   Q.   Mr. Strauss, what direction did you get from the Skadden
12:15  12   Law Firm as to the incoming wire of the $5 million into your
12:15  13   Iolta account?
12:15  14   A.   On advice of counsel, I'm invoking my Fifth Amendment
12:15  15   right.
12:15  16   Q.   And what instruction did you get from the Skadden Law Firm
12:15  17   as to the disbursement of any of the $5 million out of the
12:15  18   Iolta account of the Strauss Law Firm?
12:15  19   A.   On advice of counsel, I'm invoking my Fifth Amendment
12:15  20   right.
12:16  21   Q.   Have either Jeffrey or Paulette Carpoff, together or
12:16  22   individually, ever been clients of Hamilton Captive Management,
12:16  23   LLC?
12:16  24   A.   On advice of counsel, I'm invoking my Fifth Amendment
12:16  25   right.

USCA4 Appeal: 23-2312   Doc: 17   Filed: 12/27/2023   Pg: 120 of 242
9:23-cr-00833-RMG *SEALED*   Date Filed 12/06/23   Entry Number 26-2   Page 19 of 72

19

STRAUSS - CROSS-EXAMINATION

12:16  1   Q.   When most recent to December 19th, 2018 were the Carpoffs,
12:16  2   either together or individually, clients of Hamilton Captive
12:16  3   Management?
12:16  4   A.   On advice of counsel, I'm invoking my Fifth Amendment
12:16  5   right.
12:16  6   Q.   Did you have any conversations with either Mr. or
12:16  7   Mrs. Carpoff on December -- on or about December 19th, 2018,
12:16  8   concerning the incoming $5 million into the Iolta account?
12:16  9   A.   On advice of counsel, I'm invoking my Fifth Amendment
12:16  10  right.
12:16  11  Q.   And what conversations did you have with either Mr. or
12:16  12  Mrs. Carpoff when any of those funds were transferred out of
12:16  13  the Iolta account?
12:16  14  A.   On advice of counsel, I'm invoking my Fifth Amendment
12:17  15  right.
12:17  16  Q.   Mr. Strauss, what do you understand to be the purpose of
12:17  17  the wire in the amount of $2 million that was sent from your
12:17  18  Iolta account to Skadden Arps?
12:17  19  A.   On advice of counsel, I'm invoking my Fifth Amendment
12:17  20  right.
12:17  21  Q.   Have you ever been associated or otherwise affiliated with
12:17  22  Skadden Arps prior to December 19th, 2018?
12:17  23  A.   On advice of counsel, I'm invoking my Fifth Amendment
12:17  24  right.
12:17  25  Q.   Did you and Skadden have any joint representation

STRAUSS - CROSS-EXAMINATION

12:17    1    agreement relative to the Carpoffs?

12:17    2    **A.**    On advice of counsel, I'm invoking my Fifth Amendment

12:17    3    right.

12:17    4    **Q.**    Is there any joint representation agreement between your

12:17    5    law firm and Skadden relative to representation of DC Solar

12:17    6    Solutions or any other DC Solar entity?

12:17    7    **A.**    On advice of counsel, I'm invoking my Fifth Amendment

12:17    8    right.

12:17    9    **Q.**    What is the total amount of a wire that you may make from

12:17    10    your Iolta account that's held at South State Bank in a one-day

12:18    11    period?

12:18    12    **A.**    On advice of counsel, I'm invoking my Fifth Amendment

12:18    13    right.

12:18    14    **Q.**    Before wiring any funds whatsoever out of the Iolta

12:18    15    account -- and by funds, I do mean again the $5 million that

12:18    16    came into your account -- did you make any inquiry of anybody

12:18    17    of the purpose for such wires out of that account?

12:18    18    **A.**    On advice of counsel, I'm invoking my Fifth Amendment

12:18    19    right.

12:18    20    **Q.**    Mr. Strauss, how many wires out of your Iolta account did

12:18    21    you make?

12:18    22    **A.**    On advice of counsel, I'm invoking my Fifth Amendment

12:18    23    right.

12:18    24    **Q.**    When you -- when the wires were made out of the Iolta

12:18    25    account of the Strauss Law Firm, did you personally undertake

STRAUSS - CROSS-EXAMINATION

12:18   1   that action?

12:18   2   A.   On advice of counsel, I'm invoking my Fifth Amendment

12:18   3   right.

12:18   4   Q.   Did you appear at a physical location of South State Bank

12:18   5   to make those transfers out?

12:19   6   A.   On advice of counsel, I'm invoking my Fifth Amendment

12:19   7   right.

12:19   8   Q.   Were these wires made pursuant to telephone conversations

12:19   9   with a representative of South State Bank?

12:19   10   A.   On advice of counsel, I'm invoking my Fifth Amendment

12:19   11   right.

12:19   12   Q.   And with whom at South State did you deal when making any

12:19   13   of the wires out of the Iolta account represented by the $5

12:19   14   million?

12:19   15   A.   On advice of counsel, I'm invoking my Fifth Amendment

12:19   16   right.

12:19   17   Q.   Mr. Strauss, what is your familiarity with the

12:19   18   relationship between Skadden and Mr. and/or Mrs. Carpoff?

12:19   19   A.   On advice of counsel, I'm invoking my Fifth Amendment

12:19   20   right.

12:19   21   Q.   What is your understanding of the relationship between

12:19   22   Skadden and DC Solar Solutions or any other DC Solar entities?

12:20   23   A.   On advice of counsel, I'm invoking my Fifth Amendment

12:20   24   right.

12:20   25   Q.   Mr. Strauss, what is your understanding of the

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 123 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 22 of 72

22

STRAUSS - CROSS-EXAMINATION

12:20  1   relationship of any other recipient of the wired funds from
12:20  2   your Iolta account to Jeffrey or Paulette Carpoff?
12:20  3   A.   On advice of counsel, I'm invoking my Fifth Amendment
12:20  4   right.
12:20  5   Q.   What is your understanding of the relationship between any
12:20  6   of the entities to which you wired funds and DC Solar Solutions
12:20  7   or other DC Solar entities?
12:20  8   A.   On advice of counsel, I'm invoking my Fifth Amendment
12:20  9   right.
12:20  10  Q.   Have you discussed this proceeding with anybody at
12:20  11  Skadden?
12:20  12  A.   On advice of counsel, I'm invoking my Fifth Amendment
12:20  13  right.
12:20  14  Q.   Have you discussed this proceeding with any individual or
12:20  15  entity affiliated with any other recipients of the $5 million
12:20  16  wired out of your Iolta account?
12:20  17  A.   On advice of counsel, I'm invoking my Fifth Amendment
12:20  18  right.
12:21  19  Q.   Mr. Strauss, what is the affiliation between the fund and
12:21  20  Worldwide Property and Casualty?
12:21  21  A.   On advice of counsel, I'm invoking my Fifth Amendment
12:21  22  right.
12:21  23  Q.   Mr. Strauss, what is the relationship to your knowledge
12:21  24  between the fund and Madison First Property and Casualty?
12:21  25           MR. ALLEN:  Objection, Your Honor.  It's outside the

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 124 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 23 of 72

23

STRAUSS – CROSS-EXAMINATION

12:21  1    pleadings.
12:21  2            THE COURT:  Overruled.
12:21  3            THE WITNESS:  On advice of counsel, I'm invoking my
12:21  4    Fifth Amendment right.
12:21  5    BY MS. SHOUN:
12:21  6    Q.   Mr. Strauss, what knowledge do you have of any
12:21  7    relationship between Worldwide Property and Casualty or Madison
12:21  8    First Property and Casualty and DC Solar Solutions?
12:21  9    A.   On advice of counsel, I'm invoking my Fifth Amendment
12:21  10   right.
12:22  11           MS. SHOUN:  Your Honor, if I may approach?
12:22  12           THE COURT:  You may.
12:22  13                        (Pause.)
12:23  14           THE COURT:  Anything further?
12:23  15           MS. SHOUN:  Yes, sir.  If I may approach the witness
12:23  16   with a copy of that or --
12:23  17           THE COURT:  You may.
12:23  18           MS. SHOUN:  Thank you.
12:24  19   BY MS. SHOUN:
12:24  20   Q.   Mr. Strauss, I'm going to hand you what purports to be a
12:24  21   letter dated March 22nd, 2019 from me to you and to the Strauss
12:24  22   Law Firm LLC, and I'm going to ask you if you recognize that
12:24  23   document?
12:24  24   A.   Yes.
12:24  25   Q.   And did you receive that document?

STRAUSS - CROSS-EXAMINATION

12:24  1  **A.**   Yes.

12:24  2  **Q.**   And you've had an opportunity to review that document

12:24  3  prior to today's date?

12:24  4  **A.**   Yes.

12:24  5  **Q.**   And that is a letter from me to you of March 22nd, 2019;

12:24  6  is that correct?

12:24  7  **A.**   Yes.

12:24  8  **Q.**   Okay.  And that document asks you, does it not, to provide

12:24  9  an accounting of the funds, the $5 million that was transferred

12:24  10  into the Iolta account of the Strauss Law Firm and an

12:24  11  explanation of any monies that may have been transferred out;

12:24  12  is that right?

12:24  13  **A.**   Yes.

12:25  14        **THE COURT:**  Mr. Overstreet, you need to quit nodding

12:25  15  and communicating to your client.

12:25  16        **MR. OVERSTREET:**  Yes, Your Honor.

12:25  17        **MS. SHOUN:**  Your Honor, just as a housekeeping

12:25  18  matter, we'd ask that this be made the plaintiff's first

12:25  19  exhibit.

12:25  20        **THE COURT:**  I'm sorry?

12:25  21        **MS. SHOUN:**  We'd just ask that this be made the

12:25  22  plaintiff's first exhibit.  The witness has identified it.

12:25  23        **THE COURT:**  Any objection?

12:25  24        **MR. OVERSTREET:**  No objection.

12:25  25        **THE COURT:**  Exhibit Number 1 is admitted.  Please

STRAUSS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 12:25 | 1 | proceed. |
| 12:25 | 2 |     MS. SHOUN:  Your Honor, if I then may approach? |
| 12:25 | 3 |     THE COURT:  You may. |
| 12:25 | 4 |     MS. SHOUN:  And may I provide a copy to Your Honor at |
| 12:25 | 5 | the same time as -- |
| 12:25 | 6 |     THE COURT:  Thank you. |
| 12:25 | 7 | BY MS. SHOUN: |
| 12:25 | 8 | Q.  Mr. Strauss, I've handed you a document that purports to |
| 12:25 | 9 | be an email from Peter Strauss at |
| 12:25 | 10 | pstrauss@thestrausslawfirm.com dated March 25th, 2019 at 6:31 |
| 12:25 | 11 | p.m.  Do you recognize this document? |
| 12:26 | 12 |     MR. OVERSTREET:  I'm sorry, can I see a copy of that? |
| 12:26 | 13 |     MS. SHOUN:  Oh, I'm so sorry.  I thought I handed |
| 12:26 | 14 | that to you. |
| 12:26 | 15 |     THE WITNESS:  On advice of counsel, I'm going to |
| 12:26 | 16 | invoke my Fifth Amendment right. |
| 12:26 | 17 | BY MS. SHOUN: |
| 12:26 | 18 | Q.  You're invoking your Fifth Amendment right as to whether |
| 12:26 | 19 | you've seen that document? |
| 12:26 | 20 | A.  Yes. |
| 12:26 | 21 | Q.  I'm sorry? |
| 12:26 | 22 | A.  Yes. |
| 12:26 | 23 | Q.  Okay.  Thank you.  Mr. Strauss, did you write the text of |
| 12:26 | 24 | that particular document? |
| 12:26 | 25 | A.  On advice of counsel, I'm invoking my Fifth Amendment |

STRAUSS - CROSS-EXAMINATION

1   right.

2   Q.   Mr. Strauss, when this particular document -- this email

3   was written on March 25th, 2019, did -- did anybody assist you

4   in writing this email?

5   A.   On advice of counsel, I'm invoking my Fifth Amendment

6   right.

7   Q.   Did anybody write this email for you to use as your

8   response to the letter on behalf of the fund dated March 22nd,

9   2019?

10   A.   On advice of counsel, I'm invoking my Fifth Amendment

11   right.

12   Q.   At what point, Mr. Strauss, did you have the documentation

13   necessary for you to reach a conclusion that Solutions is the

14   only party that had an interest in and right to the $5 million

15   in your Iolta account?

16   A.   On advice of counsel, I'm invoking my Fifth Amendment

17   right.

18   Q.   And it would be accurate, would it not, Mr. Strauss, to

19   say that no monies were ever wired or otherwise delivered out

20   of your Iolta account to DC Solutions; is that correct?

21   A.   On advice of counsel, I'm invoking my Fifth Amendment

22   right.

23   Q.   At any point, did you attempt to return the $5 million

24   wired into your escrow account to Fund XXXV?

25   A.   On advice of counsel, I'm invoking my Fifth Amendment

STRAUSS - CROSS-EXAMINATION

12:27  1    right.

12:27  2    Q.   Did you wire $500,000 to Paul Meltzer on behalf of

12:27  3    Paulette Carpoff?

12:27  4    A.   On advice of counsel, I'm invoking my Fifth Amendment

12:27  5    right.

12:28  6    Q.   Did you wire $250,000 to Daniel Bakondi for -- on behalf

12:28  7    of Jeffrey Carpoff?

12:28  8    A.   On advice of counsel, I'm invoking my Fifth Amendment

12:28  9    right.

12:28  10   Q.   Did you wire $250,000 from your Iolta account to Segal and

12:28  11   Associates as a personal retainer for Jeffrey Carpoff?

12:28  12   A.   On advice of counsel, I'm invoking my Fifth Amendment

12:28  13   right.

12:28  14   Q.   Mr. Strauss, as to any wires of the $5 million from those

12:28  15   three entities -- Paul Meltzer, Daniel Bakondi, or the Segal

12:28  16   and Associates -- for whom were those transfers made?

12:28  17   A.   On advice of counsel, I'm invoking my Fifth Amendment

12:28  18   right.

12:28  19   Q.   And who instructed you to make those transfers?

12:28  20   A.   On advice of counsel, I'm invoking my Fifth Amendment

12:28  21   right.

12:28  22        MS. SHOUN:  Oh, Your Honor, I'm sorry.  As a

12:28  23   housekeeping matter, the second document handed up to

12:28  24   Mr. Strauss, I do think he identified it, but has invoked his

12:29  25   Fifth Amendment as to any other substantive answers on it, but

STRAUSS - CROSS-EXAMINATION

12:29 1    I would ask the Court still admit it as an exhibit.

12:29 2              THE COURT:  Exhibit -- is there an objection?

12:29 3              MR. OVERSTREET:  Without objection.

12:29 4              THE COURT:  Exhibit Number 2 is admitted without

12:29 5    objection.

12:29 6    BY MS. SHOUN:

12:29 7    Q.   Mr. Strauss, I'm going to go back to that exhibit.  I'm

12:29 8    sorry.  I'm jumping around a little bit.  That's the second

12:29 9    exhibit, the email that appears to come from you at your law

12:29 10   firm dated March 25th.  You indicated in that email that under

12:29 11   the purchase agreement, the fund was obligated to pay Solutions

12:29 12   for mobile solar units.  Did you make that statement?

12:29 13   A.   On advice of counsel, I'm invoking my Fifth Amendment.

12:29 14   Q.   Did somebody write that statement for you?

12:29 15   A.   On advice of counsel, I'm invoking my Fifth Amendment

12:29 16   right.

12:29 17   Q.   Mr. Strauss, how many mobile solar units were, in fact,

12:29 18   delivered under any purchase agreement entered into between the

12:29 19   fund and any third party?

12:29 20   A.   On advice of counsel, I'm invoking my Fifth Amendment

12:29 21   right.

12:29 22   Q.   Mr. Strauss, what action did you undertake to ensure that

12:30 23   any mobile solar units had been delivered?

12:30 24   A.   On advice of counsel, I'm invoking my Fifth Amendment

12:30 25   right.

STRAUSS - CROSS-EXAMINATION

| | |
|---|---|
| 12:30 | 1 |
| 12:30 | 2 |
| 12:30 | 3 |
| 12:30 | 4 |
| 12:30 | 5 |
| 12:31 | 6 |
| 12:31 | 7 |
| 12:31 | 8 |
| 12:31 | 9 |
| 12:32 | 10 |
| 12:32 | 11 |
| 12:32 | 12 |
| 12:32 | 13 |
| 12:32 | 14 |
| 12:32 | 15 |
| 12:32 | 16 |
| 12:32 | 17 |
| 12:32 | 18 |
| 12:32 | 19 |
| 12:32 | 20 |
| 12:32 | 21 |
| 12:32 | 22 |
| 12:32 | 23 |
| 12:32 | 24 |
| 12:32 | 25 |

Q.   What action did you take whatsoever, Mr. Strauss, to ensure that any of the wire transfers out of the $5 million sent to your Iolta account were proper?

A.   On advice of counsel, I'm invoking my Fifth Amendment right.

        MS. SHOUN:  Beg the Court's indulgence just one moment.

                        (Pause.)

        MS. SHOUN:  Your Honor, if I may approach the witness?

        THE COURT:  You may.

BY MS. SHOUN:

Q.   Mr. Strauss, I'm going to hand to you what appears to be an email sent from Peter Strauss at pstrauss@thestrausslawfirm.com to Armando Gomez on March 27th, 2019 at 12:58 p.m., and I'll ask you if you recognize that email.

A.   On advice of counsel, I'm invoking my Fifth Amendment right.

Q.   Mr. Strauss, why would -- to what letter are you referring in that email to Mr. Armando, that you indicate that you have just received a letter?  Which letter would that be?

A.   On advice of counsel, I'm invoking my Fifth Amendment right.

Q.   Could that be the follow-up letter from our -- from Nexsen

STRAUSS - CROSS-EXAMINATION

12:32  1    Pruet on behalf of the fund again asking you for an accounting
12:32  2    as to the money?
12:32  3    A.   On advice of counsel, I'm invoking my Fifth Amendment
12:32  4    right.
12:32  5    Q.   Did you receive a response from Mr. Gomez?
12:33  6    A.   On advice of counsel, I'm invoking my Fifth Amendment
12:33  7    right.
12:33  8            MS. SHOUN:  Your Honor, the -- I don't know that the
12:33  9    witness identified the document, but we would ask that it be
12:33  10   admitted.  We move it be admitted.
12:33  11           THE COURT:  That's number 3?
12:33  12           MS. SHOUN:  Yes, sir.
12:33  13           THE COURT:  Is there an objection?
12:33  14           MR. OVERSTREET:  Without objection.
12:33  15           MR. WOOTEN:  Your Honor, I apologize.  Patrick Wooten
12:33  16   again on behalf of some of the transferees.  I don't know what
12:33  17   documents are being passed around, but it sounded like these
12:33  18   may be privileged documents.  Maybe these are documents where
12:33  19   third parties are on the -- but I just want to make sure our
12:33  20   privilege objections are preserved.
12:33  21           THE COURT:  Of course you're not a party to this
12:33  22   proceeding.  You're a recipient.  I'm going to give you every
12:33  23   chance to be heard on matters.  The -- it appears to me that --
12:33  24   and this was raised by Mr. Overstreet earlier.  It appears
12:33  25   these documents in which he is -- he is receiving funds and

STRAUSS - CROSS-EXAMINATION

12:33   1   he's distributing funds, he's working as an escrow agent.  He's

12:34   2   just like a bank.  He's not functioning as a lawyer at the

12:34   3   time, and those would not be privileged.  These are escrow

12:34   4   payments.  So -- but I note your objection for the record.

12:34   5                   Yes, sir?

12:34   6             MR. OVERSTREET:  Your Honor, very briefly, just so

12:34   7   that the record is clear.  I appreciate your noting the fact

12:34   8   that I also had some concerns about turning all this

12:34   9   information over that could have privileged implications, and I

12:34  10   provided to opposing counsel and the Court a notebook of

12:34  11   emails, which my understanding is Your Honor has reviewed and

12:34  12   come to the conclusion that there aren't any privileges

12:34  13   associated with those communications, thus allowing me to

12:34  14   produce it in full court.

12:34  15             THE COURT:  Right.  They -- my review of the

12:34  16   documents indicated that they were simply a processing of cash

12:34  17   through the escrow account of the Strauss Law Firm, and that he

12:34  18   was serving as an escrow agent, and that that would not be

12:35  19   subject to privilege.  So I did review those, and I ruled they

12:35  20   were -- they were not protected by privilege.

12:35  21                   Okay.  Anything further?

12:35  22             MS. SHOUN:  Just a couple more, Your Honor, if the

12:35  23   Court will allow.

12:35  24   BY MS. SHOUN:

12:35  25   Q.   Mr. Strauss, were you ever acting pursuant to some escrow

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 133 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed: 12/06/23    Entry Number 26-2    Page 32 of 72

32

STRAUSS - CROSS-EXAMINATION

1  agreement with the fund?

2  **A.**   On advice of counsel, I'm invoking my Fifth Amendment

3  right.

4  **Q.**   Mr. Strauss, were you or your law firm ever -- and I'm

5  sorry.  In the previous question, that should have applied to

6  you and your law firm, just so we understand.  Is that fair?

7  Same answer?

8  **A.**   Yes.

9  **Q.**   All right.  Did you or your law firm ever act pursuant to

10  any agreement as an escrow agent for DC Solar Solutions?

11  **A.**   On advice of counsel, I'm invoking my Fifth Amendment

12  right.

13  **Q.**   Did you or your law firm ever act pursuant to any sole --

14  any escrow agreement on behalf of Paulette and/or Jeffrey

15  Carpoff?

16  **A.**   On advice of counsel, I'm invoking my Fifth Amendment.

17  **Q.**   Mr. Strauss, what action did you undertake to ensure that

18  any of the wires out of your Iolta account of that $5 million

19  were proper?

20  **A.**   On advice of counsel, I'm invoking my Fifth Amendment

21  right.

22           **MS. SHOUN:**  Very quickly, Your Honor.

23                         (Pause.)

24           **MS. SHOUN:**  That's all I have, Your Honor.  Thank

25  you.

USCA4 Appeal: 23-2312    Doc: 17      Filed: 12/27/2023    Pg: 134 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 33 of 72

33

STRAUSS - CROSS-EXAMINATION

12:36   1      **THE COURT:**  Any questions from the defense?

12:36   2      **MR. OVERSTREET:**  No, Your Honor.

12:36   3      **THE COURT:**  You may step down, sir.

12:36   4      **THE WITNESS:**  Thank you.

12:36   5                      (Witness excused.)

12:36   6      **THE COURTROOM DEPUTY:**  Sir, may I have those

12:36   7   documents?  Thank you.

12:36   8      **THE COURT:**  Mr. Strauss, I'm going to put you on

12:36   9   notice that I intend to advise the South Carolina Supreme Court

12:36   10  that you took the Fifth Amendment today in a matter involving

12:36   11  potential criminal activity, and I would suggest you

12:36   12  self-report your appearance here today and your actions.

12:36   13          Let me address if I might and hear from some of

12:36   14  the recipients.  I know you have an active interest here, and

12:36   15  you've had very little time to address these issues.  My goal

12:36   16  is to preserve the status quo in a way that preserves these

12:37   17  funds to make a determination of who is the rightful owner of

12:37   18  these and whether or not it's within the DC Solar bankruptcy.

12:37   19  I don't know the answer to that.  I'm working that through.

12:37   20          On the record, I want to say that I have been in

12:37   21  touch with Judge Beesley in the Nevada Bankruptcy Court, and

12:37   22  we're working in concert with each other on this.  There's no

12:37   23  interest of this Court of usurping the important rights of the

12:37   24  Bankruptcy Court and the rights of the creditors in bankruptcy.

12:37   25  On the other hand, to the extent these monies are outside the

12:37    1    estate of the bankruptcy, then it's my responsibility to

12:37    2    address the claims here.  That's as simple as I can make it.

12:37    3              I want to afford everyone an opportunity to have

12:37    4    the time to review these issues.  I have a -- I presently have

12:37    5    an issue, the TRO, and have extended it to the recipients, and

12:38    6    the question then is -- and I'm trying to maintain the status

12:38    7    quo.  Does anyone while we're sorting this out have an

12:38    8    objection to the continuation of the TRO?  Let the record show

12:38    9    no one has responded.  The TRO is going to continue.

12:38   10              I want to afford the recipients an adequate time

12:38   11    to investigate this matter.  I've had issues raised.  I've now

12:38   12    gotten two responses in.  One I haven't -- I'll be candid with

12:38   13    you -- from a Mr. Bakondi, I have not had a chance to review.

12:38   14    It arrived just moments before the hearing.  I did receive one

12:38   15    earlier today from Mr. Wooten.  And Mr. Wooten, let me tell you

12:39   16    a piece of information I'm interested in, and perhaps you might

12:39   17    have -- help us on this or provide -- or you might be able to

12:39   18    answer this question at a later point if you don't know it now.

12:39   19    I'm trying to reconstruct how the monies left Fund XXXV and

12:39   20    ended up in the Strauss Law Firm.  Did it pass through any

12:39   21    other accounts?  Who moved -- who gave the instructions from

12:39   22    the fund's bank to transfer these monies to the Strauss Law

12:39   23    Firm?  How did the Strauss Law Firm characterize these funds in

12:39   24    its own accounts?  That is, who was the owner in this -- the

12:39   25    Strauss Law Firm identified as the owner of these funds?

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 136 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 35 of 72

35

1    Those are issues that go to whether this was

2    actually an asset of DC Solar.  I note that DC Solar did not

3    list Fund XXXV as one of its 20 top creditors, and it surely

4    would have been should the $5 million had been -- if the $5

5    million had been paid and services not delivered, it would have

6    been a debt, and it was not listed.  Has there since then been

7    a filing, a listing of assets by the -- by the debtor?  Has

8    there been a filing in Bankruptcy Court of assets?

9         **MR. WALLACE:**  Your Honor, Bruce Wallace for the

10   plaintiffs.  We do not believe so.

11        **THE COURT:**  I have not identified it on ECF.  So the

12   fair question is number 1, is this an asset of DC Solar?  And

13   even if it is, it doesn't ultimately dispose of the issue of

14   who is entitled to these funds.  I mean, that needs to be

15   sorted out, about the role of these various law firms, and they

16   have had an understandable interest in keeping the monies they

17   have received.  The Court's concern is are these -- did they

18   receive funds acquired by conversion?  And if so, did they know

19   or should have known that these were of questionable origin?

20        We know that the day before the transfer, the

21   Federal Government had seized the accounts, all the accounts of

22   DC Solar.  So I'm not sure how it could have flowed into a DC

23   Solar account.  Perhaps there are some that the Government

24   didn't know about, but I'm trying to sort all that out.

25        I understand the argument ably made by

12:42  1    Mr. Wooten and his law firm that -- that the funds from -- in
12:42  2    the accounts of Fund XXXV were payable, but were they paid by
12:42  3    the fund?  That's different.  Was it paid and -- for those
12:42  4    mobile solar generators?  Or did someone not yet identified
12:42  5    reach into those accounts, perhaps improperly, and convert it
12:42  6    to their own use?  Pretty important question here.
12:42  7              Now, even after all of that, the question about
12:42  8    who sorts that out, whether we're subject -- whether these
12:43  9    funds are subject to the -- are subject to the bankruptcy is
12:43  10   something I intend to continue my dialogue with Judge Beesley
12:43  11   and the fact finding I'm trying to do here.
12:43  12             I think we ought to have an evidentiary hearing
12:43  13   at some point for -- to try to answer these questions as
12:43  14   definitively as we can.  And, Mr. Overstreet, could we -- I'm
12:43  15   going to enter an order requiring the Strauss Law Firm to
12:43  16   produce to me documents showing how this $5 million was treated
12:43  17   in its account, how it was designated in the account.  Do you
12:43  18   understand what I'm asking?
12:43  19             MR. OVERSTREET:  Yes, sir.
12:43  20             THE COURT:  And I think that will give us one piece
12:43  21   of information.  I think it is important to determine how --
12:44  22   who gave the instructions that the money leave the fund and go
12:44  23   to the Strauss Law Firm.  There was a -- I understand -- was
12:44  24   that a wire I saw on a bank account?  Was that a wire transfer,
12:44  25   Ms. Shoun?

USCA4 Appeal: 23-2312    Doc: 17      Filed: 12/27/2023    Pg: 138 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 37 of 72

37

| | | |
|---|---|---|
| 12:44 | 1 | MS. SHOUN: Into the Strauss Iolta? |
| 12:44 | 2 | THE COURT: Yes. |
| 12:44 | 3 | MS. SHOUN: Yes, sir, Your Honor. |
| 12:44 | 4 | THE COURT: From? |
| 12:44 | 5 | MS. SHOUN: As I understand it, it was from Paulette |
| 12:44 | 6 | Carpoff, Your Honor. And I may -- |
| 12:44 | 7 | THE COURT: From Paulette Carpoff personally? |
| 12:44 | 8 | MS. SHOUN: Yes, sir. I may be able to actually -- |
| 12:44 | 9 | if the Court will give me one minute, I may be able to produce |
| 12:44 | 10 | a copy of that for Your Honor. |
| 12:44 | 11 | THE COURT: Okay. You may take a moment. |
| 12:44 | 12 | (Pause.) |
| 12:44 | 13 | MS. SHOUN: May I approach, Your Honor? |
| 12:44 | 14 | THE COURT: You may. Do we know, Ms. Shoun, why |
| 12:45 | 15 | Ms. Paulette Carpoff would have authority to move money out of |
| 12:45 | 16 | the -- of an independent, freestanding fund, investment fund? |
| 12:45 | 17 | MS. SHOUN: No, sir. |
| 12:45 | 18 | THE COURT: I have not been provided a copy of any -- |
| 12:45 | 19 | I know I have the -- this equipment sales agreement and a note. |
| 12:45 | 20 | Do we have an LLC organizational document? |
| 12:45 | 21 | MS. SHOUN: Yes, sir. |
| 12:45 | 22 | MR. WALLACE: Just one second, Your Honor. |
| 12:45 | 23 | MS. SHOUN: We have -- I think we have a copy, Your |
| 12:45 | 24 | Honor, an extra copy. If Your Honor doesn't mind, I think we |
| 12:45 | 25 | probably printed it on two-sided pages. |

| 12:45 | 1 | THE COURT: I can survive that. |
| 12:45 | 2 | MS. SHOUN: Okay. If I may approach. |
| 12:46 | 3 | THE COURT: I want to -- I want everybody to be on |
| 12:46 | 4 | the same page here, and I want the plaintiff to provide to the |
| 12:46 | 5 | nine recipients the documents we're talking about here. I |
| 12:46 | 6 | think they need access to this. |
| 12:46 | 7 | MS. SHOUN: Certainly, Your Honor. |
| 12:46 | 8 | THE COURT: I want to make sure they have -- and to |
| 12:46 | 9 | the extent when we have a hearing, I will say to the |
| 12:46 | 10 | recipients' counsel, we'll have a deadline for you to produce |
| 12:46 | 11 | to the parties any documents that may shed some light on this. |
| 12:46 | 12 | It may be worthwhile if you don't have -- you |
| 12:47 | 13 | have not yet done this, is to perhaps depose the bank official |
| 12:47 | 14 | involved to figure out exactly what happened. |
| 12:47 | 15 | MS. SHOUN: Yes, sir. |
| 12:47 | 16 | THE COURT: Do we know whether Paulette Carpoff has |
| 12:47 | 17 | any role with Investment Fund XXXV? |
| 12:47 | 18 | MS. SHOUN: She does not. Any knowledge we have of |
| 12:47 | 19 | this fund, Your Honor, she does not. This fund was entered |
| 12:47 | 20 | into -- or this fund was created, if you will, the LLC was |
| 12:47 | 21 | created in late November of 2018, and then, of course, this |
| 12:47 | 22 | raid upon the Carpoffs and the DC Solar entities was made on |
| 12:47 | 23 | December 18th. There was no representation that the Carpoffs |
| 12:47 | 24 | were involved, and, in fact -- |
| 12:47 | 25 | THE COURT: Wasn't there a provision about |

1  independence?  There would be a fiduciary issue; would there

2  not be?

3          MS. SHOUN:  Your Honor, Section 3.145 -- V.  Oh, it's

4  V.  Sorry.

5          THE COURT:  Three point --

6          MS. SHOUN:  3.14V, as in victory.

7          THE COURT:  Thank you.  Give me a second.  "The

8  managing member is not an affiliate of the sponsor.  The

9  managing member has not entered into any contract agreement,

10  understanding, or arrangement with the sponsor, any affiliate

11  of the sponsor relating to mobile solar facilities other than

12  the transaction documents."

13          So I want everyone to sort of understand where

14  I'm going here.  I'm just trying to figure out was this some

15  kind of regular transfer of a financing relating -- funds

16  relating to an equipment sale in the ordinary course of

17  business, or was this -- which is suggested by the recipient

18  filing I've had -- or was this an irregular transaction

19  facilitated by someone with no authority to take the funds, and

20  that the funds were essentially a conversion for the personal

21  use of the person who took the fund?

22          MS. SHOUN:  Of course, Your Honor.  And we would --

23          THE COURT:  That is to me the question, and I don't

24  want to suggest for a moment -- I don't have any suggestion

25  that any of these recipients would have been involved in that

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 141 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 40 of 72

40

12:49  1    end of the transaction, but if, in fact, these are converted
12:49  2    funds, then -- and are not funds of DC Solar, then why would we
12:49  3    not be here to sort this out?  I mean, if they are, I think
12:49  4    they should be in Nevada.  I think that's exactly where they
12:49  5    should be, if they're assets of DC Solar.  There might be other
12:50  6    arguments why they are assets of DC Solar, but I do think
12:50  7    having looked at the sales agreement, those funds were payable,
12:50  8    but not paid.  I mean, no one had a right to snatch the money
12:50  9    out of the fund.
12:50  10            I do think, Ms. Shoun, it would be helpful to
12:50  11   know more about exactly the instructions that the CTBC Bank
12:50  12   had --
12:50  13            MS. SHOUN:  Yes, sir.
12:50  14            THE COURT:  -- and what authority it had --
12:50  15            MS. SHOUN:  Yes, sir.
12:50  16            THE COURT:  -- to transfer those funds to the Strauss
12:50  17   Law Firm.
12:50  18            MS. SHOUN:  Yes, sir.
12:50  19            THE COURT:  I think that is a missing piece here
12:50  20   that -- we see here it is from Paulette Carpoff.  I presume
12:50  21   she, like Mr. Strauss, is going to take the Fifth, so you're
12:50  22   not going to get it from her, but the bank should have some
12:50  23   documentation of its authority, and if there is some authority,
12:50  24   then we need to know about that.
12:50  25            MS. SHOUN:  Yes, sir.

12:50   1          THE COURT:  If it's some legitimate authority to act

12:50   2   on behalf of the fund or some other instructions they have a

12:51   3   right to go grab the money on behalf of Solar -- DC Solar, but

12:51   4   Ms. Carpoff is not -- is a different -- is an individual, and

12:51   5   DC Solar is a corporate entity.

12:51   6          MS. SHOUN:  Exactly, Your Honor.  And one reason we

12:51   7   directed Your Honor's attention to that particular section

12:51   8   mentioned earlier, and then the 3.17 as well, 3.17M, where

12:51   9   actually, Your Honor, there were affirmative representations

12:51   10  that there was no affiliation with the sponsor, and the sponsor

12:51   11  being the DC Solar entity.

12:51   12         THE COURT:  I would think it would present serious

12:51   13  fiduciary issues if they're merged.

12:51   14         MS. SHOUN:  Exactly.

12:51   15         THE COURT:  They're supposed to be an arm's length

12:51   16  transaction.

12:51   17         MS. SHOUN:  Yes, sir.

12:51   18         THE COURT:  And -- but I want to afford everyone an

12:51   19  opportunity to be heard, and I'm not -- I'm not trying to make

12:51   20  any rush to judgment here.  I do think we need to set up a

12:51   21  mechanism where we can make certain reasonable factual

12:52   22  findings.

12:52   23             Mr. Wooten, you got any suggestion how much time

12:52   24  you folks might need?

12:52   25         MR. WOOTEN:  We were asking for like 10 days.  You

12:52  1    know, I -- we obviously hadn't heard Your Honor's comments when

12:52  2    we submitted that, but --

12:52  3             THE COURT:  I'm trying to focus you on where, you

12:52  4    know, I think the issue is here.

12:52  5             MR. WOOTEN:  Right.

12:52  6             THE COURT:  And I will say I don't think we all have

12:52  7    a definitive answer yet about where it is, but if there are

12:52  8    funds out there that were unlawfully taken and converted and

12:52  9    then distributed to third parties, that's a -- that's not a

12:52  10   DC -- that's not a DC Solar issue if it never passed through DC

12:52  11   Solar, never had a purpose of being related to DC Solar.  It

12:52  12   was simply a conversion by some person or entity other than DC

12:52  13   Solar.  Then that doesn't answer the question of the

12:52  14   entitlement of these nine recipients.  That's a whole 'nother

12:53  15   issue.  We'd have to sort that out, but -- but they would be --

12:53  16   you know, they would have been paid with -- if that scenario is

12:53  17   correct -- with stolen money.  And the question is do they know

12:53  18   or have reason to know that there was some question about those

12:53  19   funds, particularly in light of the fact that the day before

12:53  20   the Federal Government had acted to seize all accounts?

12:53  21             Yes, sir.  You wish to speak?

12:53  22             MR. ALLEN:  Yes, sir, Your Honor.  Just from a timing

12:53  23   point of view, I start a trial on Friday in State Court.  I'll

12:53  24   be in trial all week at least, so from a timing point of view,

12:53  25   I would ask for at least 15 days to be able to respond.

12:53　1　　　　　But I've also got some -- the other concern I've

12:53　2　got is that any knowledge that might be imputed to Strauss Law

12:53　3　Firm that therefore may be imputed to Hamilton Captive

12:53　4　Management LLC.  The problem that comes -- the stolen funds

12:53　5　question we've got is really that this fiduciary issue doesn't

12:53　6　belong here, because the money was transferred from a bank

12:54　7　that's not -- has no association with any of the parties that

12:54　8　are defendants in this case.  We think the plaintiffs should be

12:54　9　in the best position to know that information, as to whether or

12:54　10　not they were -- where they were transferred from and who had

12:54　11　-- it's their account.

12:54　12　　　THE COURT:  Let me say, I would say under normal

12:54　13　circumstances that you are absolutely correct, but they get

12:54　14　a -- they learned subsequently that someone has taken $5

12:54　15　million out of their account, someone who doesn't have the

12:54　16　authority to do that.

12:54　17　　　MR. ALLEN:  Who's not a defendant here in this action

12:54　18　is the problem.

12:54　19　　　THE COURT:  Correct, but who has taken the money and

12:54　20　delivered it to the Strauss Law Firm, and they brought an in

12:54　21　rem action for their $5 million.  And what you do there is you

12:54　22　bring all the claimants in, and you sort it out.  And I don't

12:54　23　know whether the plaintiffs' assessment of the facts is

12:54　24　correct.  I just don't know the answer to that.  And -- but I

12:54　25　think it's an important issue, and I want to afford everyone

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 145 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed: 12/06/23    Entry Number 26-2    Page 44 of 72

44

12:55   1   the opportunity, all nine recipients -- you know, many of them
12:55   2   are across the country and so forth.  I want to afford
12:55   3   everybody an opportunity to make a reasonable inquiry to
12:55   4   determine the provenance of these funds.
12:55   5           And once we sort that issue out, we got to sort
12:55   6   out is that subject to the bankruptcy estate?  Is that part of
12:55   7   DC Solar?  And -- and we'll have to sort out who should decide
12:55   8   that.  I think both -- if that were true, the Bankruptcy Court
12:55   9   and District Court would have potentially concurrent
12:55   10  jurisdiction to determine that.  The question is who should do
12:55   11  it?  And I want to just discuss that with Judge Beesley.  I
12:55   12  want to sort it out, but I want to know the facts first,
12:55   13  because the facts may establish that it is unquestionably a DC
12:55   14  Solar asset.  I just don't know right now.  I certainly have
12:55   15  had facts that raise a lot of concerns that there was something
12:55   16  untoward here.  Now, whether that is, in fact -- when we
12:56   17  actually sort it all out that's true, but there's certainly
12:56   18  enough here -- as they say, where there's smoke, there may be
12:56   19  fire.  I want to see if there's actually fire here.
12:56   20          MR. ALLEN:  The concern from Hamilton Captive
12:56   21  Management's request from Your Honor is this.  It's now going
12:56   22  to be accused because of the role of Mr. Strauss in his role
12:56   23  with Captive Management.  Mr. Strauss in his attempts to
12:56   24  cooperate obviously has to do so under his own entities there,
12:56   25  and in doing so, there was some questions whether or not we

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 146 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed: 12/06/23    Entry Number 26-2    Page 45 of 72

45

12:56   1   would be cooperating, basically putting everything on hold.

12:56   2   And I'm here to represent we'll be more than happy to do that

12:56   3   in cooperation --

12:56   4        THE COURT:  What I'm trying to do is -- I understand

12:56   5   that the Strauss Law Firm is prepared to pay to the Court, a

12:56   6   pretty reliable place to put money -- the 1.5 million received

12:56   7   while we sort this out.

12:56   8            Now, these other law firms, I want -- these

12:56   9   other folks, I want to sort out from them, hear from them about

12:57   10  things before I -- and that's why I said if you don't object to

12:57   11  the TRO continuing, there's not an objection, otherwise I'm

12:57   12  going to issue an injunction, because I'm trying to preserve

12:57   13  those funds while we have time to figure this out.

12:57   14       MR. ALLEN:  It directly affects 150 other

12:57   15  corporations as it relates to Hamilton Captive Management,

12:57   16  because those funds were in the normal course of business.

12:57   17  They were purchasing an insurance contract that was

12:57   18  administered.  It was bound, and so the reality is that I need

12:57   19  an order of the Court to be able to do that is all I was

12:57   20  putting on the record.

12:57   21       THE COURT:  I'll give you an order.

12:57   22       MR. ALLEN:  Thank you, Your Honor.

12:57   23       THE COURT:  I'll provide you the order.

12:57   24            Mr. Wooten, do you have any thoughts?

12:57   25       MR. WOOTEN:  Yes, I do.  I guess as far as the amount

1    of time, the more time you can provide us, the better.

2         THE COURT:  I'm thinking 30 days frankly.  I just

3    think everybody needs a little bit of time to catch their

4    breath here.  If there's not an objection to the continuation

5    of the TRO, otherwise I'm going to issue an injunction.  That's

6    why -- the lawyers are here representing about half of these

7    recipients.  I don't mind issuing a preliminary injunction

8    unless -- if the parties object to the continuation of the TRO.

9         MR. WOOTEN:  And so the order Your Honor would enter

10   would be one that says essentially the same thing that the

11   order issued the other day did --

12        THE COURT:  Don't spend the money.  Don't transfer

13   it.  I'll make a determination later whether you're going to

14   have to pay it into the Court.

15        MR. WOOTEN:  Okay.  I just -- one concern I have

16   frankly, Your Honor, is I've not had this situation come up

17   before where a client is not a party, you know, not served with

18   process, and then comes just sort of as an invitee to a

19   hearing, and we're being asked obviously about an order that

20   would affect their interests, and so I don't want to waive any

21   objections.  Like you said, I want to catch my breath, and so I

22   want -- I do want to object to any attempt to exercise

23   jurisdiction over these clients --

24        THE COURT:  Does your client intend to honor my

25   order?

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 148 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 47 of 72

47

12:59    1          **MR. WOOTEN:**  My --

12:59    2          **THE COURT:**  Your client regarding the maintenance of

12:59    3    the funds, do they intend to do that?

12:59    4          **MR. WOOTEN:**  Yes.  Your Honor, we -- we are willing

12:59    5    to -- here's what I will say.  I don't want to say we intend to

12:59    6    honor it if doing that results in some sort of waiver.

12:59    7          **THE COURT:**  You're not waiving anything.  I'm trying

12:59    8    to maintain the status quo to give your client the chance

12:59    9    you've asked for to explain it.

12:59    10         **MR. WOOTEN:**  Right.

12:59    11         **THE COURT:**  And give you enough time to actually

12:59    12   figure it out.

12:59    13         **MR. WOOTEN:**  Right.

12:59    14         **THE COURT:**  You're trying to figure this out.  You

12:59    15   don't know much more than I do, Mr. Wooten.  I mean, we all --

12:59    16   that's very clear.  All of us are struggling to figure out what

12:59    17   the facts are.  We need time to figure this out.  I can't have

12:59    18   these funds transferred away, expended while we're trying to

01:00    19   figure it out.  I'm going to preserve it.  I think I've heard

01:00    20   enough to say there's something perhaps untoward happening

01:00    21   here, and it appears to me that it is important to preserve the

01:00    22   status quo while we figure it out, protect everybody's rights

01:00    23   here.  That's all I'm trying to do.

01:00    24         **MR. WOOTEN:**  Okay.  Well, so in light of that, Your

01:00    25   Honor, I would agree that our clients will maintain the status

01:00  1    quo with respect to the money that they have, but not waiving

01:00  2    any objections --

01:00  3         THE COURT:  Nobody is waiving any -- including

01:00  4    jurisdiction right at this moment.  All I'm doing is preserving

01:00  5    the money to figure it out, and then somewhere these law firms

01:00  6    are going to have to deal either with me or the bankruptcy

01:00  7    judge about the -- their entitlement to funds.  To the extent

01:00  8    it's an asset of DC Solar, that's one issue.  If it's stolen

01:00  9    funds, then you get to the issue of did they know or should

01:01  10   have known, kind of holder in due course, all those issues that

01:01  11   need to be sorted out.  And I want to -- I'm going to assure

01:01  12   that if I'm the one deciding that, I'm going to give everybody

01:01  13   a full opportunity to be heard and a full opportunity to

01:01  14   investigate the facts.

01:01  15        MR. WOOTEN:  So if I can just ask one question -- and

01:01  16   I normally wouldn't ask a question to the Court, but my

01:01  17   understanding is that there was, you know, this last minute

01:01  18   memorandum that we submitted to the Court.

01:01  19        THE COURT:  Yes.

01:01  20        MR. WOOTEN:  And in that document, East West Bank is

01:01  21   authorizing this 13 million some odd dollars to go to -- or to

01:01  22   go from the fund to DC Solar.

01:01  23        THE COURT:  It's actually authorizing it to paying it

01:01  24   into the -- into the investment fund.  That's how I understand

01:02  25   it, and then the manager of the fund needs to transfer it.

That's an extra step.  Ms. Carpoff does not have, the best I
can see, the authority to reach into the supposedly independent
investment fund and to take the money.  There's an extra step
there.  I've been trying to sort out did the manager do that?
Did the manager reach in and transfer it to Ms. Carpoff?  I
don't know the answer to that.  But I have not -- I know that
the Nexsen Pruet law firm wrote the manager, who in a sort of
bewildering thing never wrote back.  I mean, you're supposed to
be managing a fund, and $5 million is missing, and you don't
respond to your client, to the investor, the principal investor
in the fund?  How would that be?  And so that raises questions
about what is actually going on there?

        And so I think we need to figure out was that --
though the funds were -- were potentially payable at that
point, were they actually paid, and what are they going to be
paid for?  They're for 325 solar generators.  At this moment,
DC Solar has shut -- literally shut the lights off.  They've
laid off their staff.  All their accounts have been ceased.
There's no way in the world they're ever going to perform.
This is not a normal equipment sale at this point.  But if the
monies went into DC Solar, that would be one thing.  You could
say, "Well, still you had this contract," but if it went to a
third party, and it was just snatched out of that account by
someone who has no right to do it, that is a very different
situation, and whether that is exactly what happened here, we

01:03  1    need further -- we need further evidence.

01:03  2             I know the plaintiffs assert that.  Is that

01:04  3    fair, Ms. Shoun, that you're asserting that basically

01:04  4    Ms. Carpoff took the money?

01:04  5         MS. SHOUN:  We know -- what we know, Your Honor, has

01:04  6    been presented to this Court, and that is that -- quite

01:04  7    correctly the Court states that the authorization was for this

01:04  8    investment to be paid into fund, and that investment was paid

01:04  9    into fund.  Then on the 18th of December, essentially

01:04  10   everything was frozen, seized by the Federal Government.  No

01:04  11   mobile solar units were delivered.  Then subsequently after

01:04  12   filing this action, we found that wire transfer made by

01:04  13   Ms. Carpoff directly into the Iolta account.

01:04  14        THE COURT:  Mr. Wooten, have you been provided a copy

01:04  15   of this wire transfer?

01:04  16        MR. WOOTEN:  Not that I know of.

01:04  17        THE COURT:  I mean, this is why it's important that

01:04  18   you -- that we get everybody on the same page.  I'm going to

01:04  19   send an order kind of -- I want the recipients to get all this

01:04  20   information, because --

01:04  21        MS. SHOUN:  Yes, of course, Your Honor.

01:04  22        THE COURT:  And then the recipients may have

01:04  23   information themselves relevant to you, and -- but I'm trying

01:05  24   to sort out how this money got moved from the fund to the

01:05  25   Strauss Law Firm.  I think that is a very material thing, and

USCA4 Appeal: 23-2312    Doc: 17      Filed: 12/27/2023      Pg: 152 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 51 of 72

51

01:05  1    did it -- was it transferred to DC Solar in some way?  I have

01:05  2    trouble imagining how that could have occurred, because DC

01:05  3    Solar was defunct at that point, literally defunct.  The lights

01:05  4    were out, the staff was laid off, and all its accounts were

01:05  5    seized by the Federal Government.

01:05  6          **MS. SHOUN:**  The day before the wire transfer took

01:05  7    place.

01:05  8          **THE COURT:**  Literally the day before the wire

01:05  9    transfer.

01:05  10         **MR. WOOTEN:**  And, Your Honor, one thing I'm not clear

01:05  11   on though is the -- this cash flow memorandum.  My

01:05  12   understanding is that the East West Bank is not merely signing

01:05  13   this document authorizing --

01:05  14         **THE COURT:**  They're the investor.  They're an

01:05  15   investor into the fund.  The fund holds the money to transfer

01:05  16   to DC Solar.  The East West Bank is the investor.

01:06  17         **MR. WOOTEN:**  Right.

01:06  18         **THE COURT:**  So they've transferred -- as I understand

01:06  19   the documents -- and I'm prepared to be instructed otherwise

01:06  20   here -- is that as part of this agreement, East West Bank paid

01:06  21   into the fund monies for them to be transferred to DC Solar by

01:06  22   its manager to pay for 325 solar generators.  Instead of the

01:06  23   manager -- this is what plaintiffs essentially showed by this

01:06  24   document.  Instead of the manager, Halo Management, exercising

01:06  25   its authority to make that transfer, Mrs. Paulette Carpoff took

1    the money and transferred it to the Strauss Law Firm, and then
2    it was distributed what appears to be for the personal use of
3    the Carpoffs.  That might be -- not saying it is -- potentially
4    a conversion of that money and not a -- so that's why I said
5    was this was a regular transaction, as you describe it in your
6    pleading, or is it an irregular one in which the action is
7    untoward?

8         I don't think it's fair -- I mean, I'm not
9    jumping on you, Mr. Wooten, because you don't have all the
10   facts, and I'm not sure any of us have all the facts, and we
11   need all those facts to sort this out, and I want to give
12   everybody enough time and enough opportunity to do it.

13        And I'm preparing as you look into it -- and I
14   say this for all the counsel for the recipients.  If you -- if
15   you feel like you need discovery, talk to me about that.  Let
16   me know that.  I personally think that it may be useful for
17   someone to depose the folks at the bank.

18        **MS. SHOUN:**  And, Your Honor, I was going to ask the
19   Court about that.  We are happy to undertake that endeavor, but
20   to be frank with the Court, I'm not sure logistically how long
21   that would actually take.  We are willing to undertake what we
22   need to do to present the facts sufficient to this Court to
23   make a determination as to where this needs to go.

24        **THE COURT:**  I think it is important to know how --
25   what was the mechanism out of which and under which authority,

01:08  1    whoever acted -- it indicates here it's Ms. Carpoff -- under
01:08  2    what authority did she have?  What was the -- I mean, the bank
01:08  3    must have had some -- you would think, some notion about the
01:08  4    authority for her to move $5 million out of an account she did
01:08  5    not own.  What was their understanding?  And maybe there will
01:08  6    be something that is very -- that indicates that she somehow
01:08  7    had the authority of DC Solar -- I don't know that -- to act as
01:08  8    an agent of DC Solar, but -- or -- I don't think she could act
01:09  9    as the manager, because that would violate the independence of
01:09  10   the manager.
01:09  11         MS. SHOUN:  And the very terms of the agreement.
01:09  12         THE COURT:  And the very terms of the agreement.  It
01:09  13   just -- this is a little bit of a confounding -- and I will say
01:09  14   to Judge Beesley, it's confounding to him trying to figure out,
01:09  15   and putting all of this together.
01:09  16         MS. SHOUN:  And frankly, Your Honor, there may be
01:09  17   occasions where -- again, I don't know what the Court
01:09  18   envisions, but we would like the opportunity again to pursue
01:09  19   additional discovery, and it may be directed to some of the
01:09  20   recipients as well as to --
01:09  21         THE COURT:  Let's -- at this point, let's figure out
01:09  22   whether this is in the estate.  I want to leave the recipients
01:09  23   out of it for that purpose right now.
01:09  24         MS. SHOUN:  Yes, sir.
01:09  25         THE COURT:  Let's figure out is this an asset or not

01:09    1    of DC Solar?  That's the first issue.  And then if it's not, I

01:09    2    need then to decide am I really the one to decide it's not an

01:09    3    asset, or is that Judge Beesley's responsibility?  I need to --

01:10    4    and I want to work collaboratively with the Bankruptcy Court on

01:10    5    this.  And then to the extent that it is not an asset of DC

01:10    6    Solar, then we've got to sort out well, what right do these

01:10    7    recipients have to retain funds that were the property of

01:10    8    another person who had their funds converted?

01:10    9            Yes, Mr. Wooten?

01:10   10       MR. WOOTEN:  One question I have is that going back

01:10   11    to the cash flow memorandum, my understanding is East West Bank

01:10   12    is not only authorizing the $13 million payment to the fund.

01:10   13    They are also signing this document authorizing the fund to

01:10   14    transfer 12 million -- 12.5 million to DC Solar.  And what I'm

01:10   15    wondering is is it disputed that the $5 million is a portion of

01:10   16    the 12.5 that East West Bank is authorizing the fund to

01:11   17    transfer to DC Solar?  Is that disputed in this case or -- that

01:11   18    would help me in talking to my clients.

01:11   19       MR. ALLEN:  Which brings up another matter, without

01:11   20    any finding that there's actually been an inappropriate

01:11   21    conversion, how do we then seize the funds here that are in my

01:11   22    client's possession without finding that there is at least a

01:11   23    risk of even being converted?  We don't know that the actual

01:11   24    original quote-unquote conversion was an inappropriate action

01:11   25    at this time.  We're asking, you know, executives of the people

1    that received these funds to testify regarding the receipt of

2    funds.  We haven't even established there was an inappropriate

3    conversion.

4         THE COURT:  Well, we got somebody who doesn't appear

5    to have any right to do it taking the money.  I mean, that's --

6    that's at least a color -- there's a very strong indication.

7    So if you're objecting to it, file an objection, and I'll enter

8    a preliminary injunction, and I'll make a finding under the

9    appropriate standards.  I believe there's a likelihood of

10   success that this was improperly taken.  If you wish to object,

11   file an objection.  I will then enter an order.

12        MR. WOOTEN:  Well, and so I still --

13        THE COURT:  All I'm trying to do is get control of

14   these funds so that -- and if these companies and law firms are

15   entitled to it, I'm certainly not going to mess with their

16   right to -- I will not -- I will not -- I certainly don't seek

17   to take any funds that are lawfully theirs.

18            I would just simply say if there was a

19   conversion and the circumstances are that all of these law

20   firms were fully aware of this Federal Court action a day or

21   two before, it's hard to understand how they would know or --

22   not know or have reason to know there might be something

23   questionable about these funds.  That's the only question.

24        MR. WOOTEN:  Well, and one comment, Your Honor, about

25   the recipients knowing or should have known -- should have

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 157 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 56 of 72

56

01:13    1    known about anything questionable is, you know, it's not like

01:13    2    it was a coincidence that there was this raid and then

01:13    3    immediately thereafter the recipients were hired or retained.

01:13    4    They were obviously hired in response to the -- you know, the

01:13    5    raid.  And so the reason they needed -- these folks needed

01:13    6    lawyers like Skadden was because there was a raid.  So --

01:13    7         THE COURT:  Right, but Mr. -- but Mr. Wooten, if DC

01:13    8    Solar had hired two guys to go into a bank and rob it and then

01:13    9    paid the law firms -- kind of an absurd situation, you would

01:13   10    say -- surely they'd have reason to know that they could not

01:13   11    keep the money, right?  I mean, we would agree with that.

01:13   12    Well, how about if they just did it by wire transfer?  Instead

01:13   13    of having a firearm and two black masks when they go in, they

01:13   14    just wire transferred it by fraud.  I don't know if that's the

01:13   15    case or not.  I really don't.  I'm just saying to you that

01:14   16    there are questions here that need to be answered, and I would

01:14   17    think the analysis eventually would be were they holders sort

01:14   18    of in due course without notice, or did they have reason to

01:14   19    know?  Because the question is who is properly entitled to

01:14   20    these monies, the one who had money stolen or the company that

01:14   21    perhaps knew or should have known that it came from a

01:14   22    questionable source?

01:14   23         I mean, where exactly would the Carpoffs get

01:14   24    $5 million if the Government seized all their money?  I mean,

01:14   25    exactly where would that money come from?  How would they have

USCA4 Appeal: 23-2312    Doc: 17      Filed: 12/27/2023    Pg: 158 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 57 of 72

57

01:14  1    it?

01:14  2            MR. WOOTEN:  My understanding is that the Carpoffs

01:14  3    had the Strauss Law Firm, who was their lawyer, wire the money

01:14  4    to these law firms, and so --

01:14  5            THE COURT:  Doesn't look like he's acting as a

01:14  6    lawyer.  Looks like to me he's just an escrow agent.  He's

01:15  7    getting the money in.  He's sending it out.  That's a whole

01:15  8    'nother question about exactly what he's doing in his role.

01:15  9            MR. WOOTEN:  Right.  Well, Your Honor, I appreciate

01:15  10   the time to respond to this.  And the only other comment I

01:15  11   wanted to make, I know I interjected during the

01:15  12   cross-examination, but I'm not clear on the documents that were

01:15  13   turned over, and I guess I am concerned about there being

01:15  14   emails with, you know, Skadden or these other clients of

01:15  15   ours --

01:15  16           THE COURT:  They're all about wire transfers.

01:15  17   They're wire -- it's simply -- it's nothing -- I haven't seen

01:15  18   anything substantive at all in them.  They're simply

01:15  19   facilitating the transfers, the wire transfers from the Strauss

01:15  20   account into their account.  It's really a tracing device,

01:15  21   trying to trace where the money went.  We didn't know that

01:15  22   until the other day where it went.  The Strauss Law Firm had

01:15  23   not provided any information to the plaintiffs about what

01:15  24   happened to their money, and that was -- and this is in

01:15  25   furtherance of determining where that money went.  I didn't see

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 159 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed: 12/06/23    Entry Number 26-2    Page 58 of 72

58

01:16  1    anything in it in which any of the law firms expressed anything

01:16  2    that would be remotely attorney-client communications.

01:16  3         MR. WOOTEN:  Your Honor, when -- Your Honor, you've

01:16  4    laid out what your -- the gist of your concern, and I think I

01:16  5    understand the information you're generally looking for, but

01:16  6    I'm wondering if it would be helpful for you to sort of set

01:16  7    forth, "Here's the information I would like to hear from the

01:16  8    recipients."

01:16  9         THE COURT:  Yeah, I think I should do an order, and I

01:16  10   need -- you know, we're doing something a little out of the

01:16  11   ordinary here.  I mean, we are.  We're trying to sort out an in

01:16  12   rem action.  I don't know how many of you do in rem actions.

01:16  13   It's not terribly common to be suing over $5 million.  I

01:16  14   usually have it when they're drug seizures, you know, that kind

01:16  15   of thing, and everybody is invited to come in and claim whose

01:16  16   money it is and that car they seized.  Nobody wants to show up,

01:16  17   of course.  And, you know, this is a little bit different.

01:17  18        I want to make sure we have an orderly process

01:17  19   that provides due process to everyone, and I'm trying to break

01:17  20   it down.  Step one is the question being raised, was there

01:17  21   anything irregular about this?  Was there?  Was there some

01:17  22   question?  Because I think if it is an asset of DC Solar,

01:17  23   everybody pack up and go to Nevada.  You're going to sort it

01:17  24   out there.

01:17  25        If it's -- if it's not, I think you're likely

1    going to stick around here and sort it out here.  I mean,

2    that's sort of the way I view it.

3           And it may be that I will initially let -- have

4    Judge Beesley make that determination.  I want to sort -- I

5    want to find out what the record shows us first, because we

6    just don't know -- we don't have enough information.

7           But this is a -- plaintiffs have raised a

8    legitimate question about how their money came from their

9    supposedly independent fund into the Strauss Law Firm by

10   Mrs. Carpoff.  If that, in fact, happened -- and we got a

11   document now that shows it -- exactly how did that happen?

12       MR. WOOTEN:  And so Ms. Carpoff had authority over

13   this account that was -- the fund's account somehow?

14       THE COURT:  We don't think so.  They don't think she

15   would have.

16       MR. ALLEN:  That goes back to our original issue,

17   which is how is the jurisdiction not where she is to determine

18   whether or not that was an authorized transfer or not?

19       THE COURT:  Because you're -- because Strauss is

20   here.  Jurisdiction is here.  The money arrived here.  Got to

21   be somewhere.  It passed out all around the United States.

22   Somebody's got to have it.  You want to have us to go nine

23   different jurisdictions to figure it out?  I don't think so.

24           Let's get to the merits here, folks.  I want to

25   get to the bottom of this.  I don't want all of us to waste a

01:19    1    lot of time on this.  So step 1, we're not going to mess with

01:19    2    the recipients in terms of their entitlement to the money.

01:19    3    We'll save later whether -- we're going to sort out first

01:19    4    whether this is an asset of DC Solar or not.

01:19    5                    Anyone else wish to speak?

01:19    6            MR. BARKER:  Your Honor, again this is Jake Barker on

01:19    7    behalf of just one of the recipients, BH Venture Capital LLC.

01:19    8    While we are procedurally situated very similarly to

01:19    9    Mr. Wooten's clients, the factual reasoning behind why we're a

01:19    10   recipient, what our role was and our relationship to Solar is

01:19    11   quite different.

01:19    12           THE COURT:  Tell me about that.

01:19    13           MR. BARKER:  Well, Your Honor, BH Venture Capital is

01:19    14   an entity that was formed the purpose of acting as

01:19    15   debtor-in-possession lender in the DC Solar bankruptcy.

01:19    16           THE COURT:  Okay.

01:20    17           MR. BARKER:  My client and DC Solar executed a loan

01:20    18   term sheet through -- with the anticipation of providing

01:20    19   debtor-in-possession financing in that -- in the Nevada

01:20    20   bankruptcy.

01:20    21           THE COURT:  And what happened to that?

01:20    22           MR. BARKER:  For a variety of reasons --

01:20    23           THE COURT:  Trustee objected.

01:20    24           MR. BARKER:  The --

01:20    25           THE COURT:  It was 3 million bucks, and trustee said

USCA4 Appeal: 23-2312    Doc: 17      Filed: 12/27/2023      Pg: 162 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 61 of 72

61

01:20  1    no way.

01:20  2            MR. BARKER:  The lending relationship did not

01:20  3    manifest.

01:20  4            THE COURT:  Correct.

01:20  5            MR. BARKER:  However, in the term sheet there is a

01:20  6    call for a payment of $50,000 nonrefundable underwriting fee to

01:20  7    cover the costs for underwriting these loans.

01:20  8            THE COURT:  Did your -- did your client -- was it

01:20  9    aware that all the accounts of DC Solar had been seized?

01:20  10           MR. BARKER:  I believe at some point they were made

01:20  11   aware of it.  I could not say --

01:20  12           THE COURT:  And that the Carpoffs' personal accounts

01:21  13   had been seized and all the corporations had been seized?

01:21  14           MR. BARKER:  I can't speak to their knowledge to

01:21  15   that.

01:21  16           THE COURT:  And that 20 FBI agents had circled their

01:21  17   house and taken everything out of the house?  You think they

01:21  18   might have known that since it was in all the newspapers out

01:21  19   there?

01:21  20           MR. BARKER:  I could not tell you if they did or not.

01:21  21           THE COURT:  Okay.  I'm just saying your folks aren't

01:21  22   someone to just say, "Oh, my God.  These people might have done

01:21  23   something wrong."  I mean, it's just a fair question about what

01:21  24   they -- you know, do they have reason to question where these

01:21  25   monies came from?

01:21  1        We've already given the hypothetical.  How about if

01:21  2   two bank robbers where they took the money and took it to your

01:21  3   client, would you be entitled to it?  And, of course, everybody

01:21  4   says, "No, of course not."

01:21  5        MR. BARKER:  This is not some rogue action.  We

01:21  6   applied within the Bankruptcy Court to be a

01:21  7   debtor-in-possession.

01:21  8        THE COURT:  Of course.  Of course, but I'm just

01:21  9   saying your entitlement to that $50,000, your right to hold

01:21  10  that $50,000 may turn on the origins of those funds.

01:22  11        I mean, I take it that was a -- who was your

01:22  12  client going to have a loan -- was it going to be with DC

01:22  13  Solar?

01:22  14        MR. BARKER:  I believe so, yes, Your Honor.

01:22  15        THE COURT:  And was anybody else going to be on the

01:22  16  loan other than DC Solar?

01:22  17        MR. BARKER:  Well, I believe there's some related

01:22  18  entities in that bankruptcy, but I couldn't tell you.

01:22  19        THE COURT:  Right, there are like eight different

01:22  20  entities.

01:22  21        MR. BARKER:  I guess my point was --

01:22  22        THE COURT:  Are the Carpoffs in bankruptcy

01:22  23  personally?

01:22  24        MR. BAKER:  Sir?

01:22  25        THE COURT:  Are the Carpoffs in bankruptcy?

01:22    1          **MS. SHOUN:** Not that we're aware, Your Honor.

01:22    2          **THE COURT:** Okay.

01:22    3          **MR. BARKER:** But to the matter at hand, Your Honor,

01:22    4    we again, like Mr. Wooten's clients, without waiving any of our

01:22    5    objections to jurisdiction and all of that, would think that

01:22    6    the time frame you kind of suggested with this kind of status

01:22    7    quo standstill order to kind of figure out where we are would

01:22    8    be helpful to us.

01:22    9          **THE COURT:** Yeah, I think what we need -- and I just

01:22   10    need to look at formally how to do this.  I'm sort of

01:22   11    inclined -- let me ask these two captives, if I don't have you

01:22   12    pay it into the Court, can -- do you have any objection to

01:23   13    being subject to an injunction not to transfer the funds and to

01:23   14    hold it pending further action of the Court?

01:23   15          **MR. ALLEN:** We do not, Your Honor.  The problem

01:23   16    simply is that we need some instruction.  We'll fully

01:23   17    cooperate.  That's all we need.

01:23   18          **THE COURT:** I hear you.  I hear what -- you're being

01:23   19    perfectly reasonable about that.  I'm just -- I'm just trying

01:23   20    to sort out a way in which -- in which we can get answers to

01:23   21    these questions without being unduly disruptive and without

01:23   22    dissipating the asset while we're litigating.

01:23   23          **MR. ALLEN:** My clients will cooperate and protect

01:23   24    those funds.  We just want to make sure we're not stepping --

01:23   25          **THE COURT:** Let me ask the plaintiffs.  I'm more

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 165 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 64 of 72

64

1    inclined rather than making them pay into the fund simply to

2    require them to hold the funds in a secure account and not to

3    expend them.  Do plaintiffs have any problem with that?

4         MS. SHOUN:  Your Honor, I think that's the order

5    that's currently in place.

6         THE COURT:  Yeah, it's currently in place.  I had

7    anticipated perhaps adding in paid into the court, but I'm just

8    kind of wondering now whether that's a step that's really

9    necessary to make right now.

10         MR. ALLEN:  We'll report where it is.

11         MS. SHOUN:  Well, it may be, Your Honor, that at the

12    end of whatever time --

13         THE COURT:  Oh, it will be if your client or the

14    Bankruptcy Court --

15         MS. SHOUN:  That may be the period in which --

16         THE COURT:  -- the trustee may want to take

17    possession.

18         MS. SHOUN:  Exactly.  Exactly.

19         THE COURT:  Depending on what we determine it to be,

20    whether it's an asset of DC Solar or not.

21         MS. SHOUN:  Right.

22         THE COURT:  Okay.  I'm going to set out an order of

23    discovery, of disclosure requirements.

24         MS. SHOUN:  Okay.

25         THE COURT:  I want all recipients to know.

```
01:24    1              MS. SHOUN:  Yes, sir.

01:24    2              THE COURT:  Kind of everybody on the same page.

01:24    3              MS. SHOUN:  Yes, sir.

01:24    4              THE COURT:  So when we're handing up documents,

01:24    5    Mr. Wooten won't be saying, "What was that document?"

01:24    6              MS. SHOUN:  Right.

01:24    7              THE COURT:  I want everybody to have all the

01:24    8    documents.

01:24    9              MS. SHOUN:  I didn't see it until this morning

01:24   10    myself.

01:24   11              THE COURT:  Yeah, I understand that.  And then

01:24   12    let's -- let's think about 30 days.  If you need -- I will add

01:24   13    in the order that you have the authority to go depose --

01:24   14              MS. SHOUN:  Perfect.

01:24   15              THE COURT:  -- the folks at the CTBC Bank.

01:25   16              MS. SHOUN:  Perfect.

01:25   17              THE COURT:  Mr. Overstreet, you got something you

01:25   18    want to share with me?

01:25   19              MR. OVERSTREET:  Very briefly, Your Honor.  Just for

01:25   20    the record pursuant to my email to the Court last night,

01:25   21    Mr. Joe Griffith has been engaged by the Strauss Law Firm -- or

01:25   22    by Peter Strauss individually and apologizes that he can't be

01:25   23    here because he's out of the state, but intends to appear as

01:25   24    co-counsel with me.

01:25   25              THE COURT:  Good.
```

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 167 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 66 of 72

66

01:25   1          **MR. OVERSTREET:**  And was involved in the prep of this

01:25   2   hearing, so I just wanted that to be on the record, Your Honor.

01:25   3          **THE COURT:**  Well, Mr. Griffith is a fine attorney.

01:25   4   He practices in front of me regularly.  I know him well.

01:25   5               Yes?  Anything further?

01:25   6          **MS. SHOUN:**  Well, just about a matter of

01:25   7   clarification, Your Honor.  We are more than happy to provide

01:25   8   the documents, the relevant -- or what Your Honor sees as

01:25   9   relevant to every recipient.  We're happy to do that.  I just

01:25  10   want to make sure that I understand what Your Honor sees as

01:25  11   those.

01:25  12               We have the wire indication from Ms. Carpoff.

01:25  13   We have what appears to be the wire receipt -- and I'm not a

01:25  14   bank lawyer, so I'm probably not using the right terminology

01:25  15   there -- where it went into the Strauss account.  We have the

01:26  16   wire transfer forms that were provided by the Strauss Law

01:26  17   Firm's counsel on Monday.  We're happy to distribute those if

01:26  18   the recipients don't have them.

01:26  19          **THE COURT:**  Yeah, and I think these -- you know, the

01:26  20   LLC.

01:26  21          **MS. SHOUN:**  The LLC operating agreement.  The

01:26  22   purchase agreement.

01:26  23          **THE COURT:**  The documents Mr. Wooten was talking

01:26  24   about with the page, the document with the funds, the -- the

01:26  25   equipment sales agreement.

| | |
|---|---|
| 01:26 | 1 |

```
01:26   1          MS. SHOUN:  Purchase agreement, yes, sir.

01:26   2          THE COURT:  I just think everything needs to be --

01:26   3   everybody needs to be on the same page, and then if everybody

01:26   4   knows that, then they can go find other information about,

01:26   5   "Hold it a minute.  You think it's this, but it's actually

01:26   6   something else.  It may look this way, but it's not."  Then we

01:26   7   want to know that.  We want to get it right.  Nobody is -- you

01:26   8   know, this Court does not have a dog in this fight.

01:27   9          MS. SHOUN:  Yes, sir.

01:27  10          THE COURT:  I'm just trying to sort out the fair and

01:27  11   just disposition of this.  It's either your client's funds, or

01:27  12   you're a creditor in the bankruptcy.

01:27  13          MS. SHOUN:  Right.  Exactly.

01:27  14          THE COURT:  I mean, that's one of the two things.

01:27  15   And of course we know that part of the money also went to DC

01:27  16   Solar, the initial monies, and --

01:27  17          MS. SHOUN:  And those are --

01:27  18          THE COURT:  And those are -- it makes you a creditor

01:27  19   in the bankruptcy as to those.  The question is is the

01:27  20   additional 5 million part of that.

01:27  21          MS. SHOUN:  Exactly.

01:27  22          THE COURT:  That's the only question.

01:27  23          MS. SHOUN:  Your Honor, there may be information or

01:27  24   we have reason to believe there may be information in the hands

01:27  25   of some of the recipients, and I understand Your Honor's order
```

1    leave their entitlement as to these funds out of it now.

2    However, we have reason to believe there may be information in

3    the hands of some recipients that may help to answer this

4    Court's questions as to the flow of the monies, if you will.

5         THE COURT:  Well, tell me exactly -- I mean, I'm most

6    interested how the money got out of the fund and into the

7    Strauss Law Firm.

8         MS. SHOUN:  Precisely.

9         THE COURT:  And if you think one of the recipients

10   had knowledge of that or played a role with that, that would be

11   important information, but you're going to have to make a

12   showing to me that they -- more than just saying, "I'm going to

13   do a little fishing expedition by starting to depose these

14   people."  You're going to have to show me something first.  I'm

15   not going to authorize that now, but if you have documents you

16   want to -- you want to make the point, what we're going to do

17   is you're going to make a motion, and I will let people respond

18   who may be affected.

19        MS. SHOUN:  Okay.

20        THE COURT:  And then I'll make a determination about

21   whether, you know, the -- let's be candid.  To the extent your

22   hypothesis is correct, anybody involved in the transaction

23   potentially has criminal implications tied to them.  If they're

24   actually involved in converting the funds --

25        MS. SHOUN:  I see, Your Honor.  Yes, sir.

1    **THE COURT:**  And I -- you know, I haven't seen any
2    indication up to this point that any of the recipients --
3    there's nothing you've shown me that suggests that.
4        **MS. SHOUN:**  Exactly, Your Honor, but again, we have
5    this huge gap, as Your Honor has pointed out a couple of times,
6    as to how did it leap from fund to Carpoff to Strauss.  And we
7    at least have some documentation that it was in the fund, and
8    we have some documentation that Paulette Carpoff somehow
9    managed to wire it out to Strauss, but other than what may be
10   in the documents presented to us this morning -- and frankly, I
11   haven't had an opportunity to look at all of those, as Your
12   Honor knows -- we don't know if there may have been some other
13   party involved in that gap.
14       **THE COURT:**  Well, I want some indication before I
15   have you going after these law firms.
16       **MS. SHOUN:**  Yes, sir.  And we don't -- we're not even
17   at this point --
18       **THE COURT:**  It looks like to me they're all being
19   retained.  I think that was the point that was being made.
20   They were being retained in response to the federal action
21   which had occurred.
22       **MS. SHOUN:**  The day before.
23       **THE COURT:**  The day before.  Okay?  So, you know,
24   let's get to the bottom of that.  Let's leave the recipients --
25   if you've got evidence to suggest the recipients may have been

01:30    1    part of a conspiracy in that regard, I'd be glad to proceed,

01:30    2    but up to this point, I haven't seen that, and I'm not

01:30    3    authorizing a deposition.  I'll put it in writing in an order.

01:30    4         MS. SHOUN:  And, Your Honor, I don't think at this

01:30    5    point we would even anticipate maybe a deposition of any of the

01:30    6    recipients, but if they have -- again, if they would have

01:30    7    documents much like the Court ordered the Strauss Law Firm to

01:30    8    produce that would indicate the flow of that money --

01:30    9         THE COURT:  Well, I haven't seen anything, but it

01:30   10    looks like to me what you've given me so far is I see the CTBC

01:30   11    Bank, which for the record is the holder of the funds for

01:30   12    the -- for the Fund XXXV.

01:30   13         MS. SHOUN:  Yes, sir.

01:31   14         THE COURT:  I see money going, landing at Strauss

01:31   15    from CTBC Bank --

01:31   16         MS. SHOUN:  Yes, sir.

01:31   17         THE COURT:  -- in a direct wire, and I see the name

01:31   18    of Mrs. Paulette Carpoff in the middle it, a name that by

01:31   19    everything I know about shouldn't be there.

01:31   20         MS. SHOUN:  Right.

01:31   21         THE COURT:  That's all we know right now, and that

01:31   22    doesn't suggest to me any responsibility by any of these

01:31   23    recipients.

01:31   24         MS. SHOUN:  Yes, sir.

01:31   25         THE COURT:  I mean, that's just -- to me it's just a

01:31    1    whole 'nother question.

01:31    2            MS. SHOUN:  And it may be a question that Your Honor

01:31    3    or that Judge Beesley addresses later.

01:31    4            THE COURT:  Somebody -- Judge Beesley and I are going

01:31    5    to have to figure out the entitlement of these recipients.

01:31    6            MS. SHOUN:  Yes, sir.

01:31    7            THE COURT:  But the first question is is this a DC

01:31    8    Solar asset?

01:31    9            Okay.  Anything further?

01:31   10            MS. SHOUN:  Nothing from the plaintiffs, Your Honor.

01:31   11            THE COURT:  From the defense?

01:31   12            MR. OVERSTREET:  No, Your Honor.  Thank you.

01:31   13            THE COURT:  Very good.

01:31   14            MS. SHOUN:  But thank you, Your Honor.  You spent a

01:31   15    lot of time with us, and we appreciate the Court's analysis.

01:31   16            THE COURT:  Glad to do it.  We're going to figure it

01:31   17    all out before it's over and try to do a little justice.  This

01:32   18    hearing is adjourned.

         19

         20

         21

         22

         23

         24

         25

USCA4 Appeal: 23-2312    Doc: 17    Filed: 12/27/2023    Pg: 173 of 242
9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-2    Page 72 of 72

72

1                           * * * * * * * *

2                           <u>**CERTIFICATE**</u>

3           I, Tana J. Hess, CCR, FCRR, Official Court Reporter

4    for the United States District Court, District of South

5    Carolina, certify that the foregoing is a true and correct

6    transcript, to the best of my ability and understanding, from

7    the record of proceedings in the above-entitled matter.

8

9

10                          _____
                            Tana J. Hess, CRR, FCRR, RMR
11                          Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Case No.: 2:23-cr-00833-RMG |
| | ) |
| v. | ) **AFFIDAVIT OF PETER STRAUSS** |
| | ) |
| PETER STRAUSS | ) |
| | ) |

PERSONALLY APPEARED BEFORE ME, Peter J. Strauss, who first being duly sworn, says:

1. I am over eighteen (18) years of age and of sound mind, and I am competent to testify to the matters set forth herein.

2. I am the defendant in the action captioned *United States v. Peter Strauss*, 9:23-cr-833-RMG, currently under seal.

3. I am providing this affidavit in support of my motion for the recusal of the Hon. Richard M. Gergel.

4. I believe in good faith that Judge Gergel has a personal bias against me and in favor of the U.S. Attorney's Office, and that Judge Gergel's impartiality might reasonably be questioned.

5. Judge Gergel presided over the prior civil case involving Paulette Carpoff's $5 million wire to the Strauss Law Firm's trust account, *Solar Eclipse Investment Fund XXXV, LLC and East West Bank v. $5,000,000 U.S. Dollars Deposited to IOLTA Account of the Strauss Law Firm, LLC in rem, and the Strauss Law Firm, LLC, in personam*, Civil Action No. 9:19-cv-01176-RMG (D.S.C.) (the "Fund 35-EWB Case").

6. Although my pending criminal case does not involve the $5 million transfer that was the subject of the Fund-35 EWB Case, many of the facts at issue in the Fund 35-EWB case overlap with the facts at issue in my pending criminal case.

7.    Judge Gergel's comments and actions while presiding over the Fund 35-EWB Case have led me to believe that he was independently investigating the facts and was relying on his independent investigation rather than evidence presented to the Court, that he had predetermined that I was involved in criminal conduct related to the Carpoffs and DC Solar, and that he has a personal bias against me and in favor of the U.S. Attorney's Office.

8.    At the first hearing in the Fund 35-EWB Case on May 6, 2019 – less than two weeks after the civil complaint was filed – Judge Gergel characterized the transfer as "likely an illegal transfer[,]" and commented that the recipients' right to those funds was "looking pretty dubious[,]" and that "[t]hese transactions appear to be unlawful."

9.    Judge Gergel commented at the hearing that SEC investigators and FBI agents were attending every hearing in the DC Solar bankruptcy action, and stated that "my head of my U.S. Attorneys Office is sitting in the back row here right now, and there's a lot of Government interest in all of this."

10.    At the same May 6, 2019 hearing where Judge Gergel characterized the transfer as "likely an illegal transfer" and pointed out that federal law enforcement agents were interested in all of this and were in attendance at the hearing, Judge Gergel ordered me to appear in his courtroom less than three days later to testify about the "app[arently] unlawful" transactions.

11.    Although there was no indication that I would not appear on May 9, 2019 as directed, Judge Gergel threatened to have the U.S. Marshalls "escort" me to the hearing, which I understood to mean he would have me arrested.

12.    In light of the comments and actions of Judge Gergel at the May 6, 2019 hearing, I immediately engaged criminal defense counsel. My criminal defense counsel was not able to attend the May 9, 2019 hearing on such short notice.

13.    Prior to the May 9, 2019 hearing, my civil counsel in the Fund 35-EWB Case advised Judge Gergel and counsel for Fund 35-EWB that I would be asserting my Fifth Amendment right to not answer questions about the transactions Judge Gergel had characterized as "likely illegal."

14.    On May 9, 2019, I appeared in Judge Gergel's courtroom and was questioned under oath by Judge Gergel and counsel for Fund 35-EWB. I answered as many questions as I could that did not involve the subject transactions. When Judge Gergel began questioning me about the subject transactions, I responded that I was asserting my Fifth Amendment right to not answer questions about the subject transactions on advice of counsel. Judge Gergel insisted that I state on the record that I was asserting my Fifth Amendment right because my answer may tend to incriminate me.

15.    I have no training or experience in criminal law, and when I was unsure about whether to assert my Fifth Amendment right in response to some of the questions, I looked to my civil attorney for direction. Judge Gergel directed my civil attorney to stop communicating with me about whether to assert my Fifth Amendment right.

16.    After I finished testifying on May 9, 2019, Judge Gergel stated that he intended to advise the South Carolina Supreme Court that I invoked the Fifth Amendment and suggested that I self-report the same. I did not believe and still do not believe that a lawyer can or should be subject to discipline for invoking the Fifth Amendment.

17.    Judge Gergel subsequently made a comment at the May 9, 2019 hearing comparing me to Paulette Carpoff because I asserted my Fifth Amendment right.

18.    At the end of the May 9, 2019 hearing, Judge Gergel commented that "[t]o the extent [Fund 35-EWB's] hypothesis is correct, anybody involved in this transaction potentially has criminal implications tied to them."

19.    While presiding over the Fund 35-EWB Case, both before and during the May 6, 2019 and May 9, 2019 hearings, Judge Gergel made several references to information that had not been presented to the Court. I believe Judge Gergel independently investigated the facts at issue, relied on the results of his investigation, and in some instances, used the results of his investigation to support inferences favorable to the Government's position in my pending criminal case.

20.    Before I appeared through counsel in the Fund 35-EWB Case, Judge Gergel visited the Strauss Law Firm's website and reviewed information about the firm's employees and practice areas, which he quoted in the April 30, 2019 order entered in the Fund 35-EWB Case.

21.    At the May 6, 2019 and May 9, 2019 hearings, Judge Gergel made several more references to information that had not been presented to the Court in the Fund 35-EWB Case.

22.    At both hearings, Judge Gergel referred to unspecified press reports about the search and seizure warrants executed on December 18, 2018. Judge Gergel described the press reports in a light favorable to the Government's narrative, which he used to infer that I and everyone involved in the transactions had to have immediately known that the funds were illicit. These include comments and references to press reports that "dozens of FBI agents [were] circling the Carpoffs home"; that on the day the warrants were executed, "DC Solar was defunct at that point, literally defunct. The lights were off, the staff was laid off, and all of its accounts were seized by the Federal Government"; that "all accounts of DC Solar had been seized . . . that the Carpoffs' personal accounts had been seized and all the corporations had been seized"; and that "it was in all the newspapers out there."

4

23.      Judge Gergel did not identify the source of the press reports he referenced at the hearings or provide any indication whether the reports were published around the time of December 18, 2018 raid or later when details about the Carpoffs' massive fraud became public.

24.      Judge Gergel did not reference any press reports that did not support the Government's narrative. For example, the Martinez (California) Gazette, where the Carpoffs and DC Solar were based, published an article on December 20, 2018 that quoted a statement from the Carpoffs' lawyer at Skadden Arps describing the December 18, 2018 raid as related to an ongoing tax dispute and indicating the Carpoffs planned to "continue to grow their business." The newspaper published several more reports through mid-February, 2019 that related the raid to an ongoing tax dispute and indicated DC Solar was "continu[ing] to receive strong support from its employees, customers, its partner and its investors."

25.      Judge Gergel stated at the May 6, 2019 hearing that he had spoken with the Nevada bankruptcy judge presiding over the D.C. Solar bankruptcy action about Fund 35-EWB Case.

26.      At the May 9, 2019 hearing, Judge Gergel again stated that he had been in touch with the Nevada bankruptcy judge and that they were "working in concert with each other on this."

27.      Judge Gergel also referenced and relied upon select information about the bankruptcy that was not provided to the Court in the Fund-35 EWB Case. He stated that the $5,000,000.00 transfer in question would have surely made Fund 35 one of the largest creditors in the bankruptcy, but noted that it was not listed as one of the top 20 creditors.

28.      At the same time, Judge Gergel seemed to have disregarded other information about the bankruptcy that was not favorable to the Government's narrative. For example, Judge Gergel commented several times that the DC Solar entities were shut down or "defunct" as of December 18, 2018, despite that the DC Solar entities initially filed to reorganize under Chapter 11 in

February 2019 and engaged a nationally recognized professional restructuring advisor to lead the reorganization.

29.    I believe in good faith that Judge Gergel predetermined in the Fund 35-EWB Case that I had engaged in criminal conduct and that his independent investigation in the Fund 35-EWB Case was focused on identifying information favorable to the Government's narrative to the exclusion of information that was neutral or favorable to my defense.

30.    In further support of my motion for the recusal of Judge Gergel, I have reviewed the opinion of Barbara M. Seymour dated November 29, 2023 and incorporate the same into this affidavit.

31.    The facts set forth in Ms. Seymour's opinion are true and accurate to the best of my knowledge.

32.    Based upon the facts set forth in Ms. Seymour's opinion and for the reasons set forth therein, I believe in good faith that Judge Gergel has a personal bias against me and in favor of the U.S. Attorney's Office, and that Judge Gergel's impartiality might reasonably be questioned.

THE AFFIANT FURTHER SAYETH NOT.

_____
Peter J. Strauss

Sworn to and subscribed to before me
This _4_ day of December, 2023.

_____ Robert Eaton
NOTARY PUBLIC FOR SOUTH CAROLINA

My Commission Expires: 07/27/2027

6

## CERTIFICATE OF COUNSEL

I, Joseph P. Griffith, Jr., am counsel of record for Peter Strauss in the matter captioned *United States v. Peter Strauss*, 9:23-cr-833-RMG. I certify that the Affidavit of Peter Strauss dated December 4, 2023 and the motion it supports are made in good faith.

_____
Joseph P. Griffith, Jr.

EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| United States of America, | ) | Criminal Action No.: 9:23-cr-833-RMG |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Peter J. Strauss, | ) | |
| | ) | |
| _____ Defendant. _____ | ) | |

The Affiant, Barbara M. Seymour, an attorney licensed and in good standing in South Carolina and Georgia, being duly sworn, states as follows:

1. I have been retained as an expert witness by counsel for Peter Strauss and have been asked to offer my expert opinions as to whether Judge Gergel should be recused or disqualified from presiding over the criminal matter against Mr. Strauss.

2. I make this affidavit in reliance on the documents and information provided to me regarding relevant facts from this case and a prior civil case based on my qualifications and professional experience and my knowledge and understanding of the legal and ethical principles stated herein.

3. I have the requisite professional knowledge and experience and I am qualified to offer expert opinions in the field of legal and judicial ethics, including the standard of conduct and professional obligations of judges in circumstances potentially warranting recusal or disqualification such as those presented in this affidavit. My qualifications include the following, which are set out more fully in my attached curriculum vitae.

   a. I earned a Juris Doctor degree from the University of Georgia School of Law in 1993.

   b. I am an attorney licensed to practice law in South Carolina and Georgia and have been in good standing in those jurisdictions since 1993.

1

c.  From 1993 to 2000, I worked as a trial lawyer in a plaintiff's practice that represented clients in personal injury, products liability, and workers' compensation matters.

d.  From 2000 to 2017, I worked as an investigating and prosecuting attorney for the Office of Disciplinary Counsel to the Supreme Court of South Carolina, including service as the Deputy Disciplinary Counsel from 2007 until 2017. The matters I handled for the Office of Disciplinary Counsel involved the capacity and professional conduct of lawyers and judges.

e.  Since 2017, I have been in private practice, focusing exclusively on matters involving legal malpractice, ethical compliance, lawyer and judicial discipline, discovery disputes, Bar admissions, government ethics, and the unauthorized practice of law. My practice includes providing expert witness opinions and testimony on issues involving the standard of care for lawyers and the ethical obligations of judges, including matters of disqualification and recusal.

f.  I have extensively read and studied articles, treatises, and other publications on ethics of lawyers and judges. I have written articles, manuals, and other publications on a variety of topics related to the duties and practices of judges, lawyers, and paralegals. I have presented more than 350 continuing legal education programs and guest lectures at local, state, and national meetings and conferences on a variety of ethics-related topics.

g.  As lead counsel, I have had approximately 130 opinions published by the Supreme Court of South Carolina. All of those cases involved the professional conduct and capacity of lawyers or judges.

4.  All of the opinions expressed herein are opinions I hold to a reasonable degree of professional and legal certainty; they are more probable than not.

5.  In formulating my opinions and preparing this affidavit, I have reviewed and relied upon the following documents:

2

Exhibit A: Transcript of the May 6, 2019 hearing (TR1), attached.

Exhibit B: Transcript of the May 9, 2019 hearing (TR2), attached.

6. In formulating my opinions and preparing this affidavit, I have been provided with and relied upon the factual information summarized as follows, which I am assuming to be accurate and complete for purposes of this affidavit:

There was a civil dispute in federal court related to a series of bank account transfers, including deposits and disbursements from one or more client trust accounts of Mr. Strauss. That case was Solar Eclipse Investment Fund XXXV, LLC and East West Bank vs. $5,000,000.00 U.S. Dollars Deposited to IOLTA Account of The Strauss Law Firm, LLC, *in rem*, and The Strauss Law Firm, LLC, *in personam*, Civil Action No. 9:19-cv-1176. On May 6, 2019, United States District Judge Gergel presided over a hearing on a pending Motion for Temporary Restraining Order and Preliminary Injunction.

At that hearing, the judge stated:

> [I]t appears that the $5 million transfer to the Strauss Law Firm is likely an illegal transfer, and those recipients [to whom the funds were disbursed] are in receipt of funds that should not have gone to them from this fund. … it was certainly done in a way that appears surreptitious to me. TR1 pg.10, lines 17 - 23.

> These transactions appear to be unlawful. They would not be protected by privilege, and he appears -- it's not quite clear what capacity Mr. Strauss actually received these funds since he's taking some of the funds himself and putting them in accounts he controls. TR1 pg.13, line 22 - pg.14, line 1.

The judge also stated that he had "been in communication with the Bankruptcy Court," and spoken to the bankruptcy judge about his hearings involving the companies involved. He shared some information he learned about those hearings and the bankruptcy filings. He indicated that the $5,000,000.00 transfer in question

3

in the civil case was not listed in the bankruptcy filings and that he promised the bankruptcy judge he would do what he could "to repatriate these funds." TR1, pp. 11-12.

> I think it's looking pretty dubious that they have a right to those funds, and particularly under the circumstances where Skadden Arps [law firm] apparently particularly is involved and these other criminal defense firms are fully aware of the circumstances here, that there has been -- I mean, the press accounts, there were dozens of FBI agents circling the Carpoffs' [Mr. Strauss's clients'] home. Judge Beasley tells me that every hearing he has, he has SEC investigators and FBI agents sitting in the audience, and I don't mind to say that my head of my U.S. Attorney's Office is sitting in the back row here right now, and there's a lot of Government interest in all of this. TR1 pg.12, lines 10 – 20.

Because the attorneys at the hearing were unable to answer all of the judge's questions about the transactions, he stated, "I'[m] going to order Mr. Strauss into the Court here, and I'm going to order him to produce all the documents related to the instructions he received for these transfers." TR1 pg.11, lines 4 - 7. Although there was no indication at the hearing that Mr. Strauss might not comply with those orders, the judge also issued a warning regarding that appearance to Mr. Strauss through his law firm's counsel, stating, "Let him know that if he seems to have any difficulty getting here, I'm glad to have him escorted by the marshals." TR1 pg.13, lines 8 - 10.

On May 9, 2019, the judge held a second hearing. Mr. Strauss appeared with counsel and testified under oath. In response to almost every question posed to him by the judge and by the parties' attorneys, Mr. Strauss exercised his Fifth Amendment right and refused to answer. After Mr. Strauss's testimony concluded, the judge stated, "Mr. Strauss, I'm going to put you on notice that I intend to advise the South Carolina Supreme Court that you took the Fifth Amendment today in a matter involving potential criminal activity, and I would suggest you self-report your appearance here today and your actions." TR2 pg.33, lines 8 - 12.



At this time, Mr. Strauss has executed a plea agreement and pleaded guilty in a related criminal investigation involving a transaction different from the $5 million in question in the <u>Solar Eclipse Investment Fund XXXV, LLC</u> case, but involving the same clients. Based on the judge's statements and actions in the civil case, Mr. Strauss is concerned and believes that the judge has a personal prejudice against him, has a personal bias in favor of the U.S. Attorney's Office, and/or has demonstrated the appearance of partiality against him.

7. The documents and information I have reviewed and relied upon in formulating my opinions are of the type commonly and typically relied upon by experts in this field.

8. It is my expert opinion, held to a reasonable degree of professional and legal certainty, that the judge should recuse himself from the criminal matter against Mr. Strauss to avoid the appearance of impropriety.[1] Specifically, my opinions are as follows.

a. A federal judge should recuse himself from a sentencing hearing in a criminal case when there is a reasonable appearance of personal bias, even if the judge believes he can be impartial. This is a fundamental principle of judicial ethics and fairness and it helps ensure that the criminal justice system maintains public trust and confidence. There are several reasons why recusal in such situations is essential:

> Judicial Code of Conduct: Federal judges are bound by a Code of Conduct, which outlines their ethical obligations. One of the key principles in this code is that judges must avoid both actual bias and the appearance of bias. This means that judges should not only be impartial but also avoid situations where their impartiality might reasonably be questioned.

> Preservation of Judicial Impartiality: The cornerstone of a fair and just legal system is the impartiality of judges. Judges must be seen as unbiased and

---

[1] I offer no opinion on whether the judge has engaged in judicial impropriety.

5

neutral arbiters who apply the law objectively. This perception of impartiality is crucial to maintain public confidence in the judiciary.

Public Perception: Even if a judge genuinely believes he can be impartial, the perception of bias can undermine the public's trust in the judicial system. If the public believes a judge is personally biased or has a potential conflict of interest, it can erode confidence in the fairness of the proceedings.

Equal Protection Under the Law: The principle of equal protection under the law requires that all individuals receive the same treatment and consideration in court, regardless of their background, status, or the nature of the case. Any hint of bias, even if unintentional, can raise doubts about whether this principle is being upheld.

Fair Trial Rights: In criminal cases, the defendant has a constitutional right to a fair trial. This includes the right to be judged by an impartial tribunal. If a judge's impartiality is in question due to an appearance of bias, it can infringe upon the defendant's constitutionally protected fair trial rights.

Avoiding Litigation and Appeals: When a judge's impartiality is questioned and not addressed through recusal, it can lead to prolonged litigation and appeals. This is costly, time-consuming, and may not ultimately result in a just outcome. Recusal can help prevent such complications.

Maintaining the Integrity of the Judiciary: The integrity of the judicial system relies on judges who adhere to the highest ethical standards. Recusal in cases where impartiality might reasonably be questioned is a proactive step to maintain the reputation and credibility of the judiciary.

b. With regard to Mr. Strauss, the judge has made statements that would cause an objectively reasonable person to question his impartiality. Before being charged with any crime, Mr. Strauss was compelled to appear before

6

the judge and answer questions related to civil claims to funds processed through his client trust account. This inquiry implicated both Mr. Strauss's obligations to protect his clients' confidentiality and privilege and his own interest in avoiding potential self-incrimination. At the May 6, 2019 hearing, the judge had ruled (without hearing argument or briefing) that the information related to the transaction was "not protected, attorney-client privilege" based on his conclusion that the "transactions appear[ed] to be unlawful." TR1 pg.13, lines 20 - 22.

c. Mr. Strauss correctly and rightfully asserted Constitutional protections in response to many of the questions posed to him at the hearing. The judge expressed an opinion that a lawyer's assertion of the Fifth Amendment was unethical and required reporting to the disciplinary authorities when he stated that he would be reporting Mr. Strauss and when he suggested Mr. Strauss report himself. The judge took this position even though he acknowledged the potential criminal implications of the civil proceedings. The judge stated, "[L]et's be candid. To the extent [the plaintiff's counsel's] hypothesis is correct, anybody involved in the transaction potentially has criminal implications tied to them … [i]f they're actually involved in converting the funds[.]" TR2 pg.68, lines 21 - 24.

d. In fact, it is not professional misconduct for a lawyer to assert Fifth Amendment rights. Every American has that right and lawyers are no exception. The Fifth Amendment "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him or her not to answer official questions put to him or her in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." Lefkowitz v. Turley, 414 U.S. 70, 77 (1973). It follows that a lawyer is not subject to disciplinary sanction for invoking the Fifth Amendment privilege against self-incrimination. In Spevack v. Klein, the U.S. Supreme Court held that "the Self-Incrimination Clause of the Fifth

7

Amendment … extends its protection to lawyers as well as to other individuals, and [] it should not be watered down by imposing the dishonor of disbarment and the deprivation of a livelihood as a price for asserting it." 385 U.S. 511, 514 (1967). The Supreme Court stated that lawyers are "not excepted" from Fifth Amendment protections because the "threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion to make a lawyer relinquish the privilege." The Supreme Court held that an attorney who invokes the Fifth Amendment can suffer "no penalty," which would include "the imposition of any sanction which makes the assertion of the Fifth Amendment privilege costly."

e. Given that the law is clear that invoking the privilege against self-incrimination is not professional misconduct, the judge's reaction and response to Mr. Strauss's refusal to answer certain questions related to his clients' financial transactions would cause a reasonable defendant concern regarding the judge's ability to decide his fate in a fair and impartial manner.

f. It would also be reasonable for Mr. Strauss to be concerned about judicial impartiality based on the judge's comments at both hearings suggesting he might have participated in or assisted his clients in criminal activity related to the $5 million trust account deposit. The impending criminal charges against Mr. Strauss are not based on transactions associated with that deposit; however, Mr. Strauss should reasonably expect his fate to be determined by a judge who did not have preconceived notions about his integrity as an attorney. The perception of personal bias in this matter is heightened due to the judge's expressed affinity or affiliation with the federal prosecutor. In the first hearing, he noted, "I don't mind to say that _my_ head of _my_ U.S. Attorney's Office is sitting in the back row here right now, and there's a lot of Government interest in all of this." TR1 pg.12, lines 10 – 20 (*emphasis added*).

8

g.  It would also be reasonable for Mr. Strauss to be concerned about judicial impartiality based on the judge's apparent independent investigation about the bankruptcy proceedings involving the Carpoffs' companies. Canon 3A(4) of the Code of Judicial Conduct for U.S. Judges (effective March 12, 2019) states that "a judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers." This restriction includes "communications from lawyers, law teachers, and others who are not participants in the proceeding." (See, Commentary to Canon 3A(4).) The judge's statements regarding his communications with the bankruptcy judge and his pledge to use the civil case to assist in marshalling assets for the debtors' creditors would cause a reasonable person to question his impartiality.

h.  Canon 3C(1) of the Code of Judicial Conduct for U.S. Judges states that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned[.]" The Canon goes on to provide some examples of circumstances where such may occur, including "personal bias or prejudice concerning a party[.]" However, the issue of judicial recusal involves more than actual bias and can be required where a judge's "impartiality might reasonably be questioned." This is based on an objective standard whether "a reasonable well informed observer" outside the judiciary "might reasonably question [the judge's] impartiality on the basis of all of the circumstances." The purpose of this judicial disqualification standard is to preserve public confidence in the integrity and impartiality of the federal judiciary by requiring recusal where there might be a public perception of a lack of impartiality or fairness by a judge sitting in a particular matter. The question of recusal is broader than the issue of personal bias, extending to the potential appearance of partiality and public confidence in the integrity and fairness of the judicial process. The Court's duty to avoid even an appearance of impartiality must ultimately be decided on an objective standard designed to preserve public confidence in our

system of justice. This provision provides an objective standard and does not require a showing of actual bias.

i.  In this case, the judge's threat to file a disciplinary complaint against Mr. Strauss for asserting his Fifth Amendment rights, in direct contravention of established law; his stated opinions in the civil case that the transactions appeared "dubious," "surreptitious," "illegal," and "unlawful;" his language suggesting he is in alliance with the U.S. Attorney; and, the apparent influence of extra-judicial information combine to raise a reasonable question about his impartiality.

9. My expert opinions are based on the evidence provided to me at this time, as outlined above, all of which I have assumed to be true. The opinions in this affidavit are subject to supplementation, clarification, and modification if and when further evidence or issues are presented to me.

Barbara M. Seymour, Affiant

Columbia, SC
November 29, 2023

SWORN TO AND SIGNED in my presence on November 29, 2023.

Signature of Notary Public for the State of South Carolina

Christle Turner
Printed Name
My commission expires: 2/24/25

10

# BARBARA M. SEYMOUR, J.D.

## EDUCATION

UNIVERSITY OF GEORGIA, SCHOOL OF LAW, Juris Doctor, May 1993
UNIVERSITY OF NORTH CAROLINA AT GREENSBORO, B.S., Management & Marketing, May 1990

## PROFESSIONAL EXPERIENCE

CLAWSON & STAUBES, LLC, COLUMBIA, SOUTH CAROLINA, July 2017 – Present
**Partner.** Representing clients in Professional Responsibility, Legal Ethics, State Ethics Act, and unauthorized practice of law matters. Assisting lawyers and law firms in ensuring ethical compliance, including conflicts analysis, advertising review, risk management assessment, trust account management training, succession planning, departure and dissolution guidance, and litigation and discovery conduct. Representing lawyers, judges, and law students in Bar admission, reinstatement, and professional discipline matters. Legal malpractice consulting and testimony.

PARALEGAL DEGREE PROGRAM, MIDLANDS TECHNICAL COLLEGE , August 2000 – Present
**Adjunct Professor.** Courses have included Torts, Introduction to Law and Ethics, Civil Litigation, Law Office Management, and Business Law.

OFFICE OF DISCIPLINARY COUNSEL, SUPREME COURT OF SOUTH CAROLINA, June 2000 – July 2017
**Deputy Disciplinary Counsel.** Investigated complaints of misconduct and incapacity pursuant to the Rules of Professional Conduct, the Code of Judicial Conduct, and the Rules for Disciplinary Enforcement. Prosecuted discipline, incapacity, and contempt proceedings before the Commission on Lawyer Conduct and the Supreme Court of South Carolina. Trained new ODC attorneys and staff. Design, training, and technical support for case management software. Drafted proposed rule revisions. Provided assistance and advice to the Disciplinary Counsel in personnel, case processing, and policy matters.

PROFESSIONAL LEGAL ASSISTANTS PROGRAM, CONVERSE COLLEGE, August 1997 – June 2000
**Adjunct Instructor.** Taught Professional Responsibility, Legal Research & Writing, and Civil Litigation.

HARRIS & GRAVES, P.A., GREENVILLE, SOUTH CAROLINA, August 1993 – June 2000
**Associate.** Responsible for all aspects of client files, from initial interview to settlement or trial. Maintained an average caseload of 200 files, representing plaintiffs in civil matters. Extensive courtroom experience. Hired, trained, supervised non-lawyer staff.

## REPRESENTATIVE CASES

In the Matter of McKeever, 421 S.C. 130, 805 S.E.2d 201 (2017)
In the Matter of Breckenridge, 416 S.C. 446, 787 S.E.2d 466 (2016)
In the Matter of Berger, 408 S.C. 313, 759 S.E.2d 716 (2014)
In the Matter of Collie, 410 S.C. 556, 765 S.E.2d 835 (2014)
In the Matter of Carter, 400 S.C. 170, 733 S.E.2d 897 (2012)
In the Matter of White, 391 S.C. 581, 707 S.E.2d 411 (2011)
In the Matter of Davis, 395 S.C. 470, 719 S.E.2d 645 (2011)
In the Matter of Pennington, 393 S.C. 300, 713 S.E.2d 261 (2011)
In the Matter of Lattimore, 361 S.C. 126, 604 S.E.2d 369 (2004)
Linder v. Insurance Claims Consultants, 348 S.C. 447, 560 S.E.2d 612 (2002) (*amicus curiae*)

## BARBARA M. SEYMOUR, J.D.

### PROFESSIONAL AFFILIATIONS

- **South Carolina Bar**, Admitted November 1993
    - Professional Responsibility Committee, 2003 – Present (Chair, 2022 – Present)
    - Unauthorized Practice of Law Committee, 2016 – Present (Chair, 2018 - 2020)
    - Diversity Committee, 2017 – Present
        - Professional Standards Subcommittee Chair, 2020-2022
    - Law Related Education Committee, 1998 – Present (Chair, 2002 – 2004)
    - House of Delegates, 2017 - 2018
    - Legal Ethics and Practice Program (LEAPP), Creator & Presenter, 2009 - 2020
    - S.C. Access to Justice Commission, Limited Scope Representation Subcommittee (2017)
    - Bridge-the-Gap/Essentials Series Faculty
        - Ethics Essentials – Coordinator & Presenter, 2018 – Present
        - Personal Injury Essentials – Ethics Presenter, 2018 – Present
        - Family Law Essentials – Ethics Presenter, 2022 - Present
        - Trust Accounting, 2013 – 2014
        - Law Office Management, 2005 – 2006
    - Continuing Legal Education Committee, 2000 – 2006
    - Conventions Committee, 2000 – 2003
    - Young Lawyers Division, 1993 – 2003
        - Adopt-A-Shelter Committee, 1999 – 2000
        - Continuing Legal Education Committee, 2001 – 2002
- **State Bar of Georgia**, Admitted July 1993
    - Facilitator, First-Year Law Student Orientation on Professionalism 1997, 1999, 2000
- **SC Paralegal Certification Board**, Character and Fitness Subcommittee 2020 - Present
- **Association of Professional Responsibility Lawyers**, 2017 – Present
- **South Carolina Women Lawyers Association**, 1998 – Present
    - Judicial Election Task Force, Chair, 2018 – 2020
    - Board of Directors, 2002 – 2005
    - Membership Committee Chair, 2004 – 2005
    - Editorial Committee Chair, 2002 – 2003
    - Midlands Region Coordinator, 2002
- **National Organization of Bar Counsel**, 2000 – 2017
    - Director-at-Large, 2016 - 2017
    - Liaison to ABA Commission on Lawyer Assistance Programs, 2016 – 2017
    - Programming Committee, 2011 – 2016
    - Special Committee on Permanent Retirement, 2012
    - MRLDE Subcommittee, 2011
- National Institute for the Teaching of Ethics and Professionalism - Fellow, 2006 & 2011
- Midlands Technical College Paralegal Studies Dept. Adjunct Faculty Member of the Year, 2020
- SC Bar Law-Related Education Lawyer of the Year, 2006
- Martindale-Hubbell rating – AV Preeminent
- *South Carolina Lawyer's Weekly* Leadership in Law Award, 2013
- Richland County Bar Association, 2018 - Present
- South Carolina Trial Lawyers Association, 1993 - 2000
- Spartanburg & Greenville County Bar Associations, 1993 – 2000
- American Bar Association, 1993 – 2000, 2023 - Present



**BARBARA M. SEYMOUR, J.D.**

---

## PUBLICATIONS

Protecting the Profession and the Public: Primer on Reporting Misconduct *SC Lawyer Magazine* (Jan 2023)
Navigating the SC Disciplinary Process, *SC Lawyer Magazine* (November 2022)
Trust Accounting for South Carolina Lawyers: An Annotated Practice Manual, SC Bar Publication (2021)
Paralegal Survival Guide, Ethics & Professional Responsibility Chapter, SC Bar Publication (4d Ed. 2020)
New Year's Resolution: Escheat Unclaimed Funds! *SC Lawyer Magazine* (January 2018)
The Curious Case of Benjamin Hunt: Origins of Civility Regulation in SC, *SC Lawyer Magazine* (May 2013)
Ethics Watch: An Inside Look at Confidential Discipline, *SC Lawyer Magazine* (May 2008)

## NATIONAL CONFERENCE PRESENTATIONS

*Passing the Baton: Leaving Your Practice in Good Hands,* (panelist), American Bar Association 48th Annual Professional Responsibility Conference – New Orleans, LA (2023)

*Uncharted Waters: Navigating a Multijurisdictional Practice,* American Public Power Association Annual Legal and Regulatory Conference – Charleston, SC (2018)

*The Crucible of Discipline: The Role of Public Shaming in Promoting Professional Conduct and Protecting the Public*, National Organization of Bar Counsel Annual Meeting – New York, NY (2017)

*Just Because You're Paranoid Doesn't Mean They're Not After You: Managing Complaints Against Bar Counsel*, (panelist) NOBC Annual Meeting – New York, NY (2017)

*New Challenges in Managing Receiverships*, (moderator) NOBC Mid-Year Meeting - Miami, FL (2017)

*Attorney Discipline Procedures from Around the Globe: Comparative Analyses and Best Practices*, (panelist) 5th International Conference of Legal Regulators - Washington, DC (2016)

*The Bigger They Are, the Harder They Fall: Challenges in Prosecuting Government Officials*, (moderator) NOBC Annual Meeting – San Francisco, CA (2016)

*Ethics & the Elderly Client: Investigating Disciplinary Complaints Related to Representation of Older Clients*, (panelist) NOBC Mid-Year Meeting – San Diego, CA (2016)

*Nontraditional Legal Service Providers and the Impact of NC Board of Dental Examiners v. FTC on Lawyer Regulation*, (moderator) NOBC Annual Meeting – Chicago, IL (2015)

*Professionalism Mandates & Regulation of Lawyer Civility*, NOBC Annual Meeting – Chicago, IL (2015)

*Ten Years of Multijurisdictional Practice: The Challenge of Regulating Cross-Border Practice*, NOBC Annual Meeting – Chicago, IL (2015)

*It's Just Adding and Subtracting: Helping Lawyers Avoid Trust Accounting Disasters and Prosecuting Them When They Don't,* NOBC Mid-Year Meeting – Houston, TX (2015)

*Is Where You Sit Where You Practice? MJP, UPL, and the Virtual Practice of Law* (panelist)*,* 12th Annual Legal Malpractice & Risk Management Conference - Chicago, IL (2013)

*Prosecutorial Discretion: Disciplinary Complaints Against Public Defenders*, (panelist) NOBC Mid-Year Meeting – Dallas, TX (2013)

*This is Not Your Father's Law Firm: Investigating "National" Law Firms & Virtual Law Offices,* NOBC Annual Meeting – Chicago, IL (2012)

*A LEAPP Forward: South Carolina's Ounce-of-Prevention Approach to Lawyer Discipline,* Burge Conference on Law and Ethics, Georgia State University College of Law – Atlanta, GA (2011)

*Mandatory Overdraft Reporting: South Carolina's Holistic Approach to Trust Account Compliance,* NOBC Mid-Year Meeting – Atlanta, GA (2011)

*Judicial Ethics & Electronic Communication,* National College of Probate Judges Fall Conference – Charleston, SC (2010)

*Finding Your Way: Ethics for the Transportation Lawyer,* (panelist) American and Canadian Transportation Lawyers Associations Annual Joint Conference – Hilton Head Island, SC (2010)

*Ethics 2.0: Is New Media Really Changing Legal Ethics?* NOBC Annual Meeting – San Francisco, CA (2010)

## BARBARA M. SEYMOUR, J.D.

### LOCAL & STATE PRESENTATIONS

*Back to Basics: Trust Accounting 101*, Stewart Title Company, Title Insurance Professionals Seminar (2023); SC Workers' Compensation Education Association, Annual Conference (2017); Hilton Head Bar; SC Supreme Court Mentees (2011); Spartanburg Co. Bar; Lexington Co. Bar (2010); Richland Co. Bar

*Ten Things You Need to Know About Conflicts of Interest*, SCWCEA Annual Conf. (2023)

*Deepfake Technology and Artificial Intelligence: What Litigators Need to Know*, SC Public Defenders Association Annual Meeting; SC Injured Workers Advocates Annual Conference (2023)

*10 Things You Need to Know that You Won't Find in RPC,* Haynsworth-Perry Inn of Court (2023)

*Creating a Culture of Ethics in Public Service,* SC Association of Probate Judges Bench/Staff Seminar (2023)

*Ethics Update for Judges*, SC Association of Probate Judges Annual Meeting (2023)

*Where Angels Fear to Tread: Unauthorized Practice of Law,* Palmetto Paralegal Assn. (2003); SC Association for Justice Paralegal Seminar (2023)

*Ethics & Deepfake Scams: What You Need to Know to Protect Your Clients and Your Firm*, Chicago Title Ins. Co. Annual Claims & Underwriting Seminar, Lexington County Bar Annual CLE (2022); SC Women Lawyers Association CLE (2023)

*Recognizing & Addressing Cognitive Impairment in Your Law Office*, Charleston County Bar Wellness Committee CLE (2020); SCWLA (2023)

*Unique Ethical & Regulatory Challenges for Immigration Lawyers*, American Immigration Lawyers Assn (2022)

*Ethical Considerations for Court Employees*, Aiken County Magistrates' Office (2017); SC Assn of Clerks of Court & Registers of Deeds Fall Conference (2022)

*The Paralegal Parachute: Saving Lawyers from Themselves*, Palmetto Paralegal Assn. Lunch Meeting (2022)

*Ethics Tips for Public Defenders*, SC Public Defenders Association Annual Meeting (2022)

*Ethics & the Modern Solo Practice*, Charleston School of Law Solo Practice CLE (2022)

*School Law Ethics: Collaboration in School District Representation,* SCSBA Council of School Attorneys (2022)

*The Problem of Prejudice in the Legal Profession: Is There a Regulatory Solution?* Charleston School of Law Diversity Week Speaker Series (2022)

*Behind the Scenes at ODC: How the Discipline Process Works and How to Avoid It*, Pee Dee Inn of Court (2022); Richland Co. Bar (2021); Berkeley Co. Bar (2019); Charleston Co. Bar "What Works" (2018)

*Trust Accounts: From Set Up to Succession,* Chicago Title Ins. Co. Attorney Seminar (2022)

*Practical Advice for Taking Responsibility, Building Resilience, and Being a Better Lawyer*, Hilton Head Bar Super CLE (2021); Greenville Co. Bar Annual Conference; SCWLA CLE (2020)

*Ethics & Social Media for Litigators*, SC Defense Trial Attorneys Association Annual Conference (2020)

*Ethical Issues and Pro Se Litigants*, SC Children's Law Center, DSS Attorney Seminar (2020)

*Judicial Ethics in the Virtual World*, SC Association of Probate Judges Annual Meeting (2020)

*Defending the Borders: MJP, UPL, and Advertising for Immigration Lawyers*, SC Chapter of American Immigration Lawyers Association CLE (2020)

*A Little Help from Your Friends: SA/MH Resources for SC Lawyers*, Hilton Head Island Bar, Annual Super CLE (2020); SC Workers' Compensation Education Association, Annual Conference (2019)

*Too Good to Be True? Risks of Associating with "National" Law Firms,* SC Bankruptcy Law Association (2019)

*Judicial Ethics for Lawyers*, SCWLA (2011 & 2019); York County Bar (2011)

*Your Name (and Address) Here: How to Avoid Advertising Complaints*, Richland County Bar, Greenville Association of Criminal Defense Lawyers (2019); Charleston County Bar (2017)

*Keys to Securing Client Confidentiality*, Palmetto Paralegal Association Fall Conference (2019)

*Ethics & Civil Litigation*, SC Association for Justice Annual Conference (2018)

*Succession Planning for Lawyers and Law Firms,* SC Bankruptcy Law Association (2018)

*Those Were NOT the Days: A History of Discrimination in the Legal Profession*, SCWLA; SC Bar YLD Diversity Committee CLE; SC Bar Leadership Academy (2017)

*Multijurisdictional Practice and Unauthorized Practice of Law in Magistrate's Court*, SC Summary Court Judges

BARBARA M. SEYMOUR, J.D.

_____

Association Annual Meeting (2017)

*Back to Basics: Trust Accounting 101*, SCWCEA Annual Conf. (2017); Hilton Head Bar; SC Supreme Court Mentees (2011); Spartanburg Co. Bar; Lexington Co. Bar (2010); Richland Co. Bar; SCWCEA (2005)

*Judicial Ethics in the Internet Age,* Summary Court Judges Annual Meeting (2017); South Carolina Judicial Conference; SC Assn. of Probate Judges, Bench/Staff Seminar (2010)

*Warning Signs that Your Lawyer Might Be in Trouble,* Palmetto Paralegal Assn. (2006 & 2017)

*Ethics & Professionalism for Law Clerks & Staff Attorneys*, SC Judicial Conference (2007-2017)

*"No Comment!" Ethical Considerations in Lawyer-Media Relations*, SCWLA; Hilton Head Bar (2016)

*Unauthorized Practice, False Witnessing, and Misappropriation: Is It Time to Reconsider Certification & Regulation of Paralegals in South Carolina?* SC Legal Staff Professionals; (2015) Upstate Paralegal Assn. (2016); Palmetto Paralegal Assn. (2014)

*Ethical Considerations in the Use of Social Media by Lawyers and Law Firms*, SC Defense Trial Attorneys Assn. Annual Meeting; Lexington County Bar Annual CLE (2015)

*Ethics and Discipline Update for Real Estate Practitioners*, SC Bar Real Estate Section, Annual Convention (2016); First American Title Company, Annual Attorney Seminar (2015)

*Law Office Management, Technology, & Ethics,* SCWLA (2015); SC Legal Staff Professionals CLE (2013); Greenville County Bar CLE; Palmetto Paralegal Assn. (2012)

*Defending the Borders in the Internet Age: Multijurisdictional Practice, Virtual Law Offices, and the Unauthorized Practice of Law*, SCWLA; Hilton Head Bar; SC Judicial Conference; Chicago Title Ins. Co. Attorney Seminar (2014); Richland Co. Bar Annual Ethics Seminar; SCAJ Annual Convention (2013)

*Lawyers and Identity Theft: An Emerging Trend*, SCWLA; Hilton Head Bar Assn.; SCAJ Annual Convention (2013); SCWCEA Annual Education Conference (2012)

*Advertising Evolution: Recent Developments in the Regulation of Law Office Marketing,* SCWCEA Annual Education Conference; SCWLA; Association of Legal Marketing Professionals, Low Country Chapter; SC Injured Workers Advocates (2013)

*Thinking About the Unthinkable: Planning for Disaster, Disability, Discipline, and Death*, SCAJ, Annual Convention (2009 & 2013)

*Social Networking: Professionalism and Ethics for Paralegals*, SC Legal Staff Professionals (2011 & 2013); Upstate Paralegal Assn. (2011); Palmetto Paralegal Assn. (2010)

*Managing Ethical Issues in Your Day-to-Day Practice,* National Business Institute CLE (2006, 2007, 2012); SC Supreme Court Mentees CLE (2010)

*Substance Abuse & Mental Health Issues in the Legal Profession*, Lexington County Bar (2011)

*Two Wrongs Don't Make a Right: The Lawyer's Oath, Revisited,* SCAJ Annual Convention; SCWCEA Annual Conference (2011)

*Legal Ethics in the Digital Age,* National Business Institute CLE (2011)

*Navigating the Social Media Minefield: Are You Prepared?* SC Assn. of Legal Administrators (2011)

*Trust Accounting for Real Estate Lawyers,* South Carolina Bar Convention (2011); Stewart Title Company, Title Insurance Professionals Seminar (2006)

*Pretexting & Dissembling: Lawyers and Little White Lies*, SC Insurance Reserve Fund - Law Enforcement Defense Counsel Annual Meeting (2010); cited in Ethics of "Pretexting" in a Cyber World, 41 MCGEORGE L.REV. 2; SCWCEA Annual Conference (2009)

*Accounting & Accountants: What Lawyers Need to Know*, National Business Institute CLE (2010)

*Making the Most of Technology at Trial* (panelist)*, Assn. of Litigation Support Professionals (2010)

*Advertising in the Internet Age*, SC Assn. of Legal Administrators; Hilton Head Bar; SCWLA (2010)

*Social Networking: Professionalism in the Internet Age*, SCWLA; Lexington Co. Bar; Federal Law Clerks (2010)

*Ethical Considerations in Marketing Your Law Practice*, SCWLA; Richland Co. Bar, Annual Seminar (2009)

*Eight Simple Ways to Lose Your Law License by Email,* Hilton Head Bar; Federal Law Clerks; Richland Bar (2009); SCWLA; SCWCEA Annual Conference (2010)

## BARBARA M. SEYMOUR, J.D.

*Professional Responsibility and Lawyer Discipline in South Carolina,* SCANPO/SCDOR Annual CLE (2003); SC Attorney and CEO Clinic (2000)

*Legal Ethics for Private Investigators*, SC Assn. of Legal Investigators, Annual Conference (2007)

*How to Handle Lawyer Misconduct in Your Courtroom,* South Carolina Judicial Conference (2007)

*Basics of Legal Assisting in SC: Ethics for Legal Assistants,* Half Moon Seminars (2001, 2003, 2007)

*The Busy Lawyer's Top Five Must-Haves This Holiday Season,* SCAJ Annual Auto Torts Seminar (2007)

*Practical Legal Ethics for SC Attorneys and Law Office Staff,* Half Moon Seminars (2001, 2004, 2006)

*Screening for Conflicts & Obtaining Waivers After Ethics 2000,* SCWLA (2006)

*Ethics for Federal Practitioners,* SC Chapter of the Federal Bar Assn. (2005)

*What You Need to Know About Ethics 2000,* USC School of Law Alumni Assn., Annual CLE; SCAJ Annual Convention (panelist); SCWLA (2005)

*Revised Lawyers' Oath Seminar,* SC Claimants' Attorneys for Workers' Compensation; SC Probate Judges Assn. (2005); Hilton Head Bar; SCAJ; SC Administrative & Regulatory Lawyers Assn.; SC Assn. of Criminal Defense Lawyers; SCWLA (2004)

*Top Ten Most Frequent Complaints,* USC School of Law Alumni Assn., Annual CLE (2003)

*The Ethics Café: Overview of Ethical Considerations,* Hilton Head Bar CLE (2003)

*Think Like a Manager: A Systems Approach to Ethical Compliance,* SCWCEA Annual Conf.; SCWLA (2002)

*Top 10 Ways Lawyers Screw Up Their Reputations,* NMR&S Center on Professionalism CLE (2002)

*The Twenty-First Century Paralegal,* Converse College PLA Program, Commencement Address (2001)

*Ethical Considerations for Legal Support Staff*, Spartanburg County Paralegal Association (1999)

### SOUTH CAROLINA BAR CLE PRESENTATIONS

*Lawyers are (Vulnerable) People, Too: Tips for Succession Planning*, Speaker and Moderator, Representing Vulnerable Populations Seminar (2023)

*Ethical Considerations When Starting Your Own Law Practice*, Beyond Nuts & Bolts Seminar (2023)

*Annual Ethics Hot Tips,* Speaker and Moderator (2023)

*How to Get Paid Without Getting Disbarred,* 32nd Annual Criminal Practice in South Carolina (2023)

*Fostering an Ethical Organizational Culture: Tips for Leaders*, Hot Topics in Education Law (2023)

*Ethics and Civility: Beyond the Lawyer's Oath*, Family Law Hot Tips (2022)

*How to Avoid Grievances and What to Do When You Can't*, Annual Tips from the Bench (2015, 2017, 2022)

*Ethics & The Modern Law Firm: Lessons from the Pandemic* (2022)

*Trust Account Academy*, Distance Learning Three-Part Series (2021)

*Investigation Ethics for Litigators*, Distance Learning Video (2020)

*Diversity & Inclusion in the Profession: Where We've Been & Where We Are Going*, Ann. Convention (2018)

*Current Events in Criminal Law & Ethics,* 25th Annual Criminal Practice Seminar (2018)

*Ethics for Criminal Lawyers: The New Model Rule 8.4(g)*, 25th Annual Criminal Practice Seminar (2017)

*Common Advertising Complaints and How to Avoid Them*, Annual Convention (2017)

*Ethics and Discipline Update for Real Estate Practitioners*, Annual Convention (2016)

*A Little This Side of the Snow: The Changing Landscape of the Legal Profession*, 31st Annual NC/SC Labor & Employment Law Conference (2015)

*Ethics for Criminal Lawyers: Interactions with the Media*, 24th Annual Criminal Practice Seminar (2015)

*Loan Modification & Unauthorized Practice in Equity Court*, Master-in-Equity Bench/Bar (2014)

*"I Was Just Obeying Orders": Ethical Consideration for Attorneys & Paralegals*, The Secrets of Law Firm Profitability & Efficiency Seminar (2014)

*Ethics & Marketing: Getting Out There Without Getting in Trouble*, Rainmaking Boot Camp (2014)

*Establishing & Maintaining Your Client Trust Account*, Distance Learning Video (2012)

*Ethical Considerations in Marketing Your Law Practice*, Distance Learning Video (2008, rev. 2012)

*Ethics on the River: Annual Update on Ethics & Discipline* (2011)



## BARBARA M. SEYMOUR, J.D.

*Ethics of Bankruptcy Practice in South Carolina: Advertising in SC Post-Milavetz* (2011)
*Practice Essentials for Lawyers and Paralegals: Confidentiality in the Internet Age* (2010)
*Staying Out of eTrouble: Professional Responsibility & Online Networking,* Distance Learning (2010)
*Ethics & Online Networking,* Conference on the 75th Anniversary of the SC Workers' Comp Act (2010)
*Back to Basics: Trust Accounting 101*, Solo & Small Firm Conference (2010, 2011, 2012)
*Succession Planning for Lawyers*, Solo & Small Firm Section, Hot Tips Seminar (2010)
*Advertising in the Internet Age*, Law of Automobile Insurance Seminar (2009)
*Search Engine Marketing and Ethical Considerations for Law Firms* (2009)
*Ethics & Advertising for Family Law Practitioners*, Family Law Section, Hot Tips Seminar (2009)
*Judicial Ethics for Lawyers*, Master-in-Equity, Probate, and Family Court Bench Bar Seminars (2009)
*Ethics Update for Solo & Small Firm Practitioners,* Annual Convention (2007)
*Developments in Professional Responsibility & Lawyer Discipline,* Solo & Small Firm Section (2007)
*Ethics – Did You Know…?* Distance Learning Video (2007)
*Ethics 2000,* Tips from the Bench Seminar (2005)
*20/20 – An Optimal View of 2005: Annual Review of Disciplinary Cases* (2005)
*Hot Tips for Domestic Law Practitioners: Juggling Ethics in the Family Circus* (2003)
*Sex, Lies, and Conflicts of Interest* (2003)
*Take Your Lawyer 'Oats' Seriously: Words of Wisdom for Attorneys from Their Clients,* (2003)
*Conflicts of Interest in Domestic Cases,* Family Law Ethics Seminar (2003)
*SC Tort Claims Act: Beyond the Primer* (1998 & 2003)
*Controlling Your Environment: Ethics for Nonlawyer Staff,* Annual Convention (2002)
*Are We Having Fun Yet? Interactive Ethics Presentation* (2002)
*Ethics Roadshow,* Client Assistance Program Seminar (2002)
*Small Office Systems and Ethical Compliance,* Solo & Small Firm Section Seminar (2002)
*Ring Out the Old, Ring in the New: Ethics Update* (2001)
*Professionalism in the Real World,* Young Lawyers Division Seminar (2001)

### GUEST LECTURES & IN-HOUSE PRESENTATIONS

AGENCIES:

U.S. District Court for the Southern District of Georgia, Advisory Committee
Office of the United States Attorney, District of South Carolina
SC Commission on Prosecution Coordination
SC Department of Insurance
SC Department of Social Services
SC Appleseed Legal Justice Center
SC Department of Health & Environmental Control
SC Worker's Compensation Commission
SC Department of Labor, Licensing, and Regulation
SC Office of the Attorney General
SC Association of Counties
7th Circuit Solicitor's Office
South Carolina Legal Services
Public Employee Benefits Administration Board of Directors
SC Public Service Commission
SC House of Representatives Staff Attorney's Office



## BARBARA M. SEYMOUR, J.D.

LAW FIRMS:

      Nelson Mullins Riley & Scarborough

      Womble, Carlisle, Sandridge & Rice

      Ogletree, Deakins, Nash, Smoak & Stewart

      McAngus Goudelock & Curry

      Collins & Lacy

      Haynesworth Sinkler Boyd

      Callison Tighe Robinson

      Burnette, Shutt & McDaniel

      Turner, Padget, Graham & Laney, PA

EDUCATIONAL INSTITUTIONS:

      University of South Carolina School of Law

      Georgia State University College of Law

      Charleston School of Law

      Greenville Technical College, Paralegal Department

      Horry-Georgetown Technical College, Legal Studies Dept.



UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

* * * * * * * * * * * * * * * *      *
SOLAR ECLIPSE INVESTMENT FUND       *
XXXV, LLC and EAST WEST BANK        *
                                    *    Civil Action No. 9:19-cv-1176
versus                              *
                                    *    May 6, 2019
$5,000,000.00 U.S. DOLLARS          *
DEPOSITED TO IOLTA ACCOUNT          *
OF THE STRAUSS LAW FIRM, LLC        *
IN REM, AND THE STRAUSS LAW         *
FIRM, LLC, IN PERSONAM              *
                                    *
* * * * * * * * * * * * * * * *      *

REPORTER'S OFFICIAL TRANSCRIPT OF THE
MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION BEFORE THE
HONORABLE RICHARD M. GERGEL
UNITED STATES DISTRICT JUDGE
MAY 6, 2019

Appearances:

For the Plaintiffs:        Nexsen Pruet
                           BY: Cheryl D. Shoun
                                R. Bruce Wallace
                           PO Box 486
                           Charleston, SC 29402
                           843.577.9440

For Defendant Strauss      Earhart Overstreet
Law Firm:                  BY: David Overstreet
                                Mike McCall
                           878 Whipple Road
                           Suite 200
                           Mt. Pleasant, SC 29464
                           843.972.9400

Official Court Reporter:   Tana J. Hess, CRR, FCRR, RMR
                           U.S. District Court Reporter
                           85 Broad Street
                           Charleston, SC 29401
                           843.779.0837
                           tana.hess@scd.uscourts.gov

Proceedings recorded by mechanical stenography using
computer-aided transcription software.

EXHIBIT
A
ALL-STATE LEGAL®

---

1                    (Call to order of the court.)

2        3:58PM        THE COURT:  Please be seated.  Okay.  I am convening

3        3:58PM    a hearing in the matter of Solar Eclipse Investment Fund XXXV

4        3:58PM    LLC, and East West Bank versus $5,000,000.00 U.S. dollars, and

5        3:58PM    the Strauss Law Firm, LLC, in personam, 9:19-1176.  It's before

6        3:59PM    me -- I have a temporary restraining order I granted, and there

7        3:59PM    is a motion by the plaintiff for a preliminary injunction.

8        3:59PM        Could counsel for the plaintiff identify

9        3:59PM    themselves for the record, please?

10       3:59PM        MS. SHOUN:  Yes, sir, Your Honor.  Thank you.  I'm

11       3:59PM    Cheryl Shoun.  I'm here on behalf of plaintiffs with my partner

12       3:59PM    Bruce Wallace.

13       3:59PM        MR. WALLACE:  Good afternoon, Your Honor.

14       3:59PM        THE COURT:  Yes.  And for defense?

15       3:59PM        MR. OVERSTREET:  Your Honor, David Overstreet

16       3:59PM    represents Strauss Law Firm here with Mike McCall.

17       3:59PM        THE COURT:  And for the record, no one from the

18       3:59PM    Strauss Law Firm is here; is that correct?

19       3:59PM        MR. OVERSTREET:  That's correct, Your Honor.  I'm

20       3:59PM    here for them.

21       3:59PM        THE COURT:  Okay.  Now, the response I received from

22       3:59PM    the -- from the defendant Strauss Law Firm was that it was not

23       3:59PM    going to contest the entry of a preliminary injunction, but --

24       4:00PM    and it represented that -- that the $5 million had come into

25       4:00PM    its account and had departed; is that correct?

```
 1   MR. OVERSTREET: Yes, Your Honor.
 2        THE COURT: And, Mr. Overstreet, as I understand the
 3   situation here, funds were transferred from this Solar Eclipse
 4   Investment Fund XXXV, LLC to the Strauss Law Firm; is that
 5   correct? Was it directly from the fund -- I'll call that "the
 6   fund" -- to the Strauss Law Firm?
 7        MR. OVERSTREET: I apologize, Your Honor. I'm not
 8   sure of the particulars; only that the 5 million did come to
 9   the Strauss Law Firm Iolta.
10        THE COURT: You're not sure where it came from?
11        MR. OVERSTREET: We do have a copy of the wire for
12   that night.
13        MR. MCCALL: I believe, Your Honor, that the funds
14   did come from an account that was in the name of Solar.
15        THE COURT: So it's -- it's the solar account and
16   then into the Strauss Law Firm?
17        MR. MCCALL: Correct, Your Honor.
18        THE COURT: And to your knowledge, had the Strauss
19   Law Firm been a normal recipient of funds from that account?
20        MR. OVERSTREET: Yes, Your Honor, I do believe
21   Strauss Law Firm had received funds from them in the past to
22   the Iolta.
23        THE COURT: From the Solar Eclipse Investment Fund
24   XXXV?
25        MR. OVERSTREET: I'm not aware of that, Judge. I
```

```
 1   don't know the answer to that.
 2        THE COURT: So where would they have gotten funds
 3   from?
 4        MR. OVERSTREET: I just know they had an ongoing
 5   relationship with the Carpoffs and their entities.
 6        THE COURT: The Carpoffs. And could you state who
 7   they are?
 8        MR. OVERSTREET: My understanding is they own DC
 9   Solar.
10        THE COURT: Okay. So -- so there was a personal
11   relationship between Carpoff -- the Carpoffs and the Strauss
12   Law Firm?
13        MR. OVERSTREET: Attorney-client relationship, yes,
14   Your Honor.
15        THE COURT: Okay. And had the -- and what were the
16   Carpoffs' role in transferring this $5 million from this --
17   this fund to the Strauss Law Firm?
18        MR. OVERSTREET: I'm sorry, Judge. What was their
19   role?
20        THE COURT: What was the role of the Carpoffs
21   personally in transferring those funds?
22        MR. OVERSTREET: I'm sorry, Judge. I'm unaware of
23   that. I don't know.
24        THE COURT: You don't know. Who directed the money
25   to come to the Strauss Law Firm?
```

1  MR. OVERSTREET: My understanding, Judge, is that
2  Mr. Strauss was not aware that the money was going to come.
3  THE COURT: So how did he even learn of it?
4  MR. OVERSTREET: It hit his account.
5  THE COURT: Well, and then did he communicate with
6  somebody?
7  MR. OVERSTREET: Yes, Your Honor.
8  THE COURT: And who did he communicate with?
9  MR. OVERSTREET: My understanding is he spoke with
10  Mr. Carpoff.
11  THE COURT: Mr. Carpoff?
12  MR. OVERSTREET: I think so.
13  THE COURT: And are there any written instructions
14  from Mr. Carpoff or anyone else about where to distribute this
15  $5 million?
16  MR. OVERSTREET: I do believe, Your Honor, there is
17  some email correspondence that we can certainly pull and hand
18  to the other side regarding the distribution of the funds.
19  THE COURT: And was that your understanding from
20  Mr. Carpoff to Mr. Strauss?
21  MR. OVERSTREET: I believe so, Your Honor.
22  THE COURT: Okay. And did that detail where these
23  amounts were to go? I mean, how would Mr. Strauss know where
24  to send the money?
25  MR. OVERSTREET: I believe he was invoiced from a

1  number of entities.
2  THE COURT: How did they know that he would have the
3  money?
4  MR. OVERSTREET: I don't know that, Your Honor. I
5  assume Mr. Carpoff and his entities retained those other
6  entities, which as we discussed were law firms.
7  THE COURT: Okay. Well, some of them are law firms.
8  Not all of them. Let's go through those. $2 million went to
9  the Skadden Arps Law Firm?
10  MR. OVERSTREET: Yes, Your Honor. That's my
11  understanding.
12  THE COURT: And we have met in chambers, so I know a
13  little bit about this from you, Mr. Overstreet, and my
14  understanding is that Skadden Arps represented one of the
15  Carpoffs for about six hours; is that correct?
16  MR. MCCALL: Your Honor, I believe that Skadden
17  represented Mr. Carpoff for a month approximately and then
18  Mrs. Carpoff for the better part of a day on the day of the
19  seizure, and I believe they've also been engaged by DC Solar in
20  various capacities over several years.
21  THE COURT: Okay. And the $2 million is in the
22  Skadden Arps account? Is that what you understand?
23  MR. MCCALL: That's my understanding.
24  THE COURT: And are they holding it? Have they
25  expended those moneys?

7

```
 1   4:04PM    MR. MCCALL:  My understanding, Your Honor, is that
 2   4:04PM   those funds are currently sitting in an interest-bearing
 3   4:04PM   account, all of them.
 4   4:04PM    THE COURT:  And is -- by the way, was Mr. Strauss
 5   4:04PM   aware the day before these moneys were transferred that the
 6   4:04PM   Federal government had executed search warrants and seizure
 7   4:04PM   warrants and had seized all of the assets of the Carpoffs and
 8   4:04PM   DC Solar?  Was he aware of that?
 9   4:04PM    MR. OVERSTREET:  I don't know, Your Honor.
10   4:05PM    THE COURT:  And then there's something called Paul
11   4:05PM   Meltzer, a professional corporation in Santa Cruz, California.
12   4:05PM   What is that?  $500,000.
13   4:05PM    MR. MCCALL:  Our understanding, Your Honor, is
14   4:05PM   Mr. Meltzer is a criminal defense attorney in California who
15   4:05PM   represents either Mr. or Mrs. Carpoff.
16   4:05PM    THE COURT:  Okay.  And then there is a $750,000
17   4:05PM   payment to Worldwide Property and Casual Ltd.  SAC.  What is
18   4:05PM   that?
19   4:05PM    MR. MCCALL:  Your Honor, that is -- that is a portion
20   4:05PM   of a premium owed for Mr. Carpoff's captive insurance company,
21   4:05PM   Bay Shore Select, for the upcoming year.
22   4:05PM    THE COURT:  And who manages that Worldwide Property
23   4:05PM   and Casualty Ltd. SAC?
24   4:06PM    MR. MCCALL:  Who manages it?
25   4:06PM    THE COURT:  Yes.
```

8

```
 1   4:06PM    MR. MCCALL:  I mean, I don't know if manage is the
 2   4:06PM   appropriate term, but I can represent to the Court that the
 3   4:06PM   Strauss Law Firm -- or Peter Strauss certainly has control
 4   4:06PM   over --
 5   4:06PM    THE COURT:  Has control over that fund, that
 6   4:06PM   $750,000?
 7   4:06PM    MR. MCCALL:  Correct.  And the same would be true for
 8   4:06PM   the next $750,000.
 9   4:06PM    THE COURT:  Madison First Property and Casualty,
10   4:06PM   another $750,000.  And so Mr. Strauss transferred those funds
11   4:06PM   that had come out of this investment fund to those accounts?
12   4:06PM    MR. MCCALL:  Correct, Your Honor, for premiums for
13   4:06PM   the two captive insurance companies.
14   4:06PM    THE COURT:  And these were captive insurance
15   4:06PM   companies.  These were not DC Solar.  This was something else?
16   4:06PM    MR. MCCALL:  I believe they are DC Solar affiliated.
17   4:06PM   I believe that DC Solar solutions is the insured for one of the
18   4:06PM   captives, and then DC Solar Distributors is the insured for one
19   4:06PM   of the --
20   4:07PM    THE COURT:  Those are separate entities?
21   4:07PM    MR. MCCALL:  Correct, Your Honor.
22   4:07PM    THE COURT:  Yes, sir.  I thought so.
23   4:07PM    MR. MCCALL:  One is owned by Mr. Carpoff.  One is
24   4:07PM   owned by Mrs. Carpoff.
25   4:07PM    THE COURT:  And then the Law office of Daniel Bakondi
```

## Page 9

1  in San Francisco. Who is that? $250,000.

2  MR. MCCALL: Your Honor, we were not -- we haven't

3  been able to find out exactly who Mr. Bakondi represents in

4  this, but it's our understanding it's one of the carpoffs in

5  some connection with the ongoing investigation.

6  THE COURT: Clark Hill PLLC LLC in Las Vegas.

7  $275,000. What's that?

8  MR. MCCALL: That's law firm in Las Vegas, Your

9  Honor, that is the lead bankruptcy counsel for DC Solar and

10  affiliated entities.

11  THE COURT: And then Segal and Associates Client

12  Trust Account in Sacramento, 250,000. What's that?

13  MR. MCCALL: That is an engagement, a retainer for an

14  attorney, another criminal defense attorney in California named

15  Malcolm Segal who represents I believe Mr. Carpoff in the

16  criminal matters.

17  THE COURT: Then $175,000 to BR -- BRGR Revenue

18  Depository. What is that?

19  MR. MCCALL: That is GlassRatner, Your Honor, which

20  is the -- a gentleman at GlassRatner named Seth Freeman was

21  appointed as the chief restructuring officer for DC Solar, and

22  that was his retainer.

23  THE COURT: And then $50,000 to BH Capital Ventures

24  LLC. What is that?

25  MR. MCCALL: We haven't -- we haven't found exactly

## Page 10

1  what BH Capital Ventures is, but our understanding is they have

2  some involvement in some real estate assets that they were

3  attempting to sell when the bankruptcy was in Chapter 11 before

4  it was converted into Chapter 7.

5  THE COURT: Well, bankruptcy wasn't filed until

6  February, and these were made in December.

7  MR. MCCALL: I believe the last two were made on

8  February 1st.

9  THE COURT: Oh, I see.

10  MR. MCCALL: And so --

11  THE COURT: Still before the bankruptcy filing.

12  MR. MCCALL: I believe it might have been the day of,

13  Your Honor, and I believe they're somehow connected with some

14  real estate transactions that they were trying to carry out in

15  the bankruptcy.

16  THE COURT: Well, here is my concern. From the

17  information I have, it appears that the $5 million transfer to

18  the Strauss Law Firm is likely an illegal transfer, and those

19  recipients are in receipt of funds that should not have gone to

20  them from this fund. The fund was to purchase mobile solar

21  generators. It wasn't to pay all these lawyers and captive

22  funds and all of this, and it was certainly done in a way that

23  appears surreptitious to me. It's one day after the Government

24  has seized every asset they can of the carpoffs.

25  So there's a source of concern by the Court

1    about all of this, and I've asked you a lot of questions I
2    understand y'all can't answer for me. You just don't know the
3    answer. So I'm going to order this -- well, I'll schedule this
4    sometime Thursday. I'll going to order Mr. Strauss into the
5    Court here, and I'm going to order him to produce all the
6    documents related to the instructions he received for these
7    transfers.
8         I'm also going to extend the TRO to all of these
9    entities, and I'm going to offer them the opportunity to come
10   in to be heard on the preliminary injunction. I anticipate --
11   I don't think it takes a crystal ball -- that the plaintiff is
12   likely to add them as parties; is that fair, Ms. Shoun?
13        MS. SHOUN: Yes, sir, Your Honor, that is absolutely
14   fair.
15        THE COURT: And, you know, the easy way to do this is
16   simply to repatriate the moneys if there's some legal question
17   about it, and we'll set up a way in which that can be done to
18   the Court. I would urge you to go ahead and talk to
19   Mr. Strauss about that captive premium. And, you know, to the
20   extent the $5 million is repatriated, this Court doesn't
21   have any further jurisdiction.
22        I'll say on the record, I have been in
23   communication with the Bankruptcy Court. It does not appear
24   that this -- this liability, this obligation, this debt is
25   listed as a liability. They're not listed as creditors in the

1    bankruptcy. I've spoken to Judge Beasley about this. He has
2    asked me do what I can to repatriate these funds, and then once
3    we do that, we'll sort out between the two courts about whether
4    this is an asset of the bankruptcy or not. I don't know the
5    answer to that, but we'll need to get further evidence.
6         But right at this moment, I think the most
7    urgent thing is to -- is to restore the status quo, and to the
8    extent these law firms think they have some lawful entitlement
9    to it, they can come here and litigate that issue if they wish
10   before me. I think it's looking pretty dubious that they have
11   a right to those funds, and particularly under the
12   circumstances where Skadden Arps apparently particularly is
13   involved and these other criminal defense firms are fully aware
14   of the circumstances here, that there has been -- I mean, the
15   press accounts, there were dozens of FBI agents circling the
16   Carpoffs home. Judge Beasley tells me that every hearing he
17   has, he has SEC investigators and FBI agents sitting in the
18   audience, and I don't mind to say that my head of my U.S.
19   Attorneys office is sitting in the back row here right now, and
20   there's a lot of Government interest in all of this.
21        So I don't have any desire to put more on my
22   plate than I need, but I'm going to -- I feel like the
23   plaintiffs have a legitimate claim to these funds, at least
24   what I've heard so far, and my job is to try to restore the
25   status quo to this, and then we can sort out who actually owns

1 the money. Does that make sense to everybody?
2 MS. SHOUN: Yes, sir, Your Honor.
3 THE COURT: Mr. Overstreet, do you anticipate any
4 problem having Mr. Strauss appear on Thursday?
5 MR. OVERSTREET: Your Honor, I will call him when we
6 walk out of the courtroom. My understanding is he was in
7 Hilton Head when we spoke earlier, so I don't see that --
8 THE COURT: Let him know that if he seems to have any
9 difficulty getting here, I'm glad to have him escorted by the
10 marshals.
11 MR. OVERSTREET: Yes, sir.
12 THE COURT: Okay?
13 MR. OVERSTREET: Your Honor, if I could briefly add
14 one thing, my firm had some concern at the very beginning about
15 whether or not releasing the information related to the
16 distribution of these funds from the Iolta would in any way be
17 privileged. We'd be --
18 THE COURT: Mr. Overstreet, you raised that with me.
19 MR. OVERSTREET: Yes, Your Honor.
20 THE COURT: And I told you, and I will say on the
21 record that these are not protected, attorney-client privilege.
22 These transactions appear to be unlawful. They would not be
23 protected by privilege, and he appears -- it's not quite clear
24 what capacity Mr. Strauss actually received these funds since
25 he's taking some of the funds himself and putting them in

1 accounts he controls.
2 Ms. Shoun, do you have anything else you wish to
3 add in terms of the Court --
4 MS. SHOUN: Your Honor, only one matter of logistics,
5 and that would be the service of the TRO as it will be extended
6 to these third parties.
7 THE COURT: Yeah, let's talk about that for a minute.
8 As a practical matter, I -- I will try to get something out
9 this afternoon if that is possible and on the record. I will
10 ask and direct both counsel to do everything possible to
11 communicate with each of these entities, to allow them to
12 number 1, be advised that those funds are restrained pending
13 further action of the Court, and I'm going to afford them the
14 opportunity to appear on Thursday, if they wish, before I
15 extend the preliminary injunction to them, and then I will
16 afford them further opportunity to address this issue with the
17 Court.
18 But what we're going to do is we're going to
19 restore the fund's support, and then if there's a claim to it,
20 we'll sort out among these various parties about who has a
21 legitimate claim to these funds.
22 MS. SHOUN: Your Honor, we are not in receipt of the
23 documents from which counsel I suppose and Your Honor is
24 reading.
25 THE COURT: Would you, Mr. Overstreet, hand Ms. Shoun

```
 1   those documents now?
 2        MS. SHOUN:  Thank you.
 3        THE COURT:  And I will before the end of the day
 4   notice the hearing for Thursday.  We'll come back and do that,
 5   and we'll enter an order in just a few minutes.
 6        MS. Shoun, anything else I need to do at this
 7   point from the plaintiff?
 8        MS. SHOUN:  Beg the Court's indulgence, Your Honor.
 9        (Pause.)
10        MS. SHOUN:  Nothing, Your Honor.  Thank you.
11        THE COURT:  Mr. Overstreet, anything further?
12        MR. OVERSTREET:  No, sir.  Thank you, Your Honor.
13        THE COURT:  Very good.  And, Mr. Overstreet, I don't
14   have even the slightest suggestion that you or your law firm
15   have done anything untoward here.  It's quite clear you've come
16   in at a very late hour, and you've done everything you can to
17   try to straighten this out, and I appreciate that.  And
18   we'll -- you know, if something inappropriate has happened,
19   it's not involved your law firm.
20        MR. OVERSTREET:  Thank you, Your Honor.
21        MR. MCCALL:  Thank you, Your Honor.
22        THE COURT:  Thank you very much.  This hearing is
23   adjourned.
24        MS. SHOUN:  Thank you, Your Honor.
25
```

```
 1              * * * * * * * *
 2                 CERTIFICATE
 3        I, Tana J. Hess, CCR, FCRR, Official Court Reporter
 4   for the United States District Court, District of South
 5   Carolina, certify that the foregoing is a true and correct
 6   transcript, to the best of my ability and understanding, from
 7   the record of proceedings in the above-entitled matter.
 8
 9
10
11                 Tana J. Hess, CCR, FCRR, RMR
                   Official Court Reporter
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

```
* * * * * * * * * * * * * *
SOLAR ECLIPSE INVESTMENT FUND       *
XXXV, LLC and EAST WEST BANK        *
                                    *
versus                              *   Civil Action No. 9:19-cv-1176
                                    *
$5,000,000.00 U.S. DOLLARS          *
DEPOSITED TO IOLTA ACCOUNT          *
OF THE STRAUSS LAW FIRM, LLC        *
IN REM, AND THE STRAUSS LAW         *
FIRM, LLC, IN PERSONAM              *
* * * * * * * * * * * * * *
```

May 9, 2019

REPORTER'S OFFICIAL TRANSCRIPT OF THE
MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION BEFORE THE
HONORABLE RICHARD M. GERGEL
UNITED STATES DISTRICT JUDGE
MAY 9, 2019

Appearances:

For the Plaintiffs:
Nexsen Pruet
BY: Cheryl D. Shoun
R. Bruce Wallace
Val H. Stieglitz
J. Ronald Jones, Jr.
PO Box 486
Charleston, SC 29402
843.577.9440

For Defendant Strauss
Law Firm
Earhart Overstreet
BY: David Overstreet
878 Whipple Road
Suite 200
Mt. Pleasant, SC 29464
843.972.9400

For Recipients Hamilton
Captive Management LLC,
Worldwide Property
Casualty, and Madison
First Property Casualty
Allen Legal
BY: Samuel K. Allen
1417 Ashley River Road
Charleston, SC 29407
843.481.4000

Appearances:

For Recipients Skadden Arps
Slate Meagher & Flom
LLP, Clark Hill PLC,
Glassratner Advisory &
Capital Group LLC, Law
Offices of Paul Meitzer,
and Segal & Associates
Nelson Mullins Riley
and Scarborough
BY: Patrick Coleman Wooten
151 Meeting Street
Sixth Floor
Charleston, SC 29401
843.534.4102

For Recipient BH Capital
Ventures LLC
Graybill Lansche & Vinzani LLC
BY: Jake S. Barker
225 Seven Farms Drive
Suite 207
Charleston, SC 29492
843.408.4063

Parties present via telephone:
Jeff Hartman
Don Gaffney
Candace Carlyon
Curtis Jung
Maita Prout
Annie Li

Official Court Reporter:
Tana J. Hess, CRR, CCRR, FCRR, RMR
U.S. District Court Reporter
85 Broad Street
Charleston, SC 29401
843.779.0837
tana_hess@scd.uscourts.gov

Proceedings recorded by mechanical stenography using
computer-aided transcription software.

EXHIBIT B
ALL-STATE LEGAL®

**3**

|  | INDEX | |
| --- | --- | --- |
| **NAME** | | **PAGE** |
| Peter Strauss | | |
| Examination by the Court | | 8 |
| Cross-Examination by Ms. Shoun | | 12 |

**4**

| | |
| --- | --- |
| | (Call to order of the court.) |
| 11:55 | 2   THE COURT:  Good morning.  Please be seated. |
| 11:56 | 3   MS. SHOUN:  Good morning, Your Honor. |
| 11:56 | 4   THE COURT:  Ms. Perry, we have folks on line as |
| 11:56 | 5   well -- |
| 11:56 | 6   COURTROOM DEPUTY:  Yes, Your Honor. |
| 11:56 | 7   THE COURT:  -- on the telephone?  Okay.  Okay. |
| 11:56 | 8   Let's -- this is a -- the matter of Solar Eclipse Investment |
| 11:56 | 9   Fund XXXV versus $5,000,000.00 and the Strauss Law Firm. |
| 11:56 | 10   Could counsel identify themselves for the |
| 11:56 | 11   record, please? |
| 11:56 | 12   MS. SHOUN:  Yes, sir, Your Honor.  Thank you.  I'm |
| 11:56 | 13   Cheryl Shoun with Nexsen Pruet here on behalf of the |
| 11:57 | 14   plaintiffs.  Sitting at counsel table with me is my partner, |
| 11:57 | 15   Bruce Wallace.  Also present, Your Honor, from Nexsen Pruet on |
| 11:57 | 16   behalf of the plaintiffs is Val Stieglitz, and -- who is also |
| 11:57 | 17   on the complaint on behalf of the plaintiffs, and Ron Jones, |
| 11:57 | 18   who has not made a formal appearance, but we'd ask the Court |
| 11:57 | 19   note his appearance here today. |
| 11:57 | 20   THE COURT:  Note his appearance as well, yes. |
| 11:57 | 21   MS. SHOUN:  Thank you, Your Honor. |
| 11:57 | 22   THE COURT:  Very good. |
| 11:57 | 23   MR. OVERSTREET:  Thank you, Your Honor.  David |
| 11:57 | 24   Overstreet representing the Strauss Law Firm. |
| 11:57 | 25   THE COURT:  Yes. |

5

```
11:57   1        MR. ALLEN: Yes, Your Honor. Sam Allen on behalf of
11:57   2   Hamilton Captive Management LLC, which is a South Carolina
11:57   3   company. Also as the agent at this point in time for worldwide
11:57   4   Property Casualty and Madison First Property Casualty, which
11:57   5   are both bohemian companies.
11:57   6        THE COURT: These are recipients?
11:57   7        MR. ALLEN: They are, Your Honor.
11:57   8        THE COURT: Okay. Others representing recipients?
11:57   9        MR. WOOTEN: Your Honor, Patrick Wooten here on
11:57  10   behalf of several of the recipients: Skadden, Clark Hill,
11:57  11   GlassRatner, the Law Offices of Paul Meltzer, and Segal and
11:58  12   Associates.
11:58  13        THE COURT: Okay.
11:58  14        MR. BARKER: Good morning, Your Honor. Jacob Barker
11:58  15   here on behalf of BH Capital Ventures LLC, one of the
11:58  16   recipients.
11:58  17        THE COURT: Okay. Well, folks, we certainly seem to
11:58  18   have attracted a little bit of attention. Now, there are some
11:58  19   folks online. Could folks online identify themselves?
11:58  20        MR. HARTMAN: Your Honor, this is Jeff Hartman in
11:58  21   Reno representing Christine Lovato in the DC Solar Solutions
11:58  22   case.
11:58  23        THE COURT: Very good. Thank you.
11:58  24        UNIDENTIFIED FEMALE SPEAKER: Good morning, Your
11:58  25   Honor. This is --
```

6

```
11:58   1        THE COURT: Please say that again.
11:58   2        MR. GAFFNEY: Your Honor, this is Don Gaffney of the
11:58   3   Snell and Wilmer Law Firm in Phoenix, Arizona, representing
11:58   4   Solamore, a representative of approximately 20 investment
11:58   5   funds.
11:58   6        THE COURT: Okay.
11:59   7        MS. CARLYON: Good morning, Your Honor. Candace
11:59   8   Carlyon at Clark Hill PLC.
11:59   9        THE COURT: Okay. Anyone else?
11:59  10        MR. JUNG: Yes, good morning, Your Honor. This is --
11:59  11        THE COURT: Go ahead.
11:59  12        MR. JUNG: This is Curtis Jung. This is Curtis Jung
11:59  13   on behalf of the plaintiff, Solar Eclipse Investment Fund XXXV.
11:59  14        THE COURT: Okay.
11:59  15        MS. PROUT: This is Maita Prout, Deputy General
11:59  16   Counsel of East West Bank.
11:59  17        THE COURT: Anyone else?
11:59  18        MS. LI: Good morning, Your Honor. This is Annie Li
11:59  19   from Skadden Arps.
11:59  20        THE COURT: Okay. Anyone else?
11:59  21        okay. Folks, I have been -- the purpose of this
11:59  22   particular hearing was that I had a hearing several days ago on
11:59  23   the 6th of May, and defense counsel appeared and was able to
12:00  24   answer some of my questions, but indicated on others that he
12:00  25   would have to defer to his client to answer questions. I'm
```

9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-4    Page 30 of 62

7

| | |
|---|---|
| 12:00 | 1 | trying to sort out here a sort of threshold question, initially |
| 12:00 | 2 | a threshold question, and that is whether these funds, the $5 |
| 12:00 | 3 | million which is the subject of this litigation, was ever |
| 12:00 | 4 | taken -- taken under the control of DC Solar, or did it go from |
| 12:00 | 5 | the investment fund directly to some other third party and not |
| 12:00 | 6 | DC Solar? That obviously has potential relevance to the |
| 12:00 | 7 | jurisdiction of this court, the jurisdiction of the Bankruptcy |
| 12:00 | 8 | Court. And I was hoping that Mr. Strauss might appear and |
| 12:01 | 9 | provide us more detail about exactly how this transaction |
| 12:01 | 10 | occurred. We know that it came from the -- it's the plaintiff. |
| 12:01 | 11 | I'm going to call it "the fund". This is Solar Eclipse |
| 12:01 | 12 | Investment Fund XXXV. I'll call it "the fund" here. How it |
| 12:01 | 13 | got from the fund to Mr. Strauss' law firm, and what we can |
| 12:01 | 14 | talk about in terms of instructions you received, who gave |
| 12:01 | 15 | those instructions. So who facilitated the transfer? Who gave |
| 12:01 | 16 | instructions for the disbursal to these recipients? |
| 12:01 | 17 | And all of that is at least at this stage trying |
| 12:01 | 18 | to sort out whether this was ever an asset of DC Solar and went |
| 12:02 | 19 | into the accounts of DC Solar, or did it go -- or was it in |
| 12:02 | 20 | some way taken by someone, transferred to a third party. We'll |
| 12:02 | 21 | see who that is; and whether that would then take it outside of |
| 12:02 | 22 | the bankruptcy estate. I'm not reaching a conclusion that it |
| 12:02 | 23 | would. I don't know -- literally, I'm telling you I don't know |
| 12:02 | 24 | the answer to this. |
| 12:02 | 25 | So if I could ask -- initially what I intend to |

8

| | |
|---|---|
| 12:02 | 1 | do is put Mr. Strauss on the stand. Put him under oath, put |
| 12:02 | 2 | him on the stand. I intend to ask some questions, and then the |
| 12:02 | 3 | parties to the lawsuit may ask questions as well. |
| 12:02 | 4 | So, Mr. Strauss, if you would approach my |
| 12:02 | 5 | courtroom deputy, and she will administer the oath. |
| 12:02 | 6 | THE COURTROOM DEPUTY: Place your left hand on the |
| 12:02 | 7 | bible and raise your right hand. Please state your full name. |
| 12:03 | 8 | THE WITNESS: Peter Joseph Strauss. |
| 12:03 | 9 | (Witness sworn.) |
| 12:03 | 10 | COURTROOM DEPUTY: Thank you. Please take the stand. |
| 12:03 | 11 | PETER JOSEPH STRAUSS, |
| 12:03 | 12 | a witness called by the Court, being first duly sworn, was |
| 12:03 | 13 | examined and testified as follows: |
| 12:03 | 14 | EXAMINATION |
| 12:03 | 15 | BY THE COURT: |
| 12:03 | 16 | Q. Could you state your full name, please, sir? |
| 12:03 | 17 | A. Peter Joseph Strauss. |
| 12:03 | 18 | Q. And, Mr. Strauss, you are a licensed attorney; is that |
| 12:03 | 19 | correct? |
| 12:03 | 20 | A. Yes. |
| 12:03 | 21 | Q. And do you also operate businesses beyond just simply |
| 12:03 | 22 | operating a law practice? |
| 12:03 | 23 | A. Yes, I do. |
| 12:03 | 24 | Q. What's the nature of those businesses? |
| 12:03 | 25 | A. A captive insurance management firm. |

9:23-cr-00833-RMG *SEALED*   Date Filed 12/06/23   Page 31 of 62   Entry Number 26-4

9

STRAUSS - EXAMINATION BY THE COURT

```
12:03   1   Q.  Okay.  And what's the name of that firm?
12:03   2   A.  Hamilton Captive Management.
12:03   3   Q.  And I believe that's one of the two companies that
12:03   4   received payments after the funds arrived in your account; is
12:03   5   that correct?
12:03   6   A.  On advice of counsel, I have to invoke my Fifth Amendment
12:03   7   privilege.
12:04   8   Q.  You're asserting your Fifth Amendment right to that
12:04   9   question?
12:04  10   A.  Yes, Your Honor.
12:04  11   Q.  You -- can you share with me how the funds came to you,
12:04  12   from what account the funds derived that came to the Strauss
12:04  13   Law Firm?
12:04  14   A.  I'm sorry, Your Honor.  I have to invoke my Fifth
12:04  15   Amendment again --
12:04  16   Q.  Because --
12:04  17   A.  -- on advice of counsel.
12:04  18   Q.  -- your answer may tend to incriminate you?
12:04  19   A.  On advice of counsel, I --
12:04  20   Q.  Well, that's what it is, is it may tend to incriminate
12:04  21   you.  You're asserting your Fifth Amendment right because your
12:04  22   response may tend to incriminate you?  Is that what you're
12:04  23   telling me?
12:04  24   A.  I'm asserting my Fifth Amendment right on advice of
12:04  25   counsel.
```

10

STRAUSS - EXAMINATION BY THE COURT

```
12:04   1   Q.  Yeah, but that's -- advice of counsel is not a Fifth
12:04   2   Amendment right.  Fifth Amendment right is that you have a
12:04   3   right to remain silent, because your response may tend to
12:04   4   incriminate you, and you don't -- there's no requirement that
12:05   5   you be a witness against yourself.  That is the basis of the
12:05   6   Fifth Amendment.  Are you insisting -- asserting the Fifth
12:05   7   Amendment right because your response may tend to incriminate
12:05   8   you?
12:05   9   A.  Yes, Your Honor.
12:05  10   Q.  Okay.  Did you -- in this transfer of funds, did you have
12:05  11   any interaction or instructions from either Mr. or
12:05  12   Mrs. Carpoff?
12:05  13   A.  Your Honor, on advice of counsel, I have to invoke my
12:05  14   Fifth Amendment right.
12:05  15   Q.  Your law firm received funds.  We know that.  Your
12:05  16   attorneys have provided us documents indicating that.  Can you
12:05  17   tell me how your law firm -- how your law firm characterized
12:06  18   those funds in your Iolta account?
12:06  19   A.  On advice of counsel, I have to invoke my Fifth Amendment
12:06  20   right.
12:06  21   Q.  Had you previously received funds in this manner as you
12:06  22   received them in the $5 million?  Had that been a routine
12:06  23   practice of any type?
12:06  24   A.  On advice of counsel, I have to invoke my Fifth Amendment
12:06  25   right.
```

11

STRAUSS - EXAMINATION BY THE COURT

1  Q.  who gave you the instructions regarding the nine entities
2  which were to receive the $5 million?
3  A.  On advice of counsel, I have to invoke my Fifth Amendment
4  right.
5  Q.  I take it to any question concerning the arrival or
6  instructions or the disbursement of funds, you're going to
7  assert your Fifth Amendment right; is that correct?
8  A.  Yes, Your Honor.
9      THE COURT:  Okay.  Any questions from the plaintiff?
10     MS. SHOUN:  May I beg the Court's indulgence for just
11  a moment, Your Honor?
12     THE COURT:  Yes.
13         (Pause.)
14     MS. SHOUN:  Your Honor, if it may please the Court,
15  counsel for plaintiffs have some questions, and just as a bit
16  of a preface to this, Your Honor, I understand what Mr. Strauss
17  has indicated to the Court about invoking his Fifth Amendment
18  rights.  Nonetheless, it is our understanding because this is a
19  civil matter that it's -- it behooves us to go ahead and
20  present these questions to Mr. Strauss, even though he's
21  indicated what his answer is going to be.  So I would just ask
22  for the Court's patience and indulgence while we go through
23  this process.
24     THE COURT:  Keeping them within reason.  I think he's
25  indicated to us that he is going to assert his Fifth Amendment

12

STRAUSS - CROSS-EXAMINATION

1  right, but please proceed.
2      MS. SHOUN:  Yes, sir.  Thank you, Your Honor.
3              CROSS-EXAMINATION
4      BY MS. SHOUN:
5  Q.  Mr. Strauss, have you ever represented Solar Eclipse
6  Investment Fund XXXV?
7  A.  On advice of counsel, I need to invoke my Fifth Amendment
8  right.
9  Q.  Yes, sir.  For ease of reference, I will hereinafter refer
10  to that entity, Solar Eclipse Investment Fund XXXV, simply as
11  "the fund".
12          Were -- have you ever acted as counsel for DC
13  solar solutions?
14  A.  On advice of counsel, I'm invoking my Fifth Amendment
15  right.
16  Q.  Did you receive any funds on December 19th, 2018 as
17  counsel for DC Solar solutions?
18  A.  On advice of counsel, I'm invoking my Fifth Amendment.
19  Q.  Do you have a signed, valid retainer agreement with DC
20  Solar solutions?
21  A.  On advice of counsel, I'm invoking my Fifth Amendment
22  right.
23  Q.  When did you first review the limited liability company
24  agreement of Solar Eclipse Investment Fund?
25  A.  On advice of counsel, I'm invoking my Fifth Amendment

---

13

STRAUSS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 12:09 | 1 | right. |
| 12:09 | 2 | Q. When did you first read the solar equipment purchase |
| 12:09 | 3 | agreement entered into between the fund and DC Solar Solutions? |
| 12:09 | 4 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:09 | 5 | right. |
| 12:09 | 6 | Q. Yes, sir. Mr. Strauss, have you presented to this Court |
| 12:09 | 7 | today all documentation the court required you to present to it |
| 12:09 | 8 | relative to the $5 million wired into the Iolta account at the |
| 12:09 | 9 | Strauss Law Firm and all monies wired out of that $5 million? |
| 12:09 | 10 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:09 | 11 | right. |
| 12:09 | 12 | Q. Mr. Strauss, in responding to the Court's order that all |
| 12:09 | 13 | documents be produced relative to the wire of the $5 million |
| 12:09 | 14 | into the Iolta account of the Strauss Law Firm and all monies |
| 12:09 | 15 | wired out of the Strauss Law Firm, have you undertaken a |
| 12:09 | 16 | thorough examination of the records, your personal records, the |
| 12:09 | 17 | records of the Strauss Law Firm, and the records of Hamilton |
| 12:09 | 18 | Captive Management? |
| 12:09 | 19 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:09 | 20 | right. |
| 12:10 | 21 | Q. What is the physical address of the Strauss Law Firm? |
| 12:10 | 22 | A. 10 Hospital Center Common, Hilton Head Island, South |
| 12:10 | 23 | Carolina, 29926. |
| 12:10 | 24 | Q. Does it maintain any other physical presence? |
| 12:10 | 25 | A. I don't know how to answer that. We're moving offices |

---

14

STRAUSS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 12:10 | 1 | soon. |
| 12:10 | 2 | Q. I'm sorry? |
| 12:10 | 3 | A. We're moving offices soon. I don't know how to answer the |
| 12:10 | 4 | question. |
| 12:10 | 5 | THE COURT: Answer it as of today. |
| 12:10 | 6 | A. As of today, no. |
| 12:10 | 7 | Q. Are records of the Strauss Law Firm maintained at any |
| 12:10 | 8 | location other than the 10 Hospital Drive address in Hilton |
| 12:10 | 9 | Head Island? |
| 12:10 | 10 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:10 | 11 | right. |
| 12:10 | 12 | Q. Are the records of Hamilton Captive maintained at any |
| 12:10 | 13 | physical address other than 10 Hospital Drive, Hilton Head |
| 12:10 | 14 | Island? |
| 12:11 | 15 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:11 | 16 | right. |
| 12:11 | 17 | Q. How many personal email addresses do you maintain? |
| 12:11 | 18 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:11 | 19 | right. |
| 12:11 | 20 | Q. Do you maintain more than one? |
| 12:11 | 21 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:11 | 22 | right. |
| 12:11 | 23 | Q. How many personal telephone numbers do you maintain? |
| 12:11 | 24 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:11 | 25 | right. |

9:23-cr-00833-RMG *SEALED*   Date Filed 12/06/23   Entry Number 26-4   Page 34 of 62

15

STRAUSS - CROSS-EXAMINATION

1 Q. How many phone numbers are maintained, owned by, or
2 utilized by the Strauss Law Firm, LLC?
3 A. On advice of counsel, I'm invoking my Fifth Amendment
4 right.
5 Q. How many telephone numbers are owned, utilized or
6 otherwise maintained by Hamilton Captive?
7 A. On advice of counsel, I'm invoking my Fifth Amendment
8 right.
9 Q. Mr. Strauss, have you been apprised of any criminal action
10 being pursued against you?
11 A. On advice of counsel, I'm invoking my Fifth Amendment
12 right.
13 Q. Have you received a target letter indicating any action is
14 being investigated or pursued against you?
15 A. On advice of counsel, I'm invoking my Fifth Amendment
16 right.
17 Q. Are you aware of any criminal investigation or criminal
18 action that may be pursued against any employee or other
19 individual affiliated with the Strauss Law Firm?
20 A. On advice of counsel, I'm invoking my Fifth Amendment
21 right.
22 Q. Are you aware of any criminal investigation or action that
23 is being pursued against any individual employed by or
24 otherwise affiliated with Hamilton Captive?
25 A. On advice of counsel, I'm invoking my Fifth Amendment

16

STRAUSS - CROSS-EXAMINATION

1 right.
2 Q. In response to the court's question, you indicated, I do
3 believe, that you hold a valid license as a member of the South
4 Carolina Bar; is that correct?
5 A. Yes.
6 Q. Do you hold any other licenses issued by the state of
7 South Carolina or any other state?
8 A. Law license?
9 Q. Any other license. I mean, other than maybe a fishing
10 license or a driver's license. Do you have to -- do you hold a
11 license for your activity associated with captive management
12 work, with your insurance captive management group?
13 A. On advice of counsel, I'll invoke my Fifth Amendment
14 right.
15 Q. Mr. Strauss, is it your testimony that the $5 million at
16 issue here just landed in the Iolta account of the Strauss Law
17 Firm on December 19th, 2018 without any prior notice to the
18 Strauss Law Firm?
19 A. On advice of counsel, I'm invoking my Fifth Amendment
20 right.
21 Q. Do you have any agreement or document that sets forth the
22 basis for those funds, the $5 million being wired into the
23 Iolta account of the Strauss Law Firm on December 19th?
24 A. On advice of counsel, I'm invoking my Fifth Amendment
25 right.

17

STRAUSS - CROSS-EXAMINATION

```
12:13   1   Q.  On December 19th, 2018, did you indeed represent DC Solar
12:14   2       Solutions?
12:14   3   A.  On advice of counsel, I'm invoking my Fifth Amendment
12:14   4       right.
12:14   5   Q.  On December 19th, 2018, did you represent the fund?
12:14   6   A.  On advice of counsel, I'm invoking my Fifth Amendment
12:14   7       right.
12:14   8   Q.  On December 19th, 2018, did you represent either Jeffrey
12:14   9       or Paulette Carpoff?
12:14  10   A.  On advice of counsel, I'm invoking my Fifth Amendment
12:14  11       right.
12:14  12   Q.  Mr. Strauss, what individual or entity did you represent
12:14  13       on December 19th, 2018 that's related in any manner to the wire
12:14  14       of $5 million into your Iolta account from the fund?
12:14  15   A.  On advice of counsel, I'm invoking my Fifth Amendment
12:14  16       right.
12:14  17   Q.  How did you learn that $5 million had been wired into your
12:14  18       Iolta account?
12:14  19   A.  On advice of counsel, I'm invoking my Fifth Amendment
12:14  20       right.
12:14  21   Q.  What did you do when you learned $5 million had been wired
12:14  22       into your Iolta account?
12:14  23   A.  On advice of counsel, I'm invoking my Fifth Amendment
12:15  24       right.
12:15  25   Q.  Mr. Strauss, when did you become aware that the business
```

18

STRAUSS - CROSS-EXAMINATION

```
12:15   1       locations of DC Solar Solutions had been the subject of various
12:15   2       search and seizure warrants of the Federal Government?
12:15   3   A.  On advice of counsel, I'm invoking my Fifth Amendment
12:15   4       right.
12:15   5   Q.  At what point did you become aware that the principals of
12:15   6       the DC Solar Solutions and affiliated entities had been the
12:15   7       subject of various search and seizures warrants of the Federal
12:15   8       Government?
12:15   9   A.  On advice of counsel, I'm invoking my Fifth Amendment
12:15  10       right.
12:15  11   Q.  Mr. Strauss, what direction did you get from the Skadden
12:15  12       Law Firm as to the incoming wire of the $5 million into your
12:15  13       Iolta account?
12:15  14   A.  On advice of counsel, I'm invoking my Fifth Amendment
12:15  15       right.
12:15  16   Q.  And what instruction did you get from the Skadden Law Firm
12:15  17       as to the disbursement of any of the $5 million out of the
12:15  18       Iolta account of the Strauss Law Firm?
12:15  19   A.  On advice of counsel, I'm invoking my Fifth Amendment
12:15  20       right.
12:16  21   Q.  Have either Jeffrey or Paulette Carpoff, together or
12:16  22       individually, ever been clients of Hamilton Captive Management,
12:16  23       LLC?
12:16  24   A.  On advice of counsel, I'm invoking my Fifth Amendment
12:16  25       right.
```

9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-4    Page 36 of 62

19

STRAUSS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 12:16 | 1 | Q. When most recent to December 19th, 2018 were the Carpoffs, |
| 12:16 | 2 | either together or individually, clients of Hamilton Captive |
| 12:16 | 3 | Management? |
| 12:16 | 4 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:16 | 5 | right. |
| 12:16 | 6 | Q. Did you have any conversations with either Mr. or |
| 12:16 | 7 | Mrs. Carpoff on December -- on or about December 19th, 2018, |
| 12:16 | 8 | concerning the incoming $5 million into the Iolta account? |
| 12:16 | 9 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:16 | 10 | right. |
| 12:16 | 11 | Q. And what conversations did you have with either Mr. or |
| 12:16 | 12 | Mrs. Carpoff when any of those funds were transferred out of |
| 12:16 | 13 | the Iolta account? |
| 12:16 | 14 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:17 | 15 | right. |
| 12:17 | 16 | Q. Mr. Strauss, what do you understand to be the purpose of |
| 12:17 | 17 | the wire in the amount of $2 million that was sent from your |
| 12:17 | 18 | Iolta account to Skadden Arps? |
| 12:17 | 19 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:17 | 20 | right. |
| 12:17 | 21 | Q. Have you ever been associated or otherwise affiliated with |
| 12:17 | 22 | Skadden Arps prior to December 19th, 2018? |
| 12:17 | 23 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:17 | 24 | right. |
| 12:17 | 25 | Q. Did you and Skadden have any joint representation |

20

STRAUSS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 12:17 | 1 | agreement relative to the Carpoffs? |
| 12:17 | 2 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:17 | 3 | right. |
| 12:17 | 4 | Q. Is there any joint representation agreement between your |
| 12:17 | 5 | law firm and Skadden relative to representation of DC Solar |
| 12:17 | 6 | Solutions or any other DC Solar entity? |
| 12:17 | 7 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:17 | 8 | right. |
| 12:17 | 9 | Q. What is the total amount of a wire that you may make from |
| 12:17 | 10 | your Iolta account that's held at South State Bank in a one-day |
| 12:18 | 11 | period? |
| 12:18 | 12 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:18 | 13 | right. |
| 12:18 | 14 | Q. Before wiring any funds whatsoever out of the Iolta |
| 12:18 | 15 | account -- and by funds, I do mean again the $5 million that |
| 12:18 | 16 | came into your account -- did you make any inquiry of anybody |
| 12:18 | 17 | of the purpose for such wires out of that account? |
| 12:18 | 18 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:18 | 19 | right. |
| 12:18 | 20 | Q. Mr. Strauss, how many wires out of your Iolta account did |
| 12:18 | 21 | you make? |
| 12:18 | 22 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:18 | 23 | right. |
| 12:18 | 24 | Q. When you -- when the wires were made out of the Iolta |
| 12:18 | 25 | account of the Strauss Law Firm, did you personally undertake |

---

21

STRAUSS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 1 | 12:18 | that action? |
| 2 | 12:18 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 3 | 12:18 | right. |
| 4 | 12:18 | Q.  Did you appear at a physical location of South State Bank |
| 5 | 12:18 | to make those transfers out? |
| 6 | 12:19 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 7 | 12:19 | right. |
| 8 | 12:19 | Q.  Were these wires made pursuant to telephone conversations |
| 9 | 12:19 | with a representative of South State Bank? |
| 10 | 12:19 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 11 | 12:19 | right. |
| 12 | 12:19 | Q.  And with whom at South State did you deal when making any |
| 13 | 12:19 | of the wires out of the Iolta account represented by the $5 |
| 14 | 12:19 | million? |
| 15 | 12:19 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 16 | 12:19 | right. |
| 17 | 12:19 | Q.  Mr. Strauss, what is your familiarity with the |
| 18 | 12:19 | relationship between Skadden and Mr. and/or Mrs. Carpoff? |
| 19 | 12:19 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 20 | 12:19 | right. |
| 21 | 12:19 | Q.  What is your understanding of the relationship between |
| 22 | 12:19 | Skadden and DC Solar Solutions or any other DC Solar entities? |
| 23 | 12:20 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 24 | 12:20 | right. |
| 25 | 12:20 | Q.  Mr. Strauss, what is your understanding of the |

---

22

STRAUSS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 1 | 12:20 | relationship of any other recipient of the wired funds from |
| 2 | 12:20 | your Iolta account to Jeffrey or Paulette Carpoff? |
| 3 | 12:20 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 4 | 12:20 | right. |
| 5 | 12:20 | Q.  What is your understanding of the relationship between any |
| 6 | 12:20 | of the entities to which you wired funds and DC Solar Solutions |
| 7 | 12:20 | or other DC Solar entities? |
| 8 | 12:20 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 9 | 12:20 | right. |
| 10 | 12:20 | Q.  Have you discussed this proceeding with anybody at |
| 11 | 12:20 | Skadden? |
| 12 | 12:20 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 13 | 12:20 | right. |
| 14 | 12:20 | Q.  Have you discussed this proceeding with any individual or |
| 15 | 12:20 | entity affiliated with any other recipients of the $5 million |
| 16 | 12:20 | wired out of your Iolta account? |
| 17 | 12:20 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 18 | 12:20 | right. |
| 19 | 12:21 | Q.  Mr. Strauss, what is the affiliation between the fund and |
| 20 | 12:21 | worldwide Property and Casualty? |
| 21 | 12:21 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 22 | 12:21 | right. |
| 23 | 12:21 | Q.  Mr. Strauss, what is the relationship to your knowledge |
| 24 | 12:21 | between the fund and Madison First Property and Casualty? |
| 25 | 12:21 | MR. ALLEN:  Objection, Your Honor.  It's outside the |

9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-4    Page 38 of 62

23

STRAUSS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 12:21 | 1 | pleadings. |
| 12:21 | 2 | THE COURT: Overruled. |
| 12:21 | 3 | THE WITNESS: On advice of counsel, I'm invoking my |
| 12:21 | 4 | Fifth Amendment right. |
| 12:21 | 5 | BY MS. SHOUN: |
| 12:21 | 6 | Q. Mr. Strauss, what knowledge do you have of any |
| 12:21 | 7 | relationship between Worldwide Property and Casualty or Madison |
| 12:21 | 8 | First Property and Casualty and DC Solar Solutions? |
| 12:21 | 9 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 12:21 | 10 | right. |
| 12:22 | 11 | MS. SHOUN: Your Honor, if I may approach? |
| 12:22 | 12 | THE COURT: You may. |
| 12:22 | 13 | (Pause.) |
| 12:22 | 14 | THE COURT: Anything further? |
| 12:23 | 15 | MS. SHOUN: Yes, sir. If I may approach the witness |
| 12:23 | 16 | with a copy of that or -- |
| 12:23 | 17 | THE COURT: You may. |
| 12:23 | 18 | MS. SHOUN: Thank you. |
| 12:23 | 19 | BY MS. SHOUN: |
| 12:23 | 20 | Q. Mr. Strauss, I'm going to hand you what purports to be a |
| 12:24 | 21 | letter dated March 22nd, 2019 from me to you and to the Strauss |
| 12:24 | 22 | Law Firm LLC, and I'm going to ask you if you recognize that |
| 12:24 | 23 | document? |
| 12:24 | 24 | A. Yes. |
| 12:24 | 25 | Q. And did you receive that document? |

24

STRAUSS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 12:24 | 1 | A. Yes. |
| 12:24 | 2 | Q. And you've had an opportunity to review that document |
| 12:24 | 3 | prior to today's date? |
| 12:24 | 4 | A. Yes. |
| 12:24 | 5 | Q. And that is a letter from me to you of March 22nd, 2019; |
| 12:24 | 6 | is that correct? |
| 12:24 | 7 | A. Yes. |
| 12:24 | 8 | Q. Okay. And that document asks you, does it not, to provide |
| 12:24 | 9 | an accounting of the funds, the $5 million that was transferred |
| 12:24 | 10 | into the Iolta account of the Strauss Law Firm and an |
| 12:24 | 11 | explanation of any monies that may have been transferred out; |
| 12:24 | 12 | is that right? |
| 12:24 | 13 | A. Yes. |
| 12:24 | 14 | THE COURT: Mr. Overstreet, you need to quit nodding |
| 12:25 | 15 | and communicating to your client. |
| 12:25 | 16 | MR. OVERSTREET: Yes, Your Honor. |
| 12:25 | 17 | MS. SHOUN: Your Honor, just as a housekeeping |
| 12:25 | 18 | matter, we'd ask that this be made the plaintiff's first |
| 12:25 | 19 | exhibit. |
| 12:25 | 20 | THE COURT: I'm sorry? |
| 12:25 | 21 | MS. SHOUN: We'd just ask that this be made the |
| 12:25 | 22 | plaintiff's first exhibit. The witness has identified it. |
| 12:25 | 23 | THE COURT: Any objection? |
| 12:25 | 24 | MR. OVERSTREET: No objection. |
| 12:25 | 25 | THE COURT: Exhibit Number 1 is admitted. Please |

9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-4    Page 39 of 62

25

STRAUSS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 1 | 12:25 | proceed. |
| 2 | 12:25 | MS. SHOUN: Your Honor, if I then may approach? |
| 3 | 12:25 | THE COURT: You may. |
| 4 | 12:25 | MS. SHOUN: And may I provide a copy to Your Honor at |
| 5 | 12:25 | the same time as -- |
| 6 | 12:25 | THE COURT: Thank you. |
| 7 | 12:25 | BY MS. SHOUN: |
| 8 | 12:25 | Q. Mr. Strauss, I've handed you a document that purports to |
| 9 | 12:25 | be an email from Peter Strauss at |
| 10 | 12:25 | pstrauss@thestrausslawfirm.com dated March 25th, 2019 at 6:31 |
| 11 | 12:25 | p.m. Do you recognize this document? |
| 12 | 12:26 | MR. OVERSTREET: I'm sorry, can I see a copy of that? |
| 13 | 12:26 | MS. SHOUN: Oh, I'm so sorry. I thought I handed |
| 14 | 12:26 | that to you. |
| 15 | 12:26 | THE WITNESS: On advice of counsel, I'm going to |
| 16 | 12:26 | invoke my Fifth Amendment right. |
| 17 | 12:26 | BY MS. SHOUN: |
| 18 | 12:26 | Q. You're invoking your Fifth Amendment right as to whether |
| 19 | 12:26 | you've seen that document? |
| 20 | 12:26 | A. Yes. |
| 21 | 12:26 | Q. I'm sorry? |
| 22 | 12:26 | A. Yes. |
| 23 | 12:26 | Q. Okay. Thank you. Mr. Strauss, did you write the text of |
| 24 | 12:26 | that particular document? |
| 25 | 12:26 | A. On advice of counsel, I'm invoking my Fifth Amendment |

26

STRAUSS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 1 | 12:26 | right. |
| 2 | 12:26 | Q. Mr. Strauss, when this particular document -- this email |
| 3 | 12:26 | was written on March 25th, 2019, did -- did anybody assist you |
| 4 | 12:26 | in writing this email? |
| 5 | 12:26 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 6 | 12:26 | right. |
| 7 | 12:26 | Q. Did anybody write this email for you to use as your |
| 8 | 12:26 | response to the letter on behalf of the fund dated March 22nd, |
| 9 | 12:26 | 2019? |
| 10 | 12:27 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 11 | 12:27 | right. |
| 12 | 12:27 | Q. At what point, Mr. Strauss, did you have the documentation |
| 13 | 12:27 | necessary for you to reach a conclusion that solutions is the |
| 14 | 12:27 | only party that had an interest in and right to the $5 million |
| 15 | 12:27 | in your Iolta account? |
| 16 | 12:27 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 17 | 12:27 | right. |
| 18 | 12:27 | Q. And it would be accurate, would it not, Mr. Strauss, to |
| 19 | 12:27 | say that no monies were ever wired or otherwise delivered out |
| 20 | 12:27 | of your Iolta account to DC Solutions; is that correct? |
| 21 | 12:27 | A. On advice of counsel, I'm invoking my Fifth Amendment |
| 22 | 12:27 | right. |
| 23 | 12:27 | Q. At any point, did you attempt to return the $5 million |
| 24 | 12:27 | wired into your escrow account to Fund XXXV? |
| 25 | 12:27 | A. On advice of counsel, I'm invoking my Fifth Amendment |

9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-4    Page 40 of 62

27

STRAUSS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 12:27 | 1 | right. |
| 12:27 | 2 | Q.  Did you wire $500,000 to Paul Meltzer on behalf of |
| 12:27 | 3 | Paulette Carpoff? |
| 12:27 | 4 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 12:27 | 5 | right. |
| 12:28 | 6 | Q.  Did you wire $250,000 to Daniel Bakondi for -- on behalf |
| 12:28 | 7 | of Jeffrey Carpoff? |
| 12:28 | 8 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 12:28 | 9 | right. |
| 12:28 | 10 | Q.  Did you wire $250,000 from your Iolta account to Segal and |
| 12:28 | 11 | Associates as a personal retainer for Jeffrey Carpoff? |
| 12:28 | 12 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 12:28 | 13 | right. |
| 12:28 | 14 | Q.  Mr. Strauss, as to any wires of the $5 million from those |
| 12:28 | 15 | three entities -- Paul Meltzer, Daniel Bakondi, or the Segal |
| 12:28 | 16 | and Associates -- for whom were those transfers made? |
| 12:28 | 17 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 12:28 | 18 | right. |
| 12:28 | 19 | Q.  And who instructed you to make those transfers? |
| 12:28 | 20 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 12:28 | 21 | right. |
| 12:28 | 22 | MS. SHOUN:  Oh, Your Honor, I'm sorry.  As a |
| 12:28 | 23 | housekeeping matter, the second document handed up to |
| 12:28 | 24 | Mr. Strauss, I do think he identified it, but has invoked his |
| 12:29 | 25 | Fifth Amendment as to any other substantive answers on it, but |

28

STRAUSS - CROSS-EXAMINATION

| | | |
|---|---|---|
| 12:29 | 1 | I would ask the Court still admit it as an exhibit. |
| 12:29 | 2 | THE COURT:  Exhibit -- is there an objection? |
| 12:29 | 3 | MR. OVERSTREET:  Without objection. |
| 12:29 | 4 | THE COURT:  Exhibit Number 2 is admitted without |
| 12:29 | 5 | objection. |
| 12:29 | 6 | BY MS. SHOUN: |
| 12:29 | 7 | Q.  Mr. Strauss, I'm going to go back to that exhibit.  I'm |
| 12:29 | 8 | sorry.  I'm jumping around a little bit.  That's the second |
| 12:29 | 9 | exhibit, the email that appears to come from you at your law |
| 12:29 | 10 | firm dated March 25th.  You indicated in that email that under |
| 12:29 | 11 | the purchase agreement, the fund was obligated to pay solutions |
| 12:29 | 12 | for mobile solar units.  Did you make that statement? |
| 12:29 | 13 | A.  On advice of counsel, I'm invoking my Fifth Amendment. |
| 12:29 | 14 | Q.  Did somebody write that statement for you? |
| 12:29 | 15 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 12:29 | 16 | right. |
| 12:29 | 17 | Q.  Mr. Strauss, how many mobile solar units were, in fact, |
| 12:29 | 18 | delivered under any purchase agreement entered into between the |
| 12:29 | 19 | fund and any third party? |
| 12:30 | 20 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 12:30 | 21 | right. |
| 12:30 | 22 | Q.  Mr. Strauss, what action did you undertake to ensure that |
| 12:30 | 23 | any mobile solar units had been delivered? |
| 12:30 | 24 | A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 12:30 | 25 | right. |

29

STRAUSS - CROSS-EXAMINATION

```
12:30   1   Q.  What action did you take whatsoever, Mr. Strauss, to
12:30   2   ensure that any of the wire transfers out of the $5 million
12:30   3   sent to your Iolta account were proper?
12:30   4   A.  On advice of counsel, I'm invoking my Fifth Amendment
12:30   5   right.
12:31   6       MS. SHOUN:  Beg the Court's indulgence just one
12:31   7   moment.
12:31   8       (Pause.)
12:31   9       MS. SHOUN:  Your Honor, if I may approach the
12:32  10   witness?
12:32  11       THE COURT:  You may.
12:32  12   BY MS. SHOUN:
12:32  13   Q.  Mr. Strauss, I'm going to hand to you what appears to be
12:32  14   an email sent from Peter Strauss at
12:32  15   pstrauss@thestrausslawfirm.com to Armando Gomez on March 27th,
12:32  16   2019 at 12:58 p.m., and I'll ask you if you recognize that
12:32  17   email.
12:32  18   A.  On advice of counsel, I'm invoking my Fifth Amendment
12:32  19   right.
12:32  20   Q.  Mr. Strauss, why would -- to what letter are you referring
12:32  21   in that email to Mr. Armando, that you indicate that you have
12:32  22   just received a letter? which letter would that be?
12:32  23   A.  On advice of counsel, I'm invoking my Fifth Amendment
12:32  24   right.
12:32  25   Q.  Could that be the follow-up letter from our -- from Nexsen
```

30

STRAUSS - CROSS-EXAMINATION

```
12:32   1   Pruet on behalf of the fund again asking you for an accounting
12:32   2   as to the money?
12:32   3   A.  On advice of counsel, I'm invoking my Fifth Amendment
12:32   4   right.
12:32   5   Q.  Did you receive a response from Mr. Gomez?
12:33   6   A.  On advice of counsel, I'm invoking my Fifth Amendment
12:33   7   right.
12:33   8       MS. SHOUN:  Your Honor, the -- I don't know that the
12:33   9   witness identified the document, but we would ask that it be
12:33  10   admitted.  We move it be admitted.
12:33  11       THE COURT:  That's number 3?
12:33  12       MS. SHOUN:  Yes, sir.
12:33  13       THE COURT:  Is there an objection?
12:33  14       MR. OVERSTREET:  Without objection.
12:33  15       MR. WOOTEN:  Your Honor, I apologize.  Patrick Wooten
12:33  16   again on behalf of some of the transferees.  I don't know what
12:33  17   documents are being passed around, but it sounded like these
12:33  18   may be privileged documents.  Maybe these are documents where
12:33  19   third parties are on the -- but I just want to make sure our
12:33  20   privilege objections are preserved.
12:33  21       THE COURT:  Of course you're not a party to this
12:33  22   proceeding.  You're a recipient.  I'm going to give you every
12:33  23   chance to be heard on matters.  The -- it appears to me that --
12:33  24   and this was raised by Mr. Overstreet earlier.  It appears
12:33  25   these documents in which he is -- he is receiving funds and
```

31

STRAUSS - CROSS-EXAMINATION

| | |
|---|---|
| 12:33 | 1 he's distributing funds, he's working as an escrow agent. He's |
| 12:34 | 2 just like a bank. He's not functioning as a lawyer at the |
| 12:34 | 3 time, and those would not be privileged. These are escrow |
| 12:34 | 4 payments. So -- but I note your objection for the record. |
| 12:34 | 5    Yes, sir? |
| 12:34 | 6    MR. OVERSTREET: Your Honor, very briefly, just so |
| 12:34 | 7 that the record is clear. I appreciate your noting the fact |
| 12:34 | 8 that I also had some concerns about turning all this |
| 12:34 | 9 information over that could have privileged implications, and I |
| 12:34 | 10 provided to opposing counsel and the Court a notebook of |
| 12:34 | 11 emails, which my understanding is Your Honor has reviewed and |
| 12:34 | 12 come to the conclusion that there aren't any privileges |
| 12:34 | 13 associated with those communications, thus allowing me to |
| 12:34 | 14 produce it in full court. |
| 12:34 | 15    THE COURT: Right. They -- my review of the |
| 12:34 | 16 documents indicated that they were simply a processing of cash |
| 12:34 | 17 through the escrow account of the Strauss Law Firm, and that he |
| 12:34 | 18 was serving as an escrow agent, and that that would not be |
| 12:35 | 19 subject to privilege. So I did review those, and I ruled they |
| 12:35 | 20 were -- they were not protected by privilege. |
| 12:35 | 21    Okay. Anything further? |
| 12:35 | 22    MS. SHOUN: Just a couple more, Your Honor, if the |
| 12:35 | 23 Court will allow. |
| 12:35 | 24 BY MS. SHOUN: |
| 12:35 | 25 Q.  Mr. Strauss, were you ever acting pursuant to some escrow |

32

STRAUSS - CROSS-EXAMINATION

| | |
|---|---|
| 12:35 | 1 agreement with the fund? |
| 12:35 | 2 A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 12:35 | 3 right. |
| 12:35 | 4 Q.  Mr. Strauss, were you or your law firm ever -- and I'm |
| 12:35 | 5 sorry. In the previous question, that should have applied to |
| 12:35 | 6 you and your law firm, just so we understand. Is that fair? |
| 12:35 | 7 Same answer? |
| 12:35 | 8 A.  Yes. |
| 12:35 | 9 Q.  All right. Did you or your law firm ever act pursuant to |
| 12:35 | 10 any agreement as an escrow agent for DC Solar Solutions? |
| 12:35 | 11 A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 12:35 | 12 right. |
| 12:35 | 13 Q.  Did you or your law firm ever act pursuant to any sole -- |
| 12:35 | 14 any escrow agreement on behalf of Paulette and/or Jeffrey |
| 12:35 | 15 Carpoff? |
| 12:35 | 16 A.  On advice of counsel, I'm invoking my Fifth Amendment. |
| 12:35 | 17 Q.  Mr. Strauss, what action did you undertake to ensure that |
| 12:35 | 18 any of the wires out of your Iolta account of that $5 million |
| 12:36 | 19 were proper? |
| 12:36 | 20 A.  On advice of counsel, I'm invoking my Fifth Amendment |
| 12:36 | 21 right. |
| 12:36 | 22    MS. SHOUN: Very quickly, Your Honor. |
| 12:36 | 23    (Pause.) |
| 12:36 | 24    MS. SHOUN: That's all I have, Your Honor. Thank |
| 12:36 | 25 you. |

33

STRAUSS - CROSS-EXAMINATION

```
12:36   1    THE COURT:  Any questions from the defense?
12:36   2    MR. OVERSTREET:  No, Your Honor.
12:36   3    THE COURT:  You may step down, sir.
12:36   4    THE WITNESS:  Thank you.
12:36   5         (Witness excused.)
12:36   6    THE COURTROOM DEPUTY:  Sir, may I have those
12:36   7  documents?  Thank you.
12:36   8    THE COURT:  Mr. Strauss, I'm going to put you on
12:36   9  notice that I intend to advise the South Carolina Supreme Court
12:36   10 that you took the Fifth Amendment today in a matter involving
12:36   11 potential criminal activity, and I would suggest you
12:36   12 self-report your appearance here today and your actions.
12:36   13      Let me address if I might and hear from some of
12:36   14 the recipients.  I know you have an active interest here, and
12:36   15 you've had very little time to address these issues.  My goal
12:36   16 is to preserve the status quo in a way that preserves these
12:37   17 funds to make a determination of who is the rightful owner of
12:37   18 these and whether or not it's within the DC Solar bankruptcy.
12:37   19 I don't know the answer to that.  I'm working that through.
12:37   20      On the record, I want to say that I have been in
12:37   21 touch with Judge Beesley in the Nevada Bankruptcy Court, and
12:37   22 we're working in concert with each other on this.  There's no
12:37   23 interest of this Court of usurping the important rights of the
12:37   24 Bankruptcy court and the rights of the creditors in bankruptcy.
12:37   25 on the other hand, to the extent these monies are outside the
```

34

```
12:37   1    estate of the bankruptcy, then it's my responsibility to
12:37   2    address the claims here.  That's as simple as I can make it.
12:37   3         I want to afford everyone an opportunity to have
12:37   4    the time to review these issues.  I have a -- I presently have
12:37   5    an issue, the TRO, and have extended it to the recipients, and
12:38   6    the question then is -- and I'm trying to maintain the status
12:38   7    quo.  Does anyone while we're sorting this out have an
12:38   8    objection to the continuation of the TRO?  Let the record show
12:38   9    no one has responded.  The TRO is going to continue.
12:38   10        I want to afford the recipients an adequate time
12:38   11   to investigate this matter.  I've had issues raised.  I've now
12:38   12   gotten two responses in.  One I haven't -- I'll be candid with
12:38   13   you -- from a Mr. Bakondi, I have not had a chance to review.
12:38   14   It arrived just moments before the hearing.  I did receive one
12:38   15   earlier today from Mr. Wooten.  And Mr. Wooten, let me tell you
12:39   16   a piece of information I'm interested in, and perhaps you might
12:39   17   have -- help us on this or provide -- or you might be able to
12:39   18   answer this question at a later point if you don't know it now.
12:39   19   I'm trying to reconstruct how the monies left Fund XXXV and
12:39   20   ended up in the Strauss Law Firm.  Did it pass through any
12:39   21   other accounts?  Who moved -- who gave the instructions from
12:39   22   the fund's bank to transfer these monies to the Strauss Law
12:39   23   Firm?  How did the Strauss Law Firm characterize these funds in
12:39   24   its own accounts?  That is, who was the owner in this -- the
12:39   25   Strauss Law Firm identified as the owner of these funds?
```

9:23-cr-00833-RMG *SEALED*  Date Filed 12/06/23  Entry Number 26-4  Page 44 of 62

35

```
1        Those are issues that go to whether this was
2   actually an asset of DC Solar.  I note that DC Solar did not
3   list Fund XXXV as one of its 20 top creditors, and it surely
4   would have been should the $5 million had been -- if the $5
5   million had been paid and services not delivered, it would have
6   been a debt, and it was not listed.  Has there since then been
7   a filing, a listing of assets by the -- by the debtor?  Has
8   there been a filing in bankruptcy court of assets?
9        MR. WALLACE:  Your Honor, Bruce Wallace for the
10  plaintiffs.  We do not believe so.
11       THE COURT:  I have not identified it on ECF.  So the
12  fair question is number 1, is this an asset of DC Solar?  And
13  even if it is, it doesn't ultimately dispose of the issue of
14  who is entitled to these funds.  I mean, that needs to be
15  sorted out, about the role of these various law firms, and they
16  have had an understandable interest in keeping the monies they
17  have received.  The Court's concern is are these -- did they
18  receive funds acquired by conversion?  And if so, did they know
19  or should have known that these were of questionable origin?
20       We know that the day before the transfer, the
21  Federal Government had seized the accounts, all the accounts of
22  DC Solar.  So I'm not sure how it could have flowed into a DC
23  Solar account.  Perhaps there are some that the Government
24  didn't know about, but I'm trying to sort all that out.
25       I understand the argument ably made by
```

36

```
1   Mr. Wooten and his law firm that -- that the funds from -- in
2   the accounts of Fund XXXV were payable, but were they paid by
3   the fund?  That's different.  Was it paid and -- for those
4   mobile solar generators?  Or did someone not yet identified
5   reach into those accounts, perhaps improperly, and convert it
6   to their own use?  Pretty important question here.
7        Now, even after all of that, the question about
8   who sorts that out, whether we're subject -- whether these
9   funds are subject to the -- are subject to the bankruptcy is
10  something I intend to continue my dialogue with Judge Beesley
11  and the fact finding I'm trying to do here.
12       I think we ought to have an evidentiary hearing
13  at some point for -- to try to answer these questions as
14  definitively as we can.  And, Mr. Overstreet, could we -- I'm
15  going to enter an order requiring the Strauss Law Firm to
16  produce to me documents showing how this $5 million was treated
17  in its account, how it was designated in the account.  Do you
18  understand what I'm asking?
19       MR. OVERSTREET:  Yes, sir.
20       THE COURT:  And I think that will give us one piece
21  of information.  I think it is important to determine how --
22  who gave the instructions that the money leave the fund and go
23  to the Strauss Law Firm.  There was a -- I understand -- was
24  that a wire I saw on a bank account?  Was that a wire transfer,
25  Ms. Shoun?
```

37

| | | |
|---|---|---|
| 12:44 | 1 | MS. SHOUN: Into the Strauss Iolta? |
| 12:44 | 2 | THE COURT: Yes. |
| 12:44 | 3 | MS. SHOUN: Yes, sir, Your Honor. |
| 12:44 | 4 | THE COURT: From? |
| 12:44 | 5 | MS. SHOUN: As I understand it, it was from Paulette |
| 12:44 | 6 | Carpoff, Your Honor. And I may -- |
| 12:44 | 7 | THE COURT: From Paulette Carpoff personally? |
| 12:44 | 8 | MS. SHOUN: Yes, sir. I may be able to actually -- |
| 12:44 | 9 | if the Court will give me one minute, I may be able to produce |
| 12:44 | 10 | a copy of that for Your Honor. |
| 12:44 | 11 | THE COURT: Okay. You may take a moment. |
| 12:44 | 12 | (Pause.) |
| 12:44 | 13 | MS. SHOUN: May I approach, Your Honor? |
| 12:44 | 14 | THE COURT: You may. Do we know, Ms. Shoun, why |
| 12:45 | 15 | Ms. Paulette Carpoff would have authority to move money out of |
| 12:45 | 16 | the -- of an independent, freestanding fund, investment fund? |
| 12:45 | 17 | MS. SHOUN: No, sir. |
| 12:45 | 18 | THE COURT: I have not been provided a copy of any -- |
| 12:45 | 19 | I know I have the -- this equipment sales agreement and a note. |
| 12:45 | 20 | Do we have an LLC organizational document? |
| 12:45 | 21 | MS. SHOUN: Yes, sir. |
| 12:45 | 22 | MR. WALLACE: Just one second, Your Honor. |
| 12:45 | 23 | MS. SHOUN: We have -- I think we have a copy, Your |
| 12:45 | 24 | Honor, an extra copy. If Your Honor doesn't mind, I think we |
| 12:45 | 25 | probably printed it on two-sided pages. |

38

| | | |
|---|---|---|
| 12:45 | 1 | THE COURT: I can survive that. |
| 12:45 | 2 | MS. SHOUN: Okay. If I may approach. |
| 12:46 | 3 | THE COURT: I want to -- I want everybody to be on |
| 12:46 | 4 | the same page here, and I want the plaintiff to provide to the |
| 12:46 | 5 | nine recipients the documents we're talking about here. I |
| 12:46 | 6 | think they need access to this. |
| 12:46 | 7 | MS. SHOUN: Certainly, Your Honor. |
| 12:46 | 8 | THE COURT: I want to make sure they have -- and to |
| 12:46 | 9 | the extent when we have a hearing, I will say to the |
| 12:46 | 10 | recipients' counsel, we'll have a deadline for you to produce |
| 12:46 | 11 | to the parties any documents that may shed some light on this. |
| 12:46 | 12 | It may be worthwhile if you don't have -- you |
| 12:47 | 13 | have not yet done this, is to perhaps depose the bank official |
| 12:47 | 14 | involved to figure out exactly what happened. |
| 12:47 | 15 | MS. SHOUN: Yes, sir. |
| 12:47 | 16 | THE COURT: Do we know whether Paulette Carpoff has |
| 12:47 | 17 | any role with Investment Fund XXXV? |
| 12:47 | 18 | MS. SHOUN: She does not. Any knowledge we have of |
| 12:47 | 19 | this fund, Your Honor, she does not. This fund was entered |
| 12:47 | 20 | into -- or this fund was created, if you will, the LLC was |
| 12:47 | 21 | created in late November of 2018, and then, of course, this |
| 12:47 | 22 | raid upon the Carpoffs and the DC Solar entities was made on |
| 12:47 | 23 | December 18th. There was no representation that the Carpoffs |
| 12:47 | 24 | were involved, and, in fact -- |
| 12:47 | 25 | THE COURT: Wasn't there a provision about |

**39**

```
12:47   1   independence?  There would be a fiduciary issue; would there
12:47   2   not be?
12:47   3        MS. SHOUN:  Your Honor, Section 3.145 -- v.  Oh, it's
12:47   4   v.  Sorry.
12:47   5        THE COURT:  Three point --
12:48   6        MS. SHOUN:  3.14v, as in victory.
12:48   7        THE COURT:  Thank you.  Give me a second.  "The
12:48   8   managing member is not an affiliate of the sponsor.  The
12:48   9   managing member has not entered into any contract agreement,
12:48  10   understanding, or arrangement with the sponsor, any affiliate
12:48  11   of the sponsor relating to mobile solar facilities other than
12:48  12   the transaction documents."
12:48  13        So I want everyone to sort of understand where
12:48  14   I'm going here.  I'm just trying to figure out was this some
12:48  15   kind of regular transfer of a financing relating -- funds
12:48  16   relating to an equipment sale in the ordinary course of
12:48  17   business, or was this -- which is suggested by the recipient
12:49  18   filing I've had -- or was this an irregular transaction
12:49  19   facilitated by someone with no authority to take the funds, and
12:49  20   that the funds were essentially a conversion for the personal
12:49  21   use of the person who took the fund?
12:49  22        MS. SHOUN:  Of course, Your Honor.  And we would --
12:49  23        THE COURT:  That is to me the question, and I don't
12:49  24   want to suggest for a moment -- I don't have any suggestion
12:49  25   that any of these recipients would have been involved in that
```

**40**

```
12:49   1   end of the transaction, but if, in fact, these are converted
12:49   2   funds, then -- and are not funds of DC Solar, then why would we
12:49   3   not be here to sort this out?  I mean, if they are, I think
12:49   4   they should be in Nevada.  I think that's exactly where they
12:49   5   should be, if they're assets of DC Solar.  There might be other
12:50   6   arguments why they are assets of DC Solar, but I do think
12:50   7   having looked at the sales agreement, those funds were payable,
12:50   8   but not paid.  I mean, no one had a right to snatch the money
12:50   9   out of the fund.
12:50  10        I do think, Ms. Shoun, it would be helpful to
12:50  11   know more about exactly the instructions that the CTBC Bank
12:50  12   had --
12:50  13        MS. SHOUN:  Yes, sir.
12:50  14        THE COURT:  -- and what authority it had --
12:50  15        MS. SHOUN:  Yes, sir.
12:50  16        THE COURT:  -- to transfer those funds to the Strauss
12:50  17   Law Firm.
12:50  18        MS. SHOUN:  Yes, sir.
12:50  19        THE COURT:  I think that is a missing piece here
12:50  20   that -- we see here it is from Paulette Carpoff.  I presume
12:50  21   she, like Mr. Strauss, is going to take the Fifth, so you're
12:50  22   not going to get it from her, but the bank should have some
12:50  23   documentation of its authority, and if there is some authority,
12:50  24   then we need to know about that.
12:50  25        MS. SHOUN:  Yes, sir.
```

9:23-cr-00833-RMG *SEALED*   Date Filed 12/06/23   Entry Number 26-4   Page 47 of 62

**41**

```
12:50   1      THE COURT: If it's some legitimate authority to act
12:50   2   on behalf of the fund or some other instructions they have a
12:51   3   right to go grab the money on behalf of solar -- DC Solar, but
12:51   4   Ms. Carpoff is not -- is a different -- is an individual, and
12:51   5   DC Solar is a corporate entity.
12:51   6      MS. SHOUN: Exactly, Your Honor. And one reason we
12:51   7   directed Your Honor's attention to that particular section
12:51   8   mentioned earlier, and then the 3.17 as well, 3.17M, where
12:51   9   actually, Your Honor, there were affirmative representations
12:51  10   that there was no affiliation with the sponsor, and the sponsor
12:51  11   being the DC solar entity.
12:51  12      THE COURT: I would think it would present serious
12:51  13   fiduciary issues if they're merged.
12:51  14      MS. SHOUN: Exactly.
12:51  15      THE COURT: They're supposed to be an arm's length
12:51  16   transaction.
12:51  17      MS. SHOUN: Yes, sir.
12:51  18      THE COURT: And -- but I want to afford everyone an
12:51  19   opportunity to be heard, and I'm not -- I'm not trying to make
12:51  20   any rush to judgment here. I do think we need to set up a
12:51  21   mechanism where we can make certain reasonable factual
12:52  22   findings.
12:52  23      Mr. Wooten, you got any suggestion how much time
12:52  24   you folks might need?
12:52  25      MR. WOOTEN: We were asking for like 10 days. You
```

**42**

```
12:52   1   know, I -- we obviously hadn't heard Your Honor's comments when
12:52   2   we submitted that, but --
12:52   3      THE COURT: I'm trying to focus you on where, you
12:52   4   know, I think the issue is here.
12:52   5      MR. WOOTEN: Right.
12:52   6      THE COURT: And I will say I don't think we all have
12:52   7   a definitive answer yet about where it is, but if there are
12:52   8   funds out there that were unlawfully taken and converted and
12:52   9   then distributed to third parties, that's a -- that's not a
12:52  10   DC -- that's not a DC solar issue if it never passed through DC
12:52  11   solar, never had a purpose of being related to DC solar. It
12:52  12   was simply a conversion by some person or entity other than DC
12:52  13   solar. Then that doesn't answer the question of the
12:52  14   entitlement of these nine recipients. That's a whole 'nother
12:53  15   issue. We'd have to sort that out, but -- but they would be --
12:53  16   you know, they would have been paid with -- if that scenario is
12:53  17   correct -- with stolen money. And the question is do they know
12:53  18   or have reason to know that there was some question about those
12:53  19   funds, particularly in light of the fact that the day before
12:53  20   the Federal Government had acted to seize all accounts?
12:53  21      Yes, sir. You wish to speak?
12:53  22      MR. ALLEN: Yes, sir, Your Honor. Just from a timing
12:53  23   point of view, I start a trial on Friday in State court. I'll
12:53  24   be in trial all week at least, so from a timing point of view,
12:53  25   I would ask for at least 15 days to be able to respond.
```

43

```
 1              But I've also got some -- the other concern I've
 2   got is that any knowledge that might be imputed to Strauss Law
 3   Firm that therefore may be imputed to Hamilton Captive
 4   Management LLC.  The problem that comes -- the stolen funds
 5   question we've got is really that this fiduciary issue doesn't
 6   belong here, because the money was transferred from a bank
 7   that's not -- has no association with any of the parties that
 8   are defendants in this case.  We think the plaintiffs should be
 9   in the best position to know that information, as to whether or
10   not they were -- where they were transferred from and who had
11   -- it's their account.
12              THE COURT:  Let me say, I would say under normal
13   circumstances that you are absolutely correct, but they get
14   a -- they learned subsequently that someone has taken $5
15   million out of their account, someone who doesn't have the
16   authority to do that.
17              MR. ALLEN:  Who's not a defendant here in this action
18   is the problem.
19              THE COURT:  Correct, but who has taken the money and
20   delivered it to the Strauss Law Firm, and they brought an in
21   rem action for their $5 million.  And what you do there is you
22   bring all the claimants in, and you sort it out.  And I don't
23   know whether the plaintiffs' assessment of the facts is
24   correct.  I just don't know the answer to that.  And -- but I
25   think it's an important issue, and I want to afford everyone
```

44

```
 1   the opportunity, all nine recipients -- you know, many of them
 2   are across the country and so forth.  I want to afford
 3   everybody an opportunity to make a reasonable inquiry to
 4   determine the provenance of these funds.
 5              And once we sort that issue out, we got to sort
 6   out is that subject to the bankruptcy estate?  Is that part of
 7   DC Solar?  And -- and we'll have to sort out who should decide
 8   that.  I think both -- if that were true, the Bankruptcy Court
 9   and District Court would have potentially concurrent
10   jurisdiction to determine that.  The question is who should do
11   it?  And I want to just discuss that with Judge Beesley.  I
12   want to sort it out, but I want to know the facts first,
13   because the facts may establish that it is unquestionably a DC
14   Solar asset.  I just don't know right now.  I certainly have
15   had facts that raise a lot of concerns that there was something
16   untoward here.  Now, whether that is, in fact -- when we
17   actually sort it all out that's true, but there's certainly
18   enough here -- as they say, where there's smoke, there may be
19   fire.  I want to see if there's actually fire here.
20              MR. ALLEN:  The concern from Hamilton Captive
21   Management's request from Your Honor is this.  It's now going
22   to be accused because of the role of Mr. Strauss in his role
23   with Captive Management.  Mr. Strauss in his attempts to
24   cooperate obviously has to do so under his own entities there,
25   and in doing so, there was some questions whether or not we
```

45

```
 1   would be cooperating, basically putting everything on hold.
 2   And I'm here to represent we'll be more than happy to do that
 3   in cooperation --
 4        THE COURT:  What I'm trying to do is -- I understand
 5   that the Strauss Law Firm is prepared to pay to the Court, a
 6   pretty reliable place to put money -- the 1.5 million received
 7   while we sort this out.
 8        Now, these other law firms, I want -- these
 9   other folks, I want to sort out from them, hear from them about
10   things before I -- and that's why I said if you don't object to
11   the TRO continuing, there's not an objection, otherwise I'm
12   going to issue an injunction, because I'm trying to preserve
13   those funds while we have time to figure this out.
14        MR. ALLEN:  It directly affects 150 other
15   corporations as it relates to Hamilton Captive Management,
16   because those funds were in the normal course of business.
17   They were purchasing an insurance contract that was
18   administered.  It was bound, and so the reality is that I need
19   an order of the Court to be able to do that is all I was
20   putting on the record.
21        THE COURT:  I'll give you an order.
22        MR. ALLEN:  Thank you, Your Honor.
23        THE COURT:  I'll provide you the order.
24        Mr. Wooten, do you have any thoughts?
25        MR. WOOTEN:  Yes, I do.  I guess as far as the amount
```

46

```
 1   of time, the more time you can provide us, the better.
 2        THE COURT:  I'm thinking 30 days frankly.  I just
 3   think everybody needs a little bit of time to catch their
 4   breath here.  If there's an objection to the continuation
 5   of the TRO, otherwise I'm going to issue an injunction.  That's
 6   why -- the lawyers are here representing about half of these
 7   recipients.  I don't mind issuing a preliminary injunction
 8   unless -- if the parties object to the continuation of the TRO.
 9        MR. WOOTEN:  And so the order Your Honor would enter
10   would be one that says essentially the same thing that the
11   order issued the other day did --
12        THE COURT:  Don't spend the money.  Don't transfer
13   it.  I'll make a determination later whether you're going to
14   have to pay it into the court.
15        MR. WOOTEN:  Okay.  I just -- one concern I have
16   frankly, Your Honor, is I've not had this situation come up
17   before where a client is not a party, you know, not served with
18   process, and then comes just sort of as an invitee to a
19   hearing, and we're being asked obviously about an order that
20   would affect their interests, and so I don't want to waive any
21   objections.  Like you said, I want to catch my breath, and so I
22   want -- I do want to object to any attempt to exercise
23   jurisdiction over these clients --
24        THE COURT:  Does your client intend to honor my
25   order?
```

9:23-cr-00833-RMG *SEALED*   Date Filed 12/06/23   Entry Number 26-4   Page 50 of 62

47

```
 1   MR. WOOTEN: My --
 2   THE COURT: Your client regarding the maintenance of
 3   the funds, do they intend to do that?
 4   MR. WOOTEN: Yes. Your Honor, we -- we are willing
 5   to -- here's what I will say. I don't want to say we intend to
 6   honor it if doing that results in some sort of waiver.
 7   THE COURT: You're not waiving anything. I'm trying
 8   to maintain the status quo to give your client the chance
 9   you've asked for to explain it.
10   MR. WOOTEN: Right.
11   THE COURT: And give you enough time to actually
12   figure it out.
13   MR. WOOTEN: Right.
14   THE COURT: You're trying to figure this out. You
15   don't know much more than I do, Mr. Wooten. I mean, we all --
16   that's very clear. All of us are struggling to figure out what
17   the facts are. We need time to figure this out. I can't have
18   these funds transferred away, expended while we're trying to
19   figure it out. I'm going to preserve it. I think I've heard
20   enough to say there's something perhaps untoward happening
21   here, and it appears to me that it is important to preserve the
22   status quo while we figure it out, protect everybody's rights
23   here. That's all I'm trying to do.
24   MR. WOOTEN: Okay. Well, so in light of that, Your
25   Honor, I would agree that our clients will maintain the status
```

48

```
 1   quo with respect to the money that they have, but not waiving
 2   any objections --
 3   THE COURT: Nobody is waiving any -- including
 4   jurisdiction right at this moment. All I'm doing is preserving
 5   the money to figure it out, and then somewhere these law firms
 6   are going to have to deal either with me or the bankruptcy
 7   judge about the -- their entitlement to funds. To the extent
 8   it's an asset of DC Solar, that's one issue. If it's stolen
 9   funds, then you get to the issue of did they know or should
10   have known, kind of holder in due course, all those issues that
11   need to be sorted out. And I want to -- I'm going to assure
12   that if I'm the one deciding that, I'm going to give everybody
13   a full opportunity to be heard and a full opportunity to
14   investigate the facts.
15   MR. WOOTEN: So if I can just ask one question -- and
16   I normally wouldn't ask a question to the Court, but my
17   understanding is that there was, you know, this last minute
18   memorandum that we submitted to the Court.
19   THE COURT: Yes.
20   MR. WOOTEN: And in that document, East West Bank is
21   authorizing this 13 million some odd dollars to go to -- or to
22   go from the fund to DC Solar.
23   THE COURT: It's actually authorizing it to paying it
24   into the -- into the investment fund. That's how I understand
25   it, and then the manager of the fund needs to transfer it.
```

49

```
1   That's an extra step.  Ms. Carpoff does not have, the best I
2   can see, the authority to reach into the supposedly independent
3   investment fund and to take the money.  There's an extra step
4   there.  I've been trying to sort out did the manager do that?
5   did the manager reach in and transfer it to Ms. Carpoff?  I
6   don't know the answer to that.  But I have not -- I know that
7   the Nexsen Pruet law firm wrote the manager, who in a sort of
8   bewildering thing never wrote back.  I mean, you're supposed to
9   be managing a fund, and $5 million is missing, and you don't
10  respond to your client, to the investor, the principal investor
11  in the fund?  How would that be?  And so that raises questions
12  about what is actually going on there?
13          And so I think we need to figure out was that --
14  though the funds were -- were potentially payable at that
15  point, were they actually paid, and what are they going to be
16  paid for?  They're for 325 solar generators.  At this moment,
17  DC Solar has shut -- literally shut the lights off.  They've
18  laid off their staff.  All their accounts have been ceased.
19  There's no way in the world they're ever going to perform.
20  this is not a normal equipment sale at this point.  But if the
21  monies went into DC Solar, that would be one thing.  You could
22  say, "Well, still you had this contract," but if it went to a
23  third party, and it was just snatched out of that account by
24  someone who has no right to do it, that is a very different
25  situation, and whether that is exactly what happened here, we
```

50

```
1   need further -- we need further evidence.
2           I know the plaintiffs assert that.  Is that
3   fair, Ms. Shoun, that you're asserting that basically
4   Ms. Carpoff took the money?
5           MS. SHOUN:  We know -- what we know, Your Honor, has
6   been presented to this Court, and that is that -- quite
7   correctly the court states that the authorization was for this
8   investment to be paid into fund, and that investment was paid
9   into fund.  Then on the 18th of December, essentially
10  everything was frozen, seized by the Federal Government.  No
11  mobile solar units were delivered.  Then subsequently after
12  filing this action, we found that wire transfer made by
13  Ms. Carpoff directly into the Iolta account.
14          THE COURT:  Mr. Wooten, have you been provided a copy
15  of this wire transfer?
16          MR. WOOTEN:  Not that I know of.
17          THE COURT:  I mean, this is why it's important that
18  you -- that we get everybody on the same page.  I'm going to
19  send an order kind of -- I want the recipients to get all this
20  information, because --
21          MS. SHOUN:  Yes, of course, Your Honor.
22          THE COURT:  And then the recipients may have
23  information themselves relevant to you, and -- but I'm trying
24  to sort out how this money got moved from the fund to the
25  Strauss Law Firm.  I think that is a very material thing, and
```

9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-4    Page 52 of 62

51

1  did it -- was it transferred to DC Solar in some way?  I have
2  trouble imagining how that could have occurred, because DC
3  Solar was defunct at that point, literally defunct.  The lights
4  were out, the staff was laid off, and all its accounts were
5  seized by the Federal Government.
6        MS. SHOUN:  The day before the wire transfer took
7  place.
8        THE COURT:  Literally the day before the wire
9  transfer.
10        MR. WOOTEN:  And, Your Honor, one thing I'm not clear
11  on though is the -- this cash flow memorandum.  My
12  understanding is that the East West Bank is not merely signing
13  this document authorizing --
14        THE COURT:  They're the investor.  They're an
15  investor into the fund.  The fund holds the money to transfer
16  to DC Solar.  The East West Bank is the investor.
17        MR. WOOTEN:  Right.
18        THE COURT:  So they've transferred -- as I understand
19  the documents -- and I'm prepared to be instructed otherwise
20  here -- is that as part of this agreement, East West Bank paid
21  into the fund monies for them to be transferred to DC Solar by
22  its manager to pay for 325 solar generators.  Instead of the
23  manager -- this is what plaintiffs essentially showed by this
24  document.  Instead of the manager, Halo Management, exercising
25  its authority to make that transfer, Mrs. Paulette Carpoff took

52

1  the money and transferred it to the Strauss Law Firm, and then
2  it was distributed what appears to be for the personal use of
3  the Carpoffs.  That might be -- not saying it is -- potentially
4  a conversion of that money and not a -- so that's why I said
5  was this was a regular transaction, as you describe it in your
6  pleading, or is it an irregular one in which the action is
7  untoward?
8        I don't think it's fair -- I mean, I'm not
9  jumping on you, Mr. Wooten, because you don't have all the
10  facts, and I'm not sure any of us have all the facts, and we
11  need all those facts to sort this out, and I want to give
12  everybody enough time and enough opportunity to do it.
13        And I'm preparing as you look into it -- and I
14  say this for all the counsel for the recipients.  If you -- if
15  you feel like you need discovery, talk to me about that.  Let
16  me know that.  I personally think that it may be useful for
17  someone to depose the folks at the bank.
18        MS. SHOUN:  And, Your Honor, I was going to ask the
19  Court about that.  We are happy to undertake that endeavor, but
20  to be frank with the Court, I'm not sure logistically how long
21  that would actually take.  We are willing to undertake what we
22  need to do to present the facts sufficient to this Court to
23  make a determination as to where this needs to go.
24        THE COURT:  I think it is important to know how --
25  what was the mechanism out of which and under which authority,

53

```
01:08   1    whoever acted -- it indicates here it's Ms. Carpoff -- under
01:08   2    what authority did she have?  What was the -- I mean, the bank
01:08   3    must have had some -- you would think, some notion about the
01:08   4    authority for her to move $5 million out of an account she did
01:08   5    not own.  What was their understanding?  And maybe there will
01:08   6    be something that is very -- that indicates that she somehow
01:08   7    had the authority of DC Solar -- I don't know that -- to act as
01:08   8    an agent of DC Solar, but -- or -- I don't think she could act
01:09   9    as the manager, because that would violate the independence of
01:09   10   the manager.
01:09   11            MS. SHOUN:  And the very terms of the agreement.
01:09   12            THE COURT:  And the very terms of the agreement.  It
01:09   13   just -- this is a little bit of a confounding -- and I will say
01:09   14   to Judge Beesley, it's confounding to him trying to figure out,
01:09   15   and putting all of this together.
01:09   16            MS. SHOUN:  And frankly, Your Honor, there may be
01:09   17   occasions where -- again, I don't know what the Court
01:09   18   envisions, but we would like the opportunity again to pursue
01:09   19   additional discovery, and it may be directed to some of the
01:09   20   recipients as well as to --
01:09   21            THE COURT:  Let's -- at this point, let's figure out
01:09   22   whether this is in the estate.  I want to leave the recipients
01:09   23   out of it for that purpose right now.
01:09   24            MS. SHOUN:  Yes, sir.
01:09   25            THE COURT:  Let's figure out is this an asset or not
```

54

```
01:09   1    of DC Solar?  That's the first issue.  And then if it's not, I
01:09   2    need then to decide am I really the one to decide it's not an
01:09   3    asset, or is that Judge Beesley's responsibility?  I need to --
01:10   4    and I want to work collaboratively with the Bankruptcy court on
01:10   5    this.  And then to the extent that it is not an asset of DC
01:10   6    Solar, then we've got to sort out well, what right do these
01:10   7    recipients have to retain funds that were the property of
01:10   8    another person who had their funds converted?
01:10   9            Yes, Mr. Wooten?
01:10   10           MR. WOOTEN:  One question I have is that going back
01:10   11   to the cash Flow memorandum, my understanding is East West Bank
01:10   12   is not only authorizing the $13 million payment to the fund.
01:10   13   They are also signing this document authorizing the fund to
01:10   14   transfer 12 million -- 12.5 million to DC Solar.  And what I'm
01:10   15   wondering is is it disputed that the $5 million is a portion of
01:10   16   the 12.5 that East West Bank is authorizing the fund to
01:11   17   transfer to DC Solar?  Is that disputed in this case or -- that
01:11   18   would help me in talking to my clients.
01:11   19           MR. ALLEN:  Which brings up another matter, without
01:11   20   any finding that there's actually been an inappropriate
01:11   21   conversion, how do we then seize the funds here that are in my
01:11   22   client's possession without finding that there is at least a
01:11   23   risk of even being converted?  We don't know that the actual
01:11   24   original quote-unquote conversion was an inappropriate action
01:11   25   at this time.  We're asking, you know, executives of the people
```

9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-4    Page 54 of 62

55

```
 1   that received these funds to testify regarding the receipt of
 2   funds.  We haven't even established there was an inappropriate
 3   conversion.
 4        THE COURT:  Well, we got somebody who doesn't appear
 5   to have any right to do it taking the money.  I mean, that's --
 6   that's at least a color -- there's a very strong indication.
 7   So if you're objecting to it, file an objection, and I'll enter
 8   a preliminary injunction, and I'll make a finding under the
 9   appropriate standards.  I believe there's a likelihood of
10   success that this was improperly taken.  If you wish to object,
11   file an objection.  I will then enter an order.
12        MR. WOOTEN:  Well, and so I still --
13        THE COURT:  All I'm trying to do is get control of
14   these funds so that -- and if these companies and law firms are
15   entitled to it, I'm certainly not going to mess with their
16   right to -- I will not -- I will not -- I certainly don't seek
17   to take any funds that are lawfully theirs.
18        I would just simply say if there was a
19   conversion and the circumstances are that all of these law
20   firms were fully aware of this Federal court action a day or
21   two before, it's hard to understand how they would know or --
22   not know or have reason to know there might be something
23   questionable about these funds.  That's the only question.
24        MR. WOOTEN:  Well, and one comment, Your Honor, about
25   the recipients knowing or should have known -- should have
```

56

```
 1   known about anything questionable is, you know, it's not like
 2   it was a coincidence that there was this raid and then
 3   immediately thereafter the recipients were hired or retained.
 4   They were obviously hired in response to the -- you know, the
 5   raid.  And so the reason they needed -- these folks needed
 6   lawyers like Skadden was because there was a raid.  So --
 7        THE COURT:  Right, but Mr. -- but Mr. Wooten, if DC
 8   Solar had hired two guys to go into a bank and rob it and then
 9   paid the law firms -- kind of an absurd situation, you would
10   say -- surely they'd have reason to know that they could not
11   keep the money, right?  I mean, we would agree with that.
12        Well, how about if they just did it by wire transfer?  Instead
13   of having a firearm and two black masks when they go in, they
14   just wire transferred it by fraud.  I don't know if that's the
15   case or not.  I really don't.  I'm just saying to you that
16   there are questions here that need to be answered, and I would
17   think the analysis eventually would be were they holders sort
18   of in due course without notice, or did they have reason to
19   know?  Because the question is who is properly entitled to
20   these monies, the one who had money stolen or the company that
21   perhaps knew or should have known that it came from a
22   questionable source?
23        I mean, where exactly would the Carpoffs get
24   $5 million if the Government seized all their money?  I mean,
25   exactly where would that money come from?  How would they have
```

57

```
1    it?
2         MR. WOOTEN:  My understanding is that the carpoffs
3    had the Strauss Law Firm, who was their lawyer, wire the money
4    to these law firms, and so --
5         THE COURT:  Doesn't look like he's acting as a
6    lawyer.  Looks like to me he's just an escrow agent.  He's
7    getting the money in.  He's sending it out.  That's a whole
8    'nother question about exactly what he's doing in his role.
9         MR. WOOTEN:  Right.  Well, Your Honor, I appreciate
10   the time to respond to this.  And the only other comment I
11   wanted to make, I know I interjected during the
12   cross-examination, but I'm not clear on the documents that were
13   turned over, and I guess I am concerned about there being
14   emails with, you know, Skadden or these other clients of
15   ours --
16        THE COURT:  They're all about wire transfers.
17   They're wire -- it's simply -- it's nothing -- I haven't seen
18   anything substantive at all in them.  They're simply
19   facilitating the transfers, the wire transfers from the Strauss
20   account into their account.  It's really a tracing device,
21   trying to trace where the money went.  We didn't know that
22   until the other day where it went.  The Strauss Law Firm had
23   not provided any information to the plaintiffs about what
24   happened to their money, and that was -- and this is in
25   furtherance of determining where that money went.  I didn't see
```

58

```
1    anything in it in which any of the law firms expressed anything
2    that would be remotely attorney-client communications.
3         MR. WOOTEN:  Your Honor, when -- Your Honor, you've
4    laid out what your -- the gist of your concern, and I think I
5    understand the information you're generally looking for, but
6    I'm wondering if it would be helpful for you to sort of set
7    forth, "Here's the information I would like to hear from the
8    recipients."
9         THE COURT:  Yeah, I think I should do an order, and I
10   need -- you know, we're doing something a little out of the
11   ordinary here.  I mean, we are.  We're trying to sort out an in
12   rem action.  I don't know how many of you do in rem actions.
13   It's not terribly common to be suing over $5 million.  I
14   usually have it when they're drug seizures, you know, that kind
15   of thing, and everybody is invited to come in and claim whose
16   money it is and that car they seized.  Nobody wants to show up,
17   of course.  And, you know, this is a little bit different.
18        I want to make sure we have an orderly process
19   that provides due process to everyone, and I'm trying to break
20   it down.  Step one is the question being raised, was there
21   anything irregular about this?  Was there some
22   question?  Because I think if it is an asset of DC Solar,
23   everybody pack up and go to Nevada.  You're going to sort it
24   out there.
25        If it's -- if it's not, I think you're likely
```

59

1  going to stick around here and sort it out here. I mean,
2  that's sort of the way I view it.
3  And it may be that I will initially let -- have
4  Judge Beesley make that determination. I want to sort -- I
5  want to find out what the record shows us first, because we
6  just don't know -- we don't have enough information.
7  But this is a -- plaintiffs have raised a
8  legitimate question about how their money came from their
9  supposedly independent fund into the Strauss Law Firm by
10  Mrs. Carpoff. If that, in fact, happened -- and we got a
11  document now that shows it -- exactly how did that happen?
12  MR. WOOTEN: And so Ms. Carpoff had authority over
13  this account that was -- the fund's account somehow?
14  THE COURT: We don't think so. They don't think she
15  would have.
16  MR. ALLEN: That goes back to our original issue,
17  which is how is the jurisdiction not where she is to determine
18  whether or not that was an authorized transfer or not?
19  THE COURT: Because you're -- because Strauss is
20  here. Jurisdiction is here. The money arrived here. Got to
21  be somewhere. It passed out all around the United States.
22  Somebody's got to have it. You want to have us to go nine
23  different jurisdictions to figure it out? I don't think so.
24  Let's get to the merits here, folks. I want to
25  get to the bottom of this. I don't want all of us to waste a

60

1  lot of time on this. So step 1, we're not going to mess with
2  the recipients in terms of their entitlement to the money.
3  We'll save later whether -- we're going to sort out first
4  whether this is an asset of DC Solar or not.
5  Anyone else wish to speak?
6  MR. BARKER: Your Honor, again this is Jake Barker on
7  behalf of just one of the recipients, BH Venture Capital LLC.
8  While we are procedurally situated very similarly to
9  Mr. Wooten's clients, the factual reasoning behind why we're a
10  recipient, what our role was and our relationship to Solar is
11  quite different.
12  THE COURT: Tell me about that.
13  MR. BARKER: Well, Your Honor, BH Venture Capital is
14  an entity that was formed the purpose of acting as
15  debtor-in-possession lender in the DC Solar bankruptcy.
16  THE COURT: Okay.
17  MR. BARKER: My client and DC Solar executed a loan
18  term sheet through -- with the anticipation of providing
19  debtor-in-possession financing in that -- in the Nevada
20  bankruptcy.
21  THE COURT: And what happened to that?
22  MR. BARKER: For a variety of reasons --
23  THE COURT: Trustee objected.
24  MR. BARKER: The --
25  THE COURT: It was 3 million bucks, and trustee said

61

| | | |
|---|---|---|
| 1 | 01:20 | no way. |
| 2 | 01:20 | MR. BARKER: The lending relationship did not |
| 3 | 01:20 | manifest. |
| 4 | 01:20 | THE COURT: Correct. |
| 5 | 01:20 | MR. BARKER: However, in the term sheet there is a |
| 6 | 01:20 | call for a payment of $50,000 nonrefundable underwriting fee to |
| 7 | 01:20 | cover the costs for underwriting these loans. |
| 8 | 01:20 | THE COURT: Did your -- did your client -- was it |
| 9 | 01:20 | aware that all the accounts of DC Solar had been seized? |
| 10 | 01:20 | MR. BARKER: I believe at some point they were made |
| 11 | 01:20 | aware of it. I could not say -- |
| 12 | 01:20 | THE COURT: And that the Carpoffs' personal accounts |
| 13 | 01:21 | had been seized and all the corporations had been seized? |
| 14 | 01:21 | MR. BARKER: I can't speak to their knowledge to |
| 15 | 01:21 | that. |
| 16 | 01:21 | THE COURT: And that 20 FBI agents had circled their |
| 17 | 01:21 | house and taken everything out of the house? You think they |
| 18 | 01:21 | might have known that since it was in all the newspapers out |
| 19 | 01:21 | there? |
| 20 | 01:21 | MR. BARKER: I could not tell you if they did or not. |
| 21 | 01:21 | THE COURT: Okay. I'm just saying your folks aren't |
| 22 | 01:21 | someone to just say, "Oh, my God. These people might have done |
| 23 | 01:21 | something wrong." I mean, it's just a fair question about what |
| 24 | 01:21 | they -- you know, do they have reason to question where these |
| 25 | 01:21 | monies came from? |

62

| | | |
|---|---|---|
| 1 | 01:21 | we've already given the hypothetical. How about if |
| 2 | 01:21 | two bank robbers where they took the money and took it to your |
| 3 | 01:21 | client, would you be entitled to it? And, of course, everybody |
| 4 | 01:21 | says, "No, of course not." |
| 5 | 01:21 | MR. BARKER: This is not some rogue action. We |
| 6 | 01:21 | applied within the Bankruptcy Court to be a |
| 7 | 01:21 | debtor-in-possession. |
| 8 | 01:21 | THE COURT: Of course, of course, but I'm just |
| 9 | 01:21 | saying your entitlement to that $50,000, your right to hold |
| 10 | 01:21 | that $50,000 may turn on the origins of those funds. |
| 11 | 01:22 | I mean, I take it that was a -- who was your |
| 12 | 01:22 | client going to have a loan -- was it going to be with DC |
| 13 | 01:22 | Solar? |
| 14 | 01:22 | MR. BARKER: I believe so, yes, Your Honor. |
| 15 | 01:22 | THE COURT: And was anybody else going to be on the |
| 16 | 01:22 | loan other than DC Solar? |
| 17 | 01:22 | MR. BARKER: Well, I believe there's some related |
| 18 | 01:22 | entities in that bankruptcy, but I couldn't tell you. |
| 19 | 01:22 | THE COURT: Right, there are like eight different |
| 20 | 01:22 | entities. |
| 21 | 01:22 | MR. BARKER: I guess my point was -- |
| 22 | 01:22 | THE COURT: Are the Carpoffs in bankruptcy |
| 23 | 01:22 | personally? |
| 24 | 01:22 | MR. BAKER: Sir? |
| 25 | 01:22 | THE COURT: Are the Carpoffs in bankruptcy? |

9:23-cr-00833-RMG *SEALED*   Date Filed 12/06/23   Entry Number 26-4   Page 58 of 62

63

```
1   MS. SHOUN:  Not that we're aware, Your Honor.
2   THE COURT:  Okay.
3   MR. BARKER:  But to the matter at hand, Your Honor,
4   we again, like Mr. Wooten's clients, without waiving any of our
5   objections to jurisdiction and all of that, would think that
6   the time frame you kind of suggested with this kind of status
7   quo standstill order to kind of figure out where we are would
8   be helpful to us.
9       THE COURT:  Yeah, I think what we need -- and I just
10  need to look at formally how to do this.  I'm sort of
11  inclined -- let me ask these two captives, if I don't have you
12  pay it into the Court, can -- do you have any objection to
13  being subject to an injunction not to transfer the funds and to
14  hold it pending further action of the Court?
15  MR. ALLEN:  We do not, Your Honor.  The problem
16  simply is that we need some instruction.  We'll fully
17  cooperate.  That's all we need.
18  THE COURT:  I hear you.  I hear what -- you're being
19  perfectly reasonable about that.  I'm just -- I'm just trying
20  to sort out a way in which -- in which we can get answers to
21  these questions without being unduly disruptive and without
22  dissipating the asset while we're litigating.
23  MR. ALLEN:  My clients will cooperate and protect
24  those funds.  We just want to make sure we're not stepping --
25  THE COURT:  Let me ask the plaintiffs.  I'm more
```

64

```
1   inclined rather than making them pay into the fund simply to
2   require them to hold the funds in a secure account and not to
3   expend them.  Do plaintiffs have any problem with that?
4   MS. SHOUN:  Your Honor, I think that's the order
5   that's currently in place.
6   THE COURT:  Yeah, it's currently in place.  I had
7   anticipated perhaps adding in paid into the court, but I'm just
8   kind of wondering now whether that's a step that's really
9   necessary to make right now.
10  MR. ALLEN:  We'll report where it is.
11  MS. SHOUN:  Well, it may be, Your Honor, that at the
12  end of whatever time --
13  THE COURT:  Oh, it will be if your client or the
14  Bankruptcy Court --
15  MS. SHOUN:  That may be the period in which --
16  THE COURT:  -- the trustee may want to take
17  possession.
18  MS. SHOUN:  Exactly.  Exactly.
19  THE COURT:  Depending on what we determine it to be,
20  whether it's an asset of DC Solar or not.
21  MS. SHOUN:  Right.
22  THE COURT:  Okay.  I'm going to set out an order of
23  discovery, of disclosure requirements.
24  MS. SHOUN:  Okay.
25  THE COURT:  I want all recipients to know.
```

9:23-cr-00833-RMG *SEALED*   Date Filed 12/06/23   Entry Number 26-4   Page 59 of 62

65

```
1    MS. SHOUN:  Yes, sir.
2         THE COURT:  Kind of everybody on the same page.
3    MS. SHOUN:  Yes, sir.
4         THE COURT:  So when we're handing up documents,
5    Mr. Wooten won't be saying, "What was that document?"
6    MS. SHOUN:  Right.
7         THE COURT:  I want everybody to have all the
8    documents.
9    MS. SHOUN:  I didn't see it until this morning
10   myself.
11        THE COURT:  Yeah, I understand that.  And then
12   let's -- let's think about 30 days.  If you need -- I will add
13   in the order that you have the authority to go depose --
14   MS. SHOUN:  Perfect.
15        THE COURT:  -- the folks at the CTBC Bank.
16   MS. SHOUN:  Perfect.
17        THE COURT:  Mr. Overstreet, you got something you
18   want to share with me?
19        MR. OVERSTREET:  Very briefly, Your Honor.  Just for
20   the record pursuant to my email to the Court last night,
21   Mr. Joe Griffith has been engaged by the Strauss Law Firm -- or
22   by Peter Strauss individually and apologizes that he can't be
23   here because he's out of the state, but intends to appear as
24   co-counsel with me.
25        THE COURT:  Good.
```

66

```
1         MR. OVERSTREET:  And was involved in the prep of this
2    hearing, so I just wanted that to be on the record, Your Honor.
3         THE COURT:  Well, Mr. Griffith is a fine attorney.
4    He practices in front of me regularly.  I know him well.
5         Yes?  Anything further?
6    MS. SHOUN:  Well, just about a matter of
7    clarification, Your Honor.  We are more than happy to provide
8    the documents, the relevant -- or what Your Honor sees as
9    relevant to every recipient.  We're happy to do that.  I just
10   want to make sure that I understand what Your Honor sees as
11   those.
12        We have the wire indication from Ms. Carpoff.
13   We have what appears to be the wire receipt -- and I'm not a
14   bank lawyer, so I'm probably not using the right terminology
15   there -- where it went into the Strauss account.  We have the
16   wire transfer forms that were provided by the Strauss Law
17   Firm's counsel on Monday.  We're happy to distribute those if
18   the recipients don't have them.
19        THE COURT:  Yeah, and I think these -- you know, the
20   LLC.
21   MS. SHOUN:  The LLC operating agreement.  The
22   purchase agreement.
23        THE COURT:  The documents Mr. Wooten was talking
24   about with the page, the document with the funds, the -- the
25   equipment sales agreement.
```

9:23-cr-00833-RMG *SEALED*    Date Filed 12/06/23    Entry Number 26-4    Page 60 of 62

67

```
1   MS. SHOUN: Purchase agreement, yes, sir.
2   THE COURT: I just think everything needs to be --
3   everybody needs to be on the same page, and then if everybody
4   knows that, then they can go find other information about,
5   "Hold it a minute. You think it's this, but it's actually
6   something else. It may look this way, but it's not." Then we
7   want to know that. We want to get it right. Nobody is -- you
8   know, this Court does not have a dog in this fight.
9   MS. SHOUN: Yes, sir.
10  THE COURT: I'm just trying to sort out the fair and
11  just disposition of this. It's either your client's funds, or
12  you're a creditor in the bankruptcy.
13  MS. SHOUN: Right. Exactly.
14  THE COURT: I mean, that's one of the two things.
15  And of course we know that part of the money also went to DC
16  Solar, the initial monies, and --
17  MS. SHOUN: And those are --
18  THE COURT: And those are -- it makes you a creditor
19  in the bankruptcy as to those. The question is is the
20  additional 5 million part of that.
21  MS. SHOUN: Exactly.
22  THE COURT: That's the only question.
23  MS. SHOUN: Your Honor, there may be information or
24  we have reason to believe there may be information in the hands
25  of some of the recipients, and I understand Your Honor's order
```

68

```
1   leave their entitlement as to these funds out of it now.
2   However, we have reason to believe there may be information in
3   the hands of some recipients that may help to answer this
4   court's questions as to the flow of the monies, if you will.
5   THE COURT: Well, tell me exactly -- I mean, I'm most
6   interested how the money got out of the fund and into the
7   Strauss Law Firm.
8   MS. SHOUN: Precisely.
9   THE COURT: And if you think one of the recipients
10  had knowledge of that or played a role with that, that would be
11  important information, but you're going to have to make a
12  showing to me that they -- more than just saying, "I'm going to
13  do a little fishing expedition by starting to depose these
14  people." You're going to have to show me something first. I'm
15  not going to authorize that now, but if you have documents you
16  want to -- you want to make the point, what we're going to do
17  is you're going to make a motion, and I will let people respond
18  who may be affected.
19  MS. SHOUN: Okay.
20  THE COURT: And then I'll make a determination about
21  whether, you know, the -- let's be candid. To the extent your
22  hypothesis is correct, anybody involved in the transaction
23  potentially has criminal implications tied to them. If they're
24  actually involved in converting the funds --
25  MS. SHOUN: I see, Your Honor. Yes, sir.
```

9:23-cr-00833-RMG *SEALED*   Date Filed 12/06/23   Entry Number 26-4   Page 61 of 62

69

```
1    THE COURT:  And I -- you know, I haven't seen any
2  indication up to this point that any of the recipients --
3  there's nothing you've shown me that suggests that.
4    MS. SHOUN:  Exactly, Your Honor, but again, we have
5  this huge gap, as Your Honor has pointed out a couple of times,
6  as to how did it leap from fund to Carpoff to Strauss.  And we
7  at least have some documentation that it was in the fund, and
8  we have some documentation that Paulette Carpoff somehow
9  managed to wire it out to Strauss, but other than what may be
10 in the documents presented to us this morning -- and frankly, I
11 haven't had an opportunity to look at all of those, as Your
12 Honor knows -- we don't know if there may have been some other
13 party involved in that gap.
14   THE COURT:  Well, I want some indication before I
15 have you going after these law firms.
16   MS. SHOUN:  Yes, sir.  And we don't -- we're not even
17 at this point --
18   THE COURT:  It looks like to me they're all being
19 retained.  I think that was the point that was being made.
20 They were being retained in response to the federal action
21 which had occurred.
22   MS. SHOUN:  The day before.
23   THE COURT:  The day before.  Okay?  So, you know,
24 let's get to the bottom of that.  Let's leave the recipients --
25 if you've evidence to suggest the recipients may have been
```

70

```
1  part of a conspiracy in that regard, I'd be glad to proceed,
2  but up to this point, I haven't seen that, and I'm not
3  authorizing a deposition.  I'll put it in writing in an order.
4    MS. SHOUN:  And, Your Honor, I don't think at this
5  point we would even anticipate maybe a deposition of any of the
6  recipients, but if they have -- again, if they would have
7  documents much like the court ordered the Strauss Law Firm to
8  produce that would indicate the flow of that money --
9    THE COURT:  Well, I haven't seen anything, but it
10 looks like to me what you've given me so far is I see the CTBC
11 Bank, which for the record is the holder of the funds for
12 the -- for the Fund XXXV.
13   MS. SHOUN:  Yes, sir.
14   THE COURT:  I see money going, landing at Strauss
15 from CTBC Bank --
16   MS. SHOUN:  Yes, sir.
17   THE COURT:  -- in a direct wire, and I see the name
18 of Mrs. Paulette Carpoff in the middle it, a name that by
19 everything I know about shouldn't be there.
20   MS. SHOUN:  Right.
21   THE COURT:  That's all we know right now, and that
22 doesn't suggest to me any responsibility by any of these
23 recipients.
24   MS. SHOUN:  Yes, sir.
25   THE COURT:  I mean, that's just -- to me it's just a
```

9:23-cr-00833-RMG *SEALED*   Date Filed 12/06/23   Entry Number 26-4   Page 62 of 62

71

```
1   whole 'nother question.
2       MS. SHOUN:  And it may be a question that Your Honor
3   or that Judge Beesley addresses later.
4       THE COURT:  Somebody -- Judge Beesley and I are going
5   to have to figure out the entitlement of these recipients.
6       MS. SHOUN:  Yes, sir.
7       THE COURT:  But the first question is is this a DC
8   solar asset?
9       Okay.  Anything further?
10      MS. SHOUN:  Nothing from the plaintiffs, Your Honor.
11      THE COURT:  From the defense?
12      MR. OVERSTREET:  No, Your Honor.  Thank you.
13      THE COURT:  Very good.
14      MS. SHOUN:  But thank you, Your Honor.  You spent a
15  lot of time with us, and we appreciate the Court's analysis.
16      THE COURT:  Glad to do it.  We're going to figure it
17  all out before it's over and try to do a little justice.  This
18  hearing is adjourned.
19
20
21
22
23
24
25
```

72

```
1                      * * * * * * * * *
2                      CERTIFICATE
3       I, Tana J. Hess, CCR, FCRR, Official Court Reporter
4   for the United States District Court, District of South
5   Carolina, certify that the foregoing is a true and correct
6   transcript, to the best of my ability and understanding, from
7   the record of proceedings in the above-entitled matter.
8
9
10
11          Tana J. Hess, CCR, FCRR, RMR
            Official Court Reporter
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```